**MCDERMOTT WILL & SCHULTE LLP**

Marcus A. Helt (TX 24052187)
Jack G. Haake (TX 24127704)
2801 N. Harwood Street, Suite 2600
Dallas, Texas 75201-1574
Telephone:     (214) 295-8000
Facsimile:     (972) 232-3098
Email:         mhelt@mcdermottlaw.com
               jhaake@mcdermottlaw.com

*Proposed Counsel for the Debtors and*
*Debtors-in-Possession*

**MCDERMOTT WILL & SCHULTE LLP**

Daniel M. Simon (*pro hac vice* pending)
Carmen Dingman (*pro hac vice* pending)
Landon Foody (*pro hac vice* pending)
444 West Lake Street, Suite 4000
Chicago, Illinois 60606
Telephone:     (312) 372-2000
Facsimile:     (312) 984-7700
Email:         dsimon@mcdermottlaw.com
               cdingman@mcdermottlaw.com
               lfoody@mcdermottlaw.com

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORTH WORTH DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| INSPIRED HEALTHCARE CAPITAL | ) Case No. 26-90004 (MXM) |
| HOLDINGS, LLC, *et al.*[1] | ) |
| | ) (Joint Administration Requested) |
| Debtors. | ) (Emergency Hearing Requested) |
| | ) |

## DEBTORS' EMERGENCY MOTION
## FOR ENTRY OF INTERIM AND FINAL ORDERS
## (I) AUTHORIZING (A) POSTPETITION FINANCING AND (B) THE USE OF CASH
## COLLATERAL, (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY
## ADMINISTRATIVE EXPENSE CLAIMS, (III) GRANTING ADEQUATE PROTECTION
## TO PREPETITION SECURED PARTIES, (IV) MODIFYING THE AUTOMATIC STAY,
## (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF

---

[1] The last four digits of Inspired Healthcare Capital Holdings, LLC's federal tax identification number are 6696. There are 161 Debtors in these chapter 11 cases, which are being jointly administered for procedural purposes only. A complete list of the Debtors and the last four digits of their federal tax identification numbers are not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/InspiredHealthcare. The Debtors' mailing address is 7033 East Greenway Parkway, Suite 250, Scottsdale, AZ 85254.

**EMERGENCY RELIEF HAS BEEN REQUESTED.  RELIEF IS REQUESTED NOT LATER THAN 3:00 P.M. (CT) ON FEBRUARY 4, 2026.**

**IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST APPEAR AT THE HEARING IF ONE IS SET, OR FILE A WRITTEN RESPONSE PRIOR TO THE DATE THAT RELIEF IS REQUESTED IN THE PRECEDING PARAGRAPH. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

**A VIRTUAL HEARING WILL BE CONDUCTED ON THIS MATTER ON FEBRUARY 4, 2026 AT 3:00 P.M. (CT) IN ROOM 128, U.S. COURTHOUSE, 501 W. TENTH STREET, FORT WORTH, TEXAS, 76102.**

**YOU MAY PARTICIPATE IN THE HEARING EITHER IN PERSON OR BY AN AUDIO AND VIDEO CONNECTION.**

**AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL-IN FACILITY. YOU MAY ACCESS THE FACILITY AT 1-650-479-3207, MEETING ID: 2310-650-8783. VIDEO COMMUNICATION WILL BE BY THE USE OF THE CISCO WEBEX PLATFORM. CONNECT VIA THE CISCO WEBEX APPLICATION OR CLICK THE LINK ON JUDGE MULLIN'S HOME PAGE. CLICK THE SETTINGS ICON IN THE UPPER RIGHT CORNER AND ENTER YOUR NAME UNDER THE PERSONAL INFORMATION SETTING.**

Inspired Healthcare Capital Holdings, LLC ("Holdings") and certain of its affiliates and subsidiaries, as debtors and debtors-in-possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), hereby move (the "Motion") for entry of an interim order, attached hereto as **Exhibit A** (the "Interim Order"), and a final order (the "Final Order"), granting relief described below.  In support of this Motion, the Debtors submit the *Declaration of David Fields in Support of the Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing (A) Postpetition Financing and (B) the Use of Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to Prepetition Secured Parties, (IV) Modifying The Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "Fields Declaration"), filed contemporaneously herewith. The Debtors further state as follows:

## PRELIMINARY STATEMENT

1.     The Debtors respectfully seek authority to (a) obtain postpetition financing through a debtor-in-possession credit facility with Lapis Municipal Opportunities Fund V LP (the "DIP Lender") and (b) use the Cash Collateral of the Prepetition Secured Parties.  The proposed DIP Facility is a $35 million senior secured term loan, with $10 million available upon entry of the Interim Order.  This relief is necessary for maintaining stability during these Chapter 11 Cases.

2.     The requested relief, including continued payment of the Reallocation Fees, will provide the liquidity necessary to stabilize operations, reassure residents and families, preserve jobs, and demonstrate to regulators and counterparties that the communities can operate safely and responsibly during these Chapter 11 Cases.  By contrast, without access to debtor- in-possession financing and Cash Collateral, the Debtors would be forced to begin shutting down communities almost immediately, without the resources to implement orderly closure procedures required by law—a scenario that would endanger residents and expose the Debtors to severe regulatory and legal risk.

3.     Moreover, access to financing is critical to maintaining the going concern value of the operating Debtors.  After accounting for cash flow/deficit, cash-on-hand, minimum cash requirements, allocated enterprise-level expenses, and share of restructuring costs at the level of each community, nearly every operating Debtor lacks sufficient liquidity to continue without supplemental funding.  The requested relief will allow the Debtors to preserve asset values while pursuing transactions for the benefit of all stakeholders.

4.     The terms of the proposed DIP Facility, detailed below, are fair, reasonable, and consistent with market practice for debtor-in-possession financing of this size and complexity. The DIP Facility was negotiated in good faith and at arm's length with an unrelated third party lender, following a competitive process in which multiple sophisticated parties actively bid to

provide financing.  This competition drove down fees, interest rates, and overall costs, resulting in the most favorable terms achievable under the circumstances and delivering significant economic benefits to the Debtors' estates.

5.      Under the DIP Facility, all Debtors will be obligated and will grant the DIP Lender a superpriority administrative expense claim.  The Debtors have proposed an Allocation Protocol to allocate DIP Obligations among Debtors in a manner that ensures each Debtor bears its fair and proportionate share of expenses.  This approach is equitable because it prevents any single Debtor from subsidizing other Debtors and aligns cost responsibility with the benefits received from the DIP Facility and centralized restructuring efforts.

6.      The DIP Liens will only encumber the assets of a limited subset of operating Debtors—those without prepetition funded obligations.  The DIP Collateral will not include the Prepetition Collateral of the Prepetition Secured Parties.  In addition, the Debtors will provide the Prepetition Secured Parties with adequate protection for any Diminution  in value of their respective Prepetition Collateral.

7.      In sum, the DIP Facility represents the most favorable financing available under the circumstances, is consistent with market practice, and, together with Cash Collateral, provides the liquidity required to (a) maintain operations and uninterrupted resident care, (b) pay essential employees, (c) fund ordinary-course expenses, (d) pay costs of administration, and (e) preserve asset values during the transaction process.  These objectives are critical to the success of these Chapter 11 Cases.  Accordingly, the Debtors respectfully request that the Court approve this Motion.

## **RELIEF REQUESTED**

8.      By this Motion, the Debtors respectfully requests entry of the Interim Order and the Final Order (collectively, the "<u>DIP Orders</u>") that, among other things:

a)      authorize Inspired Healthcare Capital Holdings, LLC  (together with its affiliated Debtors identified as "Borrowers" in the DIP Credit Agreement, the "DIP Borrowers"), to obtain postpetition financing pursuant to a senior secured debtor- in-possession term loan credit facility (the "DIP Facility," and the loans issued thereunder, the "DIP Loans") subject to the terms and conditions set forth in that certain Senior Secured, Superpriority Debtor in Possession Loan and Security Agreement attached to the Interim Order as Exhibit 1 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "DIP Credit Agreement" and, together with any ancillary, collateral or related documents and agreements, including this Interim Order, the "DIP Documents"), by and among the DIP Borrowers, Debtor entities identified as "Pledging Guarantors" and "Non-Pledging Guarantors" in the DIP Credit Agreement (the "DIP Guarantors"), and the DIP Lender, consisting of new-money term loans in an aggregate principal amount of $35 million from the DIP Lender, of which $10 million will be available immediately upon entry of the Interim Order, with the remainder to be available subject to and following entry of the Final Order, in each case in accordance with the terms of the DIP Documents including the Approved Budget (defined below);

b)      authorize the Debtors to execute, deliver, and perform under the DIP Credit Agreement and the other DIP Documents, the DIP Orders, and all other related agreements and documents creating, evidencing, or securing indebtedness or obligations of any of the Debtors to the DIP Lender on account of the DIP Facility and granting or perfecting liens or security interests by any of the Debtors in favor of and for the benefit of the DIP Lender, on account of the DIP Facility, as the same now exists or may hereafter be amended, modified, supplemented, ratified, assumed, extended, renewed, restated, or replaced, and any and all of the agreements and documents currently executed or to be executed in connection therewith or related thereto, by and among any of the Debtors and the DIP Lender;

c)      authorize the Debtors to issue, incur, and guarantee all DIP Loans (including the Commitment Fee, the Exit Fee, the Break-Up Fee, and any other interest, costs and fees payable pursuant to the DIP Credit Agreement (each as defined in the DIP Credit Agreement) and for all obligations due or payable to or for the benefit of the DIP Lender under the DIP Documents (collectively, the "DIP Obligations") which DIP Obligations shall be subject and subordinate only to the Carve Out (defined below) and Permitted Liens (defined in the DIP Credit Agreement),[2] and to perform such other acts as may be required or appropriate in connection therewith;

d)      authorize the Debtors to use the proceeds of the DIP Facility and the Cash Collateral (defined below) in accordance with the DIP Credit Agreement and this Interim Order, to (a) fund the postpetition working capital needs of the Debtors;

---

[2]    The Debtors, the DIP Lender and other parties in interest reserve all rights to contest the amount, extent, priority and validity of any Permitted Lien and nothing herein or otherwise shall be deemed a waiver of any such rights. To the extent that such liens are deemed not to be valid as of the Petition Date, then the DIP Obligations shall not be subordinated to such liens.

(b) pay fees, costs and expenses of the DIP Facility on the terms and conditions described in this Interim Order and the DIP Credit Agreement, (c) pay the allowed administrative costs and expenses of these Chapter 11 Cases, in each case, in accordance with the DIP Documents, including the Approved Budget. "Cash Collateral" shall have the meaning set forth in section 363(a) of the Bankruptcy Code ("Cash Collateral");

e)    authorize the DIP Borrowers and Pledging Guarantors to grant to the DIP Lender, valid, enforceable, non-avoidable, and automatically and fully perfected and priming DIP Liens and Superpriority Claims (defined in the DIP Credit Agreement), including (a) allowed superpriority administrative expense claims pursuant to sections 364(c)(1) of the Bankruptcy Code, subject only to the Carve Out and the Permitted Liens, and (b) first priority liens in the DIP Collateral and all proceeds thereof, including, without limitation, all property constituting Cash Collateral pursuant to sections 364(c)(2), 364(c)(3), and 364(d)(1) of the Bankruptcy Code, to secure all DIP Obligations, subject only to the Carve Out and the Permitted Liens;

f)    authorizes the Debtors to grant to the DIP Lender an allowed superpriority administrative expense claims pursuant to sections 364(c)(1) of the Bankruptcy Code, subject only to the Carve Out and Permitted Liens;

g)    authorize the DIP Lender to take all commercially reasonable actions to implement and effectuate the terms of this Interim Order and the DIP Documents;

h)    authorize the Debtors to pay the DIP Lender the fees and reimburse expenses under the DIP Documents, and perform such other and further acts as required in connection with the DIP Documents;

i)    grant to the Prepetition Secured Parties automatically perfected Adequate Protection Liens (defined in the DIP Credit Agreement), Prepetition Secured Parties' Superpriority Claims (defined in the Credit Agreement) and other adequate protection as set forth in the Interim Order to the extent of Diminution (defined below), subject only to the Carve Out, DIP Superpriority Claims (defined in the DIP Credit Agreement) and Permitted Liens;

j)    waive all rights to surcharge any DIP Collateral under sections 105(a), 506(c) or 552(b) of the Bankruptcy Code or any other applicable principle of equity with respect to the DIP Lender;

k)    waive the equitable doctrine of "marshaling" and other similar doctrines with respect to the DIP Collateral with respect to the DIP Lender;

l)    vacate and modify the automatic stay of section 362 of the Bankruptcy Code to the extent set forth herein and as necessary to permit the Debtors and the DIP Lender to implement and effectuate the terms and provisions of the DIP Orders and the DIP

Documents, and authorizes the DIP Lender, upon the occurrence and continuance of an Event of Default, to deliver any notices of termination and take other actions described below and as further set forth herein;

m) authorize the Debtors to comply with the reporting requirements set forth in the DIP Credit Agreement and the DIP Orders;

n) approve the Debtors' release and indemnification of the DIP Lender to the extent set forth in the DIP Credit Agreement and the DIP Orders;

o) schedule the final hearing within thirty (30) days of the entry of the Interim Order and approving notice with respect thereto in accordance with Bankruptcy Rule 4001(c)(2); and

p) waive any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of the DIP Orders and providing for the immediate effectiveness of the DIP Orders.

## JURISDICTION AND VENUE

9.      The Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc* dated August 3, 1984, entered by the United States District Court for the Northern District of Texas. This matter is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and the Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

10.     The legal predicates for the relief requested herein are sections 105, 361, 362(d), 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503(b), and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Rules 2002-1 and 9013-1 of the *Local Bankruptcy Rules for the Northern District of Texas* (the "Local Rules"), and the *Procedures for Complex Cases in the Northern District of Texas*, effective February 6, 2023 (the "Complex Case Procedures").

11.     The Debtors confirm their consent to the entry of a final order by the Court in connection with the Motion in the event that it is later determined that the Court, absent consent

of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

**BACKGROUND**

### I.      The Chapter 11 Cases

12.      On February 2, 2026 (the "Petition Date"), each Debtor commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases") in the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division (the "Court").  Contemporaneously herewith, the Debtors have requested procedural consolidation and joint administration of the Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b). The Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

13.      To date, the Office of the United States Trustee for Region 6 (the "U.S. Trustee") has not appointed an official committee in these Chapter 11 Cases, nor has any trustee or examiner been appointed.

14.      Additional information regarding the Debtors and these Chapter 11 Cases, including the Debtors' business operations, capital structure, financial condition, and the reasons for and objectives of these Chapter 11 Cases, is set forth in the First Day Declaration.

### II.      Summary of Terms of the DIP Facility

15.      In accordance with Bankruptcy Rule 4001(b)–(d), and Section D.13 of the Complex Case Procedures, the following table concisely summarizes the significant terms of the DIP Facility and the Interim Order:[3]

---

[3]      The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced including, without limitation, the DIP Credit Agreement and the Interim Order.  To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control.

| Provision | Summary | Location |
|---|---|---|
| **DIP Borrowers** | Inspired Healthcare Capital LLC<br>Inspired Healthcare Capital Holdings, LLC<br>Inspired Senior Living of Appleton MT LLC<br>Inspired Senior Living of Appleton ST LLC<br>IHC – Ashbrook MT, LLC<br>IHC – Ashbrook ST LLC<br>Inspired Senior Living of Chesterfield MT, LLC<br>Inspired Senior Living of Chesterfield ST, LLC<br>Inspired Senior Living of Dartmouth MT, LLC<br>Inspired Senior Living of Dartmouth ST, LLC<br>Inspired Senior Living of Eatonton MT LLC<br>Inspired Senior Living of Eatonton ST LLC<br>Inspired Senior Living of Round Rock MT, LLC<br>Inspired Senior Living of Round Rock ST, LLC<br>Inspired Senior Living of Arlington Heights MT, LLC<br>Inspired Senior Living of Arlington Heights ST, LLC<br>Inspired Senior Living of Athens MT, LLC<br>Inspired Senior Living of Athens ST, LLC<br>Inspired Senior Living of Carson Valley MT, LLC<br>Inspired Senior Living of Carson Valley ST, LLC<br>Inspired Senior Living of Lake Orion MT, LLC<br>Inspired Senior Living of Lake Orion ST, LLC<br>Inspired Senior Living of Las Vegas MT, LLC<br>Inspired Senior Living of Las Vegas ST, LLC<br>Inspired Senior Living of Largo MT, LLC<br>Inspired Senior Living of Largo ST, LLC<br>Inspired Senior Living of Mequon MT, LLC<br>Inspired Senior Living of Mequon ST, LLC<br>Inspired Senior Living of Naperville MT, LLC<br>Inspired Senior Living of Naperville ST, LLC<br>IHC – Peachtree MT, LLC<br>IHC – Peachtree ST, LLC<br>Inspired Senior Living of Pinellas Park MT, LLC<br>Inspired Senior Living of Pinellas Park ST, LLC<br>Inspired Senior Living of San Marcos MT LLC<br>Inspired Senior Living of San Marcos ST LLC<br>Inspired Senior Living of New Braunfels MT, LLC<br>Inspired Senior Living of New Braunfels ST, LLC | DIP Credit Agreement, Schedule 1 |
| **Pledging Guarantors** | Inspired Senior Living of Appleton DST<br>IHC – Ashbrook DST<br>Inspired Senior Living of Chesterfield DST<br>Inspired Senior Living of Dartmouth DST<br>Inspired Senior Living of Eatonton DST<br>Inspired Senior Living of Round Rock DST | DIP Credit Agreement, Schedule 2 |

|  | Inspired Senior Living of Arlington Heights DST<br>Inspired Senior Living of Athens DST<br>Inspired Senior Living of Carson Valley DST<br>Inspired Senior Living of Lake Orion DST<br>Inspired Senior Living of Las Vegas DST<br>Inspired Senior Living of Largo DST<br>Inspired Senior Living of Mequon DST<br>Inspired Senior Living of Naperville DST<br>IHC – Peachtree DST<br>Inspired Senior Living of Pinellas Park DST<br>Inspired Senior Living of San Marcos DST<br>Inspired Senior Living of New Braunfels DST |  |
|---|---|---|
| **Non-Pledging Guarantors** | All Debtors that are not DIP Borrowers or Pledging Guarantors | DIP Credit Agreement, Schedule 3 |
| **DIP Lender** | Lapis Municipal Opportunities Fund V LP | DIP Credit Agreement, Recitals |
| **Type and Amount of the DIP Facility** | $35,000,000 (the "DIP Commitment") superpriority senior secured non-amortizing debtor-in-possession credit facility comprised of term loans, which consist of (a) an aggregate amount of up to $10,000,000 of "new money" loans (the "Interim Term Loan") that will be made available to the Debtors in accordance with the Interim Order, and (b) an aggregate amount of up to $25,000,000 of additional "new money" loans (the "Delayed Draw Term Loans" together with the Interim Term Loan, the "Loans") that will be made available to the Debtors in accordance with the Approved Budget.<br><br>Upon entry of the Final Order, Debtors may request advances up to the DIP Commitment.<br><br>Once repaid, the DIP Loans incurred under the DIP Facility cannot be reborrowed. | DIP Credit Agreement, §§ 2.1(a), (b) |
| **Use of Proceeds/ Purpose** | No Obligor shall use the proceeds of the Advances for any purpose other than to fund payments, subject in all respects to the DIP Orders, Approved Budget and the Permitted Variances, related to the: (a) working capital and other general corporate purposes of the Obligors, if applicable; (b) Professional Fees (including funding the Carve-Out Account) and expenses of administering the Chapter 11 Cases (including fees incurred prior to the Effective Date) in accordance with the Bankruptcy Code and any orders of | DIP Credit Agreement, § 6.11 |

| | | |
|---|---|---|
| | the Bankruptcy Court, as applicable; (c) fees and expenses payable under the DIP Credit Agreement, including, without limitation, the Commitment Fee, Break-Up Fee, and Exit Fee and legal fees and expenses of the Lender (including fees and expenses incurred prior to the Effective Date) and other Lender Expenses; and (d) interest and other amounts payable under the DIP Credit Agreement or in the Approved Budget. In no event may any proceeds of Advances be used for any Challenge. | |
| **Maturity Date** | 365 calendar days after the Petition Date (or such later date as agreed to by the Lender in its sole discretion) (the "Initial Maturity Date"); *provided* that the Debtors shall have the option to extend the Initial Maturity Date for two successive six-month periods if (i) no Event of Default or other DIP Termination Event has occurred, (ii) for each six month period,  the DIP Lender receives an extension fee equal to 0.50% of the Commitment Amount (i.e. $175,000.00), paid in cash on or prior to the then current Maturity Date, and , and (iii no later than 10 Business Days prior to the then current Maturity Date. the Borrowers have notified the Lender in writing of its election to extend the Maturity Date (and such election shall be deemed to be a representation and warranty by the Obligors to Lender that each of the conditions set forth in this proviso have been satisfied in full). | DIP Credit Agreement, § 1.1 |
| **Approved Budget** | (a) the initial budget, prepared by Borrowers and Pledging Guarantors, for a 9-month period commencing as of the week of on which the Petition Date occurs, that sets forth in reasonable detail all of Obligors' projected receipts and disbursements on a weekly basis, including the anticipated weekly uses of the proceeds of the DIP Facility and Cash Collateral for such period, which shall include, among other things, available cash, cash flow, trade payables and ordinary course expenses, total expenses, fees and expenses relating to the DIP Facility, fees and expenses related to the Chapter 11 Cases (including Professional Fees), and working capital and other general corporate needs (and shall contain the categories set forth in the initial Approved Budget commencing on the Petition Date and attached hereto as Exhibit B) separated into line items for each category of receipt or disbursement as set forth in the initial Approved Budget (each, a "Reporting Category") and (b) an amended or otherwise modified budget adopted with the written consent of Lender in its sole discretion; *provided* that the total amount of Loans provided pursuant to such amended Approved Budget shall | DIP Credit Agreement, § 1.1 |

| | | |
|---|---|---|
| | not exceed the total amount of the Commitments authorized by the DIP Orders. | |
| **Financial and Variance Reporting** | The Borrower Representative will, on the fourth (4th) Business Day of each week, commencing on the fourth (4th) full week after the Petition Date (the "First Testing Date"), deliver to the Lender a variance report (each such report, a "Variance Report"), in a form consistent with the form of the Approved Budget, comparing the Obligors' actual receipts and disbursements by line item for the prior calendar week and the prior four (4) calendar weeks (on a cumulative basis) with the projected receipts and disbursements for such week and the prior four (4) calendar weeks (on a cumulative basis) as reflected in the applicable Approved Budget for such weeks (the "Weekly Variance Report").<br><br>By not later than 5:00 PM Eastern Time on the First Testing Date and on each Thursday thereafter that is the four-week (4-week) anniversary of the First Testing Date (each such date, a "Monthly Variance Testing Date" and each such four-week period, the "Monthly Testing Period"), the Borrower Representative shall provide to the Lender a report detailing (i) the aggregate receipts and disbursements of the Obligors during the applicable Monthly Testing Period and since the Petition Date; and (ii) any variance (positive or negative, expressed as a percentage) between actual and budgeted aggregate disbursements for the Monthly Testing Period and since the Petition Date, as set forth in the applicable Approved Budget (a "Monthly Variance Report," together with the Weekly Variance Report, the "Approved Variance Reports"). The provision to the Lender of a Monthly Variance Report shall constitute a representation and warranty by each of the Obligors that the information contained in such Monthly Variance Report is true and correct in all material respects.<br><br>The Obligors shall comply with the following (collectively, the "Permitted Variances"): As of each Monthly Variance Testing Date, for the Monthly Testing Period ending on the Sunday preceding such Monthly Variance Testing Date, and for the period commencing on the Petition Date and ending on such Monthly Variance Testing Date, (i) the Obligors shall not allow, without the Lender's approval, all "Total Operating Disbursements," excluding, for the avoidance of doubt, "Non-Operating | DIP Credit Agreement, § 5.2 |

Disbursements" and "Restructuring Disbursements" (all as defined in the Approved Budget) to be greater than 120% of the estimated disbursement for such items in the Approved Budget, and (ii) the Obligors shall not allow, without the Lender's approval, all "Total Receipts" (as defined in the Approved Budget) to be less than 80% of the estimated Total Receipts in the Approved Budget, each for such Monthly Testing Period and for the period commencing on the Petition Date, as applicable, provided that, if disbursements are below the budgeted disbursements for a Monthly Testing Period, any such unused disbursements shall be rolled into the Approved Budget for the following Monthly Testing Period. Any material changes to the Approved Budget shall be subject to the Lender's approval. For the avoidance of doubt, any reference to "written consent" hereunder shall include consent granted by email.

Commencing at 5:00 PM (Eastern Time) on the Thursday of the fourth (4th) full calendar week after the Petition Date, and continuing at 5:00 P.M. (Eastern Time) on the Thursday of every fourth (4th) week thereafter, the weekly budget shall be updated, for a nine (9) month period commencing on such date, and shall set forth in reasonable detail all of the Obligors' projected receipts and disbursements on a weekly basis, including the anticipated weekly uses of the proceeds of the DIP Facility and Cash Collateral for such period, separated into line items corresponding to each Reporting Category, and if such updated budget is in form and substance satisfactory to the Lender, it shall become the "Approved Budget". Any update, amendments, supplements, or modifications to the Approved Budget or an Approved Variance Report shall be subject to the prior written approval of the Lender prior to the implementation thereof. If the Lender has not objected, in writing, to a proposed updated budget, or an amendment, supplement, or modification to the Approved Budget or an Approved Variance Report, within three (3) Business Days after the Lender's receipt thereof, such proposed updated budget, amendment, supplement, or modification shall be deemed acceptable to and approved by the Lender. Until any such updated budget, amendment, supplement, or modification has been approved by the Lender, the Obligors shall be subject to and be governed by the terms of the Approved Budget then in effect.

| | | |
|---|---|---|
| | At Lender's request, the Borrower Representative and the Obligors (including applicable property managers) and their financial and restructuring advisors shall participate in a conference call occurring no more than every other week, commencing on the second week following the Effective Date regarding the Approved Budget, the Chapter 11 Cases and other financial, operational and material matters.<br><br>The Borrower Representative and other Obligors shall provide to the Lender the Compliance Certificate, financial information and other information described in Exhibit E no later than the dates described in such Exhibit. | |
| **Interest Rate** | All Advances shall bear interest on the Daily Balance thereof at a rate equal to eleven point fifty percent (11.50%) per annum, calculated in accordance with Section 2.4(d) of the DIP Credit Agreement.  For the purpose of calculating interest, the Daily Balance shall exclude accrued but unpaid interest due or owing hereunder until such interest is added to the principal balance of the Loans monthly on each monthly anniversary of the Petition Date, and shall include all Fees and other amounts that have been added to principal. | DIP Credit Agreement, § 2.4(a) |
| **Default Rate** | Upon the occurrence and during the continuation of an Event of Default, all Obligations shall bear interest on the Daily Balance thereof at a per annum rate equal to three percent (3.0%), <u>plus</u> the then applicable interest rate (the "<u>Default Rate</u>") upon written notice from Lender of its election to impose interest at the Default Rate.  Any such notice may impose interest at the Default Rate retroactively to the date of the occurrence of the related Event of Default.  For the purpose of calculating interest under <u>Section 2.4(b)</u> of the DIP Credit Agreement, the Daily Balance shall exclude accrued but unpaid interest due or owing hereunder until such interest is added to the principal balance of the Loans monthly on each monthly anniversary of the Petition Date | DIP Credit Agreement, § 2.4(b) |
| **Fees** | <u>Commitment Fee; Lender Expenses</u>.  Upon the funding of the Interim Term Loan, Borrowers shall pay to Lender the Commitment Fee by adding the Commitment Fee to the principal amount of the Interim Term Loan, in the manner described herein, whereupon such capitalized Commitment Fee shall be treated as principal and accrue and compound interest as provided herein, and shall pay the applicable Lender Expenses in full in cash, including attorney's fees and other Lender Expenses accrued or otherwise incurred prior to the Effective Date, from, as applicable, the | DIP Credit Agreement, § 2.8 |

| | | |
|---|---|---|
| | proceeds of the Interim Term Loan.<br><br>Exit Fee.  The Exit Fee shall be due and payable in full upon the earliest of (i) the Maturity Date (or the earlier acceleration of the Obligations in accordance with the Loan Documents), (ii) the occurrence of a DIP Termination Event, and (iii) the payment in full of the Obligations. The Borrowers shall pay a pro rata share of the Exit Fee (using a ratio derived from comparing the principal amount to be prepaid to the Commitment Amount) when any voluntary prepayment or mandatory prepayment of the Loan is required to be made; provided that in no event will the Exit Fee be required to be paid in connection with a partial prepayment with proceeds from any casualty insurance or condemnation award; and provided further that any unpaid portion of the Exit Fee shall be due and payable on the Maturity Date (or a DIP Termination Event or any earlier acceleration of the Obligations in accordance with the Loan Documents).<br><br>Break-Up Fee.  The Break-Up Fee was fully earned and non-refundable under a letter agreement between Lender and the Obligors executed on January 23, 2026, and shall be allowable as of the Effective Date. The Break-Up Fee shall be paid to Lender when and if any of the following occurs: (i) the Closing or funding of the Initial Term Loan Commitment does not occur, including without limitation, upon the closing or funding of another debtor in possession loan facility by any Person (other than Lender) to any of the Borrowers or Pledging Guarantors, (ii) the Final Order does not enter on or before the date specified in the Milestones, or (iii) the DIP Facility is otherwise terminated; *provided* that the Break-Up Fee shall be reduced by the amount of the Commitment Fee, Exit Fee and interest paid in cash to Lender (including, without limitation any amounts paid in cash upon the repayment in full of the Obligations regardless of whether the foregoing trigger for such Break-Up Fee has occurred). | |
| **Priority** | First Lien on Unencumbered Property.  Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, perfected, binding, continuing, enforceable, and non-avoidable first priority lien on all unencumbered DIP Collateral, which DIP Liens shall be junior and subordinated only to the Carve Out; and<br><br>Priming Lien on Any Encumbered DIP Borrower Property. Pursuant to sections 363(c)(3) and 364(d)(1) of the Bankruptcy Code, a valid, perfected, binding, continuing, enforceable and non-avoidable first priority, senior priming lien on all DIP Collateral (including Cash | Interim Order, ¶ 7 |

| | | |
|---|---|---|
| | Collateral), which DIP Liens shall be junior and subordinated only to the Carve Out and Permitted Liens. | |
| **Superpriority Expense Claim** | Subject only to the Carve Out and Permitted Liens, effective immediately upon entry of this Interim Order, the Debtors granted to the DIP Lender, pursuant to section 364(c)(1) of the Bankruptcy Code, allowed superpriority administrative expense claims in the Chapter 11 Cases and any Successor Case (collectively, the "DIP Superpriority Claims") for all DIP Obligations with priority over any and all administrative expense claims and unsecured claims against the Debtors or their estates in the Chapter 11 Cases and any Successor Case, including administrative expenses or other claims of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546, 726, 1113, and 1114 or any other provision of the Bankruptcy Code or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment. The DIP Superpriority Claims shall have recourse to and be payable from all prepetition and postpetition property and assets of the Debtors and their estates and all DIP Collateral and all proceeds thereof. The DIP Superpriority Claims shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, shall be against each Debtor on a joint and several basis, and shall be payable from all prepetition and postpetition property of the Debtors and all proceeds thereof. Except with respect to the Carve Out, no costs or expenses of administration, including Professional Fees allowed and payable under sections 328, 330, or 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in these proceedings, or in any Successor Case, and no priority claims are, or will be, senior to, prior to, or on a parity with the DIP Superpriority Claims or the DIP Obligations, or with any other claims of the DIP Lender arising under the DIP Credit Agreement and/or the Interim Order. | Interim Order, ¶ 9 |
| **Conditions Precedent to the Effective Date** | (a)    All "first day" motions, including those related to the DIP Facility, filed by the Debtors and related interim and final orders, as applicable, entered within 3 business days of the Petition Date by the Bankruptcy Court in the Chapter 11 Cases shall be in form and substance reasonably satisfactory to the DIP Lender.<br>(b)    The parties shall have executed and delivered the DIP Credit Agreement. | DIP Credit Agreement, § 3.1 |

(c)     Entry by the Bankruptcy Court of the Interim Order authorizing the secured financing under the DIP Facility on the terms and conditions contemplated by the DIP Credit Agreement, authorizing the Debtors' use of Collateral subject to the terms provided herein, and otherwise on terms reasonably acceptable to the Lender no later than 3 business days after the Petition Date, and such Interim Order shall be in full force and effect and not have been vacated, reversed, stayed, modified, or amended (except in the case of a modification or amendment as consented to by the Lender, in its sole discretion) and shall not be subject to a stay pending appeal or other injunction, except as consented to by the Lender.

(d)     All corporate, trust, limited liability company and similar action and approvals necessary for the valid execution, delivery and performance by each of the Obligors in connection with the Financing and of the Loan Documents to which it is a party and the transactions contemplated thereby shall have been duly and effectively taken or obtained (as the case may be) and remain in effect as of the date hereof and evidence thereof satisfactory to the Lender shall have been provided to the Lender.

(e)     Entry by the Bankruptcy Court of an order authorizing, on an interim basis, the use of Cash Collateral, in form and substance satisfactory to Lender.

(f)     The Lender shall have a valid and perfected lien on and security interest in the Collateral of the applicable Debtors on the basis and with the priority set forth herein.

(g)     All out-of-pocket costs, fees and expenses required to be paid to the Lender under the DIP Credit Agreement and the Loan Documents or the Interim Order (including, without limitation, legal fees and expenses) incurred in connection negotiating, documenting, approving, administering, monitoring or enforcing any rights under the DIP Facility set forth in the Loan Documents or otherwise to be paid to the Lender shall have been paid

(h)     No Default or Event of Default shall have occurred, and shall be continuing, or would result from such borrowing of the Loans.

(i)     Other than the Chapter 11 Cases, as stayed upon the commencement of the Chapter 11 Cases, or as disclosed in writing to the Lender prior to the Petition Date, there shall exist no action, suit, investigation, litigation or proceeding pending or threatened in writing in any court or before any arbitrator or governmental authority that (a) would reasonably be expected to result in a material adverse effect, or (b) restrains, prevents or purports to affect

| | | |
|---|---|---|
| | materially adversely the legality, validity or enforceability of the DIP Facility or the consummation of the transactions contemplated thereby.<br><br>(j)     The making of the Interim Term Loan shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily, or permanently.<br><br>(k)     The Debtors are in compliance with the Milestones as of the Effective Date.<br><br>(l)     Since the Petition Date, other than the Chapter 11 Cases, there shall not have occurred or there shall not exist any event, condition, circumstance or contingency that, individually, or in the aggregate, (a) has had or could reasonably be expected to have a material adverse effect on the business, operations, properties, assets, performance or financial condition of Obligors taken as a whole; (b) has resulted in, or could reasonably be expected to result in, a material adverse effect on the validity or enforceability of, or the rights, remedies or benefits available to the  Lender; or (c) has had or could reasonably be expected to have, a material adverse effect on the ability of the Obligors to perform their obligations under the DIP Credit Agreement or any Loan Document. | |
| **Conditions Precedent to Loans** | (a)     No order has been entered reversing, amending, staying, vacating, terminating or otherwise modifying the DIP Orders, and there has been no motion for leave to appeal or other proceeding to set aside any such order or to challenge the relief provided for in such order, in each case, unless agreed to in writing by the Lender in its sole discretion.<br><br>(b)     No action, proceeding, investigation, regulation, or legislation shall have been instituted before any Governmental Authority to enjoin, restrain, or prohibit, or to obtain damages which arise out of, the DIP Credit Agreement or any of the other Loan Documents or the consummation of the transactions contemplated hereby.<br><br>(c)     The proceeds of the Loans requested by the Borrowers shall be used for a purpose permitted under Section 6.11 of the DIP Credit Agreement and in accordance with the Approved Budget, including Permitted Variances.<br><br>(d)     The representations and warranties of Obligors contained in the DIP Credit Agreement and in the other Loan Documents shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text | DIP Credit Agreement, § 3.2 |

| | | |
|---|---|---|
| | thereof) on and as of the date of such Advance, as though made on and as of such date (except to the extent that such representations and warranties relate solely to a specific earlier date in which case such representation and warranty shall be true and correct in all material respects as of such earlier date (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof)).<br>(e)     No Default or Event of Default under any of the Loan Documents, and no DIP Termination Event under the DIP Orders, shall have occurred and be continuing on the date of such Advance, nor shall either result from the making thereof.<br>(f)     Lender shall have received a fully executed and delivered Borrowing Notice from Borrower Representative in accordance with Section 2.2 of the DIP Credit Agreement.<br>(g)     The applicable Borrowing Notice and the Advance to be made thereunder shall comply with the then applicable Approved Budget.<br>(h)     All Lender Expenses required to be paid to the Lender at such time, under the DIP Credit Agreement and the Loan Documents or the DIP Orders, shall have been paid. | |
| **Affirmative Covenants** | Customary for transactions of this type, including reporting covenants, update meetings, and/or calls with the DIP Lender as reasonably requested. | DIP Credit Agreement, § 5 |
| **Negative Covenants** | Customary for transactions of this type, including limitations on indebtedness, liens, investments, acquisitions, and restricted payments. | DIP Credit Agreement, § 6 |
| **Milestones** | Milestone 1:   No later than three (3) days after the Petition Date, the Bankruptcy Court shall have entered the Interim Order<br><br>Milestone 2:   No later than twenty-one (21) days after entry of the Interim Order, all documentation relating to the DIP Facility, including the Loan Documents, shall be in form and substance satisfactory to the Lender and shall have been duly executed and delivered by all parties thereto.<br><br>Milestone 3:   No later than thirty-five (35) days after the Petition Date, the Bankruptcy Court shall have entered the Final Order. | DIP Credit Agreement, Schedule A-3 |

| | | |
|---|---|---|
| | Milestone 4:   No later than forty-five (45) days after the Petition Date, the Obligors shall have filed a motion for approval of procedures for the solicitation or marketing of a sale, disposition, restructuring, restructuring or other transaction selected by the Obligors (the "<u>Transaction</u>"), which motion(s) shall be in form and substance reasonably acceptable to the Lender.<br><br>Milestone 5:   No later than seventy-five (75) days after the Petition Date, the Bankruptcy Court shall have entered an order granting the Obligors' motion for approval of procedures for the marketing and Transaction (the "<u>Bidding/Solicitation Procedures Order</u>"), which order shall be in form and substance reasonably acceptable to the Lender.<br><br>Milestone 6:   An auction to select a winning bidder under the Bidding Procedures Order shall be conducted no later than one hundred fifty (150) days following the Petition Date.<br><br>Milestone 7:   No later than one hundred sixty five (165) days after the Petition Date, the Bankruptcy Court shall have entered an order approving the Transaction by approving the sale of substantially all the Obligors' assets under section 363 of the Bankruptcy Code, which order shall be in form and substance acceptable to the Lender in its sole discretion.<br><br>Milestone 8:   No later than 270 days after the Petition Date, the Transaction shall have been consummated. | |
| **Events of Defaults** | Any one or more of the following events constitute an event of default upon giving applicable notice and the expiration of the applicable cure period:<br><br>(a)    any Obligor shall fail to pay when due any principal, including, without limitation, pursuant to Section 2.3(d) of the DIP Credit Agreement, on the Maturity Date, or upon acceleration, or any interest, Fees, Lender Expenses, or any other Obligations under the DIP Credit Agreement or any other Loan Document when due;<br>(b)    any of the Milestones are not achieved by the deadline established for such Milestone in Schedule A-3 of the DIP Credit Agreement, unless extended or waived by the prior written consent of Lender;<br>(c)    any Obligor shall fail to comply with any of its obligations under Sections 5.3, 5.6, 6.1, 6.2, 6.3, 6.4, 6.8, | DIP Credit Agreement, § 7.1 |

or 6.13 of the DIP Credit Agreement;

(d)     other than as set forth in any other sub-section of this Section 7.1 of the DIP Credit Agreement, any Obligor shall fail to perform, or otherwise breach, any of its covenants or obligations contained in the DIP Credit Agreement or any Loan Document, which failure or breach shall continue for thirty (30) days after the earlier to occur of (i) the date on which such failure to comply is known to any officer of such Obligor, and (ii) the date on which the Lender shall have notified the Borrower Representative or such Obligor or its applicable representative of such failure; provided, however, that such thirty (30) day grace period shall not apply in the case of any failure that is not capable of being cured at all or within such thirty (30) day period;

(e)     any representation or warranty made by any Obligor in the DIP Credit Agreement, any Loan Document or in any agreement, certificate, instrument, financial statement, or other statement delivered to Lender pursuant to or in connection with the DIP Credit Agreement or any Loan Document shall prove to have been incorrect in any material respect when made or deemed made;

(f)     except upon Lender's prior written request or with Lender's express prior written consent (and no such consent shall be implied from any other action, inaction, or acquiescence of Lender), any Obligor shall file a motion with the Bankruptcy Court or any other court of competent jurisdiction seeking an order (or such order is otherwise entered) that by its terms modifies, reverses, revokes, stays, rescinds, vacates, or amends the DIP Order (or any material provision thereof), the DIP Credit Agreement, any other Loan Documents, or the relief or transactions otherwise contemplated in the foregoing Loan Documents (or, in each case, purports to effect any of the foregoing);

(g)     any of the Loan Documents shall cease to be in full force and effect, or the Lender's Liens on any Collateral shall fail to be validly created and enforceable, or shall fail to be perfected in any material respect at any time, or shall fail to have the priority contemplated hereby, or any material provision of the Loan Documents is invalid, or any Obligor shall challenge or contest the DIP Facility, the validity or enforceability of any Loan Documents or deny that it has further liability thereunder;

(h)     any Challenge is commenced by any Person that is not opposed by the Obligors in a timely manner in accordance with the Bankruptcy Code, the Federal Rules

of Bankruptcy Procedure and any appliable local rules, (ii) any Obligor asserts any Challenge, (iii) any Obligor investigates, joins or files any motion, application or other pleading in support of, or consents to the standing of any party, including a Committee, to assert, a Challenge, or (iv) any Obligor publicly supports any other Person that has asserted any Challenge or other requested relief contemplated in clauses (i) – (iii) above;

(i)     without the prior written consent of Lender, any Obligor shall file, or the Bankruptcy Court shall otherwise order, grant, confirm, or approve (including any approval on an interim or conditional basis) any plan of reorganization or liquidation of an Obligor, or related disclosure statement (including any amendment, modification or supplement to such plan or disclosure statement), that is not an Acceptable Plan;

(j)     except with respect to the Carve Out, any Obligor shall file any motion or application, or the Bankruptcy Court allows the motion or application of any other Person, which seeks approval for or allowance of any claim, lien, security interest ranking equal or senior in priority to the claims, liens, and security interests granted to Lender under the DIP Orders, or with respect to the Collateral or any such equal or prior claim, lien, or security interest shall be established in any manner, except, in any case, as expressly permitted under the DIP Orders;

(k)     the earliest date the Bankruptcy Court dismisses or converts (or a Borrower or Pledging Guarantor files a motion or other pleading seeking or supporting the dismissal or conversion) to Chapter 7 of any of the Chapter 11 Cases of a Borrower or Pledging Guarantor;

(l)     one or more final non-appealable judgments (and the same shall remain undischarged for a period of thirty (30) consecutive calendar days during which execution shall not be effectively stayed) and orders for the payment of money exceeding $1,000,000 in the aggregate (in each case to the extent not paid or covered by insurance or indemnities as to which the insurer or indemnifying party has been notified of such judgment or order and the applicable insurance company or indemnifying party has not denied coverage thereof) shall be rendered against any Borrower or any Pledging Guarantor and shall be subject to immediate collection and remain unsatisfied;

(m)     any damage to, or loss, theft or destruction of, any Collateral having a value in excess of $1,000,000 in the aggregate, unless such Collateral is insured as required

hereunder, the insurance company has been notified of the occurrence of such event and has not denied coverage thereof and the claim has been settled within 90 days (or such longer time as Lender may agree) of the occurrence of such event;

(n)     any DIP Termination Event under the DIP Orders;

(o)     the entry of an order appointing (or the filing by an Obligor of a motion or other pleading seeking or supporting the appointment of) a trustee or an examiner having enlarged or expanded powers (beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1104 of the Bankruptcy Code (other than a fee examiner) in the Chapter 11 Cases, or the Bankruptcy Court shall have entered an order providing for such appointment, in each case without the prior written consent of Lender in its sole discretion;

(p)     the entry of an order which provides relief from the automatic stay otherwise imposed pursuant to Section 362 of the Bankruptcy Code, which order permits any creditor or party in interest, other than Lender (other than any creditor or party in interest having a Lien on specific equipment that is senior to Lender), to realize upon, or to exercise any right or remedy with respect to, any material portion of the Collateral or any other material assets of a Borrower or Pledging Guarantor;

(q)     the entry of an order (i) surcharging any of the Collateral under Sections 105, 506(c), or any other section of the Bankruptcy Code or applicable law; (ii) allowing any administrative expense claim having priority over or ranking in parity with Lender's claims or rights against the Obligors (subject to the Carve Out) under the Loan Documents; (iii) terminating any Obligor's right to use Cash Collateral, or (iv) otherwise adversely impacting Lender's Liens and priority in the Collateral, as set forth in Section 8 of the DIP Credit Agreement and the DIP Order;

(r)     the DIP Orders, or any material provision thereof, (i)cease to be in full force and effect from and after the date of entry thereof by the Bankruptcy Court or (ii) are modified, reversed, revoked, remanded, stayed, rescinded, vacated, or amended on appeal or by the Bankruptcy Court without the prior written consent of Lender (and no such consent shall be implied from any other authorization or acquiescence by Lender);

(s)     any Obligor shall seek, or the Bankruptcy Court shall enter, an order authorizing any Obligor to obtain financing from a Person other than Lender pursuant to

|  | Section 364(d) of the Bankruptcy Code, unless (i) Lender consents in writing to such financing, or (ii) Lender is indefeasibly paid in full in cash in connection with such financing; |  |
|  | (t)      any Obligor shall make any material payments in respect of prepetition obligations other than (i) as permitted by the DIP Orders, (ii) as permitted by any "first day" or "second day" orders satisfactory to Lender, (iii) as permitted by any other order of the Bankruptcy Court satisfactory to Lender, (iv) as permitted under the DIP Credit Agreement or any other Loan Documents in accordance with the Approved Budget (subject to Permitted Variance), or (v) as otherwise agreed to by Lender in writing before such payment is made; |  |
|  | (u)      the entry of an order by the Bankruptcy Court terminating or modifying the exclusive right of any Borrower or Pledging Guarantor to file a chapter 11 plan pursuant to Section 1121 of the Bankruptcy Code, without the prior written consent of Lender; |  |
|  | (v)      any Obligor shall seek, or support any other person's motion, to (i) disallow in whole or in part the Obligations, (ii) challenge the validity and enforceability of Lender's Liens, or (iii) contest any material provision of the DIP Credit Agreement or any Loan Document; |  |
|  | (w)      any of the Borrowers or Pledging Guarantors shall fail to execute and deliver to the Lender any agreement, financing statement, trademark filing, copyright filing, notices of lien or similar instruments or other documents that the Lender may reasonably request from time to time to more fully evidence, confirm, validate, perfect, preserve and enforce the claims of and Liens created in favor of the Lender, subject to the time periods and terms set forth in the DIP Credit Agreement; or |  |
|  | (x)      the occurrence of a Change of Control. |  |
| **Remedies; Waiver or Modification of the Automatic Stay** | Subject to the terms of the DIP Orders, upon the occurrence and during the continuance of an Event of Default, and notwithstanding Section 362 of the Bankruptcy Code and without further order of the Bankruptcy Court or any other court of competent jurisdiction or the initiation of any further proceeding with Obligors, in addition to taking any other action or exercising any other rights or remedies (including, without limitation, with respect to the Liens in favor of the Lender) provided for hereunder or under any Loan Document (including the DIP Orders) or by the UCC or any other applicable law, Lender may do any one or more of the following: | DIP Credit Agreement, § 7.2 |

| | | |
|---|---|---|
| | (a)     declare the Obligations, whether evidenced by the DIP Credit Agreement or by any Loan Document, are due and payable, whereupon the Obligations shall become and be immediately due and payable, without presentment, demand, protest, further notice, or other requirements of any kind, all of which are expressly waived by the Obligors;<br>(b)     terminate the Commitments;<br>(c)     terminate, restrict, or reduce the Obligors' ability to use Cash Collateral as provided by the DIP Orders;<br>(d)     charge interest at the Default Rate;<br>(e)     obtain and liquidate the Collateral, it being understood and agreed that (1) if notice of disposition of the Collateral is required by law, ten (10) days prior notice by Lender to Borrower Representative designating the time and place of any public sale or the time after which any private sale or other intended disposition of the Collateral is to be made, shall be deemed to be reasonable notice thereof and shall constitute "authenticated notice of disposition" within the meaning of Section 9-611 of the UCC, and Obligors hereby waive any other notice, (2) Lender may bid for and purchase the Collateral at any public sale and (3) Lender may bid and purchase any Collateral at a private sale if the Collateral in question has a readily ascertainable market value;<br>(f)     require the DIP Borrowers to assemble all of the DIP Collateral constituting personal property without judicial process pursuant to Section 9-609 of the UCC;<br>(g)     take possession of all DIP Collateral constituting tangible personal property without judicial process pursuant to Section 9-609 of the UCC; and<br>(h)     exercise any of its other rights and remedies under the Loan Documents, any rights granted under the Final Order, and applicable law. | |
| **Prepayments** | <u>Optional Prepayments</u>.  Upon notice to Lender, Borrowers may prepay any Loan, in whole or in part, at any time; <u>provided</u>, that (i) the aggregate principal amount being prepaid shall be an amount not less than five million Dollars ($5,000,000) (and, unless such prepayment is for all outstanding principal amounts, multiples of $1,000,000 in excess thereof); (ii) such prepayment shall be accompanied by all accrued and unpaid interest thereon and the ratable portion of the Exit Fee due thereon, which shall be due and payable on the date of such voluntary prepayment, and (iii) any such prepayments under Section 2.3(c) of the DIP Credit Agreement shall be applied as described in Section 2.3(b) of the DIP Credit Agreement. | DIP Credit Agreement, §§ 2.3(c), (d) |

<u>Mandatory Prepayment Events</u>.

<u>Dispositions</u>.   Subject to the DIP Orders, within two (2) Business Days of the date of receipt by any Obligor of the Net Cash Proceeds of any sale or Disposition (whether through a voluntary or involuntary sale, the loss, destruction, or damage thereof or any actual condemnation, confiscation, requisition, seizure, or taking thereof or otherwise) of Collateral of a Borrower or Pledging Guarantor, the Obligors shall pay to Lender an amount equal to 90% of the Net Cash Proceeds (including insurance proceeds, condemnation awards, and payments in lieu thereof) received by such Obligor in connection with such sale or Disposition in accordance with Sections 2.3(a) and 2.3(b) of the DIP Credit Agreement.  In no event shall any amount paid to Lender under Section 2.3(d)(i) of the DIP Credit Agreement exceed the outstanding amount of the Obligations. Nothing contained in Section 2.3(d)(i) of the DIP Credit Agreement shall permit the Obligors to sell or Dispose of assets other than in accordance with the DIP Credit Agreement. In no event shall any amount paid to Lender under Section 2.3(d)(i) of the DIP Credit Agreement exceed the outstanding amount of the Obligations.

<u>Indebtedness</u>.   Subject to the DIP Orders, within two (2) Business Days of the date on which any Obligor receives proceeds of any Indebtedness (other than any Indebtedness permitted under Section 6.1 of the DIP Credit Agreement), the Obligors shall pay to Lender an amount equal to 100% of the Net Cash Proceeds of such Indebtedness in accordance with Sections 2.3(a) and 2.3(b) of the DIP Credit Agreement.  The provisions of Section 2.3(d)(ii) of the DIP Credit Agreement shall not be deemed to be implied consent to any such incurrence or maintenance of Indebtedness otherwise prohibited by the terms and conditions of the DIP Credit Agreement.  Nothing contained in Section 2.3(d)(i) of the DIP Credit Agreement shall permit the Obligors to incur or receive proceeds of Indebtedness other than in accordance with the DIP Credit Agreement. In no event shall any amount paid to Lender under Section 2.3(d)(ii) of the DIP Credit Agreement exceed the outstanding amount of the Obligations.

<u>Equity Issuance</u>. Subject to the DIP Orders, within two (2) Business Days of the date on which any Obligor receives proceeds of the issuance or sale of any  Equity Interests

|  | issued by a Borrower or Pledging Guarantor, the Obligors shall pay to Lender an amount equal to 100% of the Net Cash Proceeds of such issuance or sale in accordance with Sections 2.3(a) and 2.3(b) of the DIP Credit Agreement. The provisions of Section 2.3(d)(iii) of the DIP Credit Agreement shall not be deemed to be implied consent to any such issuance or sale of Equity Interests otherwise prohibited by the terms and conditions of the DIP Credit Agreement. In no event shall any amount paid to Lender under Section 2.3(d)(iii) of the DIP Credit Agreement exceed the outstanding amount of the Obligations.<br><br>Claims Proceeds. Subject to the DIP Orders, within two (2) Business Days of the date on which any Obligor receives proceeds of any claims or causes of actions relating to Borrowers or Pledging Guarantors (other than any Avoidance Actions), the Obligors shall pay to Lender an amount equal to 90% of the amount received in accordance with Sections 2.3(a) and 2.3(b) of the DIP Credit Agreement.  In no event shall any amount paid to Lender under Section 2.3(d)(iv) of the DIP Credit Agreement exceed the outstanding amount of the Obligations. |  |
|---|---|---|
| **Expenses; Indemnification** | In consideration for the DIP Facility, the DIP Lender shall be paid all fees, expenses and other amounts payable under the DIP Credit Agreement as such become due, including, without limitation, the Commitment Fee, the Exit Fee, and the Break-Up Fee, each of which is fully earned, non-refundable, payable in accordance with the terms of the DIP Credit Agreement, approved and allowed on a final basis upon entry of the Interim Order, (all such fees, together, the "DIP Fees"), and subject to paragraph 27 of the Interim Order, the reasonable and documented fees and expenses of the DIP Lender in connection with the DIP Facility (the "DIP Lender Expenses"). The DIP Fees and DIP Lender Expenses shall be part of the DIP Obligations and secured by the DIP Liens on DIP Collateral and all other security provided under the DIP Documents. Notwithstanding anything herein to the contrary, upon entry of the Interim Order, all reasonable and documented out-of-pocket DIP Lender Expenses incurred prior to the Closing Date shall be paid on the Closing Date, without the need to first deliver a copy of its invoice or otherwise comply with paragraph 27 of the Interim Order.<br><br>The Debtors are obligated to pay all reasonable and documented out-of-pocket DIP Lender Expenses related to | Interim Order, ¶¶ 26-28 |

the DIP Facility, including the preparation, execution, delivery, administration, and exercise of any remedies related to the DIP Documents, the Interim Order, the Final Order, and any other agreements, instruments, pleadings, or other documents prepared or reviewed in connection with any of the foregoing, whether or not any or all of the transactions contemplated hereby or by the DIP Documents are consummated.  Professionals for the DIP Lender (Foley & Lardner, LLP, and such other professionals as the DIP Lender determines necessary, the "DIP Lender's Professionals"), shall provide summary copies of any invoices (which shall not be required to contain time entries/narratives and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege, the attorney work product doctrine or any other evidentiary privilege or protection recognized under applicable law) with: (i) a summary of the work performed during the relevant compensation period; (ii) the name of, hourly rate (if applicable) of, and number of hours worked by each professional and paraprofessional who worked on the matter during the relevant compensation period; and (iii) the total fee amount being requested by electronic mail to the Debtors, U.S. Trustee and counsel to the Creditors' Committee (if appointed).  The Debtors shall promptly pay in full all such invoiced fees and expenses at the conclusion of the Review Period (defined below) other than any Disputed Invoiced Fees (defined below).  Any objections raised by the Debtors, the U.S. Trustee or the Creditors' Committee with respect to such invoices shall be subject to the Procedures for Complex Cases in the Northern District of Texas, Section D, paragraph 14(c) regarding notice parties and reasonableness (the "Disputed Invoiced Fees") must be in writing and state with particularity the grounds therefor and must be submitted to the applicable professional within ten (10) days of the receipt of such invoice (the "Review Period"); *provided*, that any failure by such party to raise a Disputed Invoiced Fee during the applicable Review Period shall constitute a waiver of any rights of such party to object to the applicable invoice. Upon delivery of the Disputed Invoiced Fee, the DIP Lender's Professionals and the objecting party shall meet and confer in good faith to resolve the objection for a

| | | |
|---|---|---|
| | period of not less than five (5) days, to be followed by the filing with this Court, if necessary, of a motion or other pleading, with at least ten (10) days' prior written notice by the submitting party of any hearing on such motion or other pleading.  No DIP Lender's Professionals shall be required to file an application seeking compensation for services or reimbursement of expenses with this Court.<br><br>The DIP Lender (and its affiliates and respective officers, directors, employees, attorneys, advisors, and agents, solely in such capacity) (each such person, an "Indemnitee") will have no liability for, and will be indemnified and held harmless by the Debtors and their estates against, any losses, claims, damages, liabilities or expenses incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof, except to the extent they are found by a final, non-appealable judgment of a court of competent jurisdiction to arise from the gross negligence, bad faith, intentional fraud, or willful misconduct of the relevant indemnified person (or any of its affiliates or any of its or its respective officers, directors, employees, advisors or agents).  Such indemnity shall not be available (i) to the extent arising from a material breach of any obligation of such Indemnitee under the DIP Credit Agreement, or (ii) to the extent arising out of any loss, claim, damage, liability or expense that does not involve an act or omission of the Debtors and that is brought by an Indemnitee against another Indemnitee. | |
| **Releases, Waivers or Limitation on any Claim or Cause of Action** | Upon entry of the Final Order, the Debtors, on their own behalf and on behalf of their estates, forever and irrevocably: (i) release, discharge, and acquit the DIP Lender and each of its respective former or current officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest, in each case solely in their capacity as such, from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, of every type, including, without limitation, any so-called "lender liability" or equitable subordination claims or defenses, solely with respect to or relating to the negotiation of and entry into the DIP Credit Agreement the other DIP Documents; and (ii) waive, discharge and release any and all defenses (including, without limitation, offsets | Interim Order, ¶ 31 |

29

| | | |
|---|---|---|
| | and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability, and avoidability of the DIP Liens and the DIP Obligations. | |
| **Section 506(c)** | Subject to entry of the Final Order, no costs or expenses of administration of the Chapter 11 Cases or any Successor Case shall be charged against or recovered from or against the DIP Lender with respect to the DIP Collateral pursuant to section 105 or section 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the DIP Lender. | Interim Order, ¶ 32(a) |
| **Marshalling** | Subject to entry of the Final Order, in no event shall the DIP Lender be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the DIP Obligations and all proceeds shall be received and applied in accordance with this Interim Order and the DIP Credit Agreement; *provided, however*, to the extent the DIP Lender exercises remedies after a DIP Termination Event and as practicable, the DIP Lender stipulates to using commercially reasonable efforts to collect from DIP Collateral other than New Braunfels Collateral, Dartmouth Collateral, Eatonton Collateral, and commercial tort claims before turning to such proceeds thereof; *provided further*, for the avoidance of doubt, this limitation on DIP Lender's exercise of remedies shall not be deemed a modification of Section 2.3 of the DIP Credit Agreement. | Interim Order, ¶ 32(b) |
| **DIP Termination Event** | "DIP Termination Event" means: (a) the occurrence of the Maturity Date, (b) the occurrence of any Event of Default under the DIP Credit Agreement or the Interim Order, or (c) the acceleration of the DIP Obligations or termination of the DIP Commitment in accordance with the terms of the DIP Credit Agreement or the other DIP Documents. | Interim Order, ¶ 23(a) |
| **Credit Bidding** | Subject to section 363(k) of the Bankruptcy Code, the DIP Lender may credit bid all or any portion of its DIP Liens up to the amount of the DIP Obligations, in connection with any proposed sale of any, all, or substantially all of the Debtors' assets, whether occurring pursuant to section 363 of the Bankruptcy Code or included as part of a reorganization plan under section 1123 of the Bankruptcy Code, including a plan subject to confirmation under section 1129(b)(2)(A)(ii) of the Bankruptcy Code, or a sale or disposition by a chapter 7 trustee for any of the Debtors under section 725 of the Bankruptcy Code.  In connection with any such credit bid by the DIP Lender, the Debtors shall, upon reasonable advance notice by the DIP Lender, provide for the assignment of such DIP Lender's right to purchase the acquired assets to one or more of the applicable DIP Lender's sub¬agents or a newly formed | Interim Order, ¶ 22 |

| | | |
|---|---|---|
| | acquisition vehicle. | |
| **Representations and Warranties** | Customary and appropriate for financings of this type. | DIP Credit Agreement, Art. 4 |

16.     The Debtors respectfully submit that the material terms are fair, reasonable, and consistent with market practice for debtor-in-possession financing of this size and complexity.

## III.     The Debtors' Prepetition Capital Structure

17.     As of the Petition Date, the Company has approximately $260 million in total funded debt obligations.  This debt arises from fifteen (15) different loan agreements with ten (10) different lenders (referred to herein as the "Prepetition Secured Parties"), each associated with a different community (collectively, the "Encumbered Debtors") as reflected in the following summary:

| Debtor | Lender | Approximate Outstanding Principal Amount |
|---|---|---|
| Inspired Senior Living of Delray Beach DST | Comerica Bank | $24,740,519 |
| Inspired Senior Living of Dunedin DST | Provident Bank | $15,202,537 |
| IHC - Candle Light Cove DST | Provident Bank | $15,294,081 |
| Inspired Senior Living of Hamilton DST | Provident Bank | $55,931,978 |
| Inspired Senior Living of North Haven DST | Provident Bank | $20,275,419 |
| Inspired Senior Living of Fort Myers DST | Stride Bank | $11,041,344 |
| Inspired Senior Living of Brookhaven DST | Synovus | $17,940,983 |
| Inspired Senior Living of Melbourne DST | Synovus | $14,295,003 |
| Inspired Senior Living of Reno DST | Synovus | $20,827,719 |
| Inspired Senior Living of Grapevine DST | Texas Security Bank | $13,208,100 |
| Inspired Senior Living of Eugene DST | HPI Fairmount Lender, LP | $14,324,054 |
| IHC - Hanover Propco, LLC[4] | Union Bank | $6,551,110 |
| Inspired Senior Living of St. Petersburg DST | Webster Bank | $13,747,303 |
| Inspired Senior Living of Augusta DST | Integrity Life Insurance Company | $16,885,000 |
| Hunan 1 LLC | Western Alliance Bank | $340,000 |

---

[4]     IHC – Hanover Propco, LLC is a wholly-owned subsidiary of Holdings.

| Debtor | Lender | Approximate Outstanding Principal Amount |
|---|---|---|
| | **TOTAL** | **$258,804,259** |

18.     Each Prepetition Secured Party purports to be secured by a first priority lien on, and security interest in, substantially all assets of their respective Encumbered Debtor.

19.     Other than the fifteen (15) Encumbered Debtors identified above, no other Debtors have any outstanding funded debt obligations owed to non-Debtor third-parties.

**IV.     The Debtors' Need for the DIP Facility**

20.     The Debtors' liquidity position is critical.  Without immediate access to debtor-in-possession financing and Cash Collateral, certain of the Debtors will lack sufficient liquidity to meet their facility-level operating obligations, including upcoming payroll and/or essential supplies.  In that event, the Debtors would face an abrupt wind-down—whether through state receivership or chapter 7 conversion—without resources to do so in an orderly or compliant manner.  Such a scenario would jeopardize the health and safety of thousands of vulnerable residents, disrupt essential medical and daily living services, expose the Debtors to significant regulatory and legal consequences, as well as jeopardize the going concern value of communities.

21.     By contrast, access to the DIP Facility and Cash Collateral will provide the liquidity necessary to stabilize operations, preserve jobs, ensure uninterrupted resident care throughout these Chapter 11 Cases, and preserve the value of the communities.  The funds will allow the Debtors to meet payroll, satisfy working capital needs, and pay the ordinary-course expenses required to maintain safe and compliant senior living facilities.

22.     The Debtors, with the assistance of their advisors, have carefully evaluated financing alternatives and concluded that the DIP Facility is the only viable source of additional

funding.  The Initial DIP Budget, attached as <u>Exhibit 2</u> to the Interim Order, reflects these needs and demonstrates that the requested financing is essential to maintain operations and pursue value- maximizing transactions.

23.    Access to this financing will also provide the stability necessary to reassure residents, employees, vendors, and regulators that the Debtors remain well-capitalized and capable of delivering high-quality care.  Without approval of this Motion, the Debtors would face an immediate and disorderly shutdown, resulting in the displacement of over 2600 residents, the loss of hundreds jobs, and irreparable harm to these estates and all stakeholders.

24.    Critically, without the DIP Facility, many of the communities would not be able to fund operations after accounting for their facility-level expenses, centralized services, and proportionate share of restructuring costs.  Courts routinely approve enterprise-wide DIP facilities where financing is essential to stabilize operations and maximize value for all stakeholders in multi-debtor cases.  *See, e.g.*, *In re Prospect Med. Holdings, Inc.*, Case No. 25-80002 (SGJ) (Bankr. N.D. Tex. Feb. 14, 2025) [Docket No. 667]; *In re SC Healthcare Holding, LLC*, Case No. 24- 10443-TMH (Bankr. D. Del. May 14, 2024) [Docket No. 313].  *See also Clyde Bergemann, Inc. v. The Babcock and Wilcox Co. (In re Babcock and Wilcox Co.)*, 250 F.3d 955, 958–59 (5th Cir. 2001) (affirming approval of debtor-in-possession financing deemed critical to each debtor); *Whorl, LLC v. Solidus Networks, Inc. (In re Solidus Networks, Inc.)*, 2008 WL 8462968, Nos. CC–08–1046–MkKPa, LA 07–20027–TD, at *6 (B.A.P. 9th Cir. Dec. 24, 2008) (finding the logic of *Babcock* "persuasive when dealing with postpetition lending to corporate groups" and holding that collective postpetition financing in jointly administered cases is not improper).

25.    In sum, the DIP Facility and access to Cash Collateral are indispensable to preserving resident safety, maintaining operations, and maximizing value for all stakeholders.

## V.    Enterprise-Wide Allocation Protocol

26.    As detailed in the First Day Declaration, each operating Debtor incurs both facility-level expenses and enterprise-level expenses for centralized services provided by Holdings, including legal, accounting, IT, investor relations, trustee and secretarial functions, reporting, transfer agent, and data processing.  These services are funded and coordinated at the enterprise level, with costs reallocated to each operating Debtor based on revenue (the "Reallocation Fees").[5] The Reallocation Fees include the costs of these Chapter 11 Cases, including Professional Fees (defined in the DIP Credit Agreement) and other administrative expenses.

27.    The Reallocation Fees are allocated to each Debtor based on revenue.   allocation is the most equitable and practical approach because (a) revenue is an objective and transparent metric that reflects each community's relative size and operational footprint; (b) higher-revenue facilities typically consume more enterprise-level resources, making revenue a reasonable proxy for benefit received; (c) a revenue-based allocation avoids distortions that could arise from occupancy fluctuations or temporary expense anomalies, ensuring stability and predictability throughout the Chapter 11 Cases; and (d) this method aligns with industry practice and prior allocation frameworks in multi-debtor healthcare cases, promoting consistency and fairness. Accordingly, the proposed Allocation Protocol, discussed in detail below, contemplates this revenue-based methodology and provides for interim allocations of DIP Obligations among Debtors, subject to true-up at plan confirmation to ensure accuracy and fairness.

---

[5]    For the two facilities under development that do not have operating revenue, Reallocation Fees are allocated based on number of units anticipated for these facilities compared to the total anticipated units.

28.     To implement this approach, the Debtors have developed the following allocation protocol (the "Allocation Protocol") to allocate DIP Obligations across Debtors:

    a.   Centralized Disbursements and Tracking:  The Debtors will maintain their Court-approved cash management system and a ledger (the "DIP Ledger") tracking (a) DIP proceeds disbursed to each Debtor/Community (the "Direct Costs"), (b) Reallocation Fees allocated to each Debtor/Community, and (c) Reallocation Fees paid to Sponsor by each Debtor/Community.

    b.   Interim Cost Allocation:  On a monthly basis, the Debtors shall prepare and report a schedule showing (a) Direct Costs and (b) Reallocation Fees allocated to each Debtor to date.

    c.   Reservation of Rights:  All intercompany allocations and rights are preserved for final reconciliation without prejudice to any party's rights to dispute allocations at plan confirmation (or otherwise through final Court order).

    d.   True-Up at Exit:  Final allocations of DIP Obligations will occur at plan confirmation (or as otherwise ordered by the Court), based on the actual Direct Costs and Reallocation Fees incurred by each Debtor/Community, less any Reallocation Fees paid to Sponsor. This true-up will determine the specific portion of DIP Obligations allocated to each Debtor/Community.

    e.   Reservation of § 506(c) Rights:  The Debtors expressly reserve all rights under Bankruptcy Code section 506(c) to seek recovery of reasonable and necessary costs and expenses of preserving or disposing of collateral, including Direct Costs and Reallocation Fees, other than with respect to the DIP Lender's interests or the DIP Collateral, neither of which, upon entry of the Final Order, are subject to surcharge of any kind.

29.     This Allocation Protocol is consistent with established bankruptcy practice for integrated enterprises.  Courts have approved similar frameworks in large multi-debtor cases. *See e.g.*, *In re SC Healthcare Holdings, LLC*, Case No. 24-10443 (TMH) (Bankr. D. Del. May 14, 2024) [Docket No. 313].  *See also In re CCA Construction, Inc.*, Case No. 24-22548 (CMG) (Bankr. D.N.J. Feb. 18, 2025) [Docket No. 174] (providing allocation mechanism through which amounts outstanding under the debtor-in-possession financing would be adjusted to account for shared services costs paid by the Debtors allocable to their non-debtor affiliates). The Allocation Protocol further ensures that the DIP Obligations and case benefits and costs are

shared equitably across the enterprise.  For these reasons, the Debtors respectfully submit that Allocation Protocol is both necessary and appropriate.

**VI.    The Debtors' Efforts to Obtain Postpetition Financing and Access Cash Collateral**

30.    With the assistance of their advisors, the Debtors conducted a broad process to evaluate potential sources of debtor-in-possession financing and other liquidity.  This process included outreach to twenty-nine (29) parties active in providing debtor-in-possession financing in the senior living and healthcare sectors.  The Debtors and their advisors carefully assessed whether incremental financing could be obtained through these channels or whether accelerated sales of estate assets could provide liquidity.

31.    Despite these efforts, no party was willing to extend financing on an unsecured or subordinate basis, the terms offered by other potential lenders were either not actionable or not competitive, and accelerated sales were deemed infeasible given timing constraints and other considerations.  Based on this market outreach, the Debtors and their advisors concluded that the proposed DIP Facility represents the best financing option available under the circumstances.

32.    The DIP Facility provides the Debtors with $35 million in new-money financing and is, by a wide margin, the most favorable and actionable proposal available.  It is the only financing that enables the Debtors to continue operating while pursuing value maximizing transactions.  Entry into the DIP Facility will allow the Debtors to maintain daily resident care, stabilize relationships with key vendors of critical healthcare supplies and services, and advance toward going-concern transactions – all while protecting resident safety and maximizing value for stakeholders.

33.    Accordingly, the Debtors submit that the DIP Facility presents the best and only viable financing option for these estates under the circumstances of these Chapter 11 Cases.

## VII.    The DIP Facility was Negotiated in Good Faith and at Arm's Length

34.    The DIP Facility is the product of extensive, good-faith, arm's-length negotiations among the Debtors and the DIP Lender, each of which was represented by experienced counsel and financial advisors.  The Debtors and their advisors actively negotiated the terms and provisions of the DIP Facility leading up to the Petition Date, including material terms of the proposed financing, ultimately resulting in the deal embodied in the DIP Credit Agreement.

35.    Three (3) parties competed heavily to provide debtor-in-possession financing. Each revised their proposals multiple times, resulting in the current DIP Facility.  This competition drove down fees, interest rates, and overall costs, resulting in the most favorable terms achievable under the circumstances and delivering significant economic benefits to the Debtors' estates.

36.    Based on these extensive negotiations among the parties, the Debtors respectfully submit that the DIP Facility represents the best financing option reasonably available to the Debtors under the current circumstances.  The claim priority, liens, and other protections to be granted to the DIP Lender pursuant to the DIP Facility were essential features of the DIP Facility, without which the DIP Lender would not have committed to provide funding for the Debtors, and are comparable to other debtor-in-possession financings and generally consistent with market terms for companies facing similar circumstances as the Debtors.

## BASIS FOR RELIEF

## I.    The Debtors Should be Authorized to Obtain Postpetition Financing Through the DIP Documents.

37.    The Debtors satisfy the requirements for relief under section 364 of the Bankruptcy Code, which authorizes a debtor to obtain secured financing under certain circumstances.  As set out above, the Debtors were unable to procure sufficient financing in the form of unsecured credit, which would be allowable under section 503(b)(1) or as an administrative expense, in accordance

with sections 364(a) or (b) of the Bankruptcy Code.  *See* 11 U.S.C. §§ 364(a), (b).  The Debtors

also negotiated vigorously, and at arm's length, with the DIP Lender to secure the DIP Facility on

the terms described herein.  For these reasons, as discussed further below, the Debtors satisfy the

necessary conditions under section 364 of the Bankruptcy Code for the authority to enter into

the DIP Facility.

### A.  Entering into the DIP Facility Is a Sound Exercise of Business Judgment.

38.     The Court should authorize the Debtors, in an exercise of their sound business

judgment, to enter into the DIP Documents and obtain access to the DIP Facility.  If an agreement

to obtain secured credit does not run afoul of the provisions of, and policies underlying,

the Bankruptcy Code, courts give debtors considerable deference in acting in accordance with their

sound business judgment in obtaining postpetition credit.  *See, e.g.*, *In re ERG Intermediate

Holdings, L.L.C.*, Case No. 15-31858 (HDH) (Bankr. N.D. Tex. June 15, 2015) [Docket No. 282]

(order approving postpetition financing as an exercise of the debtors' business judgment); *In re N.

Bay Gen. Hosp., Inc.,* Case No. 08-20368 (Bankr. S.D. Tex. July 11, 2008) (order approving

postpetition financing on an interim basis as exercise of debtors' business judgment).

39.     The Fifth Circuit has described the business judgment standard as a flexible one,

which will be satisfied if a debtor articulates a business justification and the decision furthers the

interests of the Debtors and other parties-in-interest.  *See ASARCO, Inc. v. Elliott Mgmt. (In re

ASARCO, L.L.C.),* 650 F.3d 593, 601 (5th Cir. 2011) (in the context of section 363 of the

Bankruptcy Code).  To determine whether the business judgment test is met, "the court is required

to examine whether a reasonable business person would make a similar decision under similar

circumstances." *In re Dura Auto. Sys. Inc.,* No. 06-11202 (KJC), 2007 WL 7728109, at *97 (Bankr.

D. Del. Aug. 15, 2007) (citation omitted).  In considering whether the terms of postpetition

financings are fair and reasonable, courts consider the terms in light of the relative circumstances

of both the debtor and the potential lender.  *In re Farmland Indus., Inc.,* 294 B.R. 855, 880

(Bankr. W.D. Mo. 2003).

40.     <u>Prepetition Process</u>.  As noted above, the Debtors undertook a thorough prepetition

marketing process and ultimately determined that there was no better alternative financing than

that being offered by the DIP Lender.  Accordingly, the Debtors and their advisors focused their

efforts on negotiating the terms and provisions of the DIP Facility.

41.     <u>Milestones</u>.  The DIP Credit Agreement contains certain milestones that the Debtors

must meet throughout these Chapter 11 Cases.  The milestones were negotiated by the Debtors and

the DIP Lender as a condition to providing the DIP Facility and are the result of good-faith and

arm's-length negotiations between the Debtors and the DIP Lender.  The milestones provide

the Debtors with sufficient time to effectuate the contemplated transactions while balancing the

need for an expeditious resolution of these Chapter 11 Cases.

42.     <u>Economic Terms</u>.  The DIP Facility and the accompanying economic terms were

the product of extensive, good-faith, arm's-length negotiations among the Debtors and the DIP

Lender.  The claim priority, liens, and other protections (including the waivers of section 506(c),

equities of the case, and marshalling, solely with respect to the DIP Lender, upon entry of the Final

Order), were essential features of the facility without which the DIP Lender would not have

committed to provide funding for the Debtors.  These protections are comparable to other

debtor- in-possession financings and generally consistent with market terms for companies facing

similar circumstances as the Debtors.  Accordingly, the Debtors have exercised sound business

judgment in negotiating these protections.

43.     The Debtors negotiated the DIP Documents with the DIP Lender in good faith, at

arm's length, and with the assistance of their advisors.  The Debtors believe that they have obtained

the best financing available in an amount sufficient to fund operations and the costs of these Chapter 11 Cases, and on reasonable terms. Accordingly, the Court should authorize the Debtors' entry into the DIP Documents as a reasonable exercise of the Debtors' business judgment.

**B.    The Debtors Should Be Authorized to Obtain DIP Facility on a Secured and Superpriority Basis.**

44.    Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary course of business, and (c) obtaining credit with specialized priority or with security. *See* 11 U.S.C. § 364. If a debtor-in-possession cannot obtain postpetition credit on an unsecured basis, pursuant to section 364(b) of the Bankruptcy Code, a court may authorize a debtor to obtain credit or to incur debt, the repayment of which is entitled to superpriority administrative expense status, or is secured by a senior lien on unencumbered property, or a subordinate lien on encumbered property, or a combination of the foregoing. *See* 11 U.S.C. § 364.

45.    To secure the DIP Obligations, immediately upon and effective as of entry of the Interim Order, pursuant to Bankruptcy Code sections 364(c)(2), the Debtors shall grant to the DIP Lender continuing, valid, binding, enforceable, nonavoidable, and automatically and properly perfected security interests in and liens on the DIP Collateral of the DIP Borrowers, junior and subordinated only to the Carve Out and Priority Liens.

46.    Section 364(c) of the Bankruptcy Code provides that, if a debtor is unable to obtain unsecured credit as an administrative expense under section 503(b)(1), the Court may authorize the debtor to obtain credit or incur debt (a) with priority over administrative expenses of the kind specified in sections 503(b) or 507(b); (b) secured by a lien on property of the estate that is not otherwise subject to a lien; or (c) secured by a subordinate lien on property of the estate that is already subject to a lien. 11 U.S.C. § 364(c).

40

47.     In determining whether to authorize financing under section 364(c), courts consider whether: (a) the debtor made reasonable efforts to obtain unsecured credit under sections 364(a) and (b); (b) the proposed DIP facility benefits the debtor and is necessary to preserve estate assets; and (c) the terms of the DIP facility are fair, reasonable, and adequate given the circumstances. *In re Republic Airways Holdings Inc.,* No. 16-10429 (SHL), 2016 WL 2616717, at *11 (Bankr. S.D.N.Y. May 4, 2016); *In re Ames Dep't Stores, Inc.,* 115 B.R. 34, 39-40 (Bankr. S.D.N.Y. 1990). Here, each of those considerations are satisfied.

48.     *First*, the DIP Facility is necessary to preserve the Debtors' estates. As discussed above, entry into the DIP Facility will allow the Debtors to maintain daily resident care, stabilize relationships with key vendors of critical healthcare supplies and services, and advance toward going-concern transactions – all while protecting resident safety and maximizing value for stakeholders. Without immediate access to additional financing, the Debtors will be unable to fund payroll or continue operations. The DIP Facility has been sized to provide liquidity to continue operations administer these Chapter 11 Cases.

*49.     Second*, to demonstrate that the DIP Facility is not obtainable on an unsecured basis, a debtor need only show "by a good faith effort that credit was not available without" the protections of section 364(c). *Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.),* 789 F.2d 1085, 1088 (4th Cir. 1986) (stating section 364 "imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable"). The Debtors have not been able to obtain unsecured credit or alternative debtor-in-possession financing on better terms than those reflected in the DIP Credit Agreement, and no better offers are available to the Debtors or before the Court. The DIP Credit Agreement was the only actionable financing proposal that

would allow the Debtors to continue their going-concern operations for any reasonable period after the Petition Date.

50.    *Third*, the terms of the DIP Facility are fair, reasonable, and adequate under the circumstances. The DIP Facility provides $35 million of new-money financing commitments on terms comparable to other debtor-in-possession financings and consistent with market practice for companies in similar circumstances.  Importantly, the DIP Lender will be protected in a manner expressly contemplated by section 364(c): (a) with a superpriority administrative expense claim, and (b) with senior liens only on the Debtors' unencumbered assets. The DIP Facility does not prime the liens of any Prepetition Secured Parties.

51.    In light of the foregoing, the Court should authorize the Debtors to provide the DIP Lender with superpriority administrative expense status under section 364(c)(1) of the Bankruptcy Code, together with the liens described above, in accordance with the DIP Credit Agreement.

52.    Furthermore, section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C.  §  364(d)(1). Accordingly, the Debtors may incur "priming" liens under the DIP Facility if they are unable to obtain unsecured or junior secured credit and either (a) the Prepetition Secured Parties have consented or (b) the Prepetition Secured Parties' interest in collateral is adequately protected. *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superiority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").

53.     Although the DIP Facility does not provide any liens senior to the Prepetition Secured Parties, the DIP Facility does provide the DIP Lender with senior DIP Liens, subject to, the Priority Liens, which include non-avoidable senior liens on the Collateral in existence prior to the Petition Date, which shall secure amounts not in excess of $750,000 in the aggregate across the DIP Borrowers and the Pledging Guarantors (the "Priority Liens").  The Debtors do not believe that any such liens exist in excess of $750,000 in the aggregate across the DIP Borrowers and the Pledging Guarantors.  Indeed, the Debtors currently estimate that there is less than $100,000 in liens across the DIP Borrowers and Pledging Guarantors.

54.     Out of an abundance of caution, and to the extent that the aggregate amount of non-avoidable senior liens on the Collateral in existence prior to the Petition Date exceed $750,000 across the DIP Borrowers and the Pledging Guarantors, the Debtors submit that the relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is both warranted and appropriate under the circumstances.  Here, the DIP Lender affirmatively consented to, and actively participated in providing, the proposed DIP Facility.  As set forth more fully herein, the First Day Declaration, and in the Interim Order, the Debtors believe that such lien parties are adequately protected. Accordingly, the relief requested shall be granted.

**C.      Joint and Several Liability and the Allocation Protocol Are Reasonable and Necessary.**

55.     The proposed joint and several liability structure for the DIP Facility, together with the Allocation Protocol, is both reasonable and necessary under the circumstances. Joint and several liability ensures that the DIP Lender receives the credit support required to extend financing, while the Allocation Protocol provides a fair and transparent mechanism for distributing DIP Obligations across all Debtors. This approach reflects established practice in multi-debtor cases, aligns with the integrated nature of the Debtors' operations, and guarantees that costs are

allocated proportionately to the benefits received. Without these provisions, the Debtors could not secure the financing essential to preserving resident care, maintaining operations, and maximizing value for all stakeholders. Accordingly, the Court should approve the DIP Facility and the Allocation Protocol as a sound exercise of the Debtors' business judgment and consistent with Bankruptcy Code requirements.

### D.    The Scope of the Carve Out Is Appropriate.

56.     The DIP Liens and the DIP Superpriority Claims, the Adequate Protection Liens, and the Prepetition Parties' Superpriority Claims are subject to the Carve Out.  Without the Carve Out, the Debtors' estates or other parties-in-interest could be harmed because the services that professionals might otherwise provide in these Chapter 11 Cases could be restricted.  *See In re Ames Dep't Stores,* 115 B.R. at 38 (observing that courts insist on Carve Outs for professionals representing parties-in-interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced").  Additionally, the Carve Out protects against administrative insolvency during the pendency of these Chapter 11 Cases by ensuring that funds are available to pay U.S. Trustee's fees and Professional Fees of the Professional Persons.

### E.    Debtors Should Be Authorized to Pay Fees Required by DIP Documents.

57.     The Debtors have agreed to pay certain interest and fees in connection with the DIP Facility, which are integral to the financing package.  The DIP Facility, including the fees and other economic terms of the DIP Facility, were all negotiated at arm's length.  Under the circumstances, the terms of the DIP Facility, which include the fees payable in connection therewith, are the most favorable terms the Debtors could obtain.  Furthermore, the Debtors submit that the interest payments and fees required by the DIP Facility are reasonable, comparable to other debtor-in-possession financings, and generally consistent with market terms for companies facing similar

circumstances as the Debtors.  The Debtors believe that under these circumstances, authorization to pay the fees is warranted.

>    **F.**    **The DIP Lender Should Be Deemed a Good Faith Lender under Section 364(e).**

58.    Section 364(e) of the Bankruptcy Code protects a lender that extends credit to a debtor in good faith. Specifically, it provides that the reversal or modification on appeal of an authorization to obtain credit or grant liens "does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith … unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal." 11 U.S.C. § 364(e).  This statutory protection ensures that lenders who act in good faith may rely on the validity of their loans and liens, notwithstanding subsequent appellate challenges.

59.    The Fields Declaration demonstrates that the DIP Facility was negotiated in good faith and at arm's length between sophisticated parties represented by experienced counsel and advisors.  The terms of the DIP Facility are fair, reasonable, and consistent with market practice, and the proceeds will be used only for purposes permitted under the Bankruptcy Code and authorized by this Court.  Accordingly, the Debtors respectfully submit that the Court should find the DIP Lender to be a "good-faith" lender within the meaning of section 364(e) and entitled to the full protections of that section.

**II.**    **The Debtors Should Be Authorized to Use Cash Collateral.**

60.    The Debtors' use of property of their estates, including the Cash Collateral, is governed by section 363 of the Bankruptcy Code, which provides:

>    The trustee may not use, sell, or lease cash collateral. . . unless–

>>    (A)    each entity that has an interest in such cash collateral consents; or

(B)    the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section [363].

11 U.S.C. § 363(c)(2).  Furthermore, section 363(e) provides that "on request of an entity that has an interest in property . . . proposed to be used, sold or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e).

61.    Here, the Debtors have satisfied the standards of section 363(c)(2) of the Bankruptcy Code. The Debtors intend to provide the Prepetition Secured Parties with certain forms of adequate protection (Adequate Protection Liens, Prepetition Secured Parties' Superpriority Claims and reporting) to compensate for any postpetition diminution in value, in the aggregate, of their respective interests in the Prepetition Collateral (such actual diminution, "Diminution").

62.    Further, the Debtors' use of Cash Collateral will be directed toward maintaining and safeguarding the value of the Prepetition Secured Parties' collateral – the Debtors' communities. Many of these communities are currently underperforming, with revenues insufficient to cover operating expenses.  Allowing the Debtors to use Cash Collateral therefore directly serves the Prepetition Secured Parties' interests by ensuring their collateral remains operational, staffed, and in regulatory compliance, thereby preserving rather than eroding its value. The Debtors submit that the proposed adequate protection is (a) fair and reasonable, (b) necessary to satisfy the requirements of sections 363(c)(2) and 363(e) of the Bankruptcy Code, and (c) in the best interests of the Debtors, their estates, and all stakeholders.

## III.    Modification of the Automatic Stay Is Warranted.

63.    The relief requested herein contemplates a modification of the automatic stay to the extent necessary to permit the DIP Lender to exercise all rights and remedies, and to take certain

actions without further order of or application to the Court, upon the occurrence of a DIP Termination Event (defined in the Interim Order).  Upon the occurrence of a DIP Termination Event, the DIP Lender may: (a) deliver a written notice (which may be via email) to counsel for the Debtors, the U.S. Trustee, and counsel for any Creditors' Committee (the "Remedies Notice") declaring the occurrence of a DIP Termination Event (such date, the "DIP Termination Declaration Date") and deliver a Carve Out Trigger Notice; (b) declare the termination, reduction or restriction of any commitments under the DIP Facility (including the DIP Commitment) to the extent any such commitment remains; (c) declare all DIP Obligations to be immediately due and payable, without presentment, demand or protest or other notice of any kind, all of which are expressly waived by the Debtors; (d) declare the termination, restriction or reduction of the DIP Facility and the DIP Credit Agreement as to any further liability or obligation thereunder, but without affecting the DIP Liens, the DIP Superpriority Claims, or the DIP Obligations; (e) charge default interest at the default rate set forth in the DIP Credit Agreement; and (f) declare the termination, restriction, or revocation of the ability of the Debtors to use the DIP Lender's Cash Collateral.

64.    These provisions were part of the negotiations over the terms and conditions of the DIP Facility.  Notably, the exercise of remedies will be subject to five (5) business days' notice (or otherwise extended by the Court) to allow the Debtors to seek emergency hearing before this Court solely to consider whether a DIP Termination Event occurred or is continuing, or seek other relief consistent with the DIP Orders.  Under these circumstances, the Debtors believe that the extent of the modifications to the automatic stay under the Interim Order is reasonable and should be approved.

## IV.    The DIP Facility and Access to Cash Collateral Should Be Approved.

65.    The Court may grant interim relief in respect of a motion filed pursuant to section 363(c) or 364 of the Bankruptcy Code if, as here, interim relief is "necessary to avoid immediate

and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2), (c)(2).

In examining requests for interim relief under this rule, courts generally apply the same business

judgment standard applicable to other business decisions. *See In re Ames Dep't Stores,* 115 B.R.

at 40.

66.     The Debtors and their estates will face immediate and irreparable harm absent

prompt approval of the interim relief requested.  As detailed in the First Day Declaration and

herein, the Debtors require near-term liquidity both from the DIP Facility and continued access to

Cash Collateral to sustain operations, meet payroll, and ensure uninterrupted resident care.

Granting this Motion will not only provide the funding necessary to stabilize the Debtors'

businesses, but also position them to pursue transactions that preserve enterprise value for the

benefit of all stakeholders.  For these reasons, the Debtors respectfully request that the Court

approve the interim relief sought herein on an immediate basis.

## WAIVER OF ANY APPLICABLE STAY

67.     The Debtors seek a waiver of any stay of the effectiveness of the order granting this

Motion.  Pursuant to Bankruptcy Rule 6004(h), any "order authorizing the use, sale, or lease of

property other than cash collateral is stayed until the expiration of 14 days after entry of the order,

unless the court orders otherwise."  The Debtors submit that the relief requested in this Motion is

necessary to avoid immediate and irreparable harm to the Debtors for the reasons set forth herein.

Accordingly, the Debtors submit that ample cause exists to justify a waiver of the 14-day stay

imposed by Bankruptcy Rule 6004(h), to the extent applicable.

## RESERVATION OF RIGHTS

68.     Except with respect to the DIP Facility, nothing contained in this Motion nor any

actions taken pursuant to the relief requested herein is intended or shall be construed as:

(a) an implication or admission as to the amount of, basis for, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable non-bankruptcy law; (b) an impairment or waiver of the Debtors' or any other party-in-interests' rights to dispute the amount of, basis for, or validity of any claim against, or interest in, any Debtor, its property, or its estate on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (e) a waiver of any claim or cause of action that may exist against any creditor or interest holder; (f) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code or otherwise affecting the Debtors; rights under section 365 of the Bankruptcy Code to assume or reject any executory contract or unexpired lease; (g) a waiver or limitation of the Debtors', or any other party-in-interest's, rights under the Bankruptcy Code or any other applicable law; (h) an implication or admission as to the validity, priority, enforceability, or perfection of any lien on security interest in, or other encumbrance of property of the Debtors' estates; (i) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to this Motion are valid and the rights of all parties-in-interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens; (j) a waiver of the obligation of any party in interest to file a proof of claim; or (k) an impairment or waiver of any claims or causes of action that may exist against any entity under the Bankruptcy Code or any other applicable law. If the Court grants the relief sought herein, any payment made pursuant to an order of the Court is not intended and should not be construed as a waiver of the Debtors' or any other party in interest's rights to subsequently dispute the extent, perfection, priority, validity, or amount of such claim.

## NOTICE

69.     The Debtors will provide notice of the Motion to: (a) the U.S. Trustee; (b) the Internal Revenue Service; (c) the United States Attorney for the Northern District of Texas; (d) the Attorney General for the State of Texas; (e) State Comptroller of Public Accounts; (f) the Centers for Medicare and Medicaid Services; (g) the Attorneys General for the states in which the Debtors conduct business; (h) the parties included on the Debtors' list of their 30 largest unsecured creditors; (i) counsel to the Debtors' prepetition lenders; (j) counsel to the proposed DIP Lenders; and (k) all parties entitled to notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that no other or further notice is required.

## NO PRIOR REQUEST

70.     No previous request for the relief sought herein has been made to this or any other court.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, the Debtors respectfully request that the Court enter the Interim Order, substantially in the form attached hereto as **Exhibit A**, and granting the relief requested herein and such other and further relief as may be just and proper.

Dated: February 4, 2026
       Dallas, Texas

**MCDERMOTT WILL & SCHULTE LLP**

*/s/ Marcus A. Helt*
Marcus A. Helt (TX 24052187)
Jack G. Haake (TX 24127704)
2801 N. Harwood Street, Suite 2600
Dallas, Texas 75201-1574
Telephone:    (214) 295-8000
Facsimile:    (972) 232-3098
Email:       mhelt@mcdermottlaw.com
             jhaake@mcdermottlaw.com

- and –

Daniel M. Simon (*pro hac vice* pending)
Carmen Dingman (*pro hac vice* pending)
Landon Foody (*pro hac vice* pending)
444 West Lake Street, Suite 4000
Chicago, Illinois 60606
Telephone:    (312) 372-2000
Facsimile:    (312) 984-7700
Email:       dsimon@mcdermottlaw.com
             cdingman@mcdermottlaw.com
             lfoody@mcdermottlaw.com

*Proposed Counsel for the Debtors and Debtors-in-Possession*

## CERTIFICATE OF SERVICE

I hereby certify that on this date a true and correct copy of the foregoing Motion was served by the Court's CM/ECF system on all counsel of record registered in these Chapter 11 Cases through CM/ECF. Subject to the Court's approval of their retention and access to filing privileges, the Debtors' proposed claims and noticing agent will be filing a supplemental certificate of service on the docket to reflect any additional service of the foregoing Motion.

Dated: February 4, 2026
      Dallas, Texas

**MCDERMOTT WILL & SCHULTE LLP**

*/s/ Marcus A. Helt*
Marcus A. Helt (TX 24052187)
Jack G. Haake (TX 24127704)
2801 N. Harwood Street, Suite 2600
Dallas, Texas 75201-1574
Telephone:    (214) 295-8000
Facsimile:    (972) 232-3098
Email:        mhelt@mcdermottlaw.com
             jhaake@mcdermottlaw.com

*Proposed Counsel for the Debtors and Debtors-in-Possession*

**EXHIBIT A**

## Proposed Interim Order

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| INSPIRED HEALTHCARE CAPITAL | ) Case No. 26-90004 (MXM) |
| HOLDINGS, LLC, *et al.*[1] | ) |
|  | ) (Joint Administration Requested) |
|  | ) |
| Debtors. | ) **Related to Docket No. ___** |

**INTERIM ORDER**
**(I) AUTHORIZING (A) POSTPETITION FINANCING**
**AND (B) THE USE OF CASH COLLATERAL; (II) GRANTING**
**LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE**
**EXPENSE CLAIMS; (III) GRANTING ADEQUATE PROTECTION TO**
**PREPETITION SECURED PARTIES; (IV) MODIFYING THE AUTOMATIC STAY,**
**(V) SCHEDULING A FINAL HEARING; AND (VI) GRANTING RELATED RELIEF**

---

[1]   The last four digits of Inspired Healthcare Capital Holdings, LLC's federal tax identification number are 6696. There are 161 Debtors in these chapter 11 cases, which are being jointly administered for procedural purposes only. A complete list of the Debtors and the last four digits of their federal tax identification numbers are not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/InspiredHealthcare. The Debtors' mailing address is 7033 East Greenway Parkway, Suite 250, Scottsdale, AZ 85254.

Upon the motion (the "Motion")[2] of Inspired Healthcare Capital Holdings, LLC and its affiliated debtors, as debtors and debtors in possession (collectively, the "Debtors") in the above- captioned chapter 11 cases (the "Chapter 11 Cases"), seeking entry of an order (this "Interim Order"), pursuant to sections 105, 361, 362(d), 363(c), 364(c)(1), 364(c)(2), 364(d)(1), 503(b), 506, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rules 2002-1, 4001-1, 5005-1, and 9013-1 of the Bankruptcy Local Rules for the Northern District of Texas (the "Local Rules"), and the Procedures for Complex Cases in the Northern District of Texas (the "Complex Case Procedures"), seeking entry of this Interim Order (together with all exhibits hereto) that, among other things:

   (i)    authorizes Inspired Healthcare Capital Holdings, LLC (together with its affiliated Debtors identified as "Borrowers" in the DIP Credit Agreement, the "DIP Borrowers"), to obtain postpetition financing pursuant to a senior secured debtor-in-possession term loan credit facility (the "DIP Facility," and the loans issued thereunder, the "DIP Loans") in the aggregate principal amount of up to $35,000,000 (the "DIP Commitment") of which, upon entry of this Interim Order, (the "Interim Term Loan"), $10,000,000, with the remainder to be available subject to and following entry of the Final Order (the "Delayed Draw Term Loans"), shall be made available to the Debtors and may be drawn in a single draw, and the remainder of the DIP Commitment will, subject to and upon the date of entry of the Final Order, be available through additional draws, in case subject to the terms and conditions set forth in that certain Senior Secured, Superpriority Debtor in Possession Loan and Security Agreement (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "DIP Credit Agreement" and, together with any ancillary, collateral or related documents and agreements, including this Interim Order, the "DIP Documents") by and among the DIP Borrowers, Debtor entities identified as "Pledging Guarantors" and "Non-Pledging Guarantors" in the DIP

---

[2]   Capitalized terms used but not otherwise defined herein have the meaning ascribed to them in the Motion or DIP Credit Agreement.

Credit Agreement (the "<u>DIP Guarantors</u>"), and Lapis Municipal Opportunities Fund V, LP and/or its designees, successors and assignees (the "<u>DIP Lender</u>"), the substantially final form of which DIP Credit Agreement is attached to this Interim Order as **<u>Exhibit 1</u>**;

(ii)    approves the terms of the DIP Credit Agreement, and authorizes the Debtors to execute, deliver, and perform under the DIP Credit Agreement and the other DIP Documents, the DIP Orders, and all other related agreements and documents creating, evidencing, or securing indebtedness or obligations of any of the Debtors to the DIP Lender on account of the DIP Facility;

(iii)    authorize the Debtors, on an interim basis, to issue, incur, and guarantee all DIP Loans (including the Commitment Fee , the Exit Fee, the Break-Up Fee, and any other interest, costs and fees payable pursuant to the DIP Credit Agreement) and for all obligations due or payable to or for the benefit of the DIP Lender under the DIP Documents (collectively, the "<u>DIP Obligations</u>") which DIP Obligations shall be subject and subordinate only to the Carve Out (defined below) and Permitted Liens (defined in the DIP Credit Agreement),[3] and to perform such other acts as may be required or appropriate in connection therewith;

(iv)    authorizes and directs the Debtors, on an interim basis, to use the proceeds of the DIP Facility and the Cash Collateral (as defined below) in accordance with the DIP Credit Agreement and this Interim Order, to (a) fund the postpetition working capital needs of the Debtors pending the Final Hearing (as defined below); (b) pay fees, costs and expenses of the DIP Facility on the terms and conditions described in this Interim Order and the DIP Credit Agreement, (c) pay the allowed  administrative costs and expenses of these Chapter 11 Cases, in each case, in accordance with the DIP Documents, including the Approved Budget. "Cash Collateral" shall have the meaning set forth in section 363(a) of the Bankruptcy Code ("<u>Cash Collateral</u>");

(v)    authorizes and directs the DIP Borrowers and Pledging Guarantors to grant to the DIP Lender, on an interim basis, valid, enforceable, non-avoidable, and automatically and fully perfected and priming DIP Liens (defined below) and superpriority claims, including (a) allowed superpriority administrative expense claims pursuant to sections 364(c)(1) of the Bankruptcy Code, subject only to the Carve

---

[3]    The Debtors, the DIP Lender, and other parties in interest reserve all rights to contest the amount, extent, priority, and validity of any Permitted Lien, and nothing herein or otherwise shall be deemed a waiver of any such rights. To the extent that such liens are deemed not to be valid as of the Petition Date, then the DIP Obligations shall not be subordinated to such liens.

Out (as defined below) and the Permitted Liens, and (b) liens in the DIP Collateral (as defined below) and all proceeds thereof, including, without limitation, all property constituting Cash Collateral pursuant to sections 364(c)(2), 364(c)(3), and 364(d)(1) of the Bankruptcy Code, to secure all DIP Obligations, subject only to the Carve Out and the Permitted Liens;

(vi)    authorizes and directs the Debtors to grant to the DIP Lender an allowed superpriority administrative expense claims pursuant to sections 364(c)(1) of the Bankruptcy Code, subject only to the Carve Out and Permitted Liens;

(vii)    authorizes the DIP Lender to take all commercially reasonable actions to implement and effectuate the terms of this Interim Order and the DIP Documents;

(viii)    authorizes the Debtors to pay DIP Lender the fees and reimburse expenses under the DIP Documents, and perform such other and further acts as required in connection with the DIP Documents;

(ix)    grants to the Prepetition Secured Parties automatically perfected Adequate Protection Liens (as defined below), Prepetition Secured Parties' Superpriority Claims (as defined below) and other adequate protection as set forth in this Interim Order to the extent of Diminution, subject only to the Carve Out, DIP Superpriority Claims and Permitted Liens;

(x)    subject to entry of the Final Order, except to the extent of the Carve Out, waives all rights to surcharge any DIP Collateral under sections 105(a), 506(c) or 552(b) of the Bankruptcy Code or any other applicable principle of equity with respect to the DIP Lender;

(xi)    subject to entry of the Final Order, waives the equitable doctrine of "marshaling" and other similar doctrines with respect to the DIP Collateral with respect to the DIP Lender;

(xii)    vacates and modifies the automatic stay of section 362 of the Bankruptcy Code to the extent set forth herein and as necessary to permit the Debtors and the DIP Lender to implement and effectuate the terms and provisions of the DIP Orders and the DIP Documents, and authorizes the DIP Lender, upon the occurrence and continuance of an Event of Default (as set forth herein and in the DIP Credit Agreement), to deliver any notices of termination and take other actions described below and as further set forth herein;

(xiii)    authorizes the Debtors to comply with the reporting requirements

4

set forth in the DIP Credit Agreement and the DIP Orders;

(xiv)    approving the Debtors' release and indemnification of the DIP
Lender to the extent set forth in the DIP Credit Agreement and the
DIP Orders;

(xv)    schedules the Final Hearing within thirty (30) days of the entry of
this Interim Order and approving notice with respect thereto in
accordance with Bankruptcy Rule 4001(c)(2); and

(xvi)    waives any applicable stay (including under Bankruptcy Rule 6004)
with respect to the effectiveness and enforceability of the DIP
Orders and providing for the immediate effectiveness of the DIP
Orders.

This Court, having considered the relief requested in the Motion, the exhibits attached
thereto, the First Day Declaration (defined in the Motion), the Fields Declaration, the DIP Credit
Agreement, the other papers filed with this Court, the evidence submitted and arguments made at
the interim hearing held before this Court on February 4, 2026 (the "Interim Hearing"); and due
and sufficient notice of the Interim Hearing having been given in accordance with Bankruptcy
Rules 2002 and 4001(b), (c), and (d) and all applicable Local Rules; and the Interim Hearing
having been held and concluded; and all objections, if any, to the interim relief requested in the
Motion having been withdrawn, resolved, or overruled by the Court; and it appearing that the
interim relief requested in the Motion is fair and reasonable and in the best interests of the Debtors
and their estates, necessary to avoid immediate and irreparable harm to the Debtors and their
estates, and essential for the continued operation of the Debtors' businesses and the preservation
of the value of the Debtors' assets; and it appearing that the Debtors' entry into the DIP Credit
Agreement and the other DIP Documents is a sound and prudent exercise of the Debtors' business
judgment; and after due deliberation and consideration, and good and sufficient cause appearing
therefor,

**THIS COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW BASED UPON THE MOTION, THE REPRESENTATIONS OF COUNSEL AND THE EVIDENCE SUBMITTED DURING THE HEARING:[4]**

a.      **Petition Date.**  On February 2, 2026 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court, commencing these Chapter 11 Cases.

b.      **Debtors in Possession.**  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in any of these Chapter 11 Cases.

c.      **Jurisdiction and Venue.**  The Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334 and the *Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc* dated August 3, 1984, entered by the United States District Court for the Northern District of Texas. This is a core proceeding under 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

d.      **Notice.**  The Interim Hearing was held pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2). Notice of the Motion has been provided in a manner sufficient under the circumstances and no other or further notice of the Motion or the entry of this Interim Order shall be required. The interim relief granted herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing.

e.      **Committee Formation.**  As of the date hereof, the United States Trustee for

---

[4]   The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014, and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

the Northern District of Texas (the "U.S. Trustee") has not appointed an official committee of unsecured creditors in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (a "Creditors' Committee").

f.      **No Credit Available on More Favorable Terms.**   Given their current financial condition, financing arrangements, and capital structure, and the circumstances of these Chapter 11 Cases as demonstrated by the evidence and arguments presented at the Interim Hearing, the Debtors are unable to obtain financing from sources other than the DIP Lender on terms more favorable than the DIP Facility.  The Debtors are unable to procure sufficient financing in the form of unsecured credit allowable as an administrative expense. The Debtors are also unable to obtain sufficient secured credit without granting to the DIP Lender the DIP Liens and the DIP Superpriority Claims, in each case subject and subordinate to the Carve Out and the Permitted Liens, as set forth herein and in the DIP Credit Agreement.

g.      **Good Faith.**   Based on the papers filed and the proceedings of record in these Chapter 11 Cases, (i) the extension of credit and financial accommodations under the DIP Facility, as provided by the DIP Credit Agreement, are fair, reasonable, in good faith, negotiated at arm's length, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration; (ii) the DIP Facility and the DIP Loans thereunder are being provided by the DIP Lender in "good faith" within the meaning of section 364(e) of the Bankruptcy Code in express reliance on the protections offered thereby and by order of the Court; (iii) the liens, claims, and other covenants and payments as set forth in the DIP Credit Agreement or this Interim Order, as well as the protections afforded parties acting in "good faith" under section 364(e) of the Bankruptcy Code are integral, critical, and essential components of the DIP Facility provided by the DIP Lender to the Debtors; and

(iv) the DIP Lender, the DIP Facility, the DIP Fees, the DIP Liens, and the DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code if this Interim Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise.

h.     **Good Cause.**  Good cause has been shown for the entry of this Interim Order, and the entry of this Interim Order is in the best interests of the Debtors, their estates, their residents, their creditors, their employees, and other parties in interest.

i.     **Need for Postpetition Financing and Use of Cash Collateral.**  The Debtors do not have sufficient and reliable sources of working capital to continue to operate their business in the ordinary course without access to the DIP Facility requested in the Motion. The financing provided pursuant to this Interim Order, the DIP Credit Agreement, and other DIP Documents, and the authority to use Cash Collateral granted herein will permit the Debtors to, among other things, (i) maintain health and safety of their residents by continuing the orderly operation of their businesses; (ii) make payroll for their employees, including providers essential for resident care; (iii) pay the fees, costs, and expenses incurred in connection with these Chapter 11 Cases , which are necessary to preserve enterprise value and benefit all Debtors; (iv) fund any obligations benefiting from the Carve Out; (v) maintain business relationships with vendors and suppliers; and (vi) satisfy other working capital and operational needs.

j.     **Willingness to Provide Financing.**  The DIP Lender has committed to provide financing to the Debtors subject to: (i) entry of this Interim Order; (ii) approval of the terms and conditions of the DIP Facility, the DIP Credit Agreement, and the other DIP Documents; (iii) satisfaction of the closing conditions set forth in the DIP Credit Agreement; (iv) findings and conclusions of law by this Court that the DIP Lender is extending credit to the Debtors pursuant

to this Interim Order and the DIP Credit Agreement in good faith, and that the DIP Lender's claims, superpriority claims, security interests, liens, and other protections granted pursuant to this Interim Order will have all the protections provided by section 364(e) of the Bankruptcy Code, and if any Chapter 11 Case is dismissed, the DIP Lender may enforce the DIP Documents against any such Debtor in any court of competent jurisdiction.

k.      **Adequate Protection.**  As of the Petition Date, certain of the Debtors (excluding the DIP Borrowers and Pledging Guarantors) were indebted to the Prepetition Secured Parties under the Prepetition Loan Documents (the "Encumbered Debtors"),[5] and such obligations were purportedly secured by liens and security interests granted by such Debtors or otherwise arising under applicable law (all such liens and security interests, the "Prepetition Liens") on and in certain assets of the Encumbered Debtors to the extent set forth under the Prepetition Loan Documents (all such assets, the "Prepetition Collateral"), including Cash Collateral relating to certain of the Debtors' facilities. In exchange for the Debtors' use of the Cash Collateral constituting Prepetition Collateral, and without waiving the Debtors' or any other parties' right to assert any and all challenges, causes of action, and claims against the Prepetition Secured Parties, the Prepetition Secured Parties shall receive adequate protection as set forth in this Interim Order, pursuant to sections 361 and 363 of the Bankruptcy Code, solely to the extent of any diminution in the value of their respective interests, in the aggregate, in the Prepetition Collateral which is as a result of, or arises from, or is attributable to, the imposition of the automatic stay, or the use, sale or lease of such Prepetition Collateral, or the grant of a lien under section 364 of the Bankruptcy Code and applicable case law interpreting the same (such actual diminution, "Diminution").

---

[5]   The "Prepetition Loan Documents" means all credit agreements, indentures, notes, instruments, documents, and other agreements, including all related and ancillary agreements, in each case, as amended, supplemented, modified, extended, renewed, restated or replaced from time to time, between an Encumbered Debtor and a Prepetition Secured Party.

l.       **Approved Budget.**  The Debtors have prepared and delivered to the DIP Lender and its advisors an initial budget attached as **<u>Exhibit 2</u>** (together with any additional line-item or other detail and supplements as may be provided pursuant to the terms of the DIP Credit Agreement, the "<u>Initial DIP Budget</u>").  The Initial DIP Budget reflects, among other things, for the 9-month period commencing on or about the Petition Date, the Debtors' projected operating receipts, operating disbursements, non-operating disbursements, net operating cash flow, and liquidity for each one-week period covered thereby.  The Initial DIP Budget may be modified, amended, extended, and updated from time to time in accordance with the DIP Credit Agreement or the other DIP Documents, and such modified, amended, extended, or updated budget, once approved by the Debtors and the DIP Lender, shall modify, replace, supplement, or supersede, as applicable, the Initial DIP Budget for the periods covered thereby (the Initial DIP Budget and each subsequent approved budget (including any additional line-item or other detail and supplements as may be provided pursuant to the terms of the DIP Credit Agreement) shall constitute, without duplication, an "<u>Approved Budget</u>").  The Initial DIP Budget has been prepared by the Debtors, their management, and their advisors, and the Debtors believe that the Initial DIP Budget is reasonable under the circumstances.  The DIP Lender is relying, in part, on the Debtors' agreement to comply with the Approved Budget (subject only to Permitted Variances) the terms of the DIP Credit Agreement, and this Interim Order in determining to enter into the DIP Facility and to consent to the use of their Cash Collateral provided for in this Interim Order and the DIP Documents.

m.      **Use of Cash Collateral and Proceeds of DIP Facility.**   As a condition to the Debtors' entry into the DIP Credit Agreement and the other DIP Documents and the extension of credit under the DIP Credit Agreement, including the use of Cash Collateral, the Debtors have

agreed that the proceeds of the DIP Facility and Cash Collateral shall be used solely in accordance with the terms and conditions of this Interim Order, the DIP Credit Agreement, and the Approved Budget (subject to Permitted Variances).

n.    **Section 506(c) and Marshaling.**  Subject to entry of a Final Order, as material inducement to the DIP Lender's agreement that its liens and superpriority claims shall be subject to payment of the Carve Out and the Permitted Liens, subject to entry of the Final Order, the DIP Lender is entitled to (i) a waiver of the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral and the DIP Obligations in favor of the DIP Lender; and (ii) a waiver of the provisions of section 506(c) of the Bankruptcy Code with respect to the DIP Collateral.

o.    **Requisite Authority.**  Subject to entry of this Interim Order, each Debtor has all requisite corporate or entity power and authority to execute and deliver the DIP Credit Agreement and the other DIP Documents to which it is a party and to perform its obligations thereunder.

p.    **Immediate Entry.**  Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).  Absent granting the relief set forth in this Interim Order, the Debtors' estates will be immediately and irreparably harmed. Consummation of the DIP Facility and the permitted use of Prepetition Collateral in accordance with this Interim Order and the DIP Credit Agreement are therefore in the best interests of the Debtors' estates and consistent with the Debtors' exercise of their fiduciary duties.

NOW, THEREFORE, based on the foregoing findings and conclusions, the Motion, and the record before this Court, and after due consideration, and this Court having found good and sufficient cause therefor,

**IT IS HEREBY ORDERED THAT:**

1.      **Motion Granted.**  The relief sought in the Motion is GRANTED on an interim basis as set forth herein.  Entry into the DIP Credit Agreement and, as applicable, the other DIP Documents is authorized and approved, and the use of Cash Collateral on an interim basis is authorized, in each case, subject to the terms and conditions set forth in this Interim Order and in the DIP Credit Agreement.  All objections to the Motion to the extent not withdrawn, waived, settled, or resolved are hereby denied and overruled on the merits.

2.      **Authorization of the DIP Facility.**  The Debtors are expressly and immediately authorized and empowered to execute and deliver the DIP Credit Agreement, and the other DIP Documents (as applicable), and to incur and perform the DIP Obligations in accordance with, and subject to, the terms of this Interim Order and the DIP Credit Agreement, and to execute, deliver, and perform (whether as DIP Borrowers or DIP Guarantors) under all instruments, certificates, agreements, and documents that may be required or necessary for their performance under the DIP Credit Agreement, and the creation and perfection of the DIP Liens described in and provided for by this Interim Order, the DIP Credit Agreement. Each of the Debtors is hereby authorized to pay any principal, interest, fees, expenses, and other amounts subject to and in accordance with this Interim Order, the DIP Credit Agreement, or other DIP Documents as such amounts become due and owing, without further Court approval (except as otherwise provided herein or in the DIP Credit Agreement), including, without limitation, the Commitment Fee, the Exit Fee, the Break- Up Fee, as well as any reasonable and documented out-of-pocket fees and expenses of DIP Lender's Professionals (defined below), and disbursements arising under the DIP Documents, which amounts shall not be subject to further approval of this Court and shall be non-refundable and not subject to challenge in any respect; *provided*, that the payment of the fees and expenses as

set forth herein and in the DIP Credit Agreement, subject to paragraphs 26 and 27 of this Interim

Order, and to take any other actions that may be necessary or appropriate, all to the extent provided

in this Interim Order and the DIP Documents.   Upon execution and delivery, the DIP Credit

Agreement and, as applicable, the other DIP Documents shall represent legal, valid, and binding

obligations of the Debtors, enforceable against the Debtors and their estates in accordance with

their terms. Each officer of the Debtors acting individually is hereby authorized to execute and

deliver the DIP Credit Agreement and the other DIP Documents.

3.      **DIP Obligations.**  The DIP Documents and this Interim Order shall constitute and

evidence the validity and binding effect of the DIP Obligations. All DIP Obligations shall be

enforceable against the Debtors, their respective estates, and any successors thereto, including

without limitation, any trustee appointed in these Chapter 11 Cases , or in any case under chapter

7 of the Bankruptcy Code upon the conversion of any of these Chapter 11 Cases , or the dismissal

of any of these Chapter 11 Cases , or in any other proceeding superseding or related to any of the

foregoing (the "Successor Case"), and their creditors and other parties-in-interest. Upon entry of

this Interim Order, the DIP Obligations shall include, but not be limited to, (i) the payment by the

Debtors of (a) the unpaid principal amount of and interest on the DIP Loans, as and when due,

whether at maturity, by acceleration, or otherwise, and (b) all fees and other monetary obligations

of the Debtors to the DIP Lender under the DIP Credit Agreement and this Interim Order, and

(ii) the payment and performance of all covenants, duties, agreements, obligations, and liabilities

of the Debtors to the DIP Lender under the DIP Credit Agreement and this Interim Order.

The Debtors and their successors shall be jointly and severally liable for repayment of any funds

advanced pursuant to the DIP Credit Agreement and the DIP Obligations.  The DIP Obligations

shall become due and payable, without notice or demand, on the Maturity Date or as otherwise set

13

forth in the DIP Credit Agreement. No obligation, payment, transfer, or grant of collateral as security hereunder or under the DIP Credit Agreement (including any DIP Obligation or DIP Liens) to the DIP Lender shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under any applicable law, or be subject to any disgorgement, avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination, claim, counterclaim, charge, assessment, cross-claim, defense, or any other liability or challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity for any reason.

4.      **Authorization to Enter into DIP Facility.**  The Debtors are hereby authorized to execute, deliver, enter into and, as applicable, comply with and perform all of their obligations, and to pay all fees, costs, expenses, indemnities, and other amounts contemplated, under the DIP Credit Agreement (and any other DIP Documents) and to take such other and further acts as may be necessary, appropriate, or desirable in connection therewith. Upon entry of this Interim Order, the Debtors are authorized to borrow up to aggregate amount of the Interim Amount, and the Debtors are hereby authorized to provide a guaranty of payment and performance in respect of the DIP Obligations, in each case, in accordance with the DIP Credit Agreement, and the DIP Obligations are hereby approved (as and when such amounts become earned, due, and payable in accordance with the DIP Credit Agreement) without the need to seek further Court approval. The borrowing of DIP Loans under this Interim Order and the DIP Credit Agreement shall permanently decrease the DIP Commitment and, once repaid, the DIP Loans incurred may not be re-borrowed.

5.      **DIP Collateral.**  The term "DIP Collateral"[6] means, collectively, all rights, properties and assets of each DIP Borrower and each Pledging Guarantor, including all personal

---

[6]   As set forth in the DIP Credit Agreement, capitalized terms used in this paragraph that are not otherwise defined herein have the meaning ascribed to such term in the UCC.

property, real property (including without limitation all Real Property), and Fixtures, in each case, whether now owned or existing or hereafter acquired, created or arising, whether arising before or after the Petition Date, and wherever located, including, without limitation, the following: all General Intangibles, Payment Intangibles, Instruments, Accounts, Documents, Documents of Title, Goods, Inventory, Equipment, Fixtures, Health Care Insurance Receivables, Chattel Paper, Electronic Chattel Paper, Letter of Credit Rights (whether or not the letter of credit is evidenced by a writing), Money, Deposit Accounts, cash, certificates of deposit, Investment Property, Securities, Securities Accounts, Securities Entitlements, Commodities Accounts, Supporting Obligations, Financial Assets, Escrow Account (as defined in the DIP Credit Agreement) and all monies therein, and any cash held therein, and any and all claims, rights and interests in, to or under any of the above, and all substitutions for, additions, attachments, accessories, Accessions and improvements to and replacements, products, Proceeds and insurance proceeds of any or all of the foregoing; all causes of actions(other than Borrower's and Pledging Guarantor's Avoidance Actions); all books and records relating to the foregoing, including all ledgers, federal and state tax returns, records regarding the DIP Borrowers and Pledging Guarantors' assets or liabilities, business operations or financial condition, and all computer programs or storage or any Equipment containing such information.  The DIP Collateral also includes all DIP Borrowers and Pledging Guarantors' real property (including the Real Property), leases, leasehold interests, and all rents, profits and Proceeds thereof, all contracts, contract rights, intercompany claims, rights to payment of money, arbitration awards, licenses, permits, and franchise rights, all capital stock, trust interests, all rights under insurance and proceeds thereof, all collateral support, tax or other refunds, mineral rights, and all Software, patents, copyrights, trademarks, trade names and other intellectual property (whether or not registered, and if registered, whether such intellectual property is

15

registered in the United States or in any foreign jurisdiction), together with the right to sue or otherwise  recover for any past, present and future infringement, dilution, misappropriation, or other violation or impairment thereof, and all Proceeds of any of the foregoing, including without limitation license fees, royalties, income, payments, claims, damages and proceeds of suit, now or hereafter due and/or payable with respect thereto, any and all claims, rights and interests in, to or under any of the above, and all substitutions for, additions, attachments, accessories, Accessions and improvements to and replacements, products, Proceeds and insurance proceeds of any or all of the foregoing.  Notwithstanding the foregoing, the DIP Collateral shall not include any DIP Borrower's or Pledging Guarantor's (a) Avoidance Actions or proceeds thereof, or (b) equity and/or beneficial interests issued by any Borrower, Pledging Guarantor, or Non-Pledging Guarantor.  To the extent the DIP Lender exercises remedies after a DIP Termination Event and as practicable, the DIP Lender stipulates to using commercially reasonable efforts to collect from DIP Collateral other than commercial-tort claims before turning to such proceeds thereof; *provided*, for the avoidance of doubt, this limitation on DIP Lender's exercise of remedies shall not be deemed a modification of Section 2.3 of the DIP Credit Agreement.

6.      **Disposition of Collateral.**  Notwithstanding anything otherwise provided herein, it shall be deemed a DIP Termination Event if the DIP Borrowers or Pledging Guarantors sell, transfer, or otherwise dispose of any portion of the DIP Collateral, other than in the ordinary course of business or in connection with the payments contemplated under this Interim Order or the Approved Budget (subject to the Permitted Variances), without the prior written consent of the DIP Lender, except as permitted in the DIP Credit Agreement and this Interim Order.

7.      **DIP Liens.**  To secure the DIP Obligations, immediately upon and effective as of entry of this Interim Order, pursuant to Bankruptcy Code sections 364(c)(2), and 364(d)(1),

the DIP Lender is hereby granted, on an interim basis, continuing, valid, binding, enforceable,

nonavoidable, and automatically and properly perfected security interests in and liens on the DIP

Collateral of the DIP Borrowers and Pledging Guarantors (collectively, the "<u>DIP Liens</u>") as

follows:

(i)     <u>First Lien on Unencumbered Property</u>. Pursuant to section 364(c)(2)
of the Bankruptcy Code, a valid, perfected, binding, continuing,
enforceable, and non-avoidable first-priority lien on all
unencumbered DIP Collateral, which DIP Liens shall be junior and
subordinated only to the Carve Out; and

(ii)    <u>Priming Lien on Any Encumbered DIP Borrower Property</u>.
Pursuant to sections 363(c)(3) and 364(d)(1) of the Bankruptcy
Code, a valid, perfected, binding, continuing, enforceable and non-
avoidable first-priority, senior priming lien on all DIP Collateral
(including Cash Collateral), which DIP Liens shall be junior and
subordinated only to the Carve Out and Permitted Liens.

Other than as set forth herein or in the DIP Credit Agreement, and upon entry of the Final Order,

the DIP Liens shall not be (A)  subject to sections 506, 510, 549, 550, or 551 of the Bankruptcy Code,

and/or (B) made subject to *or pari passu* with any lien or security interest heretofore or hereinafter

granted in these Chapter 11 Cases  or any Successor Case, and shall be valid and enforceable

against any trustee appointed in these Chapter 11 Cases  or any Successor Case, upon the

conversion of any of these Chapter 11 Cases  to a case under chapter 7 of the Bankruptcy Code (or

in any other Successor Case), and/or upon the dismissal of any of these Chapter 11 Cases  or

Successor Case.

8.      **Perfection of DIP Liens.**  This Interim Order shall be sufficient and conclusive

evidence of the creation, validity, perfection, and priority of all liens granted herein, including the

DIP Liens, without the necessity of execution, filing or recording any security agreement, control

agreement, pledge agreement, financing statement, mortgage, deed of trust, notice, or other

instrument or document which may otherwise be required under the law or regulation of any

17

jurisdiction or the taking of any other action (including entering into any deposit-account control agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens or to entitle the DIP Lender to the priorities granted herein. Notwithstanding the foregoing, the DIP Lender is authorized, but not required, to file, as it deems necessary or advisable, such financing statements, security agreements, mortgages, notices of liens and other similar documents to perfect or otherwise evidence the DIP Liens in accordance with applicable non-bankruptcy law, and all such financing statements, mortgages, notices and other documents shall be deemed to have been filed or recorded as of the Petition Date; *provided, however*, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens. The DIP Lender may, in its sole discretion, file an electronic copy or photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office in addition to or in lieu of such financing statements, notices of lien or similar instruments.

9.    **DIP Superpriority Claims.**  Subject only to the Carve Out and Permitted Liens, effective immediately upon entry of this Interim Order, the Debtors granted to the DIP Lender, pursuant to section 364(c)(1) of the Bankruptcy Code, allowed superpriority administrative-expense claims in these Chapter 11 Cases  and any Successor Case (collectively, the "DIP Superpriority Claims") for all DIP Obligations with priority over any and all administrative expense claims and unsecured claims against the Debtors or their estates in these Chapter 11 Cases and any Successor Case, including administrative expenses or other claims of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546, 726, 1113, and 1114 or any other provision of the Bankruptcy Code or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment.  The DIP Superpriority Claims

shall be payable have recourse and be payable from all prepetition and postpetition property and assets of the Debtors and their estates and all DIP Collateral and all proceeds thereof. The DIP Superpriority Claims shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, shall be against each Debtor on a joint and several basis, and shall be payable from all prepetition and postpetition property of the Debtors and all proceeds thereof. Except with respect to the Carve Out, no costs or expenses of administration, including professional fees allowed and payable under sections 328, 330, or 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in these proceedings, or in any Successor Case, and no priority claims are, or will be, senior to, prior to, or have parity with the DIP Superpriority Claims or the DIP Obligations, or with any other claims of the DIP Lender arising under the DIP Credit Agreement and/or this Interim Order.

10.    **No Obligation to Extend Credit.**  The DIP Lender shall have no obligation to make any loan or advance under the DIP Credit Agreement unless (i) all of the conditions precedent to the closing of the DIP Facility and such loan or advance, and other terms under the DIP Credit Agreement and this Interim Order have been satisfied in full or waived by the DIP Lender (in its sole discretion), and (ii) no Event of Default under the DIP Credit Agreement or the other DIP Documents (including this Interim Order) has occurred and is continuing.

11.    **Use of DIP Facility Proceeds.**  The Debtors shall be permitted to use DIP Loans under the DIP Facility only for the purposes specifically set forth in this Interim Order and the DIP Credit Agreement. Notwithstanding anything herein, the extensions of credit under the DIP Facility shall not constitute Cash Collateral of the Prepetition Secured Parties.

12.    **No Monitoring Obligation.**  The DIP Lender shall not have any obligation or responsibility to monitor any Debtor's use of the DIP Facility, and the DIP Lender may rely on

each Debtor's representation that the use of the DIP Facility at any time is in accordance with the requirements of this Interim Order and the DIP Credit Agreement, including the Approved Budget (subject to the Permitted Variances).

13.     **Authorization to Use Cash Collateral.**  Subject to the terms and conditions of this Interim Order and the DIP Credit Agreement, and in accordance with the Approved Budget (subject to Permitted Variances), the Debtors are authorized to use the DIP Lender's Cash Collateral until the DIP Termination Declaration Date and the Prepetition Secured Parties' Cash Collateral.

14.     **Adequate Protection for Prepetition Secured Parties.**  As adequate protection for the Debtors' use of Cash Collateral constituting Prepetition Collateral, and solely to the extent of any Diminution in the Prepetition Secured Parties' respective interests in Cash Collateral resulting from the Debtors' use of such Cash Collateral, the Prepetition Secured Parties shall receive:

> (i)     Replacement Liens. As additional adequate protection solely for any Diminution, the Prepetition Secured Parties shall continue to have valid, binding, enforceable, and perfected additional and replacement mortgages, pledges, liens, and security interests in all currently owned or hereafter acquired property and assets of their respective Encumbered Debtor of any kind or nature whatsoever, whether real or personal, tangible or intangible, wherever located, now owned or hereafter acquired or arising and all proceeds, products, rents and profits thereof, including, without limitation, accounts, revenues, inventory, equipment, investment property, instruments, chattel paper, real estate, leasehold interests, contracts, general intangibles, patents, copyrights, trademarks, deposit accounts, causes of action, tax-refund claims, commercial-tort claims, insurance proceeds and insurance premium refunds (all of the foregoing, the "Post-Petition Collateral"), to the same extent, priority, and validity that existed as of the Petition Date (such liens, the "Replacement Liens"); provided, further, that the Replacement Liens shall be subject to the Carve Out and the Permitted Liens and the Prepetition Secured Parties shall use commercially reasonable efforts to collect from all Post-Petition Collateral other than

commercial-tort claims and causes of action first before turning to such proceeds thereof;

(ii)   Supplemental Liens. As additional adequate protection solely for any Diminution, the Prepetition Secured Parties shall have a valid, perfected and enforceable continuing supplemental lien on, and security interest in, all the assets of their respective Encumbered Debtor of any kind or nature whatsoever within the meaning of section 541 of the Bankruptcy Code, whether acquired or arising before or after the Petition Date, and the proceeds, rents, products and profits therefrom (the "Supplemental Collateral"), exclusive of any commercial-tort claims and causes of action and Bankruptcy Code chapter 5 causes of actions and any proceeds therefrom (collectively, the "Supplemental Liens" and together with the Replacement Liens, the "Adequate Protection Liens"); provided, however, that the Supplemental Liens shall be subject to the Carve Out and the Permitted Liens; and

(iii)   Superpriority Claim. As additional adequate protection solely for any Diminution, the Prepetition Secured Parties shall receive a superpriority-expense claim allowed under section 507(b) of the Bankruptcy Code (the "Prepetition Secured Parties' Superpriority Claim") against all assets of their respective Encumbered DST Debtor's estate. The Prepetition Secured Parties' Superpriority Claim shall have priority over any and all other unpaid administrative expenses now existing or hereafter arising, of any kind whatsoever, of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 or 1114 of the Bankruptcy Code, and shall at all times be senior to the rights of their respective  Encumbered DST Debtor, any successor trustee or any creditor in the Chapter 11 Case or any subsequent proceedings under the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other nonconsensual lien, levy or attachment; provided, however, that the Prepetition Secured Parties' Superpriority Claim shall be subject to the Carve Out, the DIP Superpriority Claims and the Permitted Liens.

15.   **Perfection of Adequate Protection Liens.**  This Interim Order shall be sufficient and conclusive evidence of the creation, validity, perfection, and priority of all liens granted herein, including the Adequate Protection Liens, without the necessity of filing or recording any financing statement, mortgage, deed of trust, notice, or other instrument or document that may otherwise be

required under the law or regulation of any jurisdiction or the taking of any other action (including

entering into any deposit-account control agreement) to validate or perfect (in accordance with

applicable non-bankruptcy law) the Adequate Protection Liens or to entitle the Prepetition Secured

Parties to the priorities granted herein. Notwithstanding the foregoing, the Prepetition Secured

Parties are authorized, but not required, to file, as each deems necessary or advisable, such

financing statements, security agreements, mortgages, notices of liens and other similar documents

to perfect or otherwise evidence the Adequate Protection Liens in accordance with applicable non-

bankruptcy law, and all such financing statements, mortgages, notices, and other documents shall

be deemed to have been filed or recorded as of the Petition Date; provided, however, that no such

filing or recordation shall be necessary or required in order to create or perfect the Adequate

Protection Liens. The Prepetition Secured Parties may, in their respective sole discretion, file an

electronic copy or photocopy of this Interim Order as a financing statement with any filing or

recording office or with any registry of deeds or similar office in addition to or in lieu of such

financing statements, notices of lien, or similar instruments.

16.      **Modification of DIP Credit Agreement.**  The Debtors and the DIP Lender are

hereby authorized to implement, in accordance with the terms of the DIP Credit Agreement, any

non-material modifications of the DIP Credit Agreement without further notice, motion, or

application to, order of, or hearing before, this Court. Any material modification or amendment to

the DIP Credit Agreement shall only be permitted pursuant to an order of this Court, after being

submitted to this Court on five (5)  days' notice to the U.S. Trustee and the Prepetition Secured

Parties; provided, however, that any forbearance from, or waiver of, (a) a breach by the Debtors

of a covenant representation or any other agreement or (b) a default or an Event of Default, in each

case under the DIP Credit Agreement, shall not require an order of this Court. In the event of any

inconsistency between this Interim Order and the DIP Credit Agreement, this Interim Order shall control.

17.     **DIP Facility Reporting.**  Except as otherwise provided herein or approved by the DIP Lender in its reasonable discretion, the proceeds from the DIP Facility shall be used only in compliance with the terms of the DIP Credit Agreement and in accordance with the Approved Budget subjected to Permitted Variances. The Debtors shall comply with the reporting requirements and obligations set forth in the DIP Credit Agreement.

18.     **Modification of Automatic Stay.**  The automatic stay of section 362 of the Bankruptcy Code is hereby modified to the extent necessary to permit the Debtors, the DIP Lender, and, as applicable, the Prepetition Secured Parties to accomplish the transactions contemplated by this Interim Order.

19.     **Proceeds of Subsequent Financing.**  If any of the Debtors, any trustee, any examiner, or any responsible officer subsequently appointed in any of these Chapter 11 Cases  or any Successor Case, shall obtain credit or incur debt pursuant to sections 364(b), 364(c), or 364(d) of the Bankruptcy Code in violation of the DIP Credit Agreement or otherwise at any time prior to the indefeasible repayment in full in cash of all DIP Obligations (other than unasserted contingent obligations that expressly survive termination of the DIP Credit Agreement) and the termination of the DIP Lender's obligation to extend credit under the DIP Facility, then, after satisfaction of the Carve Out, and unless otherwise agreed by the DIP Lender, all cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Lender to be distributed in accordance with this Interim Order and the DIP Credit Agreement until all DIP Obligations are satisfied in full.

20.     **Payments Held in Trust.**  Except as expressly permitted in this Interim Order

including in the Approved Budget, the DIP Credit Agreement, or otherwise ordered by this Court, including in respect of the Carve Out and the Permitted Liens, if any person or entity receives any payment on account of a security interest in the DIP Collateral or receives any DIP Collateral or any proceeds of DIP Collateral prior to indefeasible payment in full in cash of all DIP Obligations under the DIP Credit Agreement and termination of the DIP Facility in accordance with the DIP Credit Agreement, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of DIP Collateral in trust and shall immediately turn over such proceeds to the DIP Lender for application in accordance with this Interim Order, the DIP Credit Agreement, or the applicable DIP Documents.

21.     **Maintenance of DIP Collateral.**  Until the payment in full of the DIP Obligations, the Debtors shall, except as otherwise agreed to by the DIP Lender in writing (email being sufficient): (i) insure the DIP Collateral as required under the DIP Credit Agreement; and (ii) maintain the cash-management system consistent with the terms and conditions of any order(s) governing the Debtors' cash-management systems and the DIP Credit Agreement.

22.     **Right to Credit Bid.**  Subject to section 363(k) of the Bankruptcy Code, the DIP Lender may credit bid all or any portion of its DIP Liens up to the amount of the DIP Obligations, in connection with any proposed sale of any, all, or substantially all of the Debtors' assets, whether occurring pursuant to section 363 of the Bankruptcy Code or included as part of a reorganization plan under section 1123 of the Bankruptcy Code, including a plan subject to confirmation under section 1129(b)(2)(A)(ii) of the Bankruptcy Code, or a sale or disposition by a chapter 7 trustee for any of the Debtors under section 725 of the Bankruptcy Code. In connection with any such credit bid by the DIP Lender, the Debtors shall, upon reasonable advance notice by the DIP Lender, provide for the assignment of such DIP Lender's right to purchase the acquired assets to one or

more of the applicable DIP Lender's subagents or a newly formed acquisition vehicle.

23.    **DIP Termination Event; Exercise of Remedies.**

a.    **DIP Termination Event.**  For purposes of this Interim Order, the term "<u>DIP</u>

<u>Termination Event</u>" shall mean:

(i)    the occurrence of the Maturity Date,

(ii)    the occurrence of any Event of Default under the DIP Credit
Agreement or this Interim Order; or

(iii)    the acceleration of the DIP Obligations or termination of the
DIP Commitment in accordance with the terms of the DIP
Credit Agreement or the other DIP Documents.

b.    **Exercise of Remedies.**  Upon the occurrence of a DIP Termination Event,

without further notice to, hearing of, application to, or order from this Court, the automatic

stay provisions of section 362 of the Bankruptcy Code shall be vacated and modified to the

extent necessary to permit the DIP Lender to take any of the following actions, at the same

or different time: (i) deliver a written notice (which may be via email) to counsel for the

Debtors, counsel for the Prepetition Secured Parties, the U.S. Trustee, and counsel for the

Creditors' Committee (if any) (the "<u>Remedies Notice</u>") declaring the occurrence of a DIP

Termination Event (such date, the "<u>DIP Termination Declaration Date</u>") and deliver a

Carve Out Trigger Notice; (ii) declare the termination, reduction or restriction of any

commitments under the DIP Facility (including the DIP Commitment) to the extent any

such commitment remains; (iii) declare all DIP Obligations to be immediately due and

payable, without presentment, demand or protest or other notice of any kind, all of which

are expressly waived by the Debtors; (iv) declare the termination, restriction or reduction

of the DIP Facility and the DIP Credit Agreement as to any further liability or obligation

thereunder, but without affecting the DIP Liens, the DIP Superpriority Claims, or the DIP

Obligations; (v) charge default interest at the default rate set forth in the DIP Credit Agreement; and (vi) declare the termination, restriction, or revocation of the ability of the Debtors to use of the DIP Lender's Cash Collateral.

c.      **Waiting Period Procedures.**  The Debtors may seek an emergency hearing solely during the period beginning on the DIP Termination Declaration Date and prior to the expiration of the five (5) business days following the DIP Termination Declaration Date (such period, the "Waiting Period").  If, however, the Debtor files a request for an emergency hearing during the Waiting Period and a hearing cannot be scheduled prior to the expiration of the Waiting Period, the Waiting Period shall be deemed automatically extended until such time as the matter can be heard by the Court. At any hearing regarding a Remedies Notice, the Court may only consider (i) whether a DIP Termination Event occurred or is continuing, and (ii) a request by the Debtors for non-consensual use of the DIP Lender's Cash Collateral. During the Waiting Period, the Debtors shall continue to have the right to use DIP Collateral (including Cash Collateral) only for payroll and other expenses critical to maintain the business of the Debtors' operating in accordance with the terms of this Interim Order and the Approved Budget.

d.      **Rights and Remedies Following Termination Date.**  Following a DIP Termination Declaration Date and the expiration of the Waiting Period, unless this Court has entered an order prior to the expiration of the Waiting Period finding that a DIP Termination Event has not occurred or is not continuing, the DIP Lender is hereby granted relief from the automatic stay of Bankruptcy Code section 362, without further notice, hearing, motion, order or other action of any kind, to exercise all rights and remedies against the DIP Collateral in accordance with this Interim Order, the DIP Credit Agreement,

26

the other DIP Documents (if any), and applicable law.

24.     **No Waiver by Failure to Seek Relief.**  The rights and remedies of the DIP Lender specified herein are cumulative and not exclusive of any rights or remedies that the DIP Lender may have under this Interim Order, the DIP Credit Agreement, applicable law, or otherwise. The failure or delay on the part of the DIP Lender to seek relief or otherwise exercise its rights and remedies under this Interim Order, the DIP Credit Agreement, or applicable law shall not constitute a waiver of any of its respective rights.  Except as expressly set forth herein, none of the rights or remedies of the DIP Lender under this Interim Order, the DIP Credit Agreement shall be deemed to have been amended, modified, suspended, or waived unless such amendment, modification, suspension, or waiver is express, in writing and signed by the DIP Lender.  No consents required hereunder by the DIP Lender shall be implied by any inaction or acquiescence by the DIP Lender.

25.     **Carve Out.**

a.      **Priority of Carve Out.**  The DIP Liens, Prepetition Liens, Adequate Protection Liens, the DIP Superpriority Claims, and Prepetition Secured Parties' Superpriority Claim shall be subject and subordinate to payment of the Carve Out. The Carve Out shall be senior to all claims and liens over all assets of the Debtors, including any DIP Collateral, as set forth in the DIP Orders.  The Carve Out is a lien subordination agreement, not a limitation on the allowance or payment of Professional Fees.

b.      **Carve Out.**  The term "Carve Out" shall mean the sum of (i) all unpaid fees required to be paid to the Clerk of the Court and to the United States Trustee under 28 U.S.C. § 1930(a)(6), together with any interest thereon pursuant to 31 U.S.C. § 3717 ("Statutory Fees"), which shall not be subject to the Approved Budget; (ii) Court-allowed

27

fees and expenses of a trustee appointed under section 726(b) of the Bankruptcy Code in

an amount not to exceed $100,000, (iii) subject to the terms and conditions of this Interim

Order, to the extent allowed at any time, whether by interim order, procedural order,

or otherwise, the reasonable unpaid fees and expenses (the "Professional Fees") incurred

by persons or firms retained by the Debtors pursuant to sections 327, 328, or 363 of the

Bankruptcy Code (the "Debtor Professionals") or, if a patient care ombudsman

(the "PCO") is appointed by order of this Court, by the PCO pursuant to section 327, 328,

or 333 of the Bankruptcy Code in an amount not to exceed $100,000 (together with

the PCO, the "PCO Professionals") or persons or firms retained by the Creditors'

Committee (if any) pursuant to sections 328 or 1103 of the Bankruptcy Code (together with

the Debtor Professionals and PCO Professionals, the "Professional Persons") that are

incurred at any time before or on the first calendar day following delivery by the DIP

Lender of a Carve Out Trigger Notice, to the extent permitted by the Approved Budget

(plus the allowed 20% variance of such amounts budgeted for each respective Professional

Persons) and are allowed by the Court under sections 327, 330, or 363 of the Bankruptcy

Code (whether allowed by the Court prior to or after delivery of a Carve Out Trigger

Notice) and remain unpaid after application of any retainers being held by such

Professional Persons (the "Pre-Trigger Date Fees"); and (iv) allowed Professional Fees of

Professional Persons in an aggregate amount not to exceed $2,500,000 incurred after the

first calendar day following delivery by the DIP Lender of the Carve Out Trigger Notice

(the "Trigger Date"), to the extent allowed by the Bankruptcy Court at any time, whether

by interim order, procedural order, or otherwise (the amounts set forth in this clause

(iv) being the "Post-Carve Out Trigger Notice Cap"); provided, however, that for the

purposes of the foregoing, any plan-success fee, financing fee, transaction fee, or other similar contingency fee shall not be included in the Pre-Trigger Date Fees or Post-Carve Out Trigger Notice Cap and shall be paid, to the extent allowed, pursuant to any confirmed plan in these Chapter 11 Cases. No amounts set forth in this subparagraph with respect to the Carve Out may be modified without the prior written consent of the DIP Lender. For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Lender or its counsel to the Debtors, their lead restructuring counsel, the Prepetition Secured Parties, the Office of the U.S. Trustee, and counsel to the Creditors' Committee (if any), which notice may be delivered following the occurrence or during the continuation of a DIP Termination Event and acceleration of the DIP Loans under and as such terms are defined in the DIP Credit Agreement, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

c.      **Payment of Allowed Professional Fees Prior to the Trigger Date.**  Any payment or reimbursement made prior to the occurrence of the Trigger Date in respect of any allowed Professional Fees shall not reduce the Carve Out.

d.      **Carve Out Account.**  As soon as reasonably practicable following entry of this Interim Order for any unfunded and accrued fees and expenses as of the date thereof, and each week thereafter, the Debtors shall fund into a segregate account (the "Carve Out Account"), not subject to the control of the DIP Lender or the Prepetition Secured Parties for each Professional Person for such week up to the lesser of (i) 120% of the amounts set forth in the Approved Budget for such Professional Person, and (ii) the actual fees incurred for such Professional Person. Amounts in the Carve Out Account shall be adjusted monthly based on the actual fee statements of the Professional Persons with balances reported to the

DIP Lender in the periodic financial reports required under the DIP Credit Agreement. The Debtors shall be authorized to use funds held in the Carve Out Account solely to pay Professional Fees of the Professional Persons, as they become allowed, due and payable; provided, however, that the Debtors' obligations to pay allowed professional fees shall in no way be limited to funds held in the applicable Carve Out Account.

e.     The Carve Out Trigger Notice shall constitute a demand to the Debtors to utilize and transfer all the Debtors' cash on hand as of such date or as subsequently received to the Carve Out Account in an amount of cash equal to the remaining unfunded portion of the Carve Out as of the Carve Out Trigger Notice. Neither the DIP Lender nor any of the Prepetition Secured Parties shall sweep or foreclose any cash on hand or subsequent cash of the Debtors (including cash received as a result of the sale or other disposition of any assets) until the Carve Out Account has been fully funded or deemed fully funded in an amount equal to all remaining unfunded portions of the Carve Out as required hereunder, including the Post-Carve Out Trigger Notice Cap.

f.     **Carve Out Draw.** Subject to exhaustion of the DIP Commitment, and subject to the applicable terms of the DIP Documents, the Debtors shall be permitted to draw on the DIP Facility in the amount not to exceed $2,500,000 solely to fund the Carve Out Account in an amount not to exceed the remaining unfunded portions of the Carve Out. Any Carve Out Trigger Notice shall be deemed a consent by the DIP Lender to authorize the Debtors to deposit Cash Collateral or DIP Facility proceeds into the Carve Out Account in an amount equal to the unfunded portion of the sum of the Post-Carve-Out Trigger Notice Cap and any Pre-Trigger Date Fees that have not already been deposited in the Carve Out Account.

g.      Notwithstanding anything contained herein to the contrary, funds transferred to the Carve Out Account (i) shall be held in trust exclusively for the benefit of the Professional Persons, including with respect to obligations arising under the Carve Out, and (ii) shall not be subject to any liens or claims granted to the DIP Lender or any other creditors and shall not constitute DIP Collateral or Prepetition Collateral.

h.      **No Direct Obligation to Pay Professional Fees;  No Waiver of Right to Object to Fees.**  The DIP Lender shall not be responsible for the direct or indirect payment or reimbursement of any fees or disbursements of any of the Professional Persons incurred in connection with these Chapter 11 Cases  or any Successor Case under any chapter of the Bankruptcy Code.  Nothing in the DIP Orders or otherwise shall be construed to obligate the DIP Lender in any way to pay compensation to, or to reimburse expenses of, any of the Professional Persons, or to guarantee that the Debtors or their estates have sufficient funds to pay such compensation or reimbursement.  Nothing herein shall be construed as consent to the allowance of any fees or expenses of Professional Persons of any of the Debtors, the Creditors' Committee (if any), any other official or unofficial committee in these Chapter 11 Cases or any Successor Case, or of any other person or entity, or shall affect the right of the DIP Lender to object to the allowance and payment of any such fees and expenses.

26.      **Approval of DIP Fees.**  In consideration for the DIP Facility, the DIP Lender shall be paid all fees, expenses and other amounts payable under the DIP Credit Agreement as such become due, including, without limitation, the Commitment Fee, the Exit Fee, and the Break-Up Fee, each of which is fully earned, non-refundable, payable in accordance with the terms of the DIP Credit Agreement, approved and allowed on a final basis upon entry of this Interim Order,

31

(all such fees, together, the "DIP Fees"), and subject to paragraph 27, the reasonable and documented fees and expenses of the DIP Lender in connection with the DIP Facility (the "DIP Lender Expenses"). The DIP Fees and DIP Lender Expenses shall be part of the DIP Obligations and secured by the DIP Liens on DIP Collateral and all other security provided under the DIP Documents.  Notwithstanding anything herein to the contrary, upon entry of this Interim Order, all reasonable and documented out-of-pocket DIP Lender Expenses incurred prior to the Closing Date shall be paid on the Closing Date, without the need to first deliver a copy of its invoice or otherwise comply with paragraph 27.

27.     **DIP Lender's Professionals' Fees.**  The Debtors are obligated to pay all reasonable and documented out-of-pocket DIP Lender Expenses related to the DIP Facility, including the preparation, execution, delivery, administration, and exercise of any remedies related to the DIP Documents, this Interim Order, the Final Order, and any other agreements, instruments, pleadings, or other documents prepared or reviewed in connection with any of the foregoing, whether or not any or all of the transactions contemplated hereby or by the DIP Documents are consummated. Professionals for the DIP Lender (Foley & Lardner, LLP, and such other professionals as the DIP Lender determines necessary, the "DIP Lender's Professionals"), shall provide summary copies of any invoices (which shall not be required to contain time entries/narratives and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney- client privilege, the attorney work-product doctrine or any other evidentiary privilege or protection recognized under applicable law) with: (i) a summary of the work performed during the relevant compensation period; (ii) the name of, hourly rate (if applicable) of, and number of hours

worked by each professional and paraprofessional who worked on the matter during the relevant compensation period; and (iii) the total fee amount being requested by electronic mail to the Debtors, U.S. Trustee, and counsel to the Creditors' Committee (if appointed).  The Debtors shall promptly pay in full all such invoiced fees and expenses at the conclusion of the Review Period (defined below) other than any Disputed Invoiced Fees (defined below).  Any objections raised by the Debtors, the U.S. Trustee, or the Creditors' Committee with respect to such invoices shall be subject to the Complex Case Procedures, Section D, paragraph 14(c) regarding notice parties and reasonableness (the "Disputed Invoiced Fees") must be in writing and state with particularity the grounds therefor and must be submitted to the applicable professional within ten (10) days of the receipt of such invoice (the "Review Period"); provided, however, that any failure by such party to raise a Disputed Invoiced Fee during the applicable Review Period shall constitute a waiver of any rights of such party to object to the applicable invoice.  Upon delivery of the Disputed Invoiced Fee, the DIP Lender's Professionals and the objecting party shall meet and confer in good faith to resolve the objection for a period of not less than five (5) days, to be followed by the filing with this Court, if necessary, of a motion or other pleading, with at least ten (10) days' prior written notice by the submitting party of any hearing on such motion or other pleading.  No DIP Lender's Professionals shall be required to file an application seeking compensation for services or reimbursement of expenses with this Court.

28.    **Indemnification.**  The DIP Lender (and its affiliates and respective officers, directors, employees, attorneys, advisors, and agents, solely in such capacity) (each such person, an "Indemnitee") will have no liability for, and will be indemnified and held harmless by the Debtors and their estates against, any losses, claims, damages, liabilities, or expenses incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof,

except to the extent they are found by a final, non-appealable judgment of a court of competent jurisdiction to arise from the gross negligence, bad faith, actual fraud, or willful misconduct of the relevant indemnified person (or any of its affiliates or any of its or its respective officers, directors, employees, advisors or agents). Such indemnity shall not be available (i) to the extent arising from a material breach of any obligation of such Indemnitee under the DIP Credit Agreement, or (ii) to the extent arising out of any loss, claim, damage, liability, or expense that does not involve an act or omission of the Debtors and that is brought by an Indemnitee against another Indemnitee.

29.     **Proofs of Claim.**  The DIP Lender shall not be required to file a proof of claim in these Chapter 11 Cases  or Successor Case, and the entry of this Interim Order shall be deemed to constitute a timely filed proof of claim. Any order entered by this Court in relation to the establishment of a bar date for any claim (including without limitation, administrative claims) in these Chapter 11 Cases  or Successor Case shall not apply to the DIP Lender. Notwithstanding the foregoing, the DIP Lender may, in its sole discretion, file (and amend or supplement) a proof of claim or aggregate proofs of claim in these Chapter 11 Cases  for any claim allowed herein.

30.     **Use of DIP Proceeds.**  Without in any way limiting the foregoing, no DIP Collateral, DIP Loans, Cash Collateral, proceeds of any of the foregoing, any portion of the Carve Out, or any other cash or funds may be used, directly or indirectly, by any of the Debtors, any official committee appointed in these Chapter 11 Cases , or any trustee or other estate representative appointed in these Chapter 11 Cases  (or any Successor Case) or any other person or entity (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith): (i) to object to, contest, prevent, hinder, delay, or interfere with, in any way, the DIP Lender's enforcement or realization on any of the DIP Collateral, or Cash Collateral, following the occurrence and continuation of a DIP Termination Event; or (ii) to investigate (including by way

34

of examinations or discovery proceedings, whether formal or informal), prepare, assert, join, commence, support, or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination, or similar relief against, or adverse to the interests of, in any capacity, the DIP Lender, and each of its respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees, past, present and future, and their respective heirs, predecessors, successors and assigns (in each case, in their respective capacities as such) with respect to any transaction, occurrence, omission, action, or other matter arising under, in connection with, or related to the Interim DIP Order, the DIP Facility, the DIP Documents, the DIP Obligations, any claim or cause of action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the DIP Obligations, the DIP Liens, the DIP Documents.

31.    **Releases.**  Subject to entry of a Final Order, the Debtors, on their own behalf and on behalf of their estates, forever and irrevocably: (i) release, discharge, and acquit the DIP Lender and each of its respective former or current officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest, in each case solely in their capacity as such, from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, of every type, including, without limitation, any so-called "lender-liability" or equitable subordination claims or defenses, solely with respect to or relating to the negotiation of and entry into the DIP Credit Agreement the other DIP Documents; and (ii) waive, discharge and release any and all defenses (including, without limitation, offsets and

counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability, and avoidability of the DIP Liens and the DIP Obligations.

32.    **Waivers.**

a.    **Limitation on Charging on Expenses.**  Subject to entry of the Final Order, no costs or expenses of administration of these Chapter 11 Cases  or any Successor Case shall be charged against or recovered from or against the DIP Lender with respect to the DIP Collateral pursuant to section 105 or section 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the DIP Lender.

b.    **No Marshaling.**  Subject to entry of the Final Order, in no event shall the DIP Lender be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the DIP Obligations and all proceeds shall be received and applied in accordance with this Interim Order and the DIP Credit Agreement; provided, however, to the extent the DIP Lender exercises remedies after a DIP Termination Event and as practicable, the DIP Lender stipulates to using commercially reasonable efforts to collect from DIP Collateral commercial-tort claims before turning to such proceeds thereof; *provided*, for the avoidance of doubt, this limitation on DIP Lender's exercise of remedies shall not be deemed a modification of Section 2.3 of the DIP Credit Agreement.

33.    **No Lender Liability.**  In determining to make any loan (whether under the DIP Credit Agreement or otherwise) or to permit the use of Cash Collateral, neither the DIP Lender nor any Prepetition Secured Party shall owe any fiduciary duty to the Debtors or their respective creditors, stakeholders, or estate, and neither the DIP Lender nor any Prepetition Secured Party shall be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors by

virtue of making the DIP Loans or allowing use of their Cash Collateral. Furthermore, nothing in this Interim Order shall impose or allow the imposition upon the DIP Lender or the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors.

34.     **Limitation of Liability.**  Nothing in this Interim Order, the DIP Credit Agreement, the Prepetition Loan Documents, or any other documents related to these transactions shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lender or any Prepetition Secured Party of (i) any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their business, or in connection with their restructuring efforts or (ii) any fiduciary duties to the Debtors, their respective creditors, stakeholders, or estates. The DIP Lender shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the DIP Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency, or other person and all risk of loss, damage, or destruction of the DIP  Collateral shall be borne by the Debtors.

35.     **Allocation Protocol; Professional Fees; DIP Ledger.**  The Allocation Protocol described in the Motion.  The Debtors shall maintain a DIP Ledger tracking (i) use of DIP Loan proceeds and (ii) allocation of Enterprise Benefits by Debtor.

36.     **Preservation of Rights; Plan True-Up**.  Nothing in this Interim Order fixes a final allocation of intercompany claims and the DIP Obligations among the Debtors.  All rights of parties in interest to challenge the interim allocations and seek a different final allocation are preserved and shall be determined in connection with confirmation of a chapter 11 plan (or by separate Court order upon notice and a hearing).  Such reservation shall not affect the DIP Lender's rights or

remedies, including the DIP Liens, DIP Collateral, DIP Superpriority Claims, the DIP Obligations, or the priority of the Carve Out.

37. **No Third-Party Beneficiaries.**    Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any Professional Person, third party, creditor, landlord, lessor, equity holder, or any direct, indirect, or incidental beneficiary.

38. **Insurance Proceeds and Policies.**    The DIP Lender shall be, and shall be deemed to be, without any further action or notice, named as an additional insured and loss payee on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral, subject to the priority rights of Prepetition Secured Parties with respect to their respective Prepetition Collateral.

39. **No Waivers or Modifications of Interim Order.**    The Debtors have agreed not to and shall not seek any modification or extension of this Interim Order without the prior written consent of the DIP Lender, and no such consent shall be implied by any other action, inaction, or acquiescence of the DIP Lender.

40. **Binding Effect of this Interim Order.**    Immediately upon entry of this Interim Order by this Court, the terms and provisions of this Interim Order shall become valid and binding upon and inure to the benefit of the Debtors, the DIP Lender, the Prepetition Secured Parties, all other stakeholders of any of the Debtors, the Creditors' Committee, and all other parties in interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in these Chapter 11 Cases , any Successor Case, or upon dismissal of any of these Chapter 11 Cases  or any Successor Case; provided, however, that the DIP Lender shall not have any obligation to permit the use of DIP Collateral (including DIP Cash Collateral) by or extend

any financing to any chapter 7 trustee, chapter 11 trustee or similar responsible person appointed for the Debtors' estates.

41.     **Investment Trust Intent.**  The borrowing by the Debtors and pledging of the DIP Collateral by the Debtors in connection with the DIP Financing is intended solely to protect and conserve the property and assets held by such Debtors and to preserve their value, and is not intended to evidence or permit the conduct of an active trade or business by any Debtor or otherwise adversely affect any Debtor's intended classification for U.S. federal income tax purposes as an investment trust pursuant to Treasury Regulation Section 301.7701-4(c).

42.     **Discharge.**  Except as otherwise agreed in writing by the DIP Lender, the DIP Obligations shall not be discharged by the entry of an order confirming any plan of reorganization or liquidation in any of these Chapter 11 Cases , notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless the DIP Obligations have been indefeasibly paid in full in cash, on or before the effective date of such confirmed plan.

43.     **Survival.**  This Interim Order, the terms of the DIP Documents, and any actions taken pursuant hereto shall survive entry of any order that may be entered: (i) confirming any chapter 11 plan in any of these Chapter 11 Cases ; (ii) converting any of these Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code; (iii) dismissing any of these Chapter 11 Cases or any Successor Case; or (iv) pursuant to which this Court abstains from hearing these Chapter 11 Cases  or Successor Case.  The terms and provisions of this Interim Order and the DIP Documents, including the claims, liens, security interests and other protections granted to the DIP Lender pursuant to this Interim Order and the DIP Documents, and the adequate protection provided to the Prepetition Secured Parties pursuant to this Interim Order,]shall continue in these Chapter 11 Cases or any Successor Case including following dismissal of any of these Chapter 11

Cases or any Successor Case in any court of competent jurisdiction, and shall maintain their priority as provided by this Interim Order until, in respect of the DIP Facility, all the DIP Obligations, pursuant to the DIP Documents and this Interim Order, have been paid in full (such payment being without prejudice to any terms or provisions contained in the DIP Facility, which survive such discharge or dismissal by their terms).  In the event of dismissal or conversion of these Chapter 11 Cases or any Successor Case, the terms of this Interim Order including the indemnification of the DIP Lender shall survive and continue, and shall not be modified by Bankruptcy Code sections 348 or 349, or otherwise, until the indefeasible repayment of all DIP Obligations are satisfied in full, which remedies may be exercised in this Court or any other court of competent jurisdiction.

44.    **Necessary Actions.**  The Debtors are authorized and directed to take such actions as are reasonable or appropriate to implement the terms of this Interim Order and the DIP Credit Agreement.

45.    **Enforceability.**  This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable immediately upon entry thereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), or 7062, any applicable Local Rules, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable, by this and any other court of competent jurisdiction, upon its entry, and there shall be no stay of execution or effectiveness of this Interim Order.

46.    **Interim Order Controls.**  In the event of any conflict between or among the terms or provisions of this Interim Order and the DIP Credit Agreement, the terms and provisions of this Interim Order shall govern and control.

40

47.    **Headings.**  All paragraph headings used in this Interim Order are for ease of reference only and shall not affect the construction or interpretation hereof.

48.    **Retention of Jurisdiction.**  This Court retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of the DIP Credit Agreement or this Interim Order, even if these Chapter 11 Cases are converted or dismissed.

49.    **Final Hearing.**  The final hearing (the "Final Hearing") on the Motion shall be held on March 3, 2026, at 1:30 p.m. (prevailing Central Time).  Any objections or responses to the entry of the proposed Final Order shall be filed with the Court and served on the following no later 4:00 p.m. (prevailing Central Time) on February 28, 2026:   (a) Inspired Healthcare Capital Holdings, LLC, c/o Ankura Consulting Group, LLC, 485 Lexington Avenue, 10th Floor, New York, NY 10017 (Attn: M. Benjamin Jones (ben.jones@ankura.com));; (b) proposed counsel to the Debtors, McDermott Will & Schulte LLP, 2801 North Harwood Street, Suite 2600, Dallas, TX 75201 (Attn: Marcus A. Helt (mhelt@mcdermottlaw.com ) and Jack G. Haake (jhaake@mcdermottlaw.com )), and 1180 Peachtree St. NE, Suite 3350, Atlanta, GA 30309 (Attn: Daniel M. Simon (dsimon@mcdermottlaw.com )), and 444 West Lake Street, Suite 4000, Chicago, IL 60606 Carmen Dingman (cdingman@mcdermottlaw.com )); (c) attorneys for the DIP Lender, Foley & Lardner, LLP, 111 Huntington Ave., Boston, MA 02199, Attn: Adrienne K. Walker (awalker@foley.com), Jamie N. Class (jclass@foley.com), and Thomas C. Scannell (tscannell@foley.com); (d) the Office of the United States Trustee, Northern District of Texas, Region 6, 1100 Commerce Street, Room 976, Dallas, TX 75242 (Attn: Susan Hersh (susan.hersh@usdoj.gov)); (e) counsel to the official committee of unsecured creditors (if any) appointed in these Chapter 11 Cases; and (f) any party that has requested notice pursuant to Bankruptcy Rule 2002. (collectively, the "Notice Parties").  If no objections to entry of the Final

Order are filed and served, the Court may enter such Final Order without further notice or hearing.

50.     The Court finds and determines that the requirements of Bankruptcy Rule 6003 are

satisfied and that the relief requested in the Motion is necessary to avoid immediate and irreparable

harm.

51.     Notice of the Motion as provided therein shall be deemed good and sufficient notice

of such Motion and the requirements of Bankruptcy Rule 6004(a), the Local Rules, and the

Complex Case Procedures are satisfied by such notice.

52.     Notwithstanding the applicability of Bankruptcy Rule 6004(h), the terms and

conditions of this Interim Order shall be immediately effective and enforceable upon its entry.

53.     All time periods set forth in this Interim Order shall be calculated in accordance

with Bankruptcy Rule 9006(a).

Prepared and presented by:

/s/ *Marcus A. Helt*
Marcus A. Helt (TX 24052187)
Jack G. Haake (TX 24127704)
**MCDERMOTT WILL & SCHULTE LLP**
2801 N. Harwood Street, Suite 2600
Dallas, Texas 75201-1574
Telephone:      (214) 295-8000
Facsimile:      (972) 232-3098
Email:          mhelt@mcdermottlaw.com
                jhaake@mcdermottlaw.com

- and -

Daniel M. Simon (admitted *pro hac vice*)
Carmen Dingman (admitted *pro hac vice*)
Landon Foody (admitted *pro hac vice*)
**MCDERMOTT WILL & SCHULTE LLP**
444 West Lake Street, Suite 4000
Chicago, Illinois 60606
Telephone:      (312) 372-2000
Facsimile:      (312) 984-7700
Email:          dsimon@mcdermottlaw.com
                cdingman@mcdermottlaw.com
                lfoody@mcdermottlaw.com

*Proposed Counsel for the Debtors and*
*Debtors-in-Possession*

**EXHIBIT 1**

**<u>DIP Credit Agreement</u>**

**SENIOR SECURED, SUPERPRIORITY DEBTOR IN POSSESSION
LOAN AND SECURITY AGREEMENT**

**AMONG**

**INSPIRED HEALTHCARE CAPITAL HOLDINGS, LLC,**

**AND THE OTHER BORROWERS AND GUARANTORS PARTY HERETO, AND**

**LAPIS MUNICIPAL OPPORTUNITIES FUND V LP**

**FEBRUARY [ ], 2026**

# TABLE OF CONTENTS

**Page**

**1.**   DEFINITIONS AND CONSTRUCTION ................................................................ 2

    1.1   Definitions ........................................................................................................ 2
    1.2   Accounting Terms ........................................................................................... 13
    1.3   UCC ................................................................................................................. 14
    1.4   Construction .................................................................................................... 14
    1.5   Schedules and Exhibits ................................................................................... 14
    1.6   Timing of Payment or Performance ................................................................ 14

**2.**   LOAN AND TERMS OF PAYMENT ................................................................ 15

    2.1   Agreement to Lend; Promise to Pay; Delayed Draw; Security Documents; and Loan
           Documents ....................................................................................................... 15
    2.2   Borrowing Procedures ..................................................................................... 15
    2.3   Payments; Reductions of the Commitments; Prepayments ............................ 16
    2.4   Interest Rates and Rates, Payments and Calculations ..................................... 18
    2.5   Crediting Payments; Clearance Charge ........................................................... 19
    2.6   Designated Account ......................................................................................... 19
    2.7   Statements of Obligations ................................................................................ 19
    2.8   Fees .................................................................................................................. 20
    2.9   Borrower Representative; Assumptions ........................................................... 20

**3.**   CONDITIONS; TERM OF AGREEMENT ........................................................ 21

    3.1   Conditions Precedent to the Effective Date .................................................... 21
    3.2   Conditions Precedent to All Advances ............................................................ 22
    3.3   Maturity ................................................................... **Error! Bookmark not defined.**
    3.4   Effect of Maturity ........................................................................................... 23

**4.**   REPRESENTATIONS AND WARRANTIES ..................................................... 23

    4.1   Due Organization and Qualification ................................................................ 24
    4.2   Due Authorization ........................................................................................... 24
    4.3   Binding Obligations ......................................................................................... 24
    4.4   Title to Properties ............................................................................................ 24
    4.5   Jurisdiction of Formation; Location of Chief Executive Office; Organizational;
           Identification Number ...................................................................................... 24
    4.6   Litigation; Commercial Tort Claims ............................................................... 24
    4.7   Fraudulent Transfer ......................................................................................... 25
    4.8   Guarantors ....................................................................................................... 25
    4.9   Payment of Taxes ............................................................................................ 25
    4.10  Approved Budget ............................................................................................. 25
    4.11  Compliance with Laws ....................................................................................
    4.12  No Other Representations ............................................... **Error! Bookmark not defined.**
    4.13  Full Disclosure ................................................................................................ 25

**5.**      AFFIRMATIVE COVENANTS ................................................................................. 25

     5.1      Notice of Certain Events ....................................................................... 25
     5.2      Reporting; Budget; Conference Calls ................................................... 26
     5.3      Existence .............................................................................................. 27
     5.4      Maintenance of Properties; Permits ..................................................... 27
     5.5      Taxes .................................................................................................... 27
     5.6      Insurance .............................................................................................. 28
     5.7      Inspection ............................................................................................. 28
     5.8      Environmental ...................................................................................... 28
     5.9      Compliance with Laws ........................................................................ 29
     5.10      Disclosure Updates .............................................................................. 29
     5.11      Further Assurances ............................................................................... 29
     5.12      Approved Budget .................................................................................. 29
     5.13      [Reserved]. ........................................................................................... 29
     5.14      [Reserved]. ........................................................................................... 29
     5.15      Material Contracts ................................................................................ 29
     5.16      [Reserved]. ........................................................**Error! Bookmark not defined.**
     5.17      Post-Closing ......................................................................................... 30

**6.**      NEGATIVE COVENANTS ................................................................................. 30

     6.1      Indebtedness. ........................................................................................ 30
     6.2      Liens. ..................................................................**Error! Bookmark not defined.**
     6.3      Restrictions on Fundamental Changes .................................................. 32
     6.4      Disposal of Assets ................................................................................ 32
     6.5      Change Name ....................................................................................... 32
     6.6      Nature of Business ............................................................................... 32
     6.7      Material Leases or Contracts; Amendments ......................................... 32
     6.8      Change of Control ................................................................................ 33
     6.9      Accounting Methods ............................................................................ 33
     6.10      Transactions with Affiliates ................................................................. 33
     6.11      Use of Advances .................................................................................. 33
     6.12      Limitation on Capital Expenditures ..................................................... 33
     6.13      Chapter 11 Cases. ................................................................................. 33
     6.14      Certain Transactions ............................................................................ 33
     6.15      Acquisitions, Loans, or Investments .................................................... 33
     6.16      Payments on Indebtedness .................................................................... 34
     6.17      Distributions or Redemptions ............................................................... 34
     6.18      Formation of Subsidiaries .................................................................... 34

**7.**      EVENTS OF DEFAULT ..................................................................................... 35

     7.1      Event of Default ................................................................................... 35
     7.2      Rights and Remedies ............................................................................ 37
     7.3      Application of Proceeds upon Event of Default ................................... 38
     7.4      Remedies Cumulative .......................................................................... 38
     7.5      Credit Bidding ..................................................................................... 39

**8.**    COLLATERAL SECURITY ............................................................................. 39

    8.1    Grant of Security Interest in the Collateral; DIP Superpriority Claims ........... 39
    8.2    Representations and Warranties in Connection with Security Interest ............. 39
    8.3    Superpriority Nature of Obligations and Liens .................................................. 40
    8.4    Power of Attorney .............................................................................................. 40
    8.5    Lender's Ability to Perform Obligations on Behalf of Borrower with Respect to the Collateral ............................................................................................................ 40
    8.6    Automatic Perfection; Filing of Financing Statements ..................................... 41
    8.7    No Discharge; Survival of Claims ..................................................................... 41

**9.**    WAIVERS; INDEMNIFICATION ............................................................... 41

    9.1    Demand; Protest; etc .......................................................................................... 41
    9.2    Lender's Liability for Collateral ....................................................................... 41
    9.3    Indemnification .................................................................................................. 41

**10.**    NOTICES ....................................................................................................... 42

**11.**    CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER ..................... 43

**12.**    AMENDMENTS; WAIVERS; SUCCESSORS ........................................... 44

    12.1    Amendments and Waivers ................................................................................. 44
    12.2    No Waivers; Cumulative Remedies ................................................................... 44
    12.3    Successors ........................................................................................................... 44

**13.**    GENERAL PROVISIONS .............................................................................. 44

    13.1    Effectiveness ...................................................................................................... 44
    13.2    Section Headings ............................................................................................... 44
    13.3    Interpretation ..................................................................................................... 45
    13.4    Severability of Provisions ................................................................................. 45
    13.5    Debtor-Creditor Relationship ............................................................................ 45
    13.6    Counterparts; Electronic Execution .................................................................. 45
    13.7    Revival and Reinstatement of Obligations ....................................................... 45
    13.8    Lender Expenses ................................................................................................ 45
    13.9    Integration .......................................................................................................... 45

**14.**    JOINT AND SEVERAL OBLIGATIONS; WAIVERS ............................... 45

    14.1    Guaranty. ............................................................................................................ 45

**15.**    ADDITIONAL OBLIGOR .............................................**Error! Bookmark not defined.**

**16.**    TREATMENT OF CERTAIN INFORMATION ......................................... 47

Exhibits
Exhibit A – Interim Order
Exhibit B – Approved Budget

Exhibit C – Compliance Certificate
Exhibit D – Form of Borrowing Notice
Exhibit E – Reporting Requirements

<u>Schedules</u>
Schedule A-1 – Authorized Persons
Schedule A-2 – Payment Account
Schedule A-3 – Milestones
Schedule D-1 – Designated Account and Designated Account Bank
Schedule 1 – Borrowers
Schedule 2 – Pledging Guarantors
Schedule 3 – Non-Pledging Guarantors
Schedule 4.1(a) – Organizational Chart
Schedule 4.4 – Real Property Legal Descriptions
Schedule 4.5 – Jurisdiction, etc.
Schedule 4.6 – Litigation and Commercial Tort Claims
Schedule 4.9 – Taxes
Schedule 4.11 – Maintenance of Properties; Permits

## SENIOR SECURED SUPERPRIORITY DEBTOR IN POSSESSION
## LOAN AND SECURITY AGREEMENT

This SENIOR SECURED SUPERPRIORITY DEBTOR IN POSSESSION LOAN AND SECURITY AGREEMENT (this "Agreement") is made as of February [__], 2026, by and among Inspired Healthcare Capital Holdings, LLC, a Delaware limited liability company ("Holdings"), as a borrower and Borrower Representative (as defined below), and each other borrower identified on Schedule 1 as a "Borrower" and hereafter party as a "Borrower" hereto (individually, a "Borrower" and collectively, the "Borrowers"), each of the guarantors identified on Schedule 2 as a "Pledging Guarantor" and hereafter party as a "Pledging Guarantor" hereto (individually, a "Pledging Guarantor" and collectively, the "Pledging Guarantors"), each of the parties identified on Schedule 3 as a "Non-Pledging Guarantor" and hereafter party as a "Non-Pledging Guarantor" hereto (individually, a "Non-Pledging Guarantor" and collectively, the "Non-Pledging Guarantors", and together with the Pledging Guarantors, each individually, a "Guarantor" and collectively, the "Guarantors"), and Lapis Municipal Opportunities Fund V LP, a Delaware limited partnership (together with its successors and assigns, the "Lender").

## RECITALS

WHEREAS, on February [ ], 2026 (the "Petition Date"), each of the Borrowers and Guarantors (together, the "Obligors") filed a petition under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Northern District of Texas (the "Chapter 11 Cases"). The Borrowers and Guarantors have requested the Lender to provide post-petition financing, as more fully described herein. Subject to the terms and conditions set forth herein, including the provision of a secured guaranty by each of the Pledging Guarantors, and an unsecured guaranty by each of the Non-Pledging Guarantors, the Lender has agreed to provide such post-petition financing.

WHEREAS, the Obligors remain in possession of their respective businesses and manage their respective properties as debtors and debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, each of the Obligors believes that the loans and other financial accommodations to the Obligors under this Agreement will enhance the aggregate borrowing powers of each of Obligors and facilitate the administration of the Chapter 11 Cases and their loan relationship with the Lender, all to the mutual advantage of each of the Obligors;

WHEREAS, each of the Obligors believes that the loans and other financial accommodations provided to the Obligors under this Agreement will preserve the value of the Obligors' businesses and assets during the Chapter 11 Cases;

WHEREAS, the Borrowers have asked the Lender to provide them with a superpriority senior secured non-amortizing debtor in possession credit facility (the "DIP Facility") comprised of term loans, which consist of (a) an aggregate amount of up to $10,000,000 of loans (the "Interim Term Loan") that will be made available to the Borrowers pursuant to Section 2.1(a) in accordance with the Interim Order; and (b) an aggregate amount of up to $25,000,000 of additional loans (the "Delayed Draw Term Loans" together with the Interim Term Loan, the "Loans") that will be made available to the Borrowers in accordance with the Approved Budget (as defined below) pursuant to Section 2.1(a) in accordance with and subject to the entry of the Final Order; and

WHEREAS, to provide for the repayment of the Loans, and the payment of the other Obligations (as defined below) of the Obligors hereunder and under the Loan Documents (as defined below), the Borrowers and Pledging Guarantors will provide and grant to the Lender certain rights and protections

pursuant to the terms hereof, security interests and liens pursuant to sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code, and each Obligor will grant to the Lender a superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code, in each case having the relative priorities as set forth in the DIP Orders, and other rights and protections as more fully described herein and in the DIP Orders.

NOW, **THEREFORE**, in consideration of the premises and of the mutual covenants and agreements contained herein, the parties hereto hereby agree as follows:

1.      **DEFINITIONS AND CONSTRUCTION.**

1.1      <u>**Definitions**</u>.  As used in this Agreement, the following terms shall have the meanings set forth below:

"<u>Acceptable Plan</u>" means a plan of reorganization or liquidation in one or more Chapter 11 Cases that is either (a) approved by Lender in its sole and absolute discretion, or (b) provides for (i) the indefeasible payment in full in cash of the Obligations in exchange for full discharge thereof, on or prior to the effective date of such plan (which effective date shall be on or prior to the Maturity Date) as a condition to the effectiveness thereof, and (ii) releases, exculpations, waivers and indemnification for Lender in form and substance consistent with this Agreement, to the maximum extent permitted by applicable law.

"<u>Additional Documents</u>" has the meaning set forth in <u>Section 5.11</u>.

"<u>Adequate Protection Liens</u>" has the meaning set forth in the DIP Orders.

"<u>Advance</u>" and "<u>Advances</u>" have the meaning set forth in Section 2.1.

"<u>Affiliate</u>" means, as to any Person, any other Person (a) that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Person, (b) who is a director or officer (i) of such Person, (ii) of any Subsidiary of such Person, or (iii) of any Person described in clause (a) above with respect to such Person, or (c) which, directly or indirectly through one or more intermediaries, is the beneficial or record owner (as defined in Rule 13d-3 of the Securities Exchange Act of 1934, as amended, as the same is in effect on the Effective Date) of ten percent (10%) or more of any class of the outstanding voting equity interests, securities or other equity or ownership interests of such Person.  For purposes of this definition, the term "control" (and the correlative terms, "controlled by" and "under common control with") shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies, whether through ownership of securities or other interests, by contract or otherwise.

"<u>Agreement</u>" has the meaning set forth in the preamble to this Agreement.

"<u>Approved Budget</u>" means (a) the initial budget, prepared by Borrowers and Pledging Guarantors, for a 9-month period commencing as of the week of on which the Petition Date occurs, that sets forth in reasonable detail all of Obligors' projected receipts and disbursements on a weekly basis, including the anticipated weekly uses of the proceeds of the DIP Facility and Cash Collateral for such period, which shall include, among other things, available cash, cash flow, trade payables and ordinary course expenses, total expenses, fees and expenses relating to the DIP Facility, fees and expenses related to the Chapter 11 Cases (including Professional Fees), and working capital and other general corporate needs (and shall contain the categories set forth in the initial Approved Budget commencing on the Petition Date and attached hereto as Exhibit B) separated into line items for each category of receipt or disbursement as set forth in the initial Approved Budget (each, a "<u>Reporting Category</u>") and (b) an amended or otherwise modified budget

adopted with the written consent of Lender in its sole discretion; provided that the total amount of Loans provided pursuant to such amended Approved Budget shall not exceed the total amount of the Commitments authorized by the DIP Orders.

"Authorized Person" means any of the individuals identified on Schedule A-1, which may be updated from time to time by written notice from Borrower Representative to Lender.

"Avoidance Actions" means any and all avoidance, recovery, subordination, derivative, or other claims, actions or remedies that may be brought by or on behalf of one or more of the Obligors or their estates or other authorized parties in interest under the Bankruptcy Code or other applicable law, including actions or remedies under Sections 5.02(d), 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code or under similar, related, or comparable state or federal statutes or common law, including fraudulent transfer laws, or under other applicable law.

"Bankruptcy Code" has the meaning set forth in the recitals to this Agreement.

"Bankruptcy Court" has the meaning set forth in the recitals to this Agreement.

"Borrower Representative" has the meaning set forth in Section 2.9 of this Agreement.

"Borrowers" has the meaning set forth in the preamble to this Agreement.

"Borrowing Notice" has the meaning set forth in Section 2.2.

"Break-Up Fee" means the fee equal to two percent (2.00%) of the Commitment Amount (i.e., $700,000.00).

"Business Day" means any day that is not a Saturday, Sunday, or other day on which banks are authorized or required to close in the State of New York.

"Capital Expenditures" means, with respect to any Person for any period, the aggregate of all expenditures by such Person during such period that are capital expenditures as determined in accordance with GAAP, whether such expenditures are paid in cash or financed.

"Capital Lease" means a lease that is required to be capitalized for financial reporting purposes in accordance with GAAP as in effect prior to the adoption and effectiveness of Accounting Standards Codification No. 842 or any successor or replacement accounting provisions.

"Carve Out" has the meaning set forth in the DIP Orders.

"Carve Out Account" has the meaning set forth in the DIP Orders.

"Cash Collateral" has the meaning set forth in the Bankruptcy Code.

"Change of Control" means the acquisition, through purchase or otherwise (including the agreement to act in concert without anything more), by any Person or group (as such term is used in Section 13(d)(3) of the Securities Exchange Act of 1934, as amended), after the date of this Agreement, of (i) the beneficial ownership, directly or indirectly, of 50% or more of the voting equity interests of Holdings or (ii) all or substantially all of the assets of the Borrowers or the Pledging Guarantors, taken as a whole, except as permitted in this Agreement.

"Chapter 11 Case" and "Chapter 11 Cases" have the meanings set forth in the recitals to this Agreement.

"Challenge" means a claim, cause of action or other challenge or contest of the nature, extent, amount, enforceability, validity, priority or perfection of the DIP Facility or the Obligations or any portion thereof, the Liens on the Collateral securing the Obligations, or the Superpriority Claim in respect of the Obligations, or any claim, defense or cause of action that seeks to avoid, recharacterize, subordinate (whether equitable subordination or otherwise), disgorge, disallow, impair or offset all or any portion of the Obligations, the Liens on the Collateral securing the Obligations, or the Superpriority Claim in respect of the Obligations.

"Collateral" means, all rights, properties and assets of each Borrower and Pledging Guarantor, and collectively, all rights, properties and assets of the Borrowers and Pledging Guarantors, including all personal property, real property (including without limitation all Real Property (defined below)), and Fixtures, in each case, whether now owned or existing or hereafter acquired, created or arising, whether arising before or after the Petition Date, and wherever located, including, without limitation, the following: (a) all General Intangibles, Payment Intangibles, Instruments, Accounts, Documents, Documents of Title, Goods, Inventory, Equipment, Fixtures, Health Care Insurance Receivables, Commercial Tort Claims, Chattel Paper, Electronic Chattel Paper, Letter of Credit Rights (whether or not the letter of credit is evidenced by a writing), Money, Deposit Accounts, cash, certificates of deposit, Investment Property, Securities, Securities Accounts, Securities Entitlements, Commodities Accounts, Supporting Obligations, Financial Assets, and any and all claims, rights and interests in, to or under any of the above, and all substitutions for, additions, attachments, accessories, Accessions and improvements to and replacements, products, Proceeds and insurance proceeds of any or all of the foregoing; (b) effective upon the entry of the Interim Order, all causes of actions (other than Borrower's and Pledging Guarantor's Avoidance Actions); and (c) all books and records relating to the foregoing, including all ledgers, federal and state tax returns, records regarding the Obligors' assets or liabilities, the Collateral, business operations or financial condition, and all computer programs or storage or any Equipment containing such information. The "Collateral" shall include all real property (including the Real Property), leases, leasehold interests, and all rents, profits and Proceeds thereof, all contracts, contract rights, intercompany claims, rights to payment of money, arbitration awards, licenses, permits, and franchise rights, all capital stock, trust interests, all rights under insurance and proceeds thereof, all collateral support, tax or other refunds, mineral rights, and all Software, patents, copyrights, trademarks, trade names and other intellectual property (whether or not registered, and if registered, whether such intellectual property is registered in the United States or in any foreign jurisdiction), together with the right to sue or otherwise  recover for any past, present and future infringement, dilution, misappropriation, or other violation or impairment thereof, and all Proceeds of any of the foregoing, including without limitation license fees, royalties, income, payments, claims, damages and proceeds of suit, now or hereafter due and/or payable with respect thereto, any and all claims, rights and interests in, to or under any of the above, and all substitutions for, additions, attachments, accessories, Accessions and improvements to and replacements, products, Proceeds and insurance proceeds of any or all of the foregoing. Capitalized terms retain the definition contained in the UCC; provided, that to the extent that the UCC is used to define any term herein and such term is defined differently in different Articles of the UCC, the definition of such term contained in Article 9 of the UCC shall govern. Notwithstanding the foregoing, the Collateral shall not include any Borrower's or Pledging Guarantor's Avoidance Actions or proceeds thereof or the Equity Interests issued by any Borrower or Pledging Guarantor.

"Commitment Amount" means $35,000,000.

"Commitments" means the aggregate commitment of Lender to fund the Loans hereunder, consisting of the Interim Term Loan Commitment and the Delayed Draw Term Loan Commitment.  The

aggregate principal amount of Lender's Commitments is thirty-five million Dollars ($35,000,000), subject to the terms of this Agreement and the DIP Orders.

"Commitment Fee" means the fee equal to one point twenty five percent (1.25%) of the Commitment Amount (i.e., $437,500.00), which fee will be fully earned, non-refundable and allowed on the Effective Date and shall be paid in kind on such date by adding the Commitment Fee to the aggregate principal amount of the Interim Term Loan.

"Committee" means the statutory committee of unsecured creditors appointed by the United States Trustee in relation to the Chapter 11 Cases, if any.

"Compliance Certificate" means a certificate substantially in the form of Exhibit C delivered by the Authorized Person of Obligors to Lender.

"Daily Balance" means, as of any date of determination and with respect to any fixed monetary Obligations, the amount of such Obligations owed at the end of such day.

"Debtor" means any affiliate of any Obligor that filed a petition under Chapter 11 of Title 11 of the United States Code and is a debtor in possession in proceedings jointly administered with the Borrowers and Pledging Guarantors.

"Default" means an event, condition, or default that, with the giving of notice, the passage of time, or both, would be an Event of Default.

"Default Rate" has the meaning set forth in Section 2.4(b).

"Delayed Draw Term Loan" has the meaning set forth in the recitals to this Agreement.

"Delayed Draw Term Loan Commitment" means the commitment of Lender to fund Advances under the Delayed Draw Term Loan in an aggregate principal amount (excluding all Fees that have been added to principal on or after the Closing Date) of twenty five million Dollars ($25,000,000), subject to the terms set forth herein and in the DIP Orders.

"Designated Account" means the Deposit Account of Borrowers at the Designated Account Bank identified on Schedule D-1, which shall be an account existing within Borrowers' cash- management system as of the Petition Date.

"Designated Account Bank" has the meaning set forth in Schedule D-1.

"DIP Facility" has the meaning set forth in the recitals to this Agreement.

"DIP Lender's Professionals" has the meaning set forth in the DIP Orders.

"DIP Orders" means the Interim Order and the Final Order, each as applicable.

"DIP Superpriority Claims" has the meaning set forth in the DIP Orders.

"DIP Termination Event" means the occurrence of the Maturity Date or any other "DIP Termination Event" as defined in the DIP Orders.

"Disposition" means any conveyance, sale, lease, license, assignment, transfer or other disposition, and "Dispose" of has the correlative meaning.

"Dollars" or "$" means United States dollars.

"Effective Date" means the date on which all of the conditions set forth in Section 3.1 of this Agreement have been satisfied or waived in writing by Lender.

"Environmental Action" means any written complaint, summons, citation, notice, directive, order, claim, litigation, investigation, judicial, or administrative proceeding, judgment, letter, or other written communication from any Governmental Authority, or any third party relating to or arising out of violations of Environmental Law or releases of Hazardous Materials (a) from any Collateral, (b) from adjoining properties or businesses of any real properties that constitute Collateral, or (c) from or onto any facilities, with respect to the Collateral, which received Hazardous Materials generated by Obligors.

"Environmental Law" means any applicable federal, state, provincial, foreign, or local statute, law, rule, regulation, ordinance, code, binding and enforceable guideline, binding and enforceable written policy, or rule of common law now or hereafter in effect and in each case as amended, or any judicial or administrative interpretation thereof, including any judicial or administrative order, consent decree, or judgment, in each case, to the extent binding on Obligors, relating to the environment, the effect of the environment on employee health, or Hazardous Materials, in each case as amended from time to time.

"Environmental Liabilities" means all liabilities, monetary obligations, losses, damages, costs, and expenses (including all reasonable fees, disbursements, and expenses of counsel, experts, or consultants, and costs of investigation and feasibility studies), fines, penalties, sanctions, and interest incurred as a result of any claim or demand, or Remedial Action required, by any Governmental Authority or any third party, and which relate to any Environmental Action.

"Environmental Lien" means any Lien in favor of any Governmental Authority for Environmental Liabilities.

"Equity Interests" means the equity, ownership or beneficial ownership interests issued by any Person.

"Escrow Account" has the meaning set forth in Section 2.3(d).

"Event of Default" has the meaning set forth in Section 8.1.

"Exit Fee" means the fee equal to the sum of zero point ninety five percent (0.95%) of the Commitment Amount (i.e., $332,500.00), which shall be fully earned, non-refundable, and allowed upon the entry of the Interim Order and the occurrence of the Effective Date, and payable on the Maturity Date or the earlier acceleration of the Obligations, or such earlier date specified in this Agreement.

"Fees" means all fees due to Lender under this Agreement, any Loan Document, or the DIP Orders, including, but not limited to, the Commitment Fee and the Exit Fee.

"Final Order" means a final order of the Bankruptcy Court authorizing and approving Obligors' entry into this Agreement and the other Loan Documents and with such modifications as are necessary to convert the Interim Order into a final order, in form and substance satisfactory to Lender, in its sole discretion, on a final basis and entered following a final hearing.

"Governmental Authority" means any federal, state, local, or other governmental or administrative body, instrumentality, board, department, or agency or any court, tribunal, administrative hearing body, arbitration panel, commission, or other similar dispute-resolving panel or body.

"<u>Guaranty</u>" means any guaranty of the Obligations, including the guaranty of the Obligations pursuant to this Agreement.

"<u>Guarantors</u>" has the meaning set forth in the Preamble to this Agreement.

"<u>Hazardous Materials</u>" means (a) substances that are defined or listed in, or otherwise classified pursuant to, any applicable laws or regulations as "hazardous substances," "hazardous materials," "hazardous wastes," "toxic substances," or any other formulation intended to define, list, or classify substances by reason of deleterious properties such as ignitability, corrosivity, reactivity, carcinogenicity, reproductive toxicity, or "EP toxicity," (b) oil, petroleum, or petroleum derived substances, natural gas, natural gas liquids, synthetic gas, drilling fluids, produced waters, and other wastes associated with the exploration, development, or production of crude oil, natural gas, or geothermal resources, (c) any flammable substances or explosives or any radioactive materials, and (d) asbestos in any form or electrical equipment that contains any oil or dielectric fluid containing levels of polychlorinated biphenyls in excess of 50 parts per million.

"<u>Indebtedness</u>" means (a) all obligations for borrowed money, including, without limitation, the Obligations, (b) all obligations evidenced by bonds, debentures, notes, or other similar instruments and all reimbursement or other obligations in respect of letters of credit, bankers acceptances, or other financial products, (c) all obligations as a lessee under Capital Leases, (d) all obligations or liabilities of others secured by a Lien on any asset of such Person, irrespective of whether such obligation or liability is assumed, (e) all payment obligations to pay the deferred purchase price of assets (other than trade payables incurred in the Ordinary Course of Business and repayable in accordance with customary trade practices), (f) all indebtedness created or arising under any conditional sale or other title retention agreement, or incurred as financing, in either case with respect to property acquired by such Person, (g) the principal balance outstanding under any synthetic lease, off-balance sheet loan or similar off-balance sheet financing products, or (h) any obligation guaranteeing or intended to guarantee (whether directly or indirectly guaranteed, endorsed, co-made, discounted, or sold with recourse) any obligation of any other Person that constitutes Indebtedness under any of clauses (a) through (h) above. For purposes of this definition, (i) the amount of any Indebtedness represented by a guaranty or other similar instrument shall be the lesser of the principal amount of the obligations guaranteed and still outstanding and the maximum amount for which the guaranteeing Person may be liable pursuant to the terms of the instrument embodying such Indebtedness, and (ii) the amount of any Indebtedness described in clause (d) above shall be the lower of the amount of the obligation and the fair market value of the assets of such Person securing such obligation.

"<u>Indemnified Liabilities</u>" has the meaning set forth in <u>Section 9.3</u>.

"<u>Indemnified Person</u>" has the meaning set forth in <u>Section 9.3</u>.

"<u>Information</u>" has the meaning set forth in <u>Section 16</u>.

"<u>Interim Order</u>" means that interim order of the Bankruptcy Court in the Chapter 11 Cases approving this Agreement, the DIP Facility and the use of Lender's Cash Collateral (within the meaning of Section 364 of the Bankruptcy Code) on an interim basis, in the form of <u>Exhibit A</u> hereto or otherwise satisfactory to the Lender in its sole discretion, as the same may be amended, modified or supplemented from time to time with the consent of the Lender in its sole discretion.

"<u>Interim Term Loan</u>" has the meaning set forth in the recitals to this Agreement.

"<u>Interim Term Loan Commitment</u>" means the commitment of Lender to fund Advances under the Interim Term Loan in an aggregate principal amount of up to ten million Dollars ($10,000,000), plus the

Commitment Fee which Commitment Fee shall be added to the principal of the Loans on the Effective Date, subject to the terms set forth herein and in the DIP Orders.

"Lender" has the meaning set forth in the preamble to this Agreement.

"Lender Expenses" means (in each case, solely in its capacity as Lender) all reasonable and documented (a) out of pocket costs or expenses (including taxes and insurance premiums) required to be paid by Obligors under any of the Loan Documents that are paid, advanced, or incurred by Lender, (b) out of pocket fees or charges paid or incurred by Lender in connection with its transactions with Obligors under any of the Loan Documents, including, but not limited to, fees or charges for photocopying, notarization, couriers and messengers, telecommunication, public record searches (including tax lien, litigation, and UCC searches and including searches with the patent and trademark office, the copyright office, or the department of motor vehicles), filing, recording, and publication, (c) out of pocket costs and expenses incurred by Lender in the disbursement of funds to Borrowers (by wire transfer or otherwise), (d) out-of-pocket charges paid or incurred by Lender resulting from the dishonor of checks payable by or to Obligors, (e) out of pocket costs, fees (including reasonable and documented external attorneys' fees) and expenses paid or incurred by Lender to correct any default or enforce any provision of the Loan Documents, or during the continuance of an Event of Default, in gaining possession of, maintaining, handling, preserving, storing, shipping, selling, preparing for a Disposition, or advertising for a Disposition of the Collateral, or any portion thereof, irrespective of whether a Disposition is consummated, (f) out of pocket audit fees and reasonable and documented expenses of Lender (including travel, meals, and lodging) related to any inspections or audits, (g) out of pocket costs and expenses of third party claims or any other suit paid or incurred by Lender in enforcing or defending the Loan Documents or in connection with the transactions contemplated by the Loan Documents or Lender's relationship with the Obligors, (h) reasonable and documented out-of-pocket costs and expenses (including, reasonable and documented external attorneys' fees) incurred by Lender incurred in advising, structuring, drafting, reviewing, administering (including travel, meals, and lodging), or amending the Loan Documents, (i) reasonable and documented out-of-pocket fees and expenses of Lender (including travel, meals, and lodging) related to any due diligence in connection with the DIP Facility or meetings with Obligors and its advisors in connection with the DIP Facility, (j) out of pocket reasonable and documented costs and expenses of Lender (including reasonable and documented external attorneys, accountants, consultants, and other advisors fees and expenses) incurred in terminating, amending, waiving, providing consents or extensions under and enforcing the DIP Facility (including reasonable and documented external attorneys, accountants, consultants, and other advisors fees), (k) out of pocket reasonable and documented costs and expenses of Lender incurred in connection with respect to the Chapter 11 Cases or successor cases (including reasonable and documented external attorney's and other advisors' fees, and the cost of appraisals) in connection with the DIP Facility, the Collateral, the Loan Documents, and the DIP Orders, or (l) out of pocket reasonable and documented costs and expenses of Lender in exercising rights or remedies under the Loan Documents and defending the Loan Documents, irrespective of whether suit is brought, or in taking any Remedial Action concerning the Collateral.

"Lender Related Person" means Lender, together with its officers, directors, employees, attorneys, representatives, and agents, including DIP Lender's Professionals.

"Lender's Liens" means the Liens granted by Borrowers and Pledging Guarantors in and to the Collateral in favor of Lender.

"Lien" means any pledge, hypothecation, assignment (which is intended as security), charge, deposit arrangement (which is intended as security), encumbrance, easement, lien (statutory or other), mortgage, security interest, or other security arrangement and any other preference, priority, or preferential arrangement of any kind or nature whatsoever (which is intended as security), including any conditional

sale contract or other title retention agreement, the interest of a lessor under a Capital Lease, and any synthetic or other financing lease having substantially the same economic effect as any of the foregoing.

"Loan Account" means the loan accounts maintained by Lender in the name of Borrowers in which shall be recorded the date and amount of each Loan made by Lender and the amount of each payment in respect thereof.

"Loan Documents" means this Agreement, DIP Orders, each Guaranty, the Additional Documents, and any other notes, account control agreements, financing statements, or security agreements executed by Obligors in connection with this Agreement in favor of Lender, any other agreement entered into, now or in the future, by Obligors and Lender in connection with this Agreement and designated a Loan Document, and all amendments, modifications, renewals, substitutions, and replacements of any of the foregoing; provided that, for the avoidance of doubt, all Loan Documents shall be in form and substance satisfactory to Lender.

"Loans" has the meaning set forth in the recitals to this Agreement, and shall include all Advances and other credit extensions hereunder.

"Mandatory Prepayment Event" means, from time to time, any of the events or circumstances mandating prepayment of the Obligations described in Section 2.3(d) of this Agreement.

"Material Adverse Change" means (a) a material adverse effect on the business, operations, properties, assets, performance or financial condition of the Obligors taken as a whole, (b) a material adverse effect on the validity or enforceability of, or the rights, remedies or benefits available to the Lender, or (c) a material adverse effect on the ability of the Obligors to perform their obligations under any Loan Documents.

"Material Contract" means each contract or agreement as to which the breach, nonperformance, cancellation, termination, loss, expiration, or failure to renew by any party thereto could reasonably be expected to result in a Material Adverse Change.

"Maturity Date" means 365 calendar days after the Petition Date (or such later date as agreed to by the Lender in its sole discretion) (the "Initial Maturity Date"); provided that the Debtors shall have the option to extend the Initial Maturity Date for two successive six-month periods if (i) no Event of Default or other DIP Termination Event has occurred, (ii) for each six month period, the DIP Lender receives an extension fee equal to 0.50% of the Commitment Amount (ie. $175,000.00), paid in cash on or prior to the then current Maturity Date, and (iii) no later than 10 Business Days prior to the then current Maturity Date. the Borrowers have notified the Lender in writing of its election to extend the Maturity Date (and such election shall be deemed to be a representation and warranty by the Obligors to Lender that each of the conditions set forth in this proviso have been satisfied in full).

"Milestones" means the Milestones set forth on Schedule A-3.

"Net Cash Proceeds" means, with respect to any Mandatory Prepayment Event, the amount of cash proceeds received (directly or indirectly) from time to time (whether as initial consideration or through the payment of deferred consideration, purchase price adjustment, earn outs,  or otherwise) by or on behalf of such Person and any other Obligor, in connection therewith, after deducting therefrom only, to the extent included in the Approved Budget (or any settlement statement (which may contain reasonable and customary charges and deductions from proceeds in respect to Real Property Dispositions) approved by Lender in its reasonable discretion with respect to any Dispositions of property of a Borrower or Pledging Guarantor)  (i) reasonable and documented fees, commissions, and expenses related thereto and required to

be paid in connection with such Mandatory Prepayment Event, (ii) taxes paid or reasonably estimated to be payable to any taxing authorities in connection with such Mandatory Prepayment Event, (iii) in the case of any Mandatory Prepayment Event described in Section 2.3(d)(i) hereof with respect to the Disposition of assets of a Borrower or Pledging Guarantor only, reasonable and documented amounts necessary to satisfy and discharge any applicable Permitted Liens described in clause (j) of the definition thereof, on the property being Disposed of, in each case, only to the extent, that the amounts so deducted are properly attributable to such Mandatory Prepayment Event, and (iv) any other amounts reasonably determined by the Borrowers to be required to be held in escrow under applicable non-bankruptcy laws.

"Non-Pledging Guarantors" has the meaning ascribed to such term in the Preamble to this Agreement.

"Obligations" means all loans, including, without limitation, the Loans, the Advances, debts, principal, interest, contingent reimbursement or indemnification obligations, liabilities (including all amounts charged to the Loan Account pursuant to this Agreement), obligations (including indemnification obligations), Fees (including the Commitment Fee and the Exit Fee), Lender Expenses, premiums, costs, expenses, and indemnities, whether primary, secondary, direct, indirect, absolute, or contingent, due or to become due, now existing or hereafter arising, fixed or otherwise, guaranties, covenants, and duties of any kind and description owing by Obligors to Lender pursuant to or evidenced by the Loan Documents and/or pursuant to or in connection with any one or more documents, instruments, or agreements described in clause (j) of the definition of Lender Expenses and, in each case, irrespective of whether for the payment of money, of Obligors to Lender under the Loan Documents and the DIP Orders, and including all interest not paid when due and all other expenses or other amounts that Obligors are required to pay or reimburse by the Loan Documents, by law, or otherwise in connection with the Loan Documents including, without limitation, in connection with the collection or enforcement of or preservation of rights of Lender under the Loan Documents. Notwithstanding the foregoing, for the avoidance of doubt, Obligations shall not include any portion of the Break-Up Fee that is reduced through the payment of other fees and interest as set forth in Section 2.8(c).

"Obligors" has the meaning set forth in the recitals to this Agreement.

"Ordinary Course" and "Ordinary Course of Business" shall mean, in respect of any Person, the ordinary course and reasonable requirements of such Person's business, as conducted in accordance with past practices, and undertaken in good faith except as such conduct has been changed resulting from the filing of the Chapter 11 Cases.

"Organizational Documents" means (a) for any corporation, the certificate or articles of incorporation, the bylaws, any certificate of designation or other instrument relating to the rights of preferred shareholders or stockholders of such corporation, any shareholder rights agreement and all applicable resolutions of the board of directors (or any committee thereof) of such corporation; (b) for any partnership, the partnership agreement and, if applicable, the certificate of limited partnership; (c) for any limited liability company, the operating agreement or limited liability company agreement and articles or certificate of formation or organization and all applicable resolutions of any managing member of such limited liability company; (d) for a statutory trust, the certificate of trust and trust agreement, as amended; and (e) any agreement between an Obligor and its shareholders, members, partners or its equity owners, or among any of the foregoing relating to the governance of such Obligor.

"Payment Account" means the Deposit Account of Lender identified on Schedule A-2, or otherwise identified to the Borrower Representative in writing by Lender.

"Permits" means any license, lease, permit, franchise, certificate, authorization, or approval issued by a Governmental Authority.

"Permitted Indebtedness" has the meaning set forth in Section 6.1.

"Permitted Liens" means:

(a)       all Liens created by the Loan Documents and the DIP Orders (including the Carve Out and Adequate Protection Liens);

(b)       Liens for taxes that are not delinquent or thereafter payable and that are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with generally accepted accounting principles as in effect from time to time and any other taxes to the extent not required to be paid not required to be paid pursuant to Section 5.5;

(c)       statutory or common law liens of landlords and liens of carriers, warehousemen, mechanics, materialmen, repairmen, construction contractors and suppliers and other like liens imposed by law or pursuant to customary reservations or retentions of title arising in the Ordinary Course of Business;

(d)       (i) pledges or deposits in connection with workers' compensation, unemployment insurance and other social security legislation, other than any Lien imposed by the Employee Retirement Income Security Act of 1974, and (ii) pledges and deposits of cash securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to any Obligor, but only to the extent expressly delineated as a line item Reporting Category in the Approved Budget (and without any Permitted Variance);

(e)       liens on equipment arising from precautionary UCC financing statements regarding operating leases of equipment;

(f)       non-exclusive licenses and sublicenses of intellectual property and other assets entered into in the Ordinary Course of Business that does not materially interfere with the ordinary conduct of the business of the Obligors, individually, or taken as a whole;

(g)       normal and customary rights of setoff upon deposits of cash in favor of banks or other depository institutions incurred in connection with the maintenance of such deposits in the Ordinary Course of Business, and not securing Indebtedness or the payment thereof;

(h)       any zoning or similar law or right reserved to or vested in any governmental authority to control or regulate the use of any real property that does not materially interfere with the ordinary conduct of the business of the Obligors, individually, or taken as a whole;

(i)       any other interest or title (and any encumbrances on such interest or title) of a lessor, sublessor, licensor or sublicensor or secured by a lessor's, sublessor's, licensor's or sublicensor's interest under leases or subleases (other than capitalized leases) or licenses or sublicenses, in each case entered into by an Obligor in the Ordinary Course of Business;

(j)       Priority Liens; and

(k)     Valid and nonavoidable senior Liens on the assets of the Non-Pledging Guarantors in existence on the Petition Date.

"Permitted Protest" means the right of any Obligor to protest any Lien (other than any Lien that secures the Obligations), Taxes (other than payroll taxes or taxes that are the subject of a United States federal tax lien), or rental payment, provided, that (a) a reserve with respect to such obligation is established on such Obligor's books and records in such amount as is required under GAAP, (b) any such protest is instituted promptly and prosecuted diligently by such Obligor in good faith, and (c) Lender is satisfied in its reasonable discretion that, while any such protest is pending, there will be no impairment of the enforceability, validity, or priority of any of Lender's Liens.

"Permitted Transfers" means (a) dispositions of inventory and other assets in the Ordinary Course of Business, (b) sale of worn-out or obsolete Equipment that is, in the reasonable judgment of Obligors, no longer economically practicable to maintain or useful in the Ordinary Course of Business, (c) dispositions of accounts receivable in connection with the collection or compromise thereof, (d) non-exclusive licenses and sublicenses of intellectual property and other assets entered into in the Ordinary Course of Business, (e) the sale or disposition of cash equivalents for fair market value and in a manner that is not otherwise prohibited by this Agreement or the Loan Documents, (f) the abandonment, transfer, cancellation or lapse of immaterial intellectual property that is, no longer economically practicable to maintain or useful in the Ordinary Course of Business, (g) dispositions among Borrowers and Pledging Guarantors, (h) dispositions among Non-Pledging Guarantors, and (i) any other dispositions contemplated by the Approved Budget.

"Permitted Variance" has the meaning ascribed to such term in Section 5.2(c) hereof.

"Person" means any natural person, corporation, limited liability company, limited partnership, general partnership, limited liability partnership, joint venture, trust, land trust, business or statutory trust, or other organization, irrespective of whether constituting a separate legal entity, and governments and agencies and political subdivisions thereof.

"Petition Date" has the meaning set forth in the recitals to this Agreement.

"Pledging Guarantors" has the meaning ascribed to such term in the Preamble to this Agreement.

"Prepetition Secured Parties' Superpriority Claim" has the meaning set forth in the DIP Orders.

"Priority Liens" means nonavoidable senior liens on the Collateral in existence prior to the Petition Date, which shall secure amounts not in excess of $750,000 in the aggregate across the Borrowers and Pledging Guarantors.

"Professional Fees" means all unpaid fees and expenses incurred by persons or firms retained by (a) the Obligors pursuant to Sections 327, 328, 329, 330, 331, 363, or 503(b)(4) of the Bankruptcy Code; or (b) the Committee pursuant to Sections 328 or 1103 of the Bankruptcy Code; provided that, to the extent that any amount of the foregoing compensation or reimbursement is denied or reduced by a Final Order of the Bankruptcy Court or any other court of competent jurisdiction, such amount shall no longer constitute Professional Fees.

"Real Property" means all real property owned by any Borrower or Pledging Guarantor.

"Record" means information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form.

"Remedial Action" means all actions taken to (a) clean up, remove, remediate, contain, treat, monitor, assess, evaluate, or in any way address Hazardous Materials in the indoor or outdoor environment, (b) prevent or minimize a release or threatened release of Hazardous Materials so they do not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment, (c) restore or reclaim natural resources or the environment, (d) perform any pre-remedial studies, investigations, or post-remedial operation and maintenance activities, or (e) conduct any other actions with respect to Hazardous Materials required by Environmental Laws.

"Reporting Category" has the meaning ascribed to such term in the definition of Approved Budget.

"Sale Order" means each order or proposed order approving the sale or sales of a Borrower's or Pledging Guarantor's assets pursuant to Section 363 of the Bankruptcy Code.

"Schedules" means those certain schedules annexed hereto and made a part hereof.

"Security Documents" means (a) all UCC financing statements, or amendments or continuations thereof, and (b) all other security agreements, mortgages, deeds of trusts, documents, agreements or filings in connection with the perfection of the Liens granted or pledged pursuant to the terms of this Agreement, any other Loan Document or the DIP Orders, as same may be amended, modified, restated or supplemented from time to time.

"Subsidiary" means, with respect to any Person, any corporation, partnership, limited liability company, association, or other business entity of which more than fifty percent (50%) of the total voting power of shares of stock (or equivalent ownership or controlling interest) entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, governors, or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof.

"Superpriority Claim Obligor" means (i) each of the Borrowers, and (ii) each of the Guarantors.

"Total Operating Disbursements" means cash operating disbursements of Obligors.

"Total Receipts" means the cash receipts of Obligors.

"UCC" means the Uniform Commercial Code as in effect in the State of New York; provided, that, if perfection or the effect of perfection or non-perfection or the priority of any security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "UCC" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection, or non-perfection or priority.

"United States" means the United States of America.

"Variance Report" has the meaning set forth in Section 5.2(c).

1.2    **Accounting Terms** All accounting terms not specifically defined herein shall be construed in accordance with GAAP; provided that, if Borrower Representative notifies Lender that Obligors request an amendment to any provision hereof to eliminate the effect of any change occurring after the Effective Date in GAAP or in the application thereof on the operation of such provision (or if Lender notifies Borrower Representative that Lender requests an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application

thereof, then Lender and Obligors hereby agree that they will negotiate, in good faith, amendments to the provisions of this Agreement that are directly affected by such change in GAAP with the intent of having the respective positions of Lender and Obligors after such change in GAAP conform as nearly as possible to their respective positions as of the date of this Agreement and, until any such amendments have been agreed upon, the provisions in this Agreement shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective. When used herein, the term "financial statements" shall include the notes and schedules thereto. Whenever the term "Borrower." "Guarantor" "Non-Pledging Guarantor" "Obligor" and "Pledging Guarantor" is used in respect of a financial covenant or a related definition, it shall be understood to mean Borrowers, Guarantors, Non-Pledging Guarantors, Obligors and Pledging Guarantors, as applicable, on a consolidated basis, unless the context clearly requires otherwise.

      1.3    **UCC**. Any terms used in this Agreement that are defined in the UCC shall be construed and defined as set forth in the UCC unless otherwise defined herein; <u>provided</u>, that to the extent that the UCC is used to define any term herein and such term is defined differently in different Articles of the UCC, the definition of such term contained in Article 9 of the UCC shall govern.

      1.4    **Construction**. Unless the context of this Agreement or the Loan Documents clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, the terms "includes" and "including" are not limiting, and the term "or" has, except as otherwise indicated, the inclusive meaning represented by the phrase "and/or." The words "hereof," "herein," "hereby," "hereunder," and similar terms in this Agreement or the Loan Documents refer to this Agreement or such other Loan Document, as the case may be, as a whole, and not to any particular provision of this Agreement or such other Loan Document, as the case may be. Section, subsection, clause, schedule, and exhibit references herein are to this Agreement unless otherwise specified. Any reference in this Agreement or in any other Loan Document to any agreement, instrument, or document shall include all alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements, thereto and thereof, as applicable (subject to any restrictions on such alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements set forth herein). The words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible (including real property, personal property and fixtures) and intangible assets and properties, including cash, securities, accounts, and contract rights. Any reference herein or in any other Loan Document to the satisfaction, repayment, or payment in full of the Obligations shall mean the irrevocable and indefeasible payment in full in cash in Dollars of all Obligations, other than continuing indemnification and expense reimbursement obligations for which no claim or demand has been asserted, and all Commitments shall have irrevocably, permanently and finally expired or shall have been terminated, cancelled and discharged. Any reference herein to any Person shall be construed to include such Person's successors and permitted assigns. Any requirement of a writing contained herein or in any Loan Document shall be satisfied by the transmission of a Record.

      1.5    **Schedules and Exhibits**. All of the schedules and exhibits attached to this Agreement shall be deemed incorporated herein by reference.

      1.6    **Timing of Payment or Performance**. When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on (or before) a day which is not a Business Day, the date of such payment or performance shall extend to the immediately succeeding Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be. When any time of day is used in a Loan Document, the prevailing time in New York City, New York shall apply.

2.      **LOAN AND TERMS OF PAYMENT.**

2.1      <u>**Agreement to Lend; Promise to Pay; Delayed Draw; Security Documents; and Loan Documents**</u>.

(a)      Subject to terms of and to any limitations on borrowing or other extensions of credit contained in the DIP Orders, whichever is then in effect, and to the terms and conditions of this Agreement, including the satisfaction or waiver of the conditions precedent in <u>Sections 3.1</u> and <u>3.2</u>, Lender agrees to make one or more Loans (each, an "<u>Advance</u>" and collectively, the "<u>Advances</u>") to the Borrowers (i) from the date that the Bankruptcy Court enters the Interim Order until the date on which the Bankruptcy Court enters the Final Order, an Interim Term Loan in the aggregate amount of up to Ten Million U.S. Dollars ($10,000,000.00), plus the capitalized Commitment Fee, which may be drawn in a single draw, and (ii) from the date on which the Bankruptcy Court enters the Final Order, additional Delayed Draw Term Loans in the aggregate amount of up to Twenty Five Million U.S. Dollars ($25,000,000,00); provided that in no event shall the outstanding principal amount of Advances (including any Delayed Draw Term Loan to fund the Carve Out Account  in accordance with the DIP Orders and this Agreement, but excluding any capitalized interest and Fees) exceed the applicable Commitment.  Each Advance (shall be made in an aggregate minimum amount of $5,000,000 (and, unless such draw is for all remaining Commitments, multiples of $1,000,000 in excess thereof).

(b)      Each Advance hereunder is subject to the satisfaction or waiver of the conditions precedent in the DIP Orders and in <u>Sections 3.1</u> and <u>3.2</u>.  Each Advance shall permanently decrease the applicable Interim Term Loan Commitment and Delayed Draw Term Loan Commitment, as applicable. Any Loans, or portion thereof, that are repaid or prepaid (whether as an optional prepayment or a mandatory prepayment) cannot be reborrowed.

(c)      The Obligations shall be secured by the Collateral of the Borrowers and Pledging Guarantors and shall be guaranteed by the Guaranty by the Obligors as set forth in this Agreement, the DIP Orders, and the other Loan Documents.

(d)      The Borrowers hereby jointly and severally promise to indefeasibly pay to Lender the Obligations (including principal (including interest and Fees that have been added to principal), interest, fees (including, as applicable, Lender Expenses and other Fees, costs, and expenses)) in Dollars in full in cash on the Maturity Date (or the earlier required payment, whether by mandatory prepayment, acceleration of the Obligations or otherwise in accordance with the Loan Documents). The Obligors hereby jointly and severally promise to indefeasibly pay to Lender an amount equal to the Net Cash Proceeds required to be paid by any such Obligor pursuant to Section 2.3(d) hereof from the sale any Real Property, and all other amounts, that are required to be paid by such Obligor to the Lender pursuant to <u>Section 2.3(d)</u> hereof.

2.2      <u>**Borrowing Procedures**</u>.  Each Advance under <u>Section 2.1(a)</u> shall be made by a written request substantially in the form of the Borrowing Notice attached hereto as <u>Exhibit D</u> (each such written request, a "<u>Borrowing Notice</u>") executed by an Authorized Person of the Borrower Representative, and delivered to Lender no later than three (3) Business Days prior to the requested funding date in the case of each Advance (or such shorter period as Lender may permit in its sole discretion), but in no event later than five (5) Business Days before the Maturity Date.  Upon satisfaction or waiver by Lender (in its sole discretion) of the conditions precedent set forth herein, Lender shall fund the Advance to the Borrower Representative on the requested funding date by causing the principal amount of the relevant Advance to be credited to the Designated Account.

2.3    **Payments; Reductions of the Commitments; Prepayments**.

(a)    **Payments by the Obligors**.  Except as otherwise expressly provided herein, all payments by Obligors shall be made to the Payment Account for the account of Lender and shall be made in immediately available funds, no later than 4:00 p.m. (Eastern time) on the dates set forth in this Section 2.3.  Any payment received by Lender later than 4:00 p.m. (Eastern time) shall be deemed to have been received on the following Business Day and any applicable interest or fee shall continue to accrue until such following Business Day.

(b)    **Application of Payments and Proceeds**.  Subject to Section 7.3, all payments remitted to Lender and all proceeds of the Collateral and of the Guaranty received by Lender shall be                              applied                              as                              follows:

(i)    first, to pay any Lender Expenses (including reasonable and documented cost or expense reimbursements, such as reasonable and documented attorneys' fees) then owed to Lender or any DIP Lender's Professionals in accordance with the DIP Orders, or indemnities then due to Lender under the Loan Documents, until indefeasibly paid in full in cash;

(ii)    second, to pay any Fees then due to Lender under the Loan Documents until indefeasibly paid in full in cash;

(iii)    third, to pay any interest then due to Lender in respect of the Loans until indefeasibly paid in full in cash;

(iv)    fourth, to pay the principal of all Loans (including all interest and Fees that have been added to the principal) until indefeasibly paid in full in cash; and

(v)    fifth, to pay any other Obligations until indefeasibly paid in full in cash; and

(vi)    sixth, to Borrower Representative (to be wired to the Designated Account) or as otherwise required by applicable law.

In the event of a direct conflict between the priority provisions of this Section 2.3(b) and any other provision contained in any Loan Document (except for the DIP Orders), it is the intention of the parties hereto that such provisions be read together and construed, to the fullest extent possible, to be in concert with each other.  In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this Section 2.3(b) shall control and govern.  Notwithstanding the foregoing, to the extent there is a conflict between the DIP Orders and any Loan Document, the DIP Orders shall control and govern.

(c)    **Optional Prepayments**.  Upon notice to Lender, Borrowers may prepay any Loan, in whole or in part, at any time; provided, that (i) the aggregate principal amount being prepaid shall be an amount not less than five million Dollars ($5,000,000) (and, unless such prepayment is for all outstanding principal amounts, multiples of $1,000,000 in excess thereof); (ii) such prepayment shall be accompanied by all accrued and unpaid interest thereon and the ratable portion of the Exit Fee due thereon, which shall be due and payable on the date of such voluntary prepayment, and (iii) any such prepayments under this Section 2.3(c) shall be applied as described in Section 2.3(b).

(d)     **Mandatory Prepayment Event**.

(i)     **Dispositions**.  Subject to the DIP Orders, within two (2) Business Days of the date of receipt by any Obligor of the Net Cash Proceeds of any sale or Disposition (whether through a voluntary or involuntary sale, the loss, destruction, or damage thereof or any actual condemnation, confiscation, requisition, seizure, or taking thereof or otherwise) of Collateral of a Borrower or Pledging Guarantor, the Obligors shall pay to Lender an amount equal to 90% of the Net Cash Proceeds (including insurance proceeds, condemnation awards, and payments in lieu thereof) received by such Obligor in connection with such sale or Disposition in accordance with Sections 2.3(a) and 2.3(b).  In no event shall any amount paid to Lender under this Section 2.3(d)(i) exceed the outstanding amount of the Obligations.  Nothing contained in this Section 2.3(d)(i) shall permit the Obligors to sell or Dispose of assets other than in accordance with this Agreement. In no event shall any amount paid to Lender under this Section 2.3(d)(i) exceed the outstanding amount of the Obligations.

(ii)     **Indebtedness**.  Subject to the DIP Orders, within two (2) Business Days of the date on which any Obligor receives proceeds of any Indebtedness (other than any Indebtedness permitted under Section 6.1 of this Agreement), the Obligors shall pay to Lender an amount equal to 100% of the Net Cash Proceeds of such Indebtedness in accordance with Sections 2.3(a) and 2.3(b).  The provisions of this Section 2.3(d)(ii) shall not be deemed to be implied consent to any such incurrence or maintenance of Indebtedness otherwise prohibited by the terms and conditions of this Agreement. Nothing contained in this Section 2.3(d)(i) shall permit the Obligors to incur or receive proceeds of Indebtedness other than in accordance with this Agreement. In no event shall any amount paid to Lender under this Section 2.3(d)(ii) exceed the outstanding amount of the Obligations.

(iii)     **Equity Issuance.** Subject to the DIP Orders, within two (2) Business Days of the date on which any Obligor receives proceeds of the issuance or sale of any  Equity Interests issued by a Borrower or Pledging Guarantor, the Obligors shall pay to Lender an amount equal to 100% of the Net Cash Proceeds of such issuance or sale in accordance with Sections 2.3(a) and 2.3(b).  The provisions of this Section 2.3(d)(iii) shall not be deemed to be implied consent to any such issuance or sale of Equity Interests otherwise prohibited by the terms and conditions of this Agreement. In no event shall any amount paid to Lender under this Section 2.3(d)(iii) exceed the outstanding amount of the Obligations.

(iv)     **Claim Proceeds**.  Subject to the DIP Orders, within two (2) Business Days of the date on which any Obligor receives proceeds of any claims or causes of actions relating to Borrowers or Pledging Guarantors (other than any Avoidance Actions), the Obligors shall pay to Lender an amount equal to 90% of the amount received in accordance with Sections 2.3(a) and 2.3(b).  In no event shall any amount paid to Lender under this Section 2.3(d)(iv) exceed the outstanding amount of the Obligations.

Notwithstanding the forgoing Sections 2.3(d)(i)-(iv), the provisions of this Section 2.3(d) shall be satisfied to the extent that (I) the Borrowers elect in writing, delivered to Lender no later than one (1) Business Day after receipt of any proceeds described in 2.3(d)(i)-(iv), to deposit the applicable proceeds in a segregated account (the "Escrow Account") in the name of Borrower or Lender, (II) the Borrowers or other applicable Obligors timely deposit such proceeds, plus interest thereon at the interest rate applicable to Advances and all other

Obligations (excluding contingent indemnification or reimbursement obligations for which no claim has been asserted) that are due or shall become due and payable through the then applicable Maturity Date (the "Mandatory Prepayment Escrowed Amount") no later than the date specified in Section 2.3(d) into the Escrow Account for the sole benefit of the Lender and the Borrowers, and (III) the Escrow Account and any proceeds therein shall be Collateral subject to Lender's Lien pursuant to the DIP Orders and shall be subject to no other Liens, and may not be used for any payment other than on account of the Obligations. In no event shall the Borrowers be required to deposit amounts in the Escrow Account in excess of the outstanding amount of the Obligations (excluding contingent indemnification or reimbursement obligations for which no claim has been asserted) due and to become due and payable through the Maturity Date, including any permitted extensions thereof. At the request of Borrower Representative, the Lender agrees to discuss with the Borrower Representative a mutually acceptable alternative distribution methodology for the Mandatory Prepayment Escrowed Amount and, subject to the DIP Orders, if an alternative agreement is reached, to enter into an amendment to the DIP Facility to effectuate such alternative.

2.4    **Interest Rates and Rates, Payments and Calculations**.

(a)    **Interest Rate**.  Except as provided in Section 2.4(b), all Advances shall bear interest on the Daily Balance thereof at a rate equal to eleven point fifty percent (11.50%) per annum, calculated in accordance with Section 2.4(d) hereof.  For the purpose of calculating interest, the Daily Balance shall exclude accrued but unpaid interest due or owing hereunder until such interest is added to the principal balance of the Loans monthly on each monthly anniversary of the Petition Date, and shall include all Fees and other amounts that have been added to principal.

(b)    **Default Rate**.  Upon the occurrence and during the continuation of an Event of Default, all Obligations shall bear interest on the Daily Balance thereof at a per annum rate equal to three percent (3.0%), plus the then applicable interest rate (the "Default Rate") upon written notice from Lender of its election to impose interest at the Default Rate.  Any such notice may impose interest at the Default Rate retroactively to the date of the occurrence of the related Event of Default.  For the purpose of calculating interest under this Section 2.4(b), the Daily Balance shall exclude accrued but unpaid interest due or owing hereunder until such interest is added to the principal balance of the Loans monthly on each monthly anniversary of the Petition Date.

(c)    **Payment**.  Interest on the Loans is payable monthly in arrears on each monthly anniversary of the Petition Date, which such payment may, at the Borrowers' election, be paid in cash and if not timely paid in cash by Borrowers on each monthly anniversary of the Petition Date, shall be paid by adding such accrued interest to the principal balance of the Loans. If added to principal, such capitalized interest shall be Loan principal and shall accrue and compound interest as provided herein.  Any and all accrued and unpaid interest shall be due and payable in cash upon the Maturity Date or such earlier date as required hereunder, whether upon prepayment, due to acceleration of the Obligations in accordance with the Loan Documents or otherwise.  Except to the extent provided to the contrary herein or as provided for in the DIP Orders, all costs and Lender Expenses payable hereunder or under any of the other Loan Documents shall be due and payable in cash, in arrears, on demand and shall be paid to the Payment Account.  Each Borrower and Pledging Guarantor hereby agrees that Lender has all rights of setoff and bankers' lien provided by applicable law on account of any accounts maintained at Lender.  Subject to the DIP Orders and without affecting the Obligors' continuing obligation to pay and perform all Obligations hereunder and under the Loan Documents when due, in the event that any amounts (including any costs and Lender Expenses due hereunder) remain unpaid when due under the Loan Agreement (with any

such failure constituting an Event of Default hereunder), Borrowers shall be deemed to have made a request for an Advance in the amount of such non-payment, and Lender may charge the Loan Account (and the Commitment shall be reduced) in an amount equal to the aggregate principal amount of such Advance; provided that, thereafter, such Advance shall constitute Obligations hereunder and shall accrue interest at the rate then applicable to Obligations (including, upon Lender's election, the Default Rate), and be added to the principal balance of the Loans on each monthly anniversary of the Petition Date, until the indefeasible payment in full in cash of all Obligations.

(d)     **Computation**.  All interest chargeable under the Loan Documents shall be computed on the basis of a 365/366-day year, in each case, for the actual number of days elapsed in the period during which the interest accrues.

(e)     **Intent to Limit Charges to Maximum Lawful Rate**.  In no event shall the interest rate or rates payable under this Agreement, plus any other amounts paid in connection herewith, exceed the highest rate permissible under any law that a court of competent jurisdiction shall, in a final determination, deem applicable.  Obligors and Lender, in executing and delivering this Agreement, intend legally to agree upon the rate or rates of interest and manner of payment stated within it; provided, that, anything contained herein to the contrary notwithstanding, if said rate or rates of interest or manner of payment with respect to any Obligor exceeds the maximum allowable under applicable law, then, *ipso facto*, as of the date of this Agreement, each Obligor is and shall be liable only for the payment of such maximum as allowed by law, and payment received from Obligors or any Obligor in excess of such legal maximum, whenever received, shall be applied to reduce the principal balance of the Obligations to the extent of such excess.

2.5     **Crediting Payments; Clearance Charge**.  The receipt of any payment item by Lender shall not be considered a payment on account unless such payment item is a wire transfer of immediately available federal funds made to the Payment Account or unless and until such payment item is honored when presented for payment.  Should any payment item not be honored when presented for payment, then the Obligors shall be deemed not to have made such payment and interest shall be calculated accordingly. Anything to the contrary contained herein notwithstanding, any payment item shall be deemed received by Lender only if it is received into the Payment Account on a Business Day on or before 4:00 p.m. (Eastern time).  If any payment item is received into the Payment Account on a non-Business Day or after 4:00 p.m. (Eastern time) on a Business Day, it shall be deemed to have been received by Lender as of the opening of business on the immediately following Business Day.  Each Obligor, to the extent permitted by the DIP Order, shall make all payments with respect to the Obligations without setoff, recoupment or counterclaims and free and clear of and without any withholding or deduction.

2.6     **Designated Account**.  Borrowers hereby agree to maintain the Designated Account with the Designated Account Bank and to receive the proceeds of the Advances requested by Borrowers and made by Lender hereunder in such Designated Account.

2.7     **Statements of Obligations**.  Lender shall maintain true, correct, and complete electronic or written records evidencing the Indebtedness and other Obligations owed by the Obligors to Lender, in which Lender will record in the Loan Account (a) the amount of all Advances made under this Agreement, (b) the amount of any principal or interest due and payable or to become due and payable from Obligors to Lender under this Agreement, and (c) all amounts received by Lender under this Agreement and the Loan Documents from the Obligors.

2.8    **Fees**.

(a)    **Commitment Fee; Lender Expenses**.  Upon the funding of the Interim Term Loan, Borrowers shall pay to Lender the Commitment Fee by adding the Commitment Fee to the principal amount of the Interim Term Loan, in the manner described herein, whereupon such capitalized Commitment Fee shall be treated as principal and accrue and compound interest as provided herein, and shall pay the applicable Lender Expenses in full in cash, including attorney's fees and other Lender Expenses accrued or otherwise incurred prior to the Effective Date, from, as applicable, the proceeds of the Interim Term Loan.

(b)    **Exit Fee**.  The Exit Fee shall be due and payable in full upon the earliest of (i) the Maturity Date (or the earlier acceleration of the Obligations in accordance with the Loan Documents), (ii) the occurrence of a DIP Termination Event, and (iii) the payment in full of the Obligations. The Borrowers shall pay a pro rata share of the Exit Fee (using a ratio derived from comparing the principal amount to be prepaid to the Commitment Amount) when any voluntary prepayment or mandatory prepayment of the Loan is required to be made; provided that in no event will the Exit Fee be required to be paid in connection with a partial prepayment with proceeds from any casualty insurance or condemnation award; and provided further that any unpaid portion of the Exit Fee shall be due and payable on the Maturity Date (or a DIP Termination Event or any earlier acceleration of the Obligations in accordance with the Loan Documents).

(c)    **Break-Up Fee**.  The Break-Up Fee was fully earned and non-refundable under a letter agreement between Lender and the Obligors executed on January 23, 2026, and shall be allowable as of the Effective Date. The Break-Up Fee shall be paid to Lender when and if any of the following occurs: (i) the Closing or funding of the Initial Term Loan Commitment does not occur, including without limitation, upon the closing or funding of another debtor in possession loan facility by any Person (other than Lender) to any of the Borrowers or Pledging Guarantors, (ii) the Final Order does not enter on or before the date specified in the Milestones, or (iii) the DIP Facility is otherwise terminated; provided that the Break-Up Fee shall be reduced by the amount of the Commitment Fee, Exit Fee and interest paid in cash to Lender (including, without limitation any amounts paid in cash upon the repayment in full of the Obligations regardless of whether the foregoing trigger for such Break-Up Fee has occurred).

Except as otherwise expressly set forth herein, in the DIP Orders, or in any of the other Loan Documents, the Fees payable to Lender under this Agreement, the DIP Orders, or any of the other Loan Documents shall not be subject to proration and shall be non-refundable and non-avoidable obligations of the Borrowers and shall be paid by Borrowers in full in cash, or deducted from the applicable Draw, as the case may be.

2.9    **Borrower Representative; Assumptions**.  As of the date hereof, Holdings (i) is hereby designated and appointed by each Obligor as its representative and agent on its behalf (the "Borrower Representative") and (ii) accepts such appointment as the Borrower Representative, in each case, for the purposes of issuing Borrowing Notices, delivering certificates including Compliance Certificates, giving instructions with respect to the disbursement of the proceeds of the Loans, giving and receiving all other notices and consents hereunder or under any of the other Loan Documents and taking all other actions (including in respect of compliance with covenants, but without relieving any other Obligor of its joint and several obligations to pay and perform the Obligations) on behalf of any Obligor, or the Borrowers, Guarantors or Obligors, under the Loan Documents.  Lender may regard any notice or other communication pursuant to any Loan Document from the Borrower Representative as a notice or communication from all Obligors.  Each warranty, covenant, agreement and undertaking made on behalf of an Obligor by the Borrower Representative shall be deemed for all purposes to have been made by such Obligor and shall be

binding upon and enforceable against such Obligor to the same extent as if the same had been made directly by such Obligor.

**3.     CONDITIONS; TERM OF AGREEMENT.**

3.1     <u>**Conditions Precedent to the Effective Date**</u>.  The agreement of the Lender to make the Loans hereunder on the Effective Date shall be subject to the satisfaction of each of the conditions set forth below (unless waived in writing by Lender in its sole discretion):

(a)     All "first day" motions, including those related to the DIP Facility, filed by the Debtors and related interim and final orders, as applicable, entered within 3 business days of the Petition Date by the Bankruptcy Court in the Chapter 11 Cases shall be in form and substance reasonably satisfactory to the DIP Lender.

(b)     The parties shall have executed and delivered this Agreement.

(c)     Entry by the Bankruptcy Court of the Interim Order authorizing the secured financing under the DIP Facility on the terms and conditions contemplated by this Agreement, authorizing the Debtors' use of Collateral subject to the terms provided herein, and otherwise on terms reasonably acceptable to the Lender no later than 3 business days after the Petition Date, and such Interim Order shall be in full force and effect and not have been vacated, reversed, stayed, modified, or amended (except in the case of a modification or amendment as consented to by the Lender, in its sole discretion) and shall not be subject to a stay pending appeal or other injunction, except as consented to by the Lender.

(d)     All corporate, trust, limited liability company and similar action and approvals necessary for the valid execution, delivery and performance by each of the Obligors in connection with the Financing and of the Loan Documents to which it is a party and the transactions contemplated thereby shall have been duly and effectively taken or obtained (as the case may be) and remain in effect as of the date hereof and evidence thereof satisfactory to the Lender shall have been provided to the Lender, it being understood that the filing resolutions submitted with each Obligor's petition for relief filed in the Chapter 11 Cases is satisfactory to the Lender.

(e)     Entry by the Bankruptcy Court of an order authorizing, on an interim basis, the use of Cash Collateral, in form and substance satisfactory to Lender.

(f)     The Lender shall have a valid and perfected lien on and security interest in the Collateral of the applicable Debtors on the basis and with the priority set forth herein.

(g)     All out-of-pocket costs, fees and expenses required to be paid to the Lender under this Agreement and the Loan Documents or the Interim Order (including, without limitation, legal fees and expenses) incurred in connection negotiating, documenting, approving, administering, monitoring or enforcing any rights under the DIP Facility set forth in the Loan Documents or otherwise to be paid to the Lender shall have been paid.

(h)     No Default or Event of Default shall have occurred, and shall be continuing, or would result from such borrowing of the Loans.

(i)     Other than the Chapter 11 Cases, as stayed upon the commencement of the Chapter 11 Cases, or as disclosed in writing to the Lender prior to the Petition Date, there shall exist no action, suit, investigation, litigation or proceeding pending or threatened in writing in any court or

before any arbitrator or governmental authority that (a) would reasonably be expected to result in a material adverse effect, or (b) restrains, prevents or purports to affect materially adversely the legality, validity or enforceability of the DIP Facility or the consummation of the transactions contemplated thereby.

(j)      The making of the Interim Term Loan shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily, or permanently.

(k)      The Debtors are in compliance with the Milestones as of the Effective Date.

(l)      Since the Petition Date, other than the Chapter 11 Cases, there shall not have occurred or there shall not exist any event, condition, circumstance or contingency that, individually, or in the aggregate, (a) has had or could reasonably be expected to have a material adverse effect on the business, operations, properties, assets, performance or financial condition of Obligors taken as a whole; (b) has resulted in, or could reasonably be expected to result in, a material adverse effect on the validity or enforceability of, or the rights, remedies or benefits available to the Lender; or (c) has had or could reasonably be expected to have, a material adverse effect on the ability of the Obligors to perform their obligations under this Agreement or any Loan Document.

3.2      **Conditions Precedent to Loans**.  Lender shall not be required to fund any Loans or fund any Loan on or after the Effective Date unless and until all of the conditions set forth below shall have been satisfied or waived in writing by Lender in its sole discretion:

(a)      No order has been entered reversing, amending, staying, vacating, terminating or otherwise modifying the DIP Orders, and there has been no motion for leave to appeal or other proceeding to set aside any such order or to challenge the relief provided for in such order, in each case, unless agreed to in writing by the Lender in its sole discretion.

(b)      No action, proceeding, investigation, regulation, or legislation shall have been instituted before any Governmental Authority to enjoin, restrain, or prohibit, or to obtain damages which arise out of, this Agreement or any of the other Loan Documents or the consummation of the transactions contemplated hereby.

(c)      The proceeds of the Loans requested by the Borrowers shall be used for a purpose permitted under Section 6.11 hereof and in accordance with the Approved Budget, including Permitted Variances.

(d)      The representations and warranties of Obligors contained in this Agreement and in the other Loan Documents shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) on and as of the date of such Advance, as though made on and as of such date (except to the extent that such representations and warranties relate solely to a specific earlier date in which case such representation and warranty shall be true and correct in all material respects as of such earlier date (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof)).

(e)      No Default or Event of Default under any of the Loan Documents, and no DIP Termination Event under the DIP Orders, shall have occurred and be continuing on the date of such Advance, nor shall either result from the making thereof.

(f)      Lender shall have received a fully executed and delivered Borrowing Notice from Borrower Representative in accordance with <u>Section 2.2</u>.

(g)      The applicable Borrowing Notice and the Advance to be made thereunder shall comply with the Approved Budget then applicable on the date of such Borrowing Notice.

(h)      All Lender Expenses required to be paid to the Lender at such time, under this Agreement and the Loan Documents or the DIP Orders, shall have been paid.

3.3      **Maturity**  This Agreement shall continue in full force and effect until the indefeasible payment in full in cash of the Obligations (other than continuing Obligations with respect to indemnification).  All Obligations including, without limitation, the outstanding unpaid principal balance (including all interest and Fees that have been added to principal) of Advances, all accrued and unpaid interest, all other Fees, Lender Expenses and all other amounts under the Loan Documents, shall be due and payable in full in cash on the Maturity Date or the earlier acceleration of the Obligations in accordance with the Loan Documents.

3.4      **Effect of Maturity**.  On the Maturity Date, the obligation of the Lender to provide any additional credit or other accommodations under the Loan Documents shall automatically terminate and all Obligations (other than continuing Obligations with respect to indemnification) shall immediately become due and payable without notice or demand.  Except after payment in full in cash of the Obligations and termination of the Commitments, no termination of any obligation of Lender shall relieve or discharge any Obligor of its duties, obligations, or covenants hereunder or under any Loan Document and Lender's Liens in the Collateral, and each Guaranty, shall continue to secure the Obligations and shall remain in effect until all Obligations (other than continuing Obligations with respect to indemnification) have been indefeasibly paid in full in cash and the Commitments has been terminated.  When all of the Obligations (other than continuing Obligations with respect to indemnification) have been indefeasibly paid in full in cash in immediately available funds and Lender has no further obligation hereunder to fund any Advances, Lender will, at the Obligors' expense, execute and deliver any payoff letters, termination statements, lien releases, discharges of security interests, and other similar discharge or release documents (and, if applicable, in recordable form) as are necessary to evidence and confirm the repayment in full of the Obligations (other than continuing Obligations with respect to indemnification) and to release, as of record, Lender's Liens and all notices of security interests and Liens previously filed by Lender with respect to the Obligations.

4.      **REPRESENTATIONS AND WARRANTIES.**

In order to induce Lender to enter into this Agreement, each Obligor and Borrower, as applicable, hereby makes the following representations and warranties to Lender.  Each Obligor and Borrower, as applicable, hereby further represents that such representations and warranties shall be true, correct, and complete, in all respects, as of the date hereof and as of the Effective Date, and shall be true, correct, and complete, in all respects, as of the date of the making of each Advance (or other extension of credit) made thereafter, as though made on and as of the date of such Advance (or other extension of credit) (except to the extent that such representations and warranties relate solely to an earlier date in which case such representation and warranty shall be true and correct in all material respects as of such earlier date (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof)) and such representations and warranties shall survive the execution and delivery of this Agreement until all Obligations have been indefeasibly paid in full in cash:

4.1    **Due Organization and Qualification**.  Each Obligor (a) is duly formed and existing and in good standing under the laws of the jurisdiction of its formation, (b) where the ownership of its assets requires such qualification, is qualified to do business in any state where the failure to be so qualified could reasonably be expected to result in a Material Adverse Change, , and (c) subject to the Bankruptcy Court's entry of the DIP Orders, and any limitation under the Bankruptcy Code or other debtor relief law, has all requisite power and authority to own and operate its properties, to carry on its business as now conducted and as proposed to be conducted, to enter into the Loan Documents to which it is a party and to carry out the transactions contemplated thereby.    Schedule 4.1(a) sets forth an organizational chart showing the complete and accurate ownership structure of the Obligors as of the date hereof and the Effective Date.

4.2    **Due Authorization**.  Subject to the Bankruptcy Court's entry of the Final Order, the execution, delivery, and performance by each Obligor of the Loan Documents to which it is a party have been duly authorized by all necessary trust, corporate, partnership or limited liability company action on the part of such Obligor and with respect to such Obligor, and has been duly executed and delivered on behalf of such Obligor by an Authorized Person, Each Authorized Person is a duly authorized officer, director or manager of each applicable Obligor. The name and title of each Authorized Person of each Obligor is set forth on Schedule A-1.

4.3    **Binding Obligations**.  Each Loan Document has been duly executed and delivered by each Obligor that is a party thereto and, subject to the entry of the DIP Orders, as applicable, is the legally valid and binding obligation of such Obligor, enforceable against such Obligor in accordance with its respective terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally (regardless of whether such enforceability is considered in a proceeding at law or in equity).

4.4    **Title to Properties**.  Each of the Borrowers and Pledging Guarantors have (a) good, sufficient, and legal title to, and (b) good and marketable title to (in the case of personal property), all of such Person's assets (including all Real Property), subject only to Permitted Liens. A complete and accurate legal description of each parcel of Real Property owned by each Borrower and Pledging Guarantor is set forth on Schedule 4.4.

4.5    **Jurisdiction of Formation; Location of Chief Executive Office; Organizational; Identification Number**.

(a)    The name (within the meaning of Section 9-503 of the UCC), jurisdiction of organization and type of entity of each Obligor, and for each Borrower and Pledging Guarantor, the direct equity owner and to the extent required to be set forth in a financing statement under the UCC, organizational number (if any) of such Borrower and Pledging Guarantor, is as set forth on Schedule 4.5 (as such Schedule may be updated from time to time by notice from such Borrower to Lender or Pledging Guarantor).

(b)    A primary mailing address of each Borrower and Pledging Guarantor is located at the address indicated on Schedule 4.5 (as such Schedule may be updated from time to time by notice from such Borrower or Pledging Guarantor to Lender).

4.6    **Litigation; Commercial Tort Claims**.  Other than in the Chapter 11 Cases, investigations by the Securities Exchange Commission and as set forth on Schedule 4.6, there are no actions, suits, proceedings, claims, or disputes pending or, to the actual knowledge of the Obligors, threatened in writing, at law, in equity, in arbitration, or before any Governmental Authority, by or against any Obligor or against any of its properties or revenues that (a) purport to affect or pertain to this Agreement or any other Loan Document, or any of the transactions contemplated hereby, or (b) except as set forth on Schedule 4.6, either

individually or in the aggregate, could reasonably be expected to cause a Material Adverse Change.  No Borrower nor any Pledging Guarantor has any right, title or interest in or to any Commercial Tort Claim, except as set forth on <u>Schedule 4.6</u>.

       4.7    **Fraudulent Transfer**.  No transfer of property is being made by such Obligor and no obligation is being incurred by such Obligor in connection with the transactions contemplated by this Agreement or the Loan Documents with the intent to hinder, delay, or defraud either present or future creditors of such Obligor.

       4.8    **Non-Pledging Guarantors**.  Each Non-Pledging Guarantor is a debtor with respect to Indebtedness for borrowed money secured by a valid and nonavoidable senior Lien on the assets of such Guarantor in existence on the Petition Date.

       4.9    **Payment of Taxes**.  Except as provided on <u>Schedule 4.9</u> or as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Change and subject to the terms of the DIP Orders and any required approval by the Bankruptcy Court, all United States federal, state, and other material tax returns and reports of the Obligors required to be filed by the Obligors with respect to the Collateral have been timely filed, and all taxes due with respect to the period covered by such tax returns and all material assessments, fees, and other governmental charges upon any Collateral that are due and payable have been paid when due and payable, other than taxes that are the subject of a Permitted Protest.

       4.10    **Approved Budget**.  Attached to this Agreement as <u>Exhibit B</u> is a true and complete copy of the Approved Budget as of the date hereof and the Effective Date.  The Approved Budget may be amended or otherwise modified from time to time in accordance with the procedures set forth in <u>Section 5.2(d)</u> of this Agreement; <u>provided</u> that, the total amount of Loans (excluding the capitalized Commitment Fee and excluding interest that has been added to the principal pursuant to the terms hereof) provided pursuant to the Approved Budget shall not exceed the Commitment Amount.

       4.11    **Permits**.  Except as set forth on <u>Schedule 4.11</u>, each Borrower and Pledging Guarantor has (a) all material Permits required for the operation of its business and (b) all Permits required for the execution, delivery, and performance by, and enforcement against, such Borrower and Pledging Guarantor of each Loan Document.  Except as set forth in <u>Schedule 4.11</u>, such Borrower and Pledging Guarantor is not in breach of or default under the provisions of any such Permit, nor is there any event, fact, condition, or circumstance which, with notice or passage of time or both, would constitute or result in any of the foregoing, which in each case could reasonably be expected to have a Material Adverse Change.

       4.12    **Full Disclosure**.  The representations, warranties and other written statements made by each of the Obligors to Lender in connection with this Agreement and the other Loan Documents do not contain any untrue statement of a material fact, or omit to state any material fact necessary in order to make the statements contained herein or therein not materially misleading in light of the circumstances in which they were made.

**5.**       **AFFIRMATIVE COVENANTS.**

       Each Obligor or Borrower, as applicable, hereby covenants and agrees that, until termination of the Commitments and indefeasible payment in full in cash of the Obligations (other than continuing Obligations with respect to indemnification), it shall comply with each of the following, as applicable:

       5.1    **Notice of Certain Events**.  The Obligors shall deliver to Lender, (i) promptly, but in any event within three (3) Business Days, upon becoming aware of any Default or Event of Default, notice of such Default or Event of Default; and (ii) promptly upon becoming aware of any litigation threatened in

writing against any Borrower or Pledging Guarantor (other than with respect to the Chapter 11 Cases) or filed (other than any adversary proceeding or other pleading filed in the Chapter 11 Cases), or any event (other than events of public knowledge in the Chapter 11 Cases), in each case which could reasonably be expected to result in a Material Adverse Change, and of any litigation threatened in writing or filed that purports to affect or pertain to this Agreement or any other Loan Document, or any of the transactions contemplated hereby and thereby,. In addition, each of the Obligors hereby agrees to maintain a system of accounting that enables each of the Obligors to produce unaudited financial statements in accordance with GAAP.

5.2    **Reporting; Budget; Conference Calls.**

(a)    The Borrower Representative will, on the fourth (4th) Business Day of each week, commencing on the fourth (4th) full week after the Petition Date (the "First Testing Date"), deliver to the Lender a variance report (each such report, a "Variance Report"), in a form consistent with the form of the Approved Budget, comparing the Obligors' actual receipts and disbursements by line item for the prior calendar week and the prior four (4) calendar weeks (on a cumulative basis) with the projected receipts and disbursements for such week and the prior four (4) calendar weeks (on a cumulative basis) as reflected in the applicable Approved Budget for such weeks (the "Weekly Variance Report").

(b)    By not later than 5:00 PM Eastern Time on the First Testing Date and on each Thursday thereafter that is the four-week (4-week) anniversary of the First Testing Date (each such date, a "Monthly Variance Testing Date" and each such four-week period, the "Monthly Testing Period"), the Borrower Representative shall provide to the Lender a report detailing (i) the aggregate receipts and disbursements of the Obligors during the applicable Monthly Testing Period and since the Petition Date; and (ii) any variance (positive or negative, expressed as a percentage) between actual and budgeted aggregate disbursements for the Monthly Testing Period and since the Petition Date, as set forth in the applicable Approved Budget (a "Monthly Variance Report," together with the Weekly Variance Report, the "Approved Variance Reports"). The provision to the Lender of a Monthly Variance Report shall constitute a representation and warranty by each of the Obligors that the information contained in such Monthly Variance Report is true and correct in all material respects.

(c)    The Obligors shall comply with the following (collectively, the "Permitted Variances"): As of each Monthly Variance Testing Date, for the Monthly Testing Period ending on the Sunday preceding such Monthly Variance Testing Date, and for the period commencing on the Petition Date and ending on such Monthly Variance Testing Date, (i) the Obligors shall not allow, without the Lender's approval, all "Total Operating Disbursements", excluding, for the avoidance of doubt, "Non-Operating Disbursements" and "Restructuring Disbursements" (all as defined in the Approved Budget) to be greater than 120% of the estimated disbursement for such items in the Approved Budget, and (ii) the Obligors shall not allow, without the Lender's approval, all "Total Receipts" (as defined in the Approved Budget) to be less than 80% of the estimated Total Receipts in the Approved Budget, each for such Monthly Testing Period and for the period commencing on the Petition Date, as applicable, provided that, if disbursements are below the budgeted disbursements for a Monthly Testing Period, any such unused disbursements shall be rolled into the Approved Budget for the following Monthly Testing Period. Any material changes to the Approved Budget shall be subject to the Lender's approval. For the avoidance of doubt, any reference to "written consent" hereunder shall include consent granted by email.

(d)    Commencing at 5:00 PM (Eastern Time) on the Thursday of the fourth (4th) full calendar week after the Petition Date, and continuing at 5:00 P.M. (Eastern Time) on the Thursday

of every fourth (4th) week thereafter, the weekly budget shall (or as more frequently as the Obligors determine, may) be updated, for a nine (9) month period commencing on such date, and shall set forth in reasonable detail all of the Obligors' projected receipts and disbursements on a weekly basis, including the anticipated weekly uses of the proceeds of the DIP Facility and Cash Collateral for such period, separated into line items corresponding to each Reporting Category, and if such updated budget is in form and substance satisfactory to the Lender, it shall become the "<u>Approved Budget</u>". Any updates, amendments, supplements, or modifications to the Approved Budget or an Approved Variance Report shall be subject to the prior written approval of the Lender prior to the implementation thereof. If the Lender has not objected, in writing, to a proposed updated budget, or an amendment, supplement, or modification to the Approved Budget or an Approved Variance Report, within three (3) Business Days after the Lender's receipt thereof, such proposed updated budget, amendment, supplement, or modification shall be deemed acceptable to and approved by the Lender. Until any such updated budget, amendment, supplement, or modification has been approved by the Lender, the Obligors shall be subject to and be governed by the terms of the Approved Budget then in effect.

(e)     At Lender's request, the Borrower Representative and the Obligors (including applicable property managers) and their financial and restructuring advisors shall participate in a conference call occurring no more than every other week, commencing on the second week following the Effective Date regarding the Approved Budget, the Chapter 11 Cases and other financial, operational and material matters.

(f)     The Borrower Representative and other Obligors shall provide to the Lender the Compliance Certificate, financial information and other information described in Exhibit E no later than the dates described in such Exhibit.

5.3     **Existence**.  At all times, each Borrower and Pledging Guarantors shall (a) maintain and preserve in full force and effect its existence, and (b) maintain its good standing in its jurisdiction of incorporation or formation, and all its rights and franchises, licenses and Permits, except where the failure to be in good standing or maintain any such rights and franchises, or licenses and Permits would not reasonably be expected to result in a Material Adverse Change.

5.4     **Maintenance of Properties; Permits**.  Each of the Borrowers and Pledging Guarantors shall (a)(i) maintain and preserve their assets in such condition as exists as of the Petition Date, with ordinary wear, tear, and casualty excepted, to the extent permitted by the Approved Budget and the Permitted Variance, and (ii) comply with the material provisions of all material leases (other than leases with other Obligors in effect as of the Petition Date) to which it is a party, or related to the Collateral pledged by it, unless (x) such provisions are the subject of a Permitted Protest or (y) compliance is not permitted or contemplated by the Approved Budget or is otherwise excused by the provisions of the Bankruptcy Code or an order of the Bankruptcy Court; and (b) maintain, comply with, and keep in full force and effect its Permits, except where failure to so comply could not reasonably be expected to have a Material Adverse Change.  Each Borrower and Pledging Guarantor shall comply with and maintain, all Permits required for the operation of its business, except where failure to so comply could not reasonably be expected to have a Material Adverse Change.

5.5     **Taxes**.  Except to the extent such payment is excused by, or is otherwise prohibited by, the provisions of the Bankruptcy Code or an order of the Bankruptcy Court, each Borrower and Pledging Guarantor shall pay in full and discharge all assessments and taxes imposed, levied, or assessed after the Petition Date against it or any Collateral, before delinquency (giving effect to any extension period), except to the extent that any such assessments and taxes shall be paid pursuant to a Sale Order or the Approved Budget or that is subject to a Permitted Protest.

5.6     **Insurance**.  At the Borrowers' and Pledging Guarantors' sole costs and expense, the Borrowers and Pledging Guarantors shall each maintain insurance with respect to the assets in which the Borrowers have any right, interest, or title, covering loss or damage by fire, theft, explosion, and all other hazards and risks as ordinarily are insured against by other Persons engaged in the same or similar businesses and consistent with the Borrowers' and Pledging Guarantors' insurance policies in effect on the Petition Date.  The Borrowers and Pledging Guarantors shall each maintain general liability, director's and officer's liability insurance, fiduciary liability insurance, employment practices liability insurance, title insurance (provided that additional title insurance shall be required at the request of Lender), as well as insurance against larceny, embezzlement, and criminal misappropriation, consistent with the Borrowers' and Pledging Guarantors' insurance policies in effect on the Petition Date.  All such policies of insurance shall be with the current providers or with responsible and reputable insurance companies and in such amounts as in existence today or as is carried generally in accordance with sound business practice by companies in similar businesses similarly situated and located.  The Borrowers and Pledging Guarantors shall each use their commercially reasonable efforts to cause, within fifteen (15) Business Days following the entry of the Interim Order, all property insurance policies covering the Collateral to be made payable to the Lender, in case of loss, pursuant to a standard lender loss payable endorsement with a standard non-contributory "lender" or "secured party" clause.  If any of the Borrowers or Pledging Guarantors' fail to maintain the insurance required by this Section 5.6, the Lender may arrange for such insurance, but at the Obligors' sole cost and expense (and such cost and expense shall be Advances hereunder and may be charged against the Loan Account) and without any responsibility on the Lender's part for obtaining the insurance, the solvency of the insurance companies, the adequacy of the coverage, or the collection of claims.  The Borrowers and Pledging Guarantors shall each give the Lender prompt notice of any loss covered by their casualty or business interruption insurance and shall comply with the mandatory prepayment provisions of Section 2.3(d) hereof.  Upon the occurrence and during the continuance of an Event of Default, the Lender shall have the sole right to file claims under any property and general liability insurance policies in respect of the Collateral, to receive, receipt, and give acquittance for any payments that may be payable thereunder, and to execute any and all endorsements, receipts, releases, assignments, reassignments or other documents that may be necessary to effect the collection, compromise, or settlement of any claims under any such insurance policies.

5.7     **Inspection**.  Borrowers and Pledging Guarantors shall each permit Lender and each of its duly authorized representatives or agents, to visit any of its properties and inspect any of its Collateral or books and records, to examine and make copies of its books and records, and to discuss its affairs, finances, and accounts with, and to be advised as to the same by, its officers and employees at such reasonable times during regular business hours and intervals as Lender may require, in each case other than information subject to confidentiality obligations and/or attorney client or other privilege; provided, that (i) the Lender shall be permitted to conduct no more than one (1) such inspection in any fiscal year, (ii) all such visits and inspections shall be made in accordance with the standard safety, visit, and inspection procedures of the Borrowers and Pledging Guarantors and their tenants, as applicable, (iii) no such visit or inspection shall unreasonably interfere with the normal business operation of the Borrowers or Pledging Guarantors and their tenants, and (iv) absent the existence of a Default or Event of Default, Lender shall provide Borrowers and Pledging Guarantors' with reasonable prior notice before any such inspections. Unless an Event of Default has occurred, any costs incurred by Lender in connection with Collateral inspections or appraisals shall be borne by Lender and shall not constitute Lender Expenses hereunder.

5.8     **Environmental**.  The Borrowers and Pledging Guarantors shall each:

(a)     Keep the Collateral owned or operated by it free of any Environmental Liens.

(b)     Comply with all applicable Environmental Laws, except where the failure to so comply would not reasonably be expected to result in a Material Adverse Change.

(c)    Promptly notify Lender of any release of which any Borrower or Pledging Guarantor has knowledge of a Hazardous Material in any reportable quantity from or onto property owned or operated by such Borrower or Pledging Guarantor that could reasonably be expected to result in a Material Adverse Change.

(d)    Promptly, but in any event within five (5) Business Days of its receipt thereof, provide Lender with written notice of any of the following:  (i) written notice that an Environmental Lien has been filed against any of the Collateral, (ii) commencement of any Environmental Action or written notice that an Environmental Action will be filed against such Borrower or Pledging Guarantor, and (ii) written notice of a violation, citation, or other administrative order from a Governmental Authority concerning violations or alleged violations of Environmental Laws by such Borrower or Pledging Guarantor, which seeks to impose liability therefor or otherwise could reasonably be expected to cause a Material Adverse Change.

5.9    **Compliance with Laws**.  Each Obligor shall comply with the requirements of all applicable laws, rules, regulations, and orders of any Governmental Authority, other than laws, rules, regulations, and orders the non-compliance with which, individually, could not reasonably be expected to result in a Material Adverse Change.

5.10    **Disclosure Updates**.  The Obligors shall each promptly, but in any event within five (5) Business Days after obtaining actual knowledge thereof, notify Lender of any written information, exhibit, or report (other than materials marked as drafts and forward-looking information, projections, estimates, and information of a general economic nature and general information about the Obligors' industry) furnished (after giving effect to any supplements thereto and when taken as a whole) to Lender contained, at the time it was furnished, any untrue statement of a material fact or omitted to state any material fact necessary to make the statements contained therein (taken as a whole) not materially misleading in light of the circumstances in which made.  Any notification pursuant to the foregoing provision will not cure or remedy the effect of the prior untrue statement of a material fact or omission of any material fact nor shall any such notification have the effect of amending or modifying this Agreement or any of the Schedules or reports hereto.

5.11    **Further Assurances**.  Upon reasonable written notice from Lender, the Borrowers and Pledging Guarantors shall each promptly execute and/or deliver to Lender any and all Security Documents, financing statements, fixture filings, endorsements of certificates of title, mortgages, deeds of trust, and all other documents, other than deposit account control agreements (collectively, the "Additional Documents"), that Lender may reasonably request in form and substance reasonably satisfactory to Lender, to create, perfect, and continue Lender's Liens in all the Collateral (whether now owned or hereafter arising or acquired, tangible or intangible, real or personal).

5.12    **Approved Budget**.  The Obligors shall each comply with the Approved Budget (as updated and supplemented in accordance with this Agreement), subject to the Permitted Variances.

5.13    **[Reserved].**

5.14    **[Reserved].**

5.15    **Material Contracts**.  The Obligors shall each deliver to Lender promptly (but in any event within five (5) Business Days) of becoming aware of any default (other than the filing of the Chapter 11 Cases) or other material breach under any Material Contract to which any Borrower or Pledging Guarantor is a party, notice of such defaults or breaches.

5.16   **Post-Closing**.  Within fifteen (15) Business Days after the entry of the Interim Order, all relevant insurances of Borrowers and Pledging Guarantors shall have been modified to include the Lender, as assignee, additional insured or lender loss payee, as applicable.

## 6.   NEGATIVE COVENANTS.

Each Obligor or Borrower, as applicable, hereby covenants and agrees that, until termination of the Commitments and the indefeasible payment in full in cash of the Obligations (other than continuing Obligations with respect to indemnification), such Obligor or Borrower, as applicable, shall comply with each of the following, as applicable:

6.1   **Indebtedness**.  No Obligor shall create, incur, assume, suffer to exist, guarantee, or otherwise become or remain, directly or indirectly, liable with respect to any Indebtedness , except for the following Indebtedness ("Permitted Indebtedness"):

(a)   Indebtedness evidenced by this Agreement and the Loan Documents (including the Carve Out);

(b)   Indebtedness outstanding as of the Petition Date;

(c)   obligations under any cash management agreement and other Indebtedness in respect of netting services, automatic clearinghouse arrangements, overdraft protections, employee credit card programs, and other cash management and similar arrangements incurred in the Ordinary Course of Business;

(d)   unsecured Indebtedness consisting of (i) the financing of insurance premiums or (ii) take-or-pay obligations contained in supply arrangements, in each case, incurred in the Ordinary Course of Business;

(e)   unsecured Indebtedness incurred by any Obligor in respect of letters of credit, bank guarantees, bankers' acceptances, warehouse receipts, or similar instruments issued or created in the Ordinary Course of Business, including in respect of workers compensation claims, health, disability, or other employee benefits or property, casualty, or liability insurance, or other Indebtedness with respect to reimbursement-type obligations regarding workers compensation claims, provided, that upon the drawing of such letter of credit, the reimbursement of obligations in respect of bankers' acceptances and the incurrence of such Indebtedness, such obligations are reimbursed promptly (but no more than five (5) Business Days) following such drawing, reimbursement obligation or incurrence;

(f)   trade Indebtedness incurred in the Ordinary Course of Business;

(g)   purchase money Indebtedness of any Non-Pledging Guarantor hereafter incurred to finance the purchase of fixed assets, and renewals, refinancings and extensions thereof;

(h)   Indebtedness incurred in the Ordinary Course of Business (A) of any Obligor under (i) appeal bonds or similar instruments and (ii) surety bonds, performance bonds, bid bonds, completion guarantees and similar obligations, workers' compensation claims, health, disability or other employee benefits, and (B) of any Non-Pledging Guarantor under payment bonds, casualty or liability insurance, self insurance obligations, secured deposits, letters of credit, bankers guarantees and bankers acceptances issued for the account of any Non-Pledging Guarantor;

(i)     Indebtedness representing deferred compensation or similar arrangements to current, future or former officers, directors, employees, members of management, or consultants of the Obligors in the Ordinary Course of Business consistent with past practice;

(j)     Indebtedness representing any Taxes to the extent such Taxes are permitted to not be paid or discharged at such time in accordance with Section 5.5;

(k)     Other Indebtedness permitted by the Approved Budget;

(l)     Indebtedness permitted by the DIP Orders, including Indebtedness secured by Adequate Protection Liens;

(m)     Indebtedness of the Non-Pledging Guarantors consisting of the Prepetition Secured Parties' Superpriority Claim;

(n)     all premiums (if any), interest (including post-petition interest), fees, expenses, charges, and additional or contingent interest on obligations described in clauses (a) through (l) above; or

(o)     guarantees by any Non-Pledging Guarantor with respect to Indebtedness permitted under this Section 6.1.

(p)     so long as no Event of Default shall have occurred or be continuing or would immediately result therefrom, other Indebtedness of Non-Pledging Guarantors not otherwise permitted under this Section 6.1 in an aggregate amount not to exceed $500,000.00.

6.2     No Obligor shall create, incur, assume, or suffer to exist on or after the date of this Agreement, directly or indirectly, any Lien on or with respect to any of its assets, of any kind, whether now owned or hereafter acquired, or any income or profits therefrom, except for Permitted Liens except;

(a)     Liens for taxes, assessments or governmental charges or levies not yet due or which are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

(b)     Liens of landlords, carriers, warehousemen, mechanics, materialmen, construction contractors and repairmen and other like Liens arising in the ordinary course of business; *provided that* such Liens secure only amounts not overdue or, if overdue for more than sixty days, are being contested in good faith by appropriate proceedings diligently conducted for which adequate reserves determined in accordance with GAAP have been established;

(c)     deposits to secure the performance (including payment) of bids, trade contracts, governmental contracts, licenses and leases (other than Indebtedness for borrowed money), statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature (including those to secure health, safety, government related and environmental obligations) incurred in the ordinary course of business

(d)     Liens securing judgments for the payment of money (or appeal or other surety bonds relating to such judgments) not constituting an Event of Default;

(e)  licenses, sublicenses, leases or subleases granted to others in the ordinary course of business of the Obligors;

(f)  customary rights of setoff upon deposits of cash in favor of banks or other depository institutions and Liens in connection with cash management agreements;

(g)  Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(h)  Liens on property of Non-Pledging Guarantors securing Indebtedness under Section 6.1(g).

(i)  Other Liens on assets of the Non-Pledging Guarantors securing obligations of not more than $500,000.

No Borrower or Pledging Guarantor shall create, incur, assume, or suffer to exist on or after the date of this Agreement, directly or indirectly, any Lien that is equal to or superior to the priority of any Liens granted by this Agreement and the DIP Orders to or in favor of the Lender on or with respect to any of the Collateral, of any kind, whether now owned or hereafter acquired, or any income or profits therefrom, except for the Carve Out and Priority Liens.

6.3  **Restrictions on Fundamental Changes**.  Except in connection with an Acceptable Plan approved by the Bankruptcy Court, the sale of substantially all of such entity's assets, or otherwise with the prior written consent of Lender, no Borrower or Pledging Guarantor shall:

(a)  enter into any merger, consolidation, reorganization, or recapitalization, or reclassify its equity interests; or

(b)  liquidate, wind up, or dissolve itself (or suffer any such liquidation or dissolution).

6.4  **Disposal of Assets**.  Except in connection with an (ii) Acceptable Plan, (ii) the sale of substantially all of such entity's assets and (iii) such other Disposition of property by the Borrower or Pledging Guarantor for fair market value in the ordinary course of business, no Borrower or Pledging Guarantor shall Dispose of (or enter into an agreement to Dispose of) any property of such Borrower or Pledging Guarantor, other than Permitted Transfers.

6.5  **Change Name**.  No Obligor shall change any Obligors' name, state of organization, or organizational identity, unless fifteen (15) days' prior written notice has been provided to Lender by such Obligor (or by the Borrower Representative on behalf of such Obligor).

6.6  **Nature of Business**.  No Borrower or Pledging Guarantor shall make any change in the nature of such Borrower's or Guarantor's business or acquire any properties or assets that are not reasonably related to the conduct of such business activities; provided, that the foregoing shall not prevent such Borrower or Pledging Guarantor from (a) engaging in any business that is reasonably related or ancillary to its business, or (b) complying with any requirement of the Bankruptcy Code.

6.7  **Material Leases or Contracts; Amendments**.  (a) No Borrower or Pledging Guarantor shall change or modify the material terms of any material lease or contract in connection with its assets except in a manner that could not reasonably be expected to result in a Material Adverse Change; and (b) No Borrower or Pledging Guarantor shall change or modify any of its Organizational Documents in a manner that is adverse to Lender.

6.8    **Change of Control**. No Borrower or Pledging Guarantor shall, except in connection with an Acceptable Plan or upon the sale of substantially all of such entity's assets, cause, permit, or suffer, directly or indirectly, any Change of Control.

6.9    **Accounting Methods**. No Obligor shall modify or change its fiscal year or its method of accounting (other than as may be required to conform to GAAP).

6.10    **Transactions with Affiliates**. No Obligor shall, directly or indirectly, enter into or permit to exist any transaction with any Affiliate of any Obligor, except for transactions (a) that are in the Ordinary Course of Business of such Obligor, (b) at prices and on terms and conditions not less favorable to such Obligor as could be obtained on an arm's length basis from unrelated third parties, (c) otherwise approved by the Bankruptcy Court pursuant to an order in form and substance satisfactory to Lender in its sole discretion, including the DIP Order, (d) pursuant to arrangements or agreements in effect on the Petition Date, or (e) permitted pursuant to the Approved Budget (including any Permitted Variance).

6.11    **Use of Advances**. No Obligor shall use the proceeds of the Advances for any purpose other than to fund payments, subject in all respects to the DIP Orders, Approved Budget and the Permitted Variances, related to the: (a) working capital and other general corporate purposes of the Obligors, if applicable; (b) Professional Fees (including funding the Carve-Out Account) and expenses of administering the Chapter 11 Cases (including fees incurred prior to the Effective Date) in accordance with the Bankruptcy Code and any orders of the Bankruptcy Court, as applicable; (c) fees and expenses payable under this Agreement, including, without limitation, the Commitment Fee, the Exit Fee and legal fees and expenses of the Lender (including fees and expenses incurred prior to the Effective Date) and other Lender Expenses; and (d) interest and other amounts payable under this Agreement or in the Approved Budget. In no event may any proceeds of Advances be used for any Challenge.

6.12    **Limitation on Capital Expenditures**. No Borrower or Pledging Guarantor shall, except as permitted by the Approved Budget (including any Permitted Variance), make or incur any Capital Expenditure.

6.13    **Chapter 11 Cases**. No Obligor shall, directly or indirectly, seek, consent, or suffer to exist, without the prior written consent of the Lender, (a) any modification, stay, vacation, or amendment to the DIP Orders, (b) a priority claim for any administrative expense or unsecured claim against any Borrower or any Pledging Guarantor (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expense of any kind set forth in Section 503(b), 506(b) or (c) 507(b) of the Bankruptcy Code) equal to or superior to the priority claim of Lender in respect to the Collateral or otherwise, other than those permitted by the DIP Order (including the Carve Out and Permitted Liens on the assets of the Non-Pledging Guarantors), and (c) any Lien on the Collateral, other than Permitted Liens and the Carve Out.

6.14    **Certain Transactions**. No Obligor shall propose or support any chapter 11 plan that is not an Acceptable Plan.

6.15    **Acquisitions, Loans, or Investments**. No Obligor shall make any acquisition, advance, loan or any other investment of any kind or nature except for the following:

(a)    acquisitions of, and advances made in connection with, inventory, equipment, goods or services in the Ordinary Course of Business;

(b)    intercompany loans and advances in the Ordinary Course of Business or consistent with past practice;

(c)      investments in negotiable instruments deposited or to be deposited for collection in the Ordinary Course of Business;

(d)      investments received in settlement of amounts due to any Obligor effected in the Ordinary Course of Business or owing to any Obligor as a result of Insolvency Proceedings involving an account debtor or upon the foreclosure or enforcement of any Lien in favor of an Obligor;

(e)      investments in Equity Interests, obligations or securities received in settlement of debts created in the Ordinary Course of Business and owing to any Obligor or in satisfaction of judgments or pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of a debtor;

(f)      investments in receivables owing to any Obligor created or acquired in the Ordinary Course of Business and payable or dischargeable in accordance with customary trade terms; provided, however, that such trade terms may include such concessionary trade terms as any Obligor deems reasonable under the circumstances;

(g)      investments in payroll, travel and similar advances to cover matters that are expected at the time of such advances ultimately to be treated as expenses for accounting purposes and that are made in the Ordinary Course of Business consistent with past practice;

(h)      guarantees of operating leases or of other obligations that do not constitute Indebtedness, in each case, in the Ordinary Course of Business;

(i)      defined contribution pension scheme, unfunded pension fund, phantom equity, cash-settled equity-based awards and other employee benefit plan obligations and liabilities to the extent that they are permitted to remain unfunded under applicable laws; and

(j)      other Investments permitted by the Approved Budget (including any Permitted Variance) and the DIP Orders.

6.16   **Payments on Indebtedness**.  No Borrower or Pledging Guarantor shall, other than with respect to the Obligations or pursuant to the Approved Budget (including any Permitted Variance) and the DIP Orders, make any payment with respect to any Indebtedness.

6.17   **Distributions or Redemptions**.  No Borrower or Pledging Guarantor shall pay any dividends or distributions on, or make any redemptions of, any equity interest of any Borrower or Pledging Guarantor; provided that the foregoing shall not prevent any wholly-owned Subsidiary (other than Holdings) from making any distribution to its direct parent.

6.18   **Formation of Subsidiaries Additional Obligors; **.  No Obligor shall form any direct or indirect Subsidiary or acquire any direct or indirect Subsidiary after the date hereof, without the prior written consent of Lender in its sole discretion, unless such Subsidiary is joined as a Non-Pledging Guarantor (if such Subsidiary is (x) a debtor with respect to Indebtedness for borrowed money secured by a valid and nonavoidable senior Lien on the assets of such Guarantor in existence on the Petition Date, or (y) a Borrower or Pledging Guarantor under this Agreement and the Loan Documents.  At all times, all direct and indirect affiliates and subsidiaries Holdings and any Obligor that becomes a Debtor and jointly administered with the Chapter 11 Cases shall be a Borrower or Pledging Guarantor or, if such Person is a Debtor with respect to Indebtedness for borrowed money secured by a valid and nonavoidable senior Lien on the assets of such Person in existence on the Petition Date, a Non-Pledging Guarantor, and each such

Person shall be bound by the applicable terms of the Loan Documents, and the Obligors and such debtors shall execute and deliver such documents, instruments and agreements reasonably requested by Lender, and pay all Lender Expenses, in connection with the foregoing.

## 7.    EVENTS OF DEFAULT.

7.1    **Event of Default**.  Any one or more of the following events shall constitute an event of default upon giving any applicable notice (if required) and the expiration of the applicable cure period (if any) (each, an "Event of Default") under this Agreement:

(a)    any Obligor shall fail to pay when due any principal, including, without limitation, pursuant to Section 2.3(d), on the Maturity Date, or upon acceleration, or any interest, Fees, Lender Expenses, or any other Obligations under this Agreement or any other Loan Document when due;

(b)    any of the Milestones are not achieved by the deadline established for such Milestone in Schedule A-3, unless extended or waived by the prior written consent of Lender;

(c)    any Obligor shall fail to comply with any of its obligations under Sections 5.3, 5.6, 6.1, 6.2, 6.3, 6.4, 6.8, or 6.13 of this Agreement;

(d)    other than as set forth in any other sub-section of this Section 7.1, any Obligor shall fail to perform, or otherwise breach, any of its covenants or obligations contained in this Agreement or any Loan Document, which failure or breach shall continue for thirty (30) days after the earlier to occur of (i) the date on which such failure to comply is known to any officer of such Obligor, and (ii) the date on which the Lender shall have notified the Borrower Representative or such Obligor or its applicable representative of such failure; provided, however, that such thirty (30) day grace period shall not apply in the case of any failure that is not capable of being cured at all or within such thirty (30) day period;

(e)    any representation or warranty made by any Obligor in this Agreement, any Loan Document or in any agreement, certificate, instrument, financial statement, or other statement delivered to Lender pursuant to or in connection with this Agreement or any Loan Document shall prove to have been incorrect in any material respect when made or deemed made;

(f)    except upon Lender's prior written request or with Lender's express prior written consent (and no such consent shall be implied from any other action, inaction, or acquiescence of Lender), any Obligor shall file a motion with the Bankruptcy Court or any other court of competent jurisdiction seeking an order (or such order is otherwise entered) that by its terms modifies, reverses, revokes, stays, rescinds, vacates, or amends the DIP Order (or any material provision thereof), this Agreement, any other Loan Documents, or the relief or transactions otherwise contemplated in the foregoing Loan Documents (or, in each case, purports to effect any of the foregoing);

(g)    any of the Loan Documents shall cease to be in full force and effect, or the Lender's Liens on any Collateral shall fail to be validly created and enforceable, or shall fail to be perfected in any material respect at any time, or shall fail to have the priority contemplated hereby, or any material provision of the Loan Documents is invalid, or any Obligor shall challenge or contest the DIP Facility, the validity or enforceability of any Loan Documents or deny that it has further liability thereunder;

(h)      (i) any Challenge is commenced by any Person that is not opposed by the Obligors in a timely manner in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and any appliable local rules, (ii) any Obligor asserts any Challenge, (iii) any Obligor investigates, joins or files any motion, application or other pleading in support of, or consents to the standing of any party, including a Committee, to assert, a Challenge, or (iv) any Obligor publicly supports any other Person that has asserted any Challenge or other requested relief contemplated in clauses (i) – (iii) above;

(i)      without the prior written consent of Lender, any Obligor shall file, or the Bankruptcy Court shall otherwise order, grant, confirm, or approve (including any approval on an interim or conditional basis) any plan of reorganization or liquidation of an Obligor, or related disclosure statement (including any amendment, modification or supplement to such plan or disclosure statement), that is not an Acceptable Plan;

(j)      except with respect to the Carve Out, any Obligor shall file any motion or application, or the Bankruptcy Court allows the motion or application of any other Person, which seeks approval for or allowance of any claim, lien, security interest ranking equal or senior in priority to the claims, liens, and security interests granted to Lender under the DIP Orders, or with respect to the Collateral or any such equal or prior claim, lien, or security interest shall be established in any manner, except, in any case, as expressly permitted under the DIP Orders;

(k)      the earliest date the Bankruptcy Court dismisses or converts (or a Borrower or Pledging Guarantor files a motion or other pleading seeking or supporting the dismissal or conversion) to Chapter 7 of any of the Chapter 11 Cases of a Borrower or Pledging Guarantor;

(l)      one or more final non-appealable judgments (and the same shall remain undischarged for a period of thirty (30) consecutive calendar days during which execution shall not be effectively stayed) and orders for the payment of money exceeding $1,000,000 in the aggregate (in each case to the extent not paid or covered by insurance or indemnities as to which the insurer or indemnifying party has been notified of such judgment or order and the applicable insurance company or indemnifying party has not denied coverage thereof) shall be rendered against any Borrower or any Pledging Guarantor and shall be subject to immediate collection and remain unsatisfied;

(m)      any damage to, or loss, theft or destruction of, any Collateral having a value in excess of $1,000,000 in the aggregate, unless such Collateral is insured as required hereunder, the insurance company has been notified of the occurrence of such event and has not denied coverage thereof and the claim has been settled within 90 days (or such longer time as Lender may agree) of the occurrence of such event;

(n)      any DIP Termination Event under the DIP Orders;

(o)      the entry of an order appointing (or the filing by an Obligor of a motion or other pleading seeking or supporting the appointment of) a trustee or an examiner having enlarged or expanded powers (beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1104 of the Bankruptcy Code (other than a fee examiner) in the Chapter 11 Cases, or the Bankruptcy Court shall have entered an order providing for such appointment, in each case without the prior written consent of Lender in its sole discretion;

(p)      the entry of an order which provides relief from the automatic stay otherwise imposed pursuant to Section 362 of the Bankruptcy Code, which order permits any creditor or party

in interest, other than Lender (other than any creditor or party in interest having a Lien on specific equipment that is senior to Lender), to realize upon, or to exercise any right or remedy with respect to, any material portion of the Collateral or any other material assets of a Borrower or Pledging Guarantor;

(q)     the entry of an order (i) surcharging any of the Collateral under Sections 105, 506(c), or any other section of the Bankruptcy Code or applicable law; (ii) allowing any administrative expense claim having priority over or ranking in parity with Lender's claims or rights against the Obligors (subject to the Carve Out) under the Loan Documents; (iii) terminating any Obligor's right to use Cash Collateral, or (iv) otherwise adversely impacting Lender's Liens and priority in the Collateral, as set forth in <u>Section 8</u> of this Agreement and the DIP Order;

(r)     the DIP Orders, or any material provision thereof, (i) cease to be in full force and effect from and after the date of entry thereof by the Bankruptcy Court or (ii) are modified, reversed, revoked, remanded, stayed, rescinded, vacated, or amended on appeal or by the Bankruptcy Court without the prior written consent of Lender (and no such consent shall be implied from any other authorization or acquiescence by Lender);

(s)     any Obligor shall seek, or the Bankruptcy Court shall enter, an order authorizing any Obligor to obtain financing from a Person other than Lender pursuant to Section 364(d) of the Bankruptcy Code, unless (i) Lender consents in writing to such financing, or (ii) Lender is indefeasibly paid in full in cash in connection with such financing;

(t)     any Obligor shall make any material payments in respect of prepetition obligations other than (i) as permitted by the DIP Orders, (ii) as permitted by any "first day" or "second day" orders satisfactory to Lender, (iii) as permitted by any other order of the Bankruptcy Court satisfactory to Lender, (iv) as permitted under this Agreement or any other Loan Documents in accordance with the Approved Budget (subject to Permitted Variance), or (v) as otherwise agreed to by Lender in writing before such payment is made;

(u)     the entry of an order by the Bankruptcy Court terminating or modifying the exclusive right of any Borrower or Pledging Guarantor to file a chapter 11 plan pursuant to Section 1121 of the Bankruptcy Code, without the prior written consent of Lender;

(v)     any Obligor shall seek, or support any other person's motion, to (i) disallow in whole or in part the Obligations, (ii) challenge the validity and enforceability of Lender's Liens, or (iii) contest any material provision of this Agreement or any Loan Document;

(w)     any of the Borrowers or Pledging Guarantors shall fail to execute and deliver to the Lender any agreement, financing statement, trademark filing, copyright filing, notices of lien or similar instruments or other documents that the Lender may reasonably request from time to time to more fully evidence, confirm, validate, perfect, preserve and enforce the claims of and Liens created in favor of the Lender, subject to the time periods and terms set forth in this Agreement; or

(x)     the occurrence of a Change of Control.

7.2     **<u>Rights and Remedies</u>**.

Subject to the terms of the DIP Orders, upon the occurrence and during the continuance of an Event of Default, and notwithstanding Section 362 of the Bankruptcy Code and without further order of the Bankruptcy Court or any other court of competent jurisdiction or the initiation of any further proceeding

with Obligors, in addition to taking any other action or exercising any other rights or remedies (including, without limitation, with respect to the Liens in favor of the Lender) provided for hereunder or under any Loan Document (including the DIP Orders) or by the UCC or any other applicable law, Lender may do any one or more of the following:

(a)      declare the Obligations, whether evidenced by this Agreement or by any Loan Document, are due and payable, whereupon the Obligations shall become and be immediately due and payable, without presentment, demand, protest, further notice, or other requirements of any kind, all of which are hereby expressly waived by the Obligors

(b)      terminate the Commitments;

(c)      terminate, restrict, or reduce Obligors' ability to use Cash Collateral to the extent provided by the DIP Orders;

(d)      charge interest at the Default Rate;

(e)      obtain and liquidate the Collateral, it being understood and agreed that (1) if notice of disposition of the Collateral is required by law, ten (10) days prior notice by Lender to Borrower Representative designating the time and place of any public sale or the time after which any private sale or other intended disposition of the Collateral is to be made, shall be deemed to be reasonable notice thereof and shall constitute "authenticated notice of disposition" within the meaning of Section 9-611 of the UCC, and Obligors hereby waive any other notice, (2) Lender may bid for and purchase the Collateral at any public sale and (3) Lender may bid and purchase any Collateral at a private sale if the Collateral in question has a readily ascertainable market value;

(f)      require Borrowers and Pledging Guarantors to assemble all of the Collateral constituting personal property without judicial process pursuant to Section 9-609 of the UCC;

(g)      take possession of all Collateral constituting tangible personal property without judicial process pursuant to Section 9-609 of the UCC; and

(h)      exercise any of its other rights and remedies under the Loan Documents, any rights granted under the Final Order, and applicable law.

7.3      **Application of Proceeds upon Event of Default**.  Lender shall apply the cash proceeds actually received from any foreclosure sale, other disposition of the Collateral upon an Event of Default as follows:  (a) first, to the Lender Expenses consisting of DIP Lender's Professionals' fees and expenses and any other reasonable and documented attorneys' fees and all reasonable and documented expenses (including, but not limited to, court costs, advertising expenses, auctioneer's fees, premiums for any required bonds, auditor's fees, amounts advanced for taxes, and other expenses) incurred by Lender in attempting to enforce this Agreement or in the prosecution or defense of any action or proceeding related to the subject matter of this Agreement; (b) second, to the discharge of any accrued but unpaid Fees (including, but not limited to, the Commitment Fee and the Exit Fee), (c) third, to the discharge of any accrued but unpaid interest on the Obligations, (d) fourth, to the outstanding principal balance of any Obligations (including all interest, Fees and other amounts that have been added to the principal), and (e) sixth, to pay any remaining surplus to Borrowers.

7.4      **Remedies Cumulative**.  The rights and remedies of Lender under this Agreement, the Loan Documents, and all other agreements shall be cumulative.  Lender shall have all rights and remedies not inconsistent herewith or with the DIP Orders, as provided under the UCC, by law, or in equity.  No exercise

by Lender of one right or remedy shall be deemed an election, and no waiver by Lender of any Event of Default shall be deemed a continuing waiver.  No delay by Lender shall constitute a waiver, election, or acquiescence by it.

7.5    **Credit Bidding**.  Regardless of whether or not an Event of Default exists, the Lender will be entitled to credit bid up to the full amount of Obligations outstanding under this Agreement in accordance with the Bankruptcy Code in any purchase and sale of assets of the Borrowers or Pledging Guarantors including, without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any plan subject to confirmation under section 1129(b)(2)(A)(ii)–(iii) of the Bankruptcy Code. In connection with the foregoing, the Lender shall have the right to assign its respective rights to "credit bid" all or any portion of the amount outstanding under the Loan Documents to a third party or newly formed acquisition vehicle.

**8.    COLLATERAL SECURITY.**

8.1    **Grant of Security Interest in the Collateral; DIP Superpriority Claims**.

(a)    Subject to the DIP Orders, to secure the payment and performance of the Obligations, each Borrower and Pledging Guarantor hereby grants, collaterally pledges, and assigns to Lender a fully perfected lien on and security interest in all of each Borrower's and Pledging Guarantor's right, title and interest in and to the Collateral, wherever located, whether existing on the Petition Date or thereafter arising or acquired.

(b)    Subject to the DIP Orders, each Obligor hereby grants to Lender DIP Superpriority Claims in the Chapter 11 Cases of the Obligors for the repayment of the Obligations.

(c)    Subject to the Carve Out and the Priority Liens, if any, the Lender's Liens and DIP Superpriority Claims shall not be made subject to or pari passu with (i) any lien, security interest, or claim heretofore or hereinafter granted in any of the Chapter 11 Cases or any successor cases, including any subsequently converted Chapter 11 Case of any Obligor to a case under chapter 7 of the Bankruptcy Code and any lien or security interest granted in favor of any federal, state, municipal, or other governmental unit (including any regulatory body), commission, board, or court for any liability of any of the Obligors, (ii) any lien or security interest that is avoided or preserved for the benefit of any of the Obligors and their estates under Section 551 of the Bankruptcy Code or otherwise, (iii) any intercompany or affiliate claim, lien, or security interest of any of the Obligors or their respective Affiliates, or (iv) any other Lien, security interest, or claim arising under Section 363 or 364 of the Bankruptcy Code granted on or after the date hereof.

(d)    In the event any of the Collateral is Disposed of by any Borrower or Pledging Guarantor, such Disposition and the proceeds thereof shall be subject in all respects to Lender's Liens.

8.2    **Representations and Warranties in Connection with Security Interest**. Each Borrower and Pledging Guarantor represents and warrants to the Lender as follows, that subject to the entry of the DIP Orders:

(a)    The Borrowers and Pledging Guarantors have full right and power to grant to the Lender a first priority perfected, security interest and Lien, on the Borrowers' and Pledging Guarantors' respective interests in the Collateral pursuant to this Agreement and the other Loan Documents;

(b)      Upon the execution and delivery of this Agreement, the Lender will have valid and automatically perfected Liens and security interests in the Collateral granted by the applicable Borrower and Pledging Guarantor, subject to no transfer or other restrictions or Liens of any kind in favor of any other Person, other than restrictions or Liens expressly permitted by Section 6.2; provided that, notwithstanding the automatic perfection and priority of Lender's Liens under the DIP Orders, Lender may, in its sole discretion, file any financing statements and other appropriate filings or recordations and/or delivery of any necessary certificates, as applicable, in respect of the Collateral and the Liens granted hereunder (including, without limitation, as contemplated in Section 8.6);

(c)      As of the date hereof and the Effective Date, no financing statement, mortgage or any other evidence of lien relating to any of the Collateral granted by such Borrower and Pledging Guarantor is on file in any public office except those on behalf of the Lender, other than any filings in respect of Liens expressly permitted by Section 6.2; and

(d)      As of the date hereof and the Effective Date, no Borrower or Pledging Guarantor is a party to, and no assets of any such Person is otherwise subject to, any agreement, document or instrument that conflicts with this Section 8.2.

8.3      **Superpriority Nature of Obligations and Liens**.  The Liens and DIP Superpriority Claims referred to in Section 8.1 shall have the priority afforded to such Liens and DIP Superpriority Claims in the DIP Orders.

8.4      **Power of Attorney**.  Upon the occurrence and during the continuance of an Event of Default, Lender will be made, constituted and appointed the true and lawful attorney for each Borrower and Pledging Guarantor (without requiring Lender to act as such) with full power of substitution to, do the following (which appointment is irrevocable and coupled with an interest):  subject to the DIP Orders, (a) execute in the name of such Person any financing statements, schedules, assignments, instruments, documents, and statements that it is or they or are obligated to give Lender under any of the Loan Documents and (b) do such other and further lawful acts and deeds in the name of such Person that Lender may deem necessary or desirable to perfect Lender's security interest or lien in any Collateral or (c) after the occurrence of an Event of Default which is continuing, (i) enforce an Account, (ii) exercise any voting or consensual rights with respect to the pledged securities, (iii) settle, compromise, compound, adjust or defend any actions, suits or proceedings relating to all or any of the Collateral, (iv) notify, or to require any Borrower or Pledging Guarantor to notify, account debtors to make payment directly to Lender, (v) make, settle and adjust claims in respect of Collateral under policies of insurance, indorsing the name of such Borrower or Pledging Guarantor on any check, draft, instrument or other item of payment for the proceeds of such policies of insurance and for making all determinations and decisions with respect thereto; provided that, nothing herein contained shall be construed as requiring or obligating Lender to make any commitment or to make any inquiry as to the nature or sufficiency of any payment received by Lender, or to present or file any claim or notice, or to take any action with respect to the Collateral or any part thereof or the moneys due or to become due in respect thereof or any property covered thereby, or (vi) commence and prosecute any and all suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect or otherwise realize on all or any of the Collateral or to enforce any rights in respect of any Collateral. Notwithstanding the foregoing, the foregoing power of attorney is a right and not an obligation of Lender and neither Lender nor its officers, directors, employees or agents shall be responsible to any Borrower or Pledging Guarantor for failure to exercise any of the foregoing rights.

8.5      **Lender's Ability to Perform Obligations on Behalf of Borrower with Respect to the Collateral**.  Lender shall have the right, but not the obligation, to perform on the Borrowers' and Pledging Guarantors' behalf, any or all of the Borrowers' obligations under this Agreement with respect to the

Collateral or otherwise, when such obligations are due, at the expense, for the account, and at the sole risk of such Borrower and shall be deemed to be Advances hereunder.

8.6 **Automatic Perfection; Filing of Financing Statements**. Subject to the terms and conditions of, and entry of, the Interim Order, the liens and security interests herein and in the Loan Documents shall be effective and automatically perfected upon the date of the Interim Order, and without the necessity of the execution, recordation or filing by any of the Borrowers or Pledging Guarantors of any mortgages, security agreements, financing statements, or other Loan Documents, or the possession or control by the Lender of or over any Collateral. Each Borrower and Pledging Guarantor irrevocably authorizes the Lender without notice to such Borrower or Pledging Guarantor to prepare and file financing statements provided for by the UCC, including, without limitation, describing such property as "all assets, whether now owned or hereafter acquired, developed or created" or words of similar effect, to perfect the Lender's security interest in the Collateral, in all jurisdictions in which the Lender believes in its sole opinion that such filing is appropriate. Each Borrower and Pledging Guarantor also irrevocably authorizes the Lender to file such continuation statements and amendments and to take such other action as may be required or appropriate, in either case in Lender's sole judgment, in order to perfect and to continue the perfection of Lender's security interests in the Collateral, unless prohibited by law.

8.7 **No Discharge; Survival of Claims**. Pursuant to Section 1141(d)(4) of the Bankruptcy Code, each Obligor hereby waives any discharge of the Obligations with respect to any chapter 11 plan that is not an Acceptable Plan.

9. **WAIVERS; INDEMNIFICATION.**

9.1 **Demand; Protest; etc**. To the extent permitted by applicable law or as expressly required pursuant to the terms of this Agreement, each Obligor hereby waives demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, nonpayment at maturity, release, compromise, settlement, extension, or renewal of documents, instruments, chattel paper, and guarantees at any time held by Lender on which such Obligor may in any way be liable.

9.2 **Lender's Liability for Collateral**. As long as Lender complies with its obligations, if any, under the UCC, Lender shall not in any way or manner be liable or responsible for: (a) the safekeeping of the Collateral, (b) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (c) any diminution in the value thereof, or (d) any act or default of any carrier, warehouseman, bailee, forwarding agency, or other Person. All risk of loss, damage, or destruction of the Collateral shall be borne by Obligors, except any thereof resulting from the gross negligence, bad faith, fraud, or willful misconduct of Lender or its representatives or agents as finally determined by the Bankruptcy Court or other court of competent jurisdiction.

9.3 **Indemnification**. Obligors shall pay, indemnify, defend, and hold any Lender Related Person (each, an "Indemnified Person") harmless (to the fullest extent permitted by law) for any losses, claims, damages, liabilities, expenses, penalties, fines, actions, judgement, and disbursements of any kind or nature whatsoever (including reasonable and documented out of pocket fees and disbursements of attorneys, experts, consultants, and all other costs and expenses actually incurred in connection therewith or in connection with the enforcement of this indemnification (as and when they are incurred and irrespective of whether suit is brought), at any time asserted against imposed upon, or incurred by any of them (a) in connection with, as a result of, or related to the execution and delivery, enforcement, performance, or administration (including any restructuring or workout with respect hereto) of this Agreement, any of the Loan Documents, or the transactions contemplated hereby or thereby or the monitoring of Obligors' compliance with the terms of the Loan Documents, (b) with respect to any investigation, litigation, or proceeding related to this Agreement, any Loan Document, or the use of the

proceeds of the credit provided hereunder (irrespective of whether any Indemnified Person is a party thereto), or any act, omission, event, or circumstance in any manner related thereto, and (c) in connection with or arising out of any presence or release of Hazardous Materials at, on, under, to or from any Collateral or any Environmental Actions, Environmental Liabilities, or Remedial Actions related in any way to any Collateral (each and all of the foregoing, the "Indemnified Liabilities").  The foregoing to the contrary notwithstanding, Obligors shall have no obligation to any Indemnified Person under this Section 9.3 with respect to any Indemnified Liability that the Bankruptcy Court or other court of competent jurisdiction finally determines to have resulted from the bad faith, fraud, gross negligence, or willful misconduct of such Indemnified Person.  This provision shall survive the termination of this Agreement and the repayment of the Obligations.  If any Indemnified Person makes any payment to any other Indemnified Person with respect to an Indemnified Liability as to which any Obligor was required to indemnify the Indemnified Person receiving such payment, the Indemnified Person making such payment is entitled to be indemnified and reimbursed by such Obligor with respect thereto.  **WITHOUT LIMITATION OF THE FOREGOING, THE INDEMNITY ABOVE SHALL APPLY TO EACH INDEMNIFIED PERSON WITH RESPECT TO INDEMNIFIED LIABILITIES WHICH IN WHOLE OR IN PART ARE CAUSED BY OR ARISE OUT OF ANY NEGLIGENT ACT OR OMISSION OF SUCH INDEMNIFIED PERSON EXCEPT FOR ANY ACT OR OMISSION THAT CONSTITUTES GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH INDEMNIFIED PERSON.**

10.    **NOTICES.**

All notices or demands relating to this Agreement or any Loan Document shall be in writing and shall be personally delivered or sent by registered or certified mail (postage prepaid, return receipt requested), overnight courier, or electronic mail (at such email addresses as a party may designate in accordance herewith)  In the case of notices or demands to any party hereunder or any service of process to any party hereunder, they shall be sent to the respective addresses set forth below:

If to the Obligors:

Inspired Healthcare Capital Holdings, LLC
Inspired Healthcare Capital LLC
7033 East Greenway Parkway, Suite 250
Scottsdale, AZ 85254
Attn: M. Benjamin Jones, CRO

with a copy to (which shall not constitute notice):

McDermott Will & Schulte LLP
2801 North Harwood Street, Suite 2600
Dallas, TX 75201
Attn: Jack Haake, Esq.
Email: Jhaake@mwe.com

If to the Lender:

Lapis Municipal Opportunities Fund V LP
c/o Lapis Advisers, LP
811 E. 17th Street
Denver, CO 80218
Attention: Kjerstin Hatch and Joe Landen

Email:  khatch@lapisadvisers.com
        jlanden@lapisadvisers.com

with a copy to (which shall not constitute notice):

        Foley & Lardner LLP
        111 Huntington Ave. (Suite 2500)
        Boston, Massachusetts  02199
        Attn:   Adrienne K. Walker, Esq.
                Jamie N. Class, Esq.
        Email:  awalker@foley.com
                jclass@foley.com

Any party hereto may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other party.  All notices or demands sent in accordance with this Section 10, shall be deemed received on the earlier of the date of actual receipt or five (5) Business Days after the deposit thereof certified, return receipt requested in the mail; provided, that (a) notices sent by overnight courier service shall be deemed to have been given when received, and (b) notices by electronic mail shall be deemed received when sent upon confirmation of transmission as evidenced by a delivery receipt or similar electronic mail function.

**11.    CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER.**

        (a)    THE VALIDITY OF THIS AGREEMENT AND THE LOAN DOCUMENTS (UNLESS EXPRESSLY PROVIDED TO THE CONTRARY IN THE LOAN DOCUMENT IN RESPECT OF SUCH OTHER LOAN DOCUMENT), THE CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT HEREOF AND THEREOF, AND THE RIGHTS OF THE PARTIES HERETO AND THERETO WITH RESPECT TO ALL MATTERS ARISING HEREUNDER OR THEREUNDER OR RELATED HERETO OR THERETO SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

        (b)    EACH    PARTY    HERETO    HEREBY    IRREVOCABLY    AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE NON-EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT AND ANY COURT OF COMPETENT JURISDICTION, INCLUDING THE SUPREME COURT OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE NORTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, AND EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE OR, TO THE EXTENT PERMITTED BY LAW, IN SUCH FEDERAL COURT, OR OTHER COURT OF COMPETETENT JURISDICTION. OBLIGORS AND LENDER HEREBY WAIVE, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT EACH MAY HAVE TO ASSERT THE DOCTRINE OF FORUM NON CONVENIENS OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS SECTION 11(B); PROVIDED, FURTHER, HOWEVER, THAT ALL PARTIES HEREBY AGREE THAT THEY HAVE CONSENTED TO THE JURISDICTION OF THE BANKRUPTCY COURT AND THAT THE BANKRUPTCY COURT WILL RETAIN EXCLUSIVE JURISDICTION WITH

RESPECT TO ALL DISPUTES SO LONG AS THE CHAPTER 11 CASES REMAINS PENDING.

(c)     OBLIGORS AND LENDER HEREBY IRREVOCABLY WAIVE ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THE LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED THEREBY AND AGREE THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. OBLIGORS AND LENDER ACKNOWLEDGE THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS RELIED ON THE WAIVER IN ENTERING INTO THIS AGREEMENT AND THE LOAN DOCUMENTS, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN THEIR RELATED FUTURE DEALINGS. OBLIGORS AND LENDER EACH WARRANTS AND REPRESENTS THAT IT HAS HAD THE OPPORTUNITY OF REVIEWING THIS JURY WAIVER WITH LEGAL COUNSEL, AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS.

## 12.     AMENDMENTS; WAIVERS; SUCCESSORS.

12.1     **Amendments and Waivers**.  No amendment, waiver, or other modification of any provision of this Agreement or any Loan Document, and no consent with respect to any departure therefrom, shall be effective unless the same shall be in writing and signed by Lender and Obligors that are party thereto and then any such waiver or consent shall be effective, but only in the specific instance and for the specific purpose for which given.

12.2     **No Waivers; Cumulative Remedies**.  No failure by Lender to exercise any right, remedy, or option under this Agreement or any Loan Document, or delay by Lender in exercising the same, will operate as a waiver thereof.  No waiver by Lender will be effective unless it is in writing, and then only to the extent specifically stated.  No waiver by Lender on any occasion shall affect or diminish Lender's rights thereafter to require strict performance by Obligors of any provision of this Agreement.  Lender's rights under this Agreement and the Loan Documents will be cumulative and not exclusive of any other right or remedy that Lender may have.

12.3     **Successors**.  This Agreement shall bind and inure to the benefit of the respective successors and permitted assigns of each of the parties; provided, that no Obligor may assign this Agreement or any rights or duties hereunder without Lender's prior written consent and such consent shall not, unless otherwise provided in such consent, release such Obligor from its Obligations.  Any assignment by such Obligor which is not explicitly permitted hereunder shall be void *ab initio*.  Lender (with the consent of Borrower Representative, which shall not be unreasonably withheld or delayed, nor shall such consent be required if an Event of Default has occurred and is continuing or to any Affiliate of Lender, and which consent shall be deemed given if Borrower Representative does not respond to such request within three (3) Business Days) may freely assign all or part of its rights and duties hereunder to any Person.

## 13.     GENERAL PROVISIONS.

13.1     **Effectiveness**.  This Agreement shall be binding and deemed effective when executed by Obligors and Lender.

13.2     **Section Headings**.  Headings, numbers and terms used for definitions have been set forth herein for convenience only.  Unless the contrary is compelled by the context, everything contained in each Section applies equally to this entire Agreement.

13.3   **Interpretation**.  Neither this Agreement nor any uncertainty or ambiguity herein shall be construed against Lender or Obligors, whether under any rule of construction or otherwise.  On the contrary, this Agreement has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to accomplish fairly the purposes and intentions of all parties hereto.

13.4   **Severability of Provisions**.  Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

13.5   **Debtor-Creditor Relationship**.  The relationship between Lender, on the one hand, and Obligors, on the other hand, is solely that of creditor and debtor, as applicable.  Lender has not (and shall not be deemed to have) any fiduciary relationship or duty to Obligors arising out of or in connection with the Loan Documents or the transactions contemplated thereby, and there is no agency or joint venture relationship between Lender, on the one hand, and Obligors, on the other hand, by virtue of any Loan Document or any transaction contemplated therein.

13.6   **Counterparts; Electronic Execution**.  This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same agreement.  Delivery of an executed counterpart of this Agreement by facsimile or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement. Any party delivering an executed counterpart of this Agreement by facsimile or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.  The foregoing shall apply to each other Loan Document *mutatis mutandis*.

13.7   **Revival and Reinstatement of Obligations**.  If the incurrence or payment of the Obligations by Obligors or the transfer to Lender of any property should for any reason subsequently be asserted, or declared, to be void or voidable under any state or federal law relating to creditors' rights, including provisions of the Bankruptcy Code relating to fraudulent conveyances, preferences, or other voidable or recoverable payments of money or transfers of property (each, a "Voidable Transfer"), and if Lender is required to repay or restore, in whole or in part, any such Voidable Transfer, or elects to do so upon the reasonable advice of its counsel, then, as to any such Voidable Transfer, or the amount thereof that Lender is required or elects to repay or restore, and as to all reasonable, documented, and actual out-of-pocket costs, expenses, and attorneys' fees of Lender related thereto, the liability of Obligors automatically shall be revived, reinstated, and restored and shall exist as though such Voidable Transfer had never been made.

13.8   **Lender Expenses**.  Subject to the applicable provisions of the DIP Orders, if any, the Obligors hereby agree to pay any and all Lender Expenses promptly after written demand therefor by Lender and that such Obligations shall survive payment or satisfaction in full of all other Obligations.

13.9   **Integration**.  This Agreement, together with the other Loan Documents, reflects the entire understanding of the parties with respect to the transactions contemplated hereby and shall not be contradicted or qualified by any other agreement, oral or written, before the date hereof.

**14.   JOINT AND SEVERAL OBLIGATIONS; WAIVERS.**

14.1   **Guaranty.**

(a)      For value received in connection with the Loans under the Facility, and the provision of the Facility to the Borrowers and the use of proceeds thereof, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, each Obligor hereby unconditionally and irrevocably, and jointly and severally with the other Obligors, guarantees to the Lender the full and prompt payment when due, whether at stated maturity, by required prepayment, upon acceleration, demand or otherwise of the Obligations and the punctual performance by all Obligors of all of the terms contained in this Agreement and the Loan Documents. This guaranty is a guaranty of payment and performance and is not merely a guaranty of collection.

(b)      Each Obligor consents and agrees that the Lender may, at any time and from time to time, to the extent permitted by the DIP Orders and this Agreement, without notice or demand, and without affecting the enforceability or continuing effectiveness hereof: (a) amend, extend, renew, compromise, discharge, accelerate or otherwise change the time for payment or the terms of the Obligations or any part thereof; (b) take, hold, exchange, enforce, waive, release, fail to perfect, sell, or otherwise dispose of any security for the payment of the Obligations; (c) apply such security and direct the order or manner of sale thereof as the Lender may determine; and (d) release or substitute one or more of any endorsers or other Obligors from their respective Obligations.

(c)      Each Obligor waives to the fullest extent permitted by the DIP Order and applicable law, (i) any defense arising by reason of any disability or other defense of the Obligor, or the cessation from any cause whatsoever (including any act or omission of the Lender) of the liability of any Obligor; (ii) any defense based on any claim that such Obligor's obligations exceed or are more burdensome than those of Holdings or another Obligor; (iii) the benefit of any statute of limitations affecting such Obligor's liability hereunder; (iv) any right to require any Lender to proceed against a Obligor or any particular Obligor, or to proceed against or exhaust any security for the Obligations, or pursue any other remedy in the Lender's power whatsoever and any defense based upon the doctrines of marshalling of assets or of election of remedies; (v) any benefit of and any right to participate in any security now or hereafter held by the Lender; (vi) any fact or circumstance related to the Obligations which might otherwise constitute a defense to the obligations of such Obligor hereunder and (vii) any and all other defenses or benefits that may be derived from or afforded by applicable law limiting the liability of or exonerating guarantors or sureties, other than the defense that the Obligations have been fully performed and indefeasibly paid in full in cash.

(d)      Except to the extent provided in the DIP Orders, each Obligor expressly waives all presentments, demands for payment or performance, notices of nonpayment or nonperformance, protests, notices of protest, notices of dishonor and all other notices or demands of any kind or nature whatsoever with respect to the Obligations, and all notices of acceptance of this guaranty or of the existence, creation or incurrence of new or additional Obligations. This guaranty shall not be affected by the genuineness, validity, regularity or enforceability of the Obligations or any instrument or agreement evidencing any Obligations, or by the existence, validity, enforceability, perfection, non-perfection or extent of any collateral therefor, or by any fact or circumstance relating to the Obligations which might otherwise constitute a defense to the obligations of any Obligor under this guaranty, and each Obligor hereby irrevocably waives any defenses it may now have or hereafter acquire in any way relating to any or all of the foregoing, in each case, other than the defense that the Guaranteed Obligations have been fully performed and indefeasibly paid in full in cash.

(e)      The obligations of each Obligor hereunder are those of primary obligor, and not merely as surety, and are independent of the Obligations and the obligations of any other Obligor,

and subject to appliable law, a separate action may be brought against any Obligor to enforce this guaranty whether or not an Obligor or any other person or entity is joined as a party.

(f)     Without the consent of Lender, no Obligor shall exercise any right of subrogation, contribution, indemnity, reimbursement or similar rights with respect to any payments it makes under the Agreement or the Loan Documents until all of the Obligations and any amounts payable under this guaranty have been indefeasibly paid and performed in full. If any amounts are paid to any Obligor in violation of the foregoing limitation, then, subject to the DIP Order, such amounts shall be held in trust for the benefit of the Lender and shall forthwith be paid to the Lender to reduce the amount of the Obligations, whether matured or unmatured.

(g)     This guaranty is a continuing and irrevocable guaranty of all Obligations now or hereafter existing and shall remain in full force and effect until all Obligations are indefeasibly paid in full in cash. Notwithstanding the foregoing, and subject to the DIP Orders, this guaranty shall continue in full force and effect or be revived, as the case may be, if any payment by or on behalf of any Obligor is made, or any Lender exercises its right of setoff, in respect of the Obligations and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Lender) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Chapter 11 Case or any successor case, or otherwise, all as if such payment had not been made or such setoff had not occurred and regardless of any prior revocation, rescission, termination or reduction. The obligations of each Obligor under this section shall survive termination of the Agreement.

(h)     Each Obligor acknowledges and agrees that it has the sole responsibility for, and has adequate means of, obtaining from Holdings and each other Obligor such information concerning the financial condition, business and operations of such Persons as such Obligor requires, and such Obligor is not relying on the Lender at any time, to disclose to such Obligor any information relating to the business, operations or financial condition of Holdings or any other Person (and each Obligor hereby waives any duty on the part of the Lender to disclose such information and any defense relating to the failure to provide the same).

IN ADDITION TO, AND WITHOUT LIMITING ANY TERM OR PROVISION OF, THIS AGREEMENT, ALL OBLIGATIONS HEREUNDER AND UNDER THE LOAN DOCUMENTS OF EACH OBLIGOR IS JOINT AND SEVERAL.  TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE OBLIGATIONS OF EACH OBLIGOR SHALL NOT BE AFFECTED BY (A) THE FAILURE OF LENDER TO ASSERT ANY CLAIM OR DEMAND OR TO ENFORCE OR EXERCISE ANY RIGHT OR REMEDY AGAINST ANY OTHER OBLIGOR UNDER THE PROVISIONS OF THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR OTHERWISE, (B) ANY RESCISSION, WAIVER, AMENDMENT OR MODIFICATION OF, OR ANY RELEASE FROM ANY OF THE TERMS OR PROVISIONS OF, THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR (C) THE FAILURE TO PERFECT ANY SECURITY INTEREST IN, OR THE RELEASE OF, ANY OF THE COLLATERAL OR OTHER SECURITY HELD BY LENDER.

## 15.     TREATMENT OF CERTAIN INFORMATION.

Lender agrees to use reasonable precautions to keep confidential, in accordance with its customary procedures for handling confidential information of the same nature, all non-public information regarding any Obligor pursuant to this Agreement which (a) is clearly identified by such Person as being confidential at the time the same is delivered to Lender or (b) constitutes any financial statement, financial projections or forecasts, budget, compliance certificate, audit report, management letter or accountants' certification

delivered hereunder ("Information"); provided, however, that nothing herein shall limit the disclosure of any such Information (i) to any Lender Related Person as need to know such Information, (ii) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, or requested by any bank regulatory authority, (iii) to auditors or accountants, and any analogous counterpart thereof, (v) in connection with any litigation to which Lender is a party arising from or related to this Agreement or the Loan Documents, (vi) to the extent such Information (A) becomes publicly available other than as a result of a breach of this Agreement, (B) becomes available to Lender on a confidential basis from a source other than any Obligor or any of its Subsidiaries or Affiliates so long as such source is not known by Lender to be bound by obligations of confidentiality with respect to such Information, or (C) was available to Lender on a non- confidential basis prior its disclosure to Lender by Obligor, and (vii) to the extent that any Obligor shall have consented to such disclosure in writing.

[Remainder of Page Left Blank]

IN WITNESS WHEREOF, the undersigned has executed this Loan and Security Agreement as of the date written above.

**LENDER**

LAPIS MUNICIPAL OPPORTUNITIES FUND V LP

  By: Lapis-GP LLC

_____
Name:
Title:

IN WITNESS WHEREOF, I have duly executed this Agreement as of the date first set forth above.

**INSPIRED HEALTHCARE CAPITAL, LLC**
**INSPIRED HEALTHCARE CAPITAL HOLDINGS, LLC**
**INSPIRED SENIOR LIVING OF APPLETON MT LLC**
**INSPIRED SENIOR LIVING OF APPLETON ST LLC**
**IHC – ASHBROOK MT, LLC**
**IHC – ASHBROOK ST, LLC**
**INSPIRED SENIOR LIVING OF CHESTERFIELD MT, LLC**
**INSPIRED SENIOR LIVING OF CHESTERFIELD ST, LLC**
**INSPIRED SENIOR LIVING OF DARTMOUTH MT, LLC**
**INSPIRED SENIOR LIVING OF DARTMOUTH ST, LLC**
**INSPIRED SENIOR LIVING OF EATONTON MT LLC**
**INSPIRED SENIOR LIVING OF EATONTON ST LLC**
**INSPIRED SENIOR LIVING OF ROUND ROCK MT, LLC**
**INSPIRED SENIOR LIVING OF ROUND ROCK ST, LLC**
**INSPIRED SENIOR LIVING OF ARLINGTON HEIGHTS MT, LLC**
**INSPIRED SENIOR LIVING OF ARLINGTON HEIGHTS ST, LLC**
**INSPIRED SENIOR LIVING OF ATHENS MT, LLC**
**INSPIRED SENIOR LIVING OF ATHENS ST, LLC**
**INSPIRED SENIOR LIVING OF CARSON VALLEY MT, LLC**
**INSPIRED SENIOR LIVING OF CARSON VALLEY ST, LLC**
**INSPIRED SENIOR LIVING OF LAKE ORION MT, LLC**
**INSPIRED SENIOR LIVING OF LAKE ORION ST, LLC**
**INSPIRED SENIOR LIVING OF LAS VEGAS MT, LLC**

**INSPIRED SENIOR LIVING OF LAS VEGAS
ST, LLC**
**INSPIRED SENIOR LIVING OF LARGO MT,
LLC**
**INSPIRED SENIOR LIVING OF LARGO ST,
LLC**
**INSPIRED SENIOR LIVING OF MEQUON
MT, LLC**
**INSPIRED SENIOR LIVING OF MEQUON
ST, LLC**
**INSPIRED SENIOR LIVING OF
NAPERVILLE MT, LLC**
**INSPIRED SENIOR LIVING OF
NAPERVILLE ST, LLC**
**IHC – PEACHTREE MT, LLC**
**IHC – PEACHTREE ST, LLC**
**INSPIRED SENIOR LIVING OF PINELLAS
PARK MT, LLC**
**INSPIRED SENIOR LIVING OF PINELLAS
PARK ST, LLC**
**INSPIRED SENIOR LIVING OF SAN
MARCOS MT LLC**
**INSPIRED SENIOR LIVING OF SAN
MARCOS ST LLC**
**INSPIRED SENIOR LIVING OF NEW
BRAUNFELS MT, LLC**
**INSPIRED SENIOR LIVING OF NEW
BRAUNFELS ST, LLC**
**INSPIRED SENIOR LIVING OF APPLETON
DST**
**IHC – ASHBROOK DST**
**INSPIRED SENIOR LIVING OF
CHESTERFIELD DST**
**INSPIRED SENIOR LIVING OF
DARTMOUTH DST**
**INSPIRED SENIOR LIVING OF EATONTON
DST**
**INSPIRED SENIOR LIVING OF ROUND
ROCK DST**
**INSPIRED SENIOR LIVING OF ARLINGTON
HEIGHTS DST**
**INSPIRED SENIOR LIVING OF ATHENS DST**
**INSPIRED SENIOR LIVING OF CARSON
VALLEY DST**
**INSPIRED SENIOR LIVING OF LAKE
ORION DST**

**INSPIRED SENIOR LIVING OF LAS VEGAS DST**
**INSPIRED SENIOR LIVING OF LARGO DST**
**INSPIRED SENIOR LIVING OF MEQUON DST**
**INSPIRED SENIOR LIVING OF NAPERVILLE DST**
**IHC – PEACHTREE DST**
**INSPIRED SENIOR LIVING OF PINELLAS PARK DST**
**INSPIRED SENIOR LIVING OF SAN MARCOS DST**
**INSPIRED SENIOR LIVING OF NEW BRAUNFELS DST**
**INSPIRED SENIOR LIVING OF AUGUSTA DST**
**INSPIRED SENIOR LIVING OF AUGUSTA MT, LLC**
**INSPIRED SENIOR LIVING OF AUGUSTA ST, LLC**
**INSPIRED SENIOR LIVING OF BROOKHAVEN DST**
**INSPIRED SENIOR LIVING OF BROOKHAVEN MT, LLC**
**INSPIRED SENIOR LIVING OF BROOKHAVEN ST, LLC**
**IHC – CANDLE LIGHT COVE DST**
**IHC – CANDLE LIGHT COVE MT, LLC**
**IHC – CANDLE LIGHT COVE ST, LLC**
**INSPIRED SENIOR LIVING OF GRAPEVINE DST**
**INSPIRED SENIOR LIVING OF GRAPEVINE MT, LLC**
**INSPIRED SENIOR LIVING OF GRAPEVINE ST, LLC**
**INSPIRED SENIOR LIVING OF DELRAY BEACH DST**
**INSPIRED SENIOR LIVING OF DELRAY BEACH MT, LLC**
**INSPIRED SENIOR LIVING OF DELRAY BEACH ST, LLC**
**INSPIRED SENIOR LIVING OF DUNEDIN DST**
**INSPIRED SENIOR LIVING OF DUNEDIN MT, LLC**

**INSPIRED SENIOR LIVING OF DUNEDIN
ST, LLC**
**INSPIRED SENIOR LIVING OF EUGENE
DST**
**INSPIRED SENIOR LIVING OF EUGENE
MT, LLC**
**INSPIRED SENIOR LIVING OF EUGENE ST,
LLC**
**INSPIRED SENIOR LIVING OF FORT
MYERS DST**
**INSPIRED SENIOR LIVING OF FORT
MYERS MT, LLC**
**INSPIRED SENIOR LIVING OF FORT
MYERS ST, LLC**
**INSPIRED SENIOR LIVING OF HAMILTON
DST**
**INSPIRED SENIOR LIVING OF HAMILTON
MT, LLC**
**INSPIRED SENIOR LIVING OF HAMILTON
ST, LLC**
**INSPIRED SENIOR LIVING OF
MELBOURNE DST**
**INSPIRED SENIOR LIVING OF
MELBOURNE MT, LLC**
**INSPIRED SENIOR LIVING OF
MELBOURNE ST, LLC**
**INSPIRED SENIOR LIVING OF NORTH
HAVEN DST**
**INSPIRED SENIOR LIVING OF NORTH
HAVEN MT, LLC**
**INSPIRED SENIOR LIVING OF NORTH
HAVEN ST, LLC**
**INSPIRED SENIOR LIVING OF RENO DST**
**INSPIRED SENIOR LIVING OF RENO MT,
LLC**
**INSPIRED SENIOR LIVING OF RENO ST,
LLC**
**INSPIRED SENIOR LIVING OF ST.
PETERSBURG DST**
**INSPIRED SENIOR LIVING OF ST.
PETERSBURG MT, LLC**
**INSPIRED SENIOR LIVING OF ST.
PETERSBURG ST, LLC**
**INSPIRED HEALTHCARE CAPITAL
INCOME FUND LLC**

**INSPIRED HEALTHCARE CAPITAL
INCOME FUND 2 LLC
INSPIRED HEALTHCARE CAPITAL
INCOME FUND 3, LLC
INSPIRED HEALTHCARE CAPITAL
INCOME FUND 5, LLC
INSPIRED HEALTHCARE CAPITAL
INCOME FUND 5 NOTES, LLC
INSPIRED HEALTHCARE CAPITAL
LIQUIDITY FUND, LLC
INSPIRED HEALTHCARE CAPITAL FUND
LP
IHC SECURITY INCOME FUND LLC
IHC DEVELOPMENT FUND III, LLC
IHC DEVELOPMENT FUND IV, LLC
ZOL MANAGEMENT, LLC
HUNAN 1, LLC
MSL MANAGEMENT, LLC
SUKIYAKI 10, LLC
SUKIYAKI 14, LLC
IHC - HANOVER PROPCO, LLC
INSPIRED SENIOR LIVING OF HANOVER,
LLC
INSPIRED SENIOR LIVING OF SAN TAN
DEVELOPMENT, LLC
SAN TAN SENIOR LIVING, LLC
INSPIRED SENIOR LIVING OF PAYSON
DEVELOPMENT, LLC
LUCAS CONSTRUCTION HOLDINGS, LLC
LUCAS CONSTRUCTION GROUP, LLC
INNOV8TION HOLDINGS, LLC
INNOV8TION MARKETING, LLC
CRE8TIVE HOLDINGS, LLC
CRE8TIVE ARCHITECTS, LLC
INSPIRED HEALTHCARE CAPITAL FUND
SERVICES, LLC
NSITE DEVELOPMENT, LLC
SENIOR HOUSING MARKETING AGENCY,
LLC
SENIOR HOUSING MANAGEMENT GROUP,
LLC
SHMG-AUGUSTA GA, LLC
SHMG-NAPERVILLE IL, LLC
INSPIRED SENIOR LIVING OF CRESWELL
DEVELOPMENT, LLC
CRESWELL SENIOR LIVING, LLC**

**INSPIRED SENIOR LIVING OF WINERY
LANE DEVELOPMENT LLC
WINERY LANE SENIOR LIVING, LLC
VOLANTE HOLDCO, LLC
VOLANTE SENIOR LIVING LLC
VSL-ARLINGTON IL, LLC
VSL-ASHBROOK GA, LLC
VSL-CARSON VALLEY NV, LLC
VSL-CHESTERFIELD MI, LLC
VSL-DELRAY BEACH FL, LLC
VSL-DUNEDIN FL, LLC
VSL-EUGENE OR, LLC
VSL-FORT MYERS FL, LLC
VSL-GRAPEVINE TX, LLC
VSL- HAMILTON NJ, LLC
VSL- LAKE ORION MI, LLC
VSL-LARGO FL, LLC
VSL-LAS VEGAS NV, LLC
VSL-MELBOURNE FL, LLC
VSL-PEACHTREE AL, LLC
VSL-PINELLAS FL, LLC
VSL-RENO, NV, LLC
VSL-ROUND ROCK TX, LLC
VSL - SAN MARCOS TX, LLC
VSL-ST. PETERSBURG FL, LLC
VSL-HANOVER MN, LLC
VSL-HARMONY OR, LLC
VSL-CRESWELL OR, LLC
VSL-ROSEBURG OR, LLC
IHC-AUGUSTA II PROPCO, LLC
IHC – HARMONY PROPCO, LLC
IHC – HARMONY OPCO, LLC**

By: _____
Name: M. Benjamin Jones
Title: Authorized Signatory

**Exhibit A**
**Interim Order**

**Exhibit B**
**Approved Budget**

**Exhibit C**
**Compliance Certificate**

**Exhibit D**
**Form of Borrowing Notice**

**Exhibit E**
**Reporting Requirements**

**Schedule A-1**
**Authorized Persons**

1.  M. Benjamin Jones, Chief Restructuring Officer

**Schedule A-2**
**Payment Account**

To be provided separately.

## Schedule A-3
## Milestones

Each of the following milestones and related deadlines are the "Milestones":

| Milestone | Event |
|---|---|
| Milestone 1: | No later than three (3) days after the Petition Date, the Bankruptcy Court shall have entered the Interim Order. |
| Milestone 2: | No later than twenty-one (21) days after entry of the Interim Order, all documentation relating to the DIP Facility, including the Loan Documents, shall be in form and substance satisfactory to the Lender and shall have been duly executed and delivered by all parties thereto. |
| Milestone 3: | No later than thirty-five (35) days after the Petition Date, the Bankruptcy Court shall have entered the Final Order. |
| Milestone 4: | No later than forty-five (45) days after the Petition Date, the Obligors shall have filed a motion for approval of procedures for the solicitation or marketing of a sale, disposition, restructuring, restructuring or other transaction selected by the Obligors (the "Transaction"), which motion(s) shall be in form and substance reasonably acceptable to the Lender. |
| Milestone 5: | No later than seventy-five (75) days after the Petition Date, the Bankruptcy Court shall have entered an order granting the Obligors' motion for approval of procedures for the marketing and Transaction (the "Bidding/Solicitation Procedures Order"), which order shall be in form and substance reasonably acceptable to the Lender. |
| Milestone 6: | An auction to select a winning bidder under the Bidding Procedures Order shall be conducted no later than one hundred fifty (150) days following the Petition Date. |
| Milestone 7: | No later than one hundred sixty five (165) days after the Petition Date, the Bankruptcy Court shall have entered an order approving the Transaction by approving the sale of substantially all the Obligors' assets under section 363 of the Bankruptcy Code, which order shall be in form and substance acceptable to the Lender in its sole discretion. |
| Milestone 8: | No later than 270 days after the Petition Date, the Transaction shall have been consummated. |

**Schedule D-1**
**Designated Account and Designated Account Bank**

**Schedule 1**
**Borrowers**

1.   Inspired Healthcare Capital LLC
2.   Inspired Healthcare Capital Holdings, LLC
3.   Inspired Senior Living of Appleton MT LLC
4.   Inspired Senior Living of Appleton ST LLC
5.   IHC – Ashbrook MT, LLC
6.   IHC – Ashbrook ST LLC
7.   Inspired Senior Living of Chesterfield MT, LLC
8.   Inspired Senior Living of Chesterfield ST, LLC
9.   Inspired Senior Living of Dartmouth MT, LLC
10.  Inspired Senior Living of Dartmouth ST, LLC
11.  Inspired Senior Living of Eatonton MT LLC
12.  Inspired Senior Living of Eatonton ST LLC
13.  Inspired Senior Living of Round Rock MT, LLC
14.  Inspired Senior Living of Round Rock ST, LLC
15.  Inspired Senior Living of Arlington Heights MT, LLC
16.  Inspired Senior Living of Arlington Heights ST, LLC
17.  Inspired Senior Living of Athens MT, LLC
18.  Inspired Senior Living of Athens ST, LLC
19.  Inspired Senior Living of Carson Valley MT, LLC
20.  Inspired Senior Living of Carson Valley ST, LLC
21.  Inspired Senior Living of Lake Orion MT, LLC
22.  Inspired Senior Living of Lake Orion ST, LLC
23.  Inspired Senior Living of Las Vegas MT, LLC
24.  Inspired Senior Living of Las Vegas ST, LLC
25.  Inspired Senior Living of Largo MT, LLC
26.  Inspired Senior Living of Largo ST, LLC
27.  Inspired Senior Living of Mequon MT, LLC
28.  Inspired Senior Living of Mequon ST, LLC
29.  Inspired Senior Living of Naperville MT, LLC
30.  Inspired Senior Living of Naperville ST, LLC
31.  IHC – Peachtree MT, LLC
32.  IHC – Peachtree ST, LLC
33.  Inspired Senior Living of Pinellas Park MT, LLC
34.  Inspired Senior Living of Pinellas Park ST, LLC
35.  Inspired Senior Living of San Marcos MT LLC
36.  Inspired Senior Living of San Marcos ST LLC
37.  Inspired Senior Living of New Braunfels MT, LLC
38.  Inspired Senior Living of New Braunfels ST, LLC

**Schedule 2**
**Pledging Guarantors**

1.  Inspired Senior Living of Appleton DST
2.  IHC – Ashbrook DST
3.  Inspired Senior Living of Chesterfield DST
4.  Inspired Senior Living of Dartmouth DST
5.  Inspired Senior Living of Eatonton DST
6.  Inspired Senior Living of Round Rock DST
7.  Inspired Senior Living of Arlington Heights DST
8.  Inspired Senior Living of Athens DST
9.  Inspired Senior Living of Carson Valley DST
10. Inspired Senior Living of Lake Orion DST
11. Inspired Senior Living of Las Vegas DST
12. Inspired Senior Living of Largo DST
13. Inspired Senior Living of Mequon DST
14. Inspired Senior Living of Naperville DST
15. IHC – Peachtree DST
16. Inspired Senior Living of Pinellas Park DST
17. Inspired Senior Living of San Marcos DST
18. Inspired Senior Living of New Braunfels DST

**Schedule 3**
**Non-Pledging Guarantors**

1.  Inspired Senior Living of Augusta DST
2.  Inspired Senior Living of Augusta MT, LLC
3.  Inspired Senior Living of Augusta ST, LLC
4.  Inspired Senior Living of Brookhaven DST
5.  Inspired Senior Living of Brookhaven MT, LLC
6.  Inspired Senior Living of Brookhaven ST, LLC
7.  IHC – Candle Light Cove DST
8.  IHC – Candle Light Cove MT, LLC
9.  IHC – Candle Light Cove St, LLC
10. Inspired Senior Living of Grapevine DST
11. Inspired Senior Living of Grapevine MT, LLC
12. Inspired Senior Living of Grapevine ST, LLC
13. Inspired Senior Living of Delray Beach DST
14. Inspired Senior Living of Delray Beach MT, LLC
15. Inspired Senior Living of Delray Beach ST, LLC
16. Inspired Senior Living of Dunedin DST
17. Inspired Senior Living of Dunedin MT, LLC
18. Inspired Senior Living of Dunedin ST, LLC
19. Inspired Senior Living of Eugene DST
20. Inspired Senior Living of Eugene MT, LLC
21. Inspired Senior Living of Eugene ST, LLC
22. Inspired Senior Living of Fort Myers DST
23. Inspired Senior Living of Fort Myers MT, LLC
24. Inspired Senior Living of Fort Myers ST, LLC
25. Inspired Senior Living of Hamilton DST
26. Inspired Senior Living of Hamilton MT, LLC
27. Inspired Senior Living of Hamilton ST, LLC
28. Inspired Senior Living of Melbourne DST
29. Inspired Senior Living of Melbourne MT, LLC
30. Inspired Senior Living of Melbourne ST, LLC
31. Inspired Senior Living of North Haven DST
32. Inspired Senior Living of North Haven MT, LLC
33. Inspired Senior Living of North Haven ST, LLC
34. Inspired Senior Living of Reno DST
35. Inspired Senior Living of Reno MT, LLC
36. Inspired Senior Living of Reno ST, LLC
37. Inspired Senior Living of St. Petersburg DST
38. Inspired Senior Living of St. Petersburg MT, LLC
39. Inspired Senior Living of St. Petersburg ST, LLC
40. Inspired Healthcare Capital Income Fund LLC
41. Inspired Healthcare Capital Income Fund 2 LLC
42. Inspired Healthcare Capital Income Fund 3, LLC
43. Inspired Healthcare Capital Income Fund 5, LLC

44.  Inspired Healthcare Capital Income Fund 5 Notes, LLC
45.  Inspired Healthcare Capital Liquidity Fund, LLC
46.  Inspired Healthcare Capital Fund LP
47.  IHC Security Income Fund LLC
48.  IHC Development Fund III, LLC
49.  IHC Development Fund IV, LLC
50.  ZOL Management, LLC
51.  Hunan 1, LLC
52.  MSL Management, LLC
53.  Sukiyaki 10, LLC
54.  Sukiyaki 14, LLC
55.  IHC - Hanover Propco, LLC
56.  Inspired Senior Living of Hanover, LLC
57.  Inspired Senior Living of San Tan Development, LLC
58.  San Tan Senior Living, LLC
59.  Inspired Senior Living of Payson Development, LLC
60.  Lucas Construction Holdings, LLC
61.  Lucas Construction Group, LLC
62.  Innov8tion Holdings, LLC
63.  Innov8tion Marketing, LLC
64.  Cre8tive Holdings, LLC
65.  Cre8tive Architects, LLC
66.  Inspired Healthcare Capital Fund Services, LLC
67.  Nsite Development, LLC
68.  Senior Housing Marketing Agency, LLC
69.  Senior Housing Management Group, LLC
70.  SHMG-Augusta GA, LLC
71.  SHMG-Naperville IL, LLC
72.  Inspired Senior Living of Creswell Development, LLC
73.  Creswell Senior Living, LLC
74.  Inspired Senior Living of Winery Lane Development LLC
75.  Winery Lane Senior Living, LLC
76.  Volante HoldCo, LLC
77.  Volante Senior Living LLC
78.  VSL-Arlington IL, LLC
79.  VSL-Ashbrook GA, LLC
80.  VSL-Carson Valley NV, LLC
81.  VSL-Chesterfield MI, LLC
82.  VSL-Delray Beach FL, LLC
83.  VSL-Dunedin FL, LLC
84.  VSL-Eugene OR, LLC
85.  VSL-Fort Myers FL, LLC
86.  VSL-Grapevine TX, LLC
87.  VSL- Hamilton NJ, LLC
88.  VSL- Lake Orion MI, LLC
89.  VSL-Largo FL, LLC

90.  VSL-Las Vegas NV, LLC
91.  VSL-Melbourne FL, LLC
92.  VSL-Peachtree AL, LLC
93.  VSL-Pinellas FL, LLC
94.  VSL-Reno, NV, LLC
95.  VSL-Round Rock TX, LLC
96.  VSL - San Marcos TX, LLC
97.  VSL-St. Petersburg FL, LLC
98.  VSL-Hanover MN, LLC
99.  VSL-Harmony OR, LLC
100. VSL-Creswell OR, LLC
101. VSL-Roseburg OR, LLC
102. IHC-Augusta II Propco, LLC
103. IHC – Harmony PropCo, LLC
104. IHC – Harmony OpCo, LLC

**Schedule 4.1(a)**
**Organizational Chart**

[see attached]

**Schedule 4.4**
**Real Property Legal Descriptions**

[see attached]

**Schedule 4.5**
**Jurisdiction, etc.**

**Schedule 4.6**
**Litigation and Commercial Tort Claims**

**Schedule 4.9**
**Taxes**

**Schedule 4.11**
**Maintenance of Properties; Permits**

**EXHIBIT 2**

**<u>Initial DIP Budget</u>**

**Inspired Healthcare Capital Holdings, LLC, et al.**
Interim DIP Budget - Consolidated Sponsor / Holdings

($ in 000's)

| # | Week # / Weeek Ending Date | 1 02/06/26 | 2 02/13/26 | 3 02/20/26 | 4 02/27/26 | 5 03/06/26 | Total 5-Week |
|---|---|---|---|---|---|---|---|
| 1. | **Receipts:** | | | | | | |
| 2. | Reallocation Fees | $ - | $ 1,444 | $ - | $ - | $ - | $ 1,444 |
| 3. | **Total Receipts** | $ - | $ 1,444 | $ - | $ - | $ - | $ 1,444 |
| 4. | **Corporate Expenses:** | | | | | | |
| 5. | Payroll and Benefits | - | 158 | 21 | 275 | 157 | 611 |
| 6. | Office Rent and Expenses | 41 | - | 11 | - | 41 | 93 |
| 7. | Software and IT Related | 81 | 6 | 38 | 60 | - | 185 |
| 8. | Insurance | 9 | - | 198 | - | 9 | 216 |
| 9. | Other Corporate Expenses | 83 | 179 | 45 | 20 | 90 | 417 |
| 10. | **Total Corporate Expenses** | $ 214 | $ 343 | $ 313 | $ 355 | $ 298 | $ 1,523 |
| 11. | Community Operational Support | 716 | 25 | 117 | 150 | 77 | 1,084 |
| 12. | Other Assets Expenses | 8 | - | 10 | - | 1 | 19 |
| 13. | **Total Operating Disbursements** | $ 938 | $ 368 | $ 440 | $ 505 | $ 376 | $ 2,626 |
| 14. | **Non-Operating Disbursements:** | | | | | | |
| 15. | Restructuring Professionals | 1,871 | 880 | 1,068 | 1,637 | 1,035 | 6,491 |
| 16. | US Trustee Fees | 280 | - | - | - | - | 280 |
| 17. | Claims Agent | 45 | 45 | 30 | 30 | 20 | 170 |
| 18. | KERP | - | - | - | - | - | - |
| 19. | Utility Deposit | 290 | - | - | - | - | 290 |
| 20. | **Total Non-Operating Disbursements** | $ 2,486 | $ 925 | $ 1,098 | $ 1,667 | $ 1,055 | $ 7,231 |
| 21. | **Net Cash Flow** | $ (3,424) | $ 151 | $ (1,538) | $ (2,172) | $ (1,431) | $ (8,413) |
| 22. | **Sponsor/Holdings Cash:** | | | | | | |
| 23. | Beginning Cash | $ 250 | $ 6,826 | $ 6,977 | $ 5,440 | $ 3,268 | $ 250 |
| 24. | Net Cash Flow | (3,424) | 151 | (1,538) | (2,172) | (1,431) | (8,413) |
| 25. | DIP Draw / Repayment[(1)] | 10,000 | - | - | - | 5,000 | 15,000 |
| 26. | **Ending Cash Sponsors / Holdings** | $ 6,826 | $ 6,977 | $ 5,440 | $ 3,268 | $ 6,837 | $ 6,837 |

*(1) The $5.0mm DIP loan in week ending 3/6/26 is subject to entry of Final Order.*