**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 26-90004 (MXM) |
| INSPIRED HEALTHCARE CAPITAL | ) | |
| HOLDINGS, LLC, *et al.*,[1] | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | (Jointly Administered) |

**OBJECTION TO DEBTORS' MOTION FOR FINAL ORDER (I) AUTHORIZING (A)
POSTPETITION FINANCING AND (B) THE USE OF CASH COLLATERAL, (II)
GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE
EXPENSE CLAIMS, (III) GRANTING ADEQUATE PROTECTION TO PREPETITION
SECURED PARTIES, (IV) MODIFYING THE AUTOMATIC STAY, (V) SCHEDULING
A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF**

Pinnacle Bank, as successor by merger to Synovus Bank, ("Pinnacle"), a secured creditor

and party in interest, files this objection to *Debtors' Motion for Final Order (I) Authorizing (A)*

*Postpetition Financing and (B) the Use of Cash Collateral, (II) Granting Liens and Providing*

*Superpriority Administrative Claims, (III) Granting Adequate Protection to Prepetition Secured*

*Parties, (IV) Modifying the Automatic Stay, (V) Securing a Final Hearing, and (VI) Granting*

*Related Relief* (the "Cash Collateral Motion" or "Motion") [Doc. 28], and respectfully submits

the following:

**BACKGROUND FACTS**

1. In 2021 and 2022, Synovus Bank ("Original Lender") financed three (3)

commercials loans to three (3) of the Debtors: Inspired Senior Living of Brookhaven DST

("Brookhaven DST"); Inspired Senior Living of Reno DST ("Reno DST"); and Inspired Senior

---

[1] The last four digits of Inspired Healthcare Capital Holdings, LLC's federal tax identification number are 6696. There are 161 Debtors in these chapter 11 cases, which are being jointly administered for procedural purposes only. A complete list of the Debtors and the last four digits of their federal tax identification numbers are not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/InspiredHealthcare. The Debtors' mailing address is 7033 East Greenway Parkway, Suite 250, Scottsdale, AZ 85254.

Living of Melbourne DST ("Melbourne DST" collectively, the "Pinnacle Borrowers" and each a "Pinnacle Borrower").

2.      The assets, liabilities, and operations of each Pinnacle Borrower are single asset entities independent of the other Pinnacle Borrowers and other Delaware Statutory Trust Debtors.  Put simply, each Pinnacle Borrower and its operations and assets have no relation to any other Pinnacle Borrower or Debtor.

3.      The loan as between Original Lender and Brookhaven DST is secured by, among other things, a skilled nursing facility, together with together with all buildings and other improvements thereon, all personal property, and all rights pertaining to such property, located at 1634 Afton Lane NE, Brookhaven, Georgia 30329 (the "Brookhaven Property").

4.      The loan as between Original Lender and Reno DST is secured by, among other things, a skilled nursing facility, together with together with all buildings and other improvements thereon, all personal property, and all rights pertaining to such property, located at 222 E. Patriot Boulevard, Reno, Nevada 89511 (the "Reno Property").

5.      The loan as between Original Lender and Melbourne DST secured by, among other things, a skilled nursing facility, together with together with all buildings and other improvements thereon, all personal property, and all rights pertaining to such property, located at 64 South Harbor City Boulevard, Melbourne, Florida 32901 (the "Melbourne Property" and collectively with the Brookhaven Property and Reno Property, the "Properties" and each a "Property").

6.      Original Lender merged into Pinnacle Bank, a Tennessee Bank, on January 2, 2026, and Pinnacle Bank is the successor in interest to Original Lender in all respects.

7.      On or about February 2, 2026 (the "Petition Date"), Debtors filed voluntary petitions under Chapter 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code").

8.      Since the Petition Date, the Debtors have continued to manage their businesses as debtors-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108 of the Bankruptcy Code.

9.      Pinnacle is owed in excess of $53 million and is one of the largest secured creditors of the Debtors as more particularly described herein.

**THE LOANS**

**A.      The Brookhaven Loan and Brookhaven Property**

10.      On or about September 30, 2021, Original Lender made a loan to Brookhaven DST in the original principal amount of $19,600,000.00 (the "Brookhaven Loan"). The Brookhaven Loan is evidenced and secured by certain documents as described hereinbelow.

11.      The indebtedness of the Brookhaven Loan is evidenced by that certain Promissory Note, dated September 30, 2021, made by Brookhaven DST in favor of Original Lender, in the original stated principal amount of $19,600,000.00 (as assumed, amended, and assigned from time to time, the "Brookhaven Note").

12.      The Brookhaven Loan is governed by that certain Loan Agreement dated September 30, 2021, executed by Original Lender and Brookhaven DST (as assumed, amended, and modified from time to time, the "Brookhaven Loan Agreement").

13.      The Brookhaven Loan is secured by that certain Deed to Secure Debt, Security Agreement and Fixture Filing dated as of September 30, 2021, executed by Borrower for the benefit of Lender (as assumed, amended, and assigned from time to time, the "Brookhaven Deed to Secure Debt"). The Brookhaven Deed to Secure Debt is recorded in the real estate records of

the Superior Court of DeKalb County, Georgia (the "Dekalb Recording Office") in Deed Book 29776, Page 762.

14.     Pursuant to the Brookhaven Deed to Secure Debt, Brookhaven DST granted Original Lender a first-priority security interest in all real property and personal property associated with the Brookhaven Property as further described therein (collectively together with the Brookhaven Property, the "Brookhaven Collateral"). The Brookhaven Collateral includes all rents, income, and any revenues generated on account of or associated with the Brookhaven Property (the "Brookhaven Rents").

15.     Original Lender further perfected its security interest in the Brookhaven Collateral through that certain UCC-1 Financing Statement filed with the Delaware Department of State at Filing No. 2021 7837272 (the "Brookhaven Borrower Financing Statement") and that certain UCC-1 Financing Statement filed with the Recording Office in Deed Book 29777, Page 1 (the "Brookhaven Fixture Filing" and together with the  Brookhaven Borrower Financing Statement, collectively, the "Brookhaven Financing Statements").

16.     The Brookhaven Loan is further secured by that certain Assignment of Leases and Rents dated as of September 30, 2021, executed by Brookhaven DST for the benefit of Original Lender (as assumed, amended, and assigned from time to time, the "Brookhaven Assignment of Leases and Rents"). The Brookhaven Assignment of Leases and Rents is recorded in the Recording Office in Deed Book 29776, Page 796.

17.     The Brookhaven Loan is further secured by that certain Guaranty Agreement dated September 30, 2021, executed by Luke Lee ("Individual Guarantor") in favor of Original Lender (as assumed, amended, and assigned from time to time, the "Brookhaven Guaranty").

18.     The Brookhaven Loan Agreement, Brookhaven Note, Brookhaven Deed to Secure Debt, Brookhaven Financing Statements, Brookhaven Assignment of Leases and Rents, Brookhaven Guaranty, and all other documents, instruments, and agreements evidencing, securing and/or relating to the Brookhaven Loan, are referred to collectively herein as the "Brookhaven Loan Documents."

19.     Pinnacle is the successor in interest to Original Lender.

20.     Pinnacle is the owner, holder, and beneficiary of the Brookhaven Loan Documents.

**B.      The Reno Loan and Reno Property**

21.     On or about March 17, 2022, Original Lender made a loan to Reno DST in the original principal amount of $22,643,500.00 (the "Reno Loan").  The Reno Loan is evidenced and secured by certain documents as described hereinbelow.

22.     The indebtedness of the Reno Loan is evidenced by that certain Promissory Note, dated March 17, 2022, made by Reno DST in favor of Original Lender, in the original stated principal amount of $22,643,500.00 (as assumed, amended, and assigned from time to time, the "Reno Note").

23.     The Reno Loan is governed by that certain Loan Agreement dated March 17, 2022, executed by Original Lender and Reno DST (as assumed, amended, and modified from time to time, the "Original Reno Loan Agreement").

24.     The Original Reno Loan Agreement was subsequently amended by that certain Amendment to Loan Agreement and Other Loan Documents dated May 1, 2023, executed by Reno DST and Original Lender (the "First Reno Amendment") and that certain Second Amendment to Loan Agreement and Other Loan Documents dated August 9, 2024, executed by

Individual, Inspired Healthcare Capital Holdings, LLC ("Entity Guarantor"), and Original

Lender (the "Second Reno Amendment," and together with First Amendment and the Original

Loan Agreement, collectively, the "Reno Loan Agreement").

25.     The Reno Loan is secured by that certain Deed of Trust, Security Agreement and

Fixture Filing dated March 17, 2022, executed by Reno DST for the benefit of Original Lender

(as assumed, amended, and assigned from time to time, the "Reno Deed of Trust"). The Reno

Deed of Trust is recorded with the County Recorder of Washoe County, Nevada, on March 17,

2022, as Doc #5286089.

26.     Pursuant to the Reno Deed of Trust, Reno DST granted Original Lender a first-

priority security interest in all real property and personal property associated with the Reno

Property as further described therein (collectively together with the Reno Property, the "Reno

Collateral").  The Reno Collateral includes all rents, income, and any revenues generated on

account of or associated with the Reno Property (the "Reno Rents").

27.     Original Lender further perfected its security interest in the Reno Collateral

through that certain UCC-1 Financing Statement filed with the Delaware Department of State at

Filing No. 2022 2303543 (the "Reno Borrower Financing Statement") and that certain UCC-1

Financing Statement recorded with the County Recorder of Washoe County, Nevada, as Doc

#5286091 (the "Reno Fixture Filing" and together with the Reno Borrower Financing Statement,

collectively, the "Reno Financing Statements").

28.     The Reno Loan is further secured by that certain Assignment of Leases and Rents

dated as of March 17, 2022, executed by Reno DST for the benefit of Original Lender (as

assumed, amended, and assigned from time to time, the "Reno Assignment of Leases and

<u>Rents</u>"). The Reno Assignment of Leases and Rents is recorded with the County Recorder of Washoe County, Nevada, on March 17, 2022, as Doc #5286090.

29.     The Reno Loan is further secured by that certain Guaranty Agreement dated March 17, 2022, executed by Individual Guarantor in favor of Original Lender (as assumed, amended, and assigned from time to time, the "<u>Reno Guaranty</u>").

30.     In connection with the Second Reno Amendment, and to further secure Reno DST's obligations to Original Lender under the Reno Note, Entity Guarantor executed that certain Payment Guaranty Agreement dated August 9, 2024, in favor of Original Guarantor (the "<u>Reno Entity Guaranty</u>").

31.     The Reno Loan Agreement, Reno Note, Reno Deed of Trust, Reno Financing Statements, Reno Assignment of Leases and Rents, Reno Guaranty, Reno Entity Guaranty, and all other documents, instruments, and agreements evidencing, securing and/or relating to the Reno Loan, are referred to collectively herein as the "<u>Reno Loan Documents.</u>"

32.     Pinnacle is the owner, holder, and beneficiary of the Reno Loan Documents.

**C.     <u>The Melbourne Loan and Melbourne Property</u>**

33.     On or about October 27, 2022, Original Lender made a loan to Melbourne DST in the original principal amount of $15,950,000.00 (the "<u>Melbourne Loan</u>").  The Melbourne Loan is evidenced and secured by certain documents as described hereinbelow.

34.     The indebtedness of the Melbourne Loan is evidenced by that certain Promissory Note, dated October 27, 2022, made by Melbourne DST in favor of Original Lender, in the original stated principal amount of $15,950,000.00 (as assumed, amended, and assigned from time to time, the "<u>Melbourne Note</u>").

35.     The Melbourne Loan is governed by that certain Loan Agreement dated October 27, 2022, executed by Original Lender and Melbourne DST (as assumed, amended, and modified from time to time, the "Original Melbourne Loan Agreement").

36.     The Original Melbourne Loan Agreement was subsequently amended by that certain Amendment to Loan Agreement and Other Loan Documents dated August 9, 2024, executed by Melbourne DST and Original Lender, executed by Individual, Entity Guarantor, and Original Lender (the "First Melbourne Amendment" and together with the Original Loan Agreement, collectively, the "Melbourne Loan Agreement").

37.     The Melbourne Loan is secured by that certain Amended and Restated Mortgage, Security Agreement and Fixture Filing dated October 27, 2022, executed by Melbourne DST for the benefit of Original Lender (as assumed, amended, and assigned from time to time, the "Melbourne Mortgage"). The Melbourne Mortgage is recorded Official Records of Brevard County, Florida as Instrument #2022261280, in Book 9648, Page 1976.

38.     Pursuant to the Melbourne Mortgage, Melbourne DST granted Original Lender a first-priority security interest in all real property and personal property associated with the Melbourne Property as further described therein (collectively together with the Melbourne Property, the "Melbourne Collateral"). The Melbourne Collateral includes all rents, income, and any revenues generated on account of or associated with the Melbourne Property (the "Melbourne Rents").

39.     Original Lender further perfected its security interest in the Melbourne Collateral through that certain UCC-1 Financing Statement filed with the Delaware Department of State at Filing No. 2022 9055690 (the "Melbourne Borrower Financing Statement") and that certain UCC-1 Financing Statement recorded with the Official Records of Brevard County, Florida as

Instrument #2022261282, in Book 9648, Page 2025 (the "Melbourne Fixture Filing" and together with the Melbourne Borrower Financing Statement, collectively, the "Melbourne Financing Statements").

40.      The Melbourne Loan is further secured by that certain Assignment of Leases and Rents dated as of October 27, 2022, executed by Melbourne DST for the benefit of Original Lender (as assumed, amended, and assigned from time to time, the "Melbourne Assignment of Leases and Rents"). The Melbourne Assignment of Leases and Rents is recorded with the Official Records of Brevard County, Florida as Instrument #2022261281, in Book 9648.

41.      The Melbourne Loan is further secured by that certain Guaranty Agreement dated October 27, 2022, executed by Individual Guarantor in favor of Original Lender (as assumed, amended, and assigned from time to time, the "Melbourne Guaranty").

42.      In connection with the First Melbourne Amendment, and to further secure Melbourne DST's obligations to Original Lender under the Melbourne Note, Entity Guarantor executed that certain Payment Guaranty Agreement dated August 9, 2024, in favor of Original Guarantor (the "Melbourne Entity Guaranty").

43.      The Melbourne Loan Agreement, Melbourne Note, Melbourne Mortgage, Melbourne Financing Statements, Melbourne Assignment of Leases and Rents, Melbourne Guaranty, Melbourne Entity Guaranty, and all other documents, instruments, and agreements evidencing, securing and/or relating to the Melbourne Loan, are referred to collectively herein as the "Melbourne Loan Documents."

44.      Pinnacle is the owner, holder, and beneficiary of the Melbourne Loan Documents.

45.      The Brookhaven Loan Documents, Reno Loan Documents, and Melbourne Loan Documents are hereinafter referred as to the "Loan Documents".

46.     The Brookhaven Collateral, Reno Collateral, and Melbourne Collateral are hereinafter referred to as the "Collateral").

## THE DEFAULTS

### A.     The Brookhaven Loan – Monetary Defaults

47.     The Brookhaven Loan Documents provide that failure to pay any installment of principal, interest, or other payments required under the Note, Deed to Secure Debt or any other Loan Document within ten (10) days after the same becomes due.

48.     Brookhaven DST defaulted on the loan because it failed to tender the November 1, 2025 payment within ten days of it becoming due.

49.     By letter dated November 18, 2025, Original Lender notified Brookhaven DST and Individual Guarantor of the monetary default (the "Brookhaven Monetary Default") and of the acceleration of the Brookhaven Loan due under the Brookhaven Loan Documents (the "Brookhaven Acceleration Letter").

50.     Brookhaven DST did not and has not paid the outstanding amounts due under the Brookhaven Loan Documents, and all amounts remain due and owing.

51.     As of the Petition Date, Pinnacle is owed more than $17,940,983.05 on the Brookhaven Loan.

### B.     The Brookhaven Loan – Non-Monetary Defaults

52.     The Brookhaven Loan Agreement requires, among other things:

> The occurrence of any material adverse change in the financial condition of Borrower, Master Tenant, Guarantor, or Sub-Manager, in each case, which, in Lender's good faith and reasonable determination, constitutes a material impairment of any such Person's ability to operate or manage the Facility or of such Person's ability to perform its obligations under the Loan Documents to which it is a party, which is not remedied within thirty (30) days after written notice; provided, that if such

> impairment cannot be remedied within such thirty (30) day period but such party is diligently pursuing such remedy, Lender shall provide such additional time not to exceed an additional sixty (60) days to remedy such impairment;

53.     Debtor Inspired Healthcare Capital Fund, LP and Individual Guarantor are presently under investigation by the U.S. Securities and Exchange Commission, thereby materially impacting Brookhaven DST's ability to operate the Brookhaven Property.

54.     Debtor Inspired Healthcare Capital LLC and Individual Guarantor have been sued concerning allegations related to, among other claims, intentional and negligent misrepresentations, thereby materially impacting Brookhaven DST's ability to operate the Brookhaven Property.

55.     The material adverse change in financial condition of Brookhaven Property, Individual Guarantor, and its affiliates constitute additional defaults under the Brookhaven Loan Agreement (the "Brookhaven Non-Monetary Defaults").

56.     By letter dated September 10, 2025, Original Lender notified Brookhaven DST and Individual Guarantor of the Brookhaven Non-Monetary Defaults under the Brookhaven Loan Documents (the "Brookhaven Notice of Default Letter").

57.     The Brookhaven Non-Monetary Defaults remain uncured as of the date hereof.

**C.    The Reno Loan – Monetary Defaults**

58.     The Reno Loan Documents provide that failure to pay any installment of principal, interest, or other payments required under the Reno Note, Reno Deed of Trust or any other Reno Loan Document within ten (10) days after the same becomes due shall constitute an Event of Default.

59.     Reno DST defaulted on the Reno Loan, because it failed to tender the October 1, 2025 and November 1, 2025 payments within ten days of becoming due (the "Reno Monetary

Defaults").

60.     By letter dated November 18, 2025, Original Lender notified Reno DST,
Individual Guarantor and Entity Guarantor of the Reno Monetary Defaults and of the
acceleration of the Reno Loan due under the Reno Loan Documents (the "Reno Acceleration
Letter").

61.     Reno DST did not and has not paid the outstanding amounts under the Reno Loan
Documents nor remitted Reno Rents to Original Lender.

62.     As of the Petition Date, Pinnacle is owed more than $20,827,719.20 on the Reno
Loan.

**D.     The Reno Loan – Non-Monetary Defaults**

63.     Non-monetary Events of Default have occurred under the Reno Loan Documents
specifically, but without limitation, under Section 7.1(e) of the Reno Loan Agreement as a result
of Reno DST's failure to maintain the minimum Debt Service Coverage Ratio set forth in
Section 4.14(a) of the Reno Loan Agreement and post the required DSCR/DY Paydown as set
forth in Section 4.14(c)(ii) of the Reno Loan Agreement with respect to the quarter ending
December 31, 2024 (the "Reno Ratio Default").

64.     As a result of the Reno Ratio Defaults, on July 29, 2025, Original Lender sent
notice to Reno DST identifying the Reno Ratio Defaults (the "First Reno Non-Monetary
Defaults Letter").

65.     The Reno Loan Agreement also requires, among other things:

> The occurrence of any material adverse change in the financial
> condition of Borrower, Master Tenant, Guarantor, or Sub-
> Manager, in each case, which, in Lender's good faith and
> reasonable determination, constitutes a material impairment of any
> such Person's ability to operate or manage the Facility or of such
> Person's ability to perform its obligations under the Loan

> Documents to which it is a party, which is not remedied within thirty (30) days after written notice; provided, that if such impairment cannot be remedied within such thirty (30) day period but such party is diligently pursuing such remedy, Lender shall provide such additional time not to exceed an additional sixty (60) days to remedy such impairment[.]

66.    Debtor Inspired Healthcare Capital Fund, LP, Individual Guarantor, and Entity Guarantor are presently under investigation by the U.S. Securities and Exchange Commission, thereby materially impacting Reno DST's ability to operate the Reno Property.

67.    Debtor Inspired Healthcare Capital LLC, Individual Guarantor, and Entity Guarantor have been sued concerning allegations related to, among other claims, intentional and negligent misrepresentations, thereby materially impacting Reno DST's ability to operate the Reno Property.

68.    On September 10, 2025, Original Lender sent Reno DST a second notice (the "Second Reno Non-Monetary Defaults Letter") notifying Reno DST that the Reno Ratio Defaults remained outstanding and were uncured and that additional Events of Default had occurred under Section 7.1(n) of the Reno Loan Agreement due to, without limitation, (i) a pending investigation by the U.S. Securities and Exchange Commission of Inspired Healthcare Capital Fund, L.P., an Affiliated entity of Borrower and Entity Guarantor, (ii) reports that the prior property manager has shuttered its operations, following resignation of its CEO, and transitioned operations to third-party management, and (iii) recent lawsuits alleging breach of loan documents and intentional misrepresentations being filed against both Entity Guarantor and Individual Guarantor and their affiliate Inspired Healthcare Capital LLC (the "Additional Reno Non-Monetary Defaults" and collectively with the Reno Ratio Defaults, the "Reno Non-Monetary Defaults").

69.    The Reno Non-Monetary Defaults remain uncured as of the date hereof.

**E.**    **The Melbourne Loan – Monetary Defaults**

70.    The Melbourne Loan Documents provide that failure to pay any installment of principal, interest, or other payments required under the Melbourne Note, Melbourne Mortgage or any other Melbourne Loan Document within ten (10) days after the same becomes due shall constitute an Event of Default.

71.    Melbourne DST defaulted on the loan because it failed to tender the October 1, 2025 and November 1, 2025 payments within ten days of becoming due (the "Melbourne Monetary Defaults").

72.    By letter dated November 18, 2025, Original Lender notified Melbourne DST, Individual Guarantor and Entity Guarantor of the Melbourne Monetary Defaults and of the acceleration of the Melbourne Loan due under the Melbourne Loan Documents (the "Melbourne Acceleration Letter").

73.    The Melbourne Acceleration Letter included Original Lender's written demand for payment of the Melbourne Rents pursuant to § 697.07, Fla. Stat.

74.    Original Lender did not and has not paid the outstanding amounts under the Melbourne Loan Documents nor remitted Melbourne Rents to Original Lender.

75.    The amounts owed under the Melbourne Loan Documents remain outstanding as of the date hereof.

76.    As of the Petition Date, Pinnacle is owed more than $14,295,002.70 on the Melbourne Loan.

**F.**    **The Melbourne Loan – Non-Monetary Defaults**

77.    Non-monetary Events of Default have occurred under the Melbourne Loan Documents. Specifically, without limitation, under Section 7.1(e) of the Melbourne Loan

Agreement as a result of Melbourne DST's failure to maintain the minimum Debt Service

Coverage Ratio set forth in Section 4.14(a) of the Melbourne Loan Agreement and post the

required DSCR/DY Paydown as set forth in Section 4.14(c)(ii) of the Melbourne Loan

Agreement with respect to the quarters ending December 31, 2024 and March 31, 2025 (the

"Melbourne Ratio Defaults").

78.     As a result of the Melbourne Ratio Defaults, on July 29, 2025, Original Lender

sent notice to Melbourne DST identifying the Melbourne Ratio Defaults (the "First Melbourne

Non-Monetary Defaults Letter").

79.     The Melbourne Loan Agreement also requires, among other things:

> The occurrence of any material adverse change in the financial
> condition of Borrower, Master Tenant, Guarantor, or Sub-
> Manager, in each case, which, in Lender's good faith and
> reasonable determination, constitutes a material impairment of any
> such Person's ability to operate or manage the Facility or of such
> Person's ability to perform its obligations under the Loan
> Documents to which it is a party, which is not remedied within
> thirty (30) days after written notice; provided, that if such
> impairment cannot be remedied within such thirty (30) day period
> but such party is diligently pursuing such remedy, Lender shall
> provide such additional time not to exceed an additional sixty (60)
> days to remedy such impairment;

80.     Debtor Inspired Healthcare Capital Fund, LP, Individual Guarantor, and Entity

Guarantor are presently under investigation by the U.S. Securities and Exchange Commission,

thereby materially impacting Melbourne DST's ability to operate the Melbourne Property.

81.     Debtor Inspired Healthcare Capital LLC, Individual Guarantor, and Entity

Guarantor have been sued concerning allegations related to, among other claims, intentional and

negligent misrepresentations, thereby materially impacting Melbourne DST's ability to operate

the Melbourne Property.

82.    On September 10, 2025, Original Lender sent Melbourne DST a second notice (the "Second Melbourne Non-Monetary Defaults Letter") notifying Melbourne DST that the Melbourne Ratio Defaults remained outstanding and were uncured and that additional Events of Default had occurred under Section 7.1(n) of the Melbourne Loan Agreement due to, without limitation, (i) a pending investigation by the U.S. Securities and Exchange Commission of Inspired Healthcare Capital Fund, L.P., an Affiliated entity of Borrower and Entity Guarantor, (ii) reports that Volante Senior Living has shuttered its operations, following resignation of its CEO, and transitioned operations to third-party management, and (iii) recent lawsuits alleging breach of loan documents and intentional misrepresentations being filed against both Entity Guarantor and Individual Guarantor and their affiliate Inspired Healthcare Capital LLC (the "Additional Melbourne Non-Monetary Defaults" and collectively with the Ratio Defaults, the "Melbourne Non-Monetary Defaults").

83.    The Melbourne Non-Monetary Defaults remain uncured as of the date hereof.

**THE LITIGATION, BROOKHAVEN FORBEARANCE, AND RENO FORBEARANCE**

84.    On December 2, 2025, Original Lender filed a: (i) Verified Complaint for Appointment of Receiver, Breach of Contract, Damages, and Attorneys' Fees and Expenses: (ii) Motion for Receiver and Brief in Support in the Superior Court of Dekalb County Georgia, initiating Case No. 25CV10685.

85.    On or about December 31, 2025, Original Lender and Brookhaven DST entered into that certain Limited Forbearance Agreement.

86.    On December 2, 2025, Original Lender filed its Complaint and Motion for Receiver in the Second Judicial District Court, County of Washoe, State of Nevada, initiating Case No. CV25-02871.

87.     On or about December 31, 2025, Original Lender and Reno DST entered into that certain Limited Forbearance Agreement (the "Reno Forbearance Agreement").

88.     On December 2, 2025, Original Lender filed its Complaint (the "Melbourne Complaint") in the Circuit Court of the Eighteenth Judicial Circuit, Brevard County, State of Florida, initiating Case No. 05-2025-CA-061092.

## OBJECTION

89.     The Motion and Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors To (A) Continue Their Existing Cash Management System and Maintain Their Existing Bank Accounts, (B) Continue to Perform Intercompany Transactions, and (C) Maintain Existing Business Forms and Books and Records; and (II) Granting Related Relief (the "Cash Management Motion") [Doc. 11] are inter-related. Accordingly, Pinnacle adopts and incorporates by reference as if fully stated herein Pinnacle's Objection to Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors To (A) Continue Their Existing Cash Management System and Maintain Their Existing Bank Accounts, (B) Continue to Perform Intercompany Transactions, and (C) Maintain Existing Business Forms and Books and Records; and (II) Granting Related Relief [Doc. 174].

**A.      The Code Prohibits Debtors' Cash Collateral Usage Request Since It Effectively Seeks to Use Pinnacle's Cash Collateral Without Authorization.**

90.     Section 363(c)(2) of the Bankruptcy Code states that the Debtor may not use, sell or lease cash collateral unless:

(A)     each entity that has an interest in the cash collateral consents; or

(B)     the court, after notice and hearing, authorizes such use in accordance with the provisions [of Section 363 of the Bankruptcy Code].

11 U.S.C. §363(c)(2).  Cash collateral includes "cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property . . . ." 11 U.S.C. §363(a).

91.     Section 363 does not require that a creditor actually own the property for it to constitute cash collateral; "the section expressly defines cash collateral as property in which a creditor has an interest, including a valid security interest." *In re Foxcroft Square Co.,* 178 B.R. 659, 664 (E.D. Pa. 1995).  The Debtors' use of the cash collateral, "absent adequate protection, would clearly cause a decrease in the value of that creditor's property in which the debtor had an interest, and would constitute an improper taking of the secured creditor's collateral." *In re 680 Fifth Avenue Assocs.*, 154 B.R. 38, 43 (Bankr. S.D.N.Y. 1993).

92.     Because cash collateral, once spent, is impossible to recover, the Bankruptcy Code strictly conditions a debtor's use of cash collateral upon the secured creditor receiving adequate protection of its interest in such collateral.  The requirement of adequate protection under section 363(e) is mandatory, and if the adequate protection cannot be provided, then the sale, lease or use of the cash collateral cannot be allowed.  *See e.g., Martin v. Commodity Credit Corp.*, 761 F.2d 472, 475 (8th Cir. 1985) (citing 11 U.S.C. § 363(e)).  The Debtor bears the burden of establishing that Pinnacle's interests in the Cash Collateral will be adequately protected.                                                                                     *See*

http://www.westlaw.com/Find/Default.wl?rs=FIPI1.0&vr=2.0&DB=1000546&DocName=11USCAS363&FindType=L&ReferencePositionType=T&ReferencePosition=SP_2c830000eaaf5 11 U.S.C. § 363(p) (debtor has burden of proof on "issue of adequate protection"); *see also* http://www.westlaw.com/Find/Default.wl?rs=FIPI1.0&vr=2.0&DB=164&FindType=Y&SerialN

um=1993141599*In re Century Investment Fund VIII L.P.,* 155 B.R. 1002 (Bankr. E.D. Wis.

1989), *aff'd,*

http://www.westlaw.com/Find/Default.wl?rs=FIPI1.0&vr=2.0&DB=350&FindType=Y&SerialN

um=1991128443937 F.2d 371 (7th Cir. 1991);

http://www.westlaw.com/Find/Default.wl?rs=FIPI1.0&vr=2.0&DB=164&FindType=Y&Refere

ncePositionType=S&SerialNum=1984110912&ReferencePosition=949*In re Philadelphia

Consumer Discount Co.,* 37 B.R. 946, 949 (E.D. Pa. 1984) (debtor had the burden to show that

its proposed use of collateral would adequately protect the creditor's interest in collateral);

http://www.westlaw.com/Find/Default.wl?rs=FIPI1.0&vr=2.0&DB=164&FindType=Y&Refere

ncePositionType=S&SerialNum=1984106495&ReferencePosition=1006*In re Development, Inc.,*

36 B.R. 998, 1006 (Bankr. D. Hawaii 1984) (burden was upon debtor to establish that creditor's

interest in property was adequately protected);

http://www.westlaw.com/Find/Default.wl?rs=FIPI1.0&vr=2.0&DB=164&FindType=Y&Refere

ncePositionType=S&SerialNum=2001850134&ReferencePosition=145*In re 5877 Poplar, L.P.,*

268 B.R. 140, 145 (Bankr. W.D. Tenn. 2001);

http://www.westlaw.com/Find/Default.wl?rs=FIPI1.0&vr=2.0&DB=164&FindType=Y&Refere

ncePositionType=S&SerialNum=1996034083&ReferencePosition=547*In re JKJ Chevrolet, Inc.,*

190 B.R. 542, 547 (Bankr. E.D. Va. 1995), *aff'd,*

http://www.westlaw.com/Find/Default.wl?rs=FIPI1.0&vr=2.0&DB=506&FindType=Y&SerialN

um=1997154480117 F.3d 1413 (4th Cir. 1997);

http://www.westlaw.com/Find/Default.wl?rs=FIPI1.0&vr=2.0&DB=164&FindType=Y&Refere

ncePositionType=S&SerialNum=1993150032&ReferencePosition=463*In re Colonial Center,

Inc.,* 156 B.R. 452, 463 (Bankr. E.D. Pa. 1993); *Matter of The Cropper Co.,* 35 B.R. 625, 633

(Bankr.                    M.D.                    Ga.                    1983);

http://www.westlaw.com/Find/Default.wl?rs=FIPI1.0&vr=2.0&DB=164&FindType=Y&Refere
ncePositionType=S&SerialNum=1984115855&ReferencePosition=863*In re Sheehan,* 38 B.R.
859, 863-864 (Bankr. D. S.D. 1984).

93.     Although adequate protection is not exclusively defined in the Bankruptcy Code,
Section 361 states that adequate protection may be provided by: (i) cash payment(s); (ii)
additional or replacement liens; or (iii) the indubitable equivalent of the entity's interest in the
property at issue.  11 U.S.C. § 361; *see also In re Accent Assocs., Inc.*, 8 B.R. 933, 936 (Bankr.
D. Mass. 1981) (explaining that Section 361 of the Bankruptcy Code specifies three non-
exclusive methods for providing a secured creditor with adequate protection).  Put differently,
"[i]n determining whether a creditor's secured interests are so protected, there must be an
individual determination of the value of that interest and whether a proposed use of cash
collateral threatens that value."  *In re Ruggiere Chrysler-Plymouth, Inc.*, 727 F.2d at 1019.  "A
finding of adequate protection should be premised on facts, or on projection grounded on a firm
evidentiary basis."  *In re Mosello*, 195 B.R. 277, 292 (Bankr. S.D.N.Y. 1996).

94.     Pinnacle has a fully perfected, first priority secured lien on the Collateral, which
includes the Brookhaven Rents, Reno Rents, and Melbourne Rents (collectively, the "Rents").
The Collateral consists of personal property and all products and proceeds thereof.

95.     Pinnacle objects to use of its cash Collateral.  As described in more detail below,
the Motion does not provide for the segregation of Pinnacle's cash Collateral, property specific
budgets, or any reporting to Pinnacle.  In addition, the Motion and Cash Management Motion
seek unlimited authorization of continued cash management systems, intercompany transfers,
and back-office expenditure allocation notwithstanding that each Property is a single purpose

entity. The Debtors have not presented any evidence regarding the value of Pinnacle's Collateral to show that replacement liens on the same Collateral will provide adequate protection for Pinnacle.   In fact, if approved, the Motion would create a further diminution in Pinnacle's Collateral by allowing the Debtors to allocate expenses of the bankruptcy cases, including Professional Fees, against Pinnacle's Collateral and prime Pinnacle's lien with a lien to secure the Carve-Out.   For these reasons, the Motion must be denied as to Pinnacle Collateral.

**B.**     **The Collateral Must be Segregated at the Property Level.**

96.     Section 363(c)(4) of the Bankruptcy Code requires the Debtor to "segregate and account for any cash collateral in the [Debtor's] possession, custody, or control."

97.     The assets, liabilities, and operations of each Pinnacle Borrower are independent of the other Pinnacle Borrowers and other Delaware Statutory Trust Debtors.  Put simply, each Pinnacle Borrower and its operations and assets have <u>no</u> relation to any other Pinnacle Borrower or Debtor.

98.     Accordingly, each Debtor operated skilled nursing facility must be considered its own single purpose entity for purposes of this bankruptcy case, and Debtor must be expected to maintain separate accounting and reporting on a *property-by-property* basis.

99.     Neither the Motion nor the proposed budget attached to the Motion identifies how Pinnacle's cash Collateral, including those contained in deposit accounts, will be segregated and separately accounted for on a property-by-property basis.

100.     Further, there should be no Intercompany Transactions (as defined in the Cash Management Motion) to ensure that Pinnacle's Collateral generated by the Properties is used exclusively for Property-level ordinary course operating expenses, Property-level debt service,

and Property-level budgeted and allocated back-office expenditures provided for under the Loan Documents and only after receipt of Pinnacle's consent.

101.    At present, Motion lacks details as to back-office expenditure allocation as between Debtors' facilities.

102.    If Debtors seek to allocate expenditures across multiple facilities, then Debtors have the burden to provide adequate disclosures as to how such expenditures will be allocated as between the Debtors' senior housing facilities.

103.    Pinnacle also asserts that any such back-office expenditures should be charged as against the Debtors' unencumbered assets *first* before seeking further relief from the Court to use Pinnacle's Collateral.

104.    Similarly, the Motion seeks authorization to use Pinnacle's Collateral for all other administrative expenses of the Chapter 11 cases, including Professional Fees, with an undefined allocation as against each Property. This effectively is a carte balance surcharge of Pinnacle's Collateral under Section 506(c) of the Bankruptcy Code without the requisite showing that the fees and expenses are the "reasonable and necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim. . . ."  11 U.S.C. §506(c).   Moreover, the Professional Fees have to be approved by the Bankruptcy Court before they can be paid by the Debtors.  Assuming arguendo, that the Court approves a fee procedures motion, only 80% of the fees could be paid through an allocation and these fees would be subject to final approval by the Court.

105.    Pinnacle objects on the basis that Debtors must identify, before usage of Pinnacle's Collateral, which expenses were actual, necessary, and incurred post-petition for the

benefit of which Property with any such request identified in a Property-level budget that is reviewed and approved by Pinnacle and supported by documentation and a monthly true-up.

106.    Further, if use of its cash Collateral is ultimately authorized, Pinnacle objects to use of its Collateral for purposes unrelated the Pinnacle Borrowers' operations of the Properties necessary to preserve and maintain the Properties.

107.    Taken as a whole, the lack of specific information on a property-by-property basis is a violation of Section 363(c)(4) and an indication of insufficient accounting.

**C.      Debtors Should be Prohibited from its Proposed Cash Management Due to Lack of Proposed Reporting.**

108.    A precondition to the authorization and use of cash Collateral requires that the Debtors provide accurate and trustworthy information to the secured creditor.  For example, in *In re O. P. Held, Inc.*, 74 B.R. 777 (Bankr. N.D.N.Y. 1987), the court held that the debtor failed to carry its burden of demonstrating that the creditor's interests would be adequately protected when it failed to produce "the type of projection[s] a prudent businessman or banker is willing to act upon." 74 B.R. at 783; *see also In re Glasstream Boats, Inc.*, 110 B.R. 611, 614 (Bankr. M.D. Ga. 1990) (both the court and the secured creditor are entitled to know, as a sum certain, the amount and value of the collateral on any given day in order to know whether the collateral was depreciating).

109.    The Debtors' proposed single-page budget attached to the Motion is a single high-level budget that fails to include any specific information on a property-by-property basis.

110.    Without detailed property-by-property information, a lender cannot adequately assess whether its Collateral is being improperly used as authorized (or prohibited) under the Bankruptcy Code and Orders from the Court.

111.    At a minimum, Weekly and Monthly Variance Reports, as provided in Section 5.2 of the DIP Loan and Security Agreement, should be provided to Pinnacle.

112.    To the extent the Rents are collected, the Debtors' extensive defaults and regulatory noncompliance may render the Properties incapable of realizing sufficient proceeds.

113.    Based upon the circumstances described above, Pinnacle does not consent to the Debtors' proposed Cash Management System nor to usage of its cash Collateral or its other Collateral at this time.

114.    At a minimum, Pinnacle is entitled to the same level of periodic financial reporting Debtors intend to provide to the DIP Lender (as defined in the Cash Collateral Motion).

115.    Accordingly, the Debtors are not permitted to use any of the cash Collateral unless the Court, after notice and a hearing, authorizes the Debtors to do so. Based on the Debtors' inability to provide Pinnacle with sufficient adequate protection of its interest in the Collateral, grounds do not exist for the Court to approve the Debtors' Motion to the extent it permits the Debtors' use of the cash Collateral.

**D.    Debtors Cannot Use Cash Collateral Without Sufficient Limitations to Adequately Protect Pinnacle.**

116.    While "adequate protection" may be a flexible concept, this flexibility cannot operate to the detriment of the secured creditor. *See In re Martin,* 761 F.2d 472, 477 (8th Cir. 1985). Regardless of the form that adequate protection takes, a secured creditor is entitled to receive the "indubitable equivalent of such entity's interest in such property." 11 U.S.C. § 361(3); *see In re Metromedia Fiber Network, Inc.,* 290 B.R. 487, 491 (Bankr. S.D.N.Y. 2003) (adequate protection is mandatory); *In re Leavell,* 56 B.R. 11, 13 (Bankr. S.D. Ill. 1985) (same).

117.    Even if this Court determines that Pinnacle's interest is adequately protected to permit Debtors' use of the cash Collateral, the Court should condition Debtors' use of any cash

Collateral and Pinnacle's other Collateral on terms and conditions that fully protect Pinnacle's interests in the cash Collateral, including without limitation:

a.  The Debtors should be required to segregate and separately account for the Rents from the Properties in a separate deposit account and strictly account for all cash Collateral received, held and/or used by Debtors in the course of operations.

b.  The Debtors should be required to segregate and separately account for all expenses incurred and proposed to be incurred or assessed on a property-by-property basis.

c.  The Debtor should be authorized to use the cash Collateral only in accordance with the terms and conditions of a budget approved by Pinnacle on a property-by-property basis (the "Budget"), which should be prepared in accordance with the Debtors' historical line-item expenses and revenue for the Properties.

d.  The proposed Budget does not have sufficient restrictions and protections with respect to Budget variances.   The DIP Loan Documents only provide for an overall twenty percent (20%) variance.   There is **no** restriction addressing line-item variances.  Expenses under any category in the Budget should not exceed the budgeted figure for that category by more than five percent (5%).

e.  The Budget should include all amounts requested as payable pursuant to 28 U.S.C. § 1930(a)(6) and administrative expenses of the kind specified in 11 U.S.C. § 503(b) incurred in the ordinary course of the Debtors' operation of the Properties.

f.  As adequate protection for use of the cash Collateral, Pinnacle should be provided with (i) continuing liens and security interests under the terms and conditions of the Loan Documents and in all Collateral; and (ii) a replacement first priority perfected security interest pursuant to Section 361(2) of the Bankruptcy Code in all Collateral generated after the Petition Date (the "Post-Petition Collateral").

g.  As adequate protection for the use of the cash Collateral, Debtors should be required to pay to Pinnacle monthly adequate protection payments (the "Adequate Protection Payments").  Debtors should include payment of the Adequate Protection Payments in the Budget.

h.  Debtors should provide Pinnacle and their counsel periodic reporting, including without limitation:

   i.  Weekly and Monthly Variance Reports as provided in Section 5.2 of the DIP Loan and Security Agreement;

   ii.  Monthly reports, including revenue and expenses, for the Brookhaven Property, the Reno Property, and the Melbourne Property; and

   iii.  Occupancy Reports for the Brookhaven Property, the Reno Property and the Melbourne Property.

i.  The Debtors should provide access to the Properties (and the premises of any affiliates where any Collateral is located) so that Pinnacle or its representative may conduct an inspection of its Collateral.

118.   Absent protections along the lines set forth above, Pinnacle's interest in the cash Collateral is not adequately protected.

**E.**      **The Motion Fails to Provide Any Default Remedies.**

119.     Should the Court overrule Pinnacle's objection and grant limited use of Pinnacle's Collateral within the context of the Debtors' Cash Management System or the Motion, then Pinnacle asserts that: (i) any breach (including any commingling, cross-usage as between Debtors or Debtors' facilities, or unauthorized allocation of expenditures or administrative expenses) of the proposed cash management order, proposed final cash collateral order or the DIP Loans (as defined in the Cash Collateral Motion), and/or (ii) appointment of a Chapter 11 Trustee or conversion of the bankruptcy cases, shall constitute cause for Pinnacle to seek expedited relief from the Court.

**F.**      **Omnibus Objections to the Debtors' Unauthorized Use of Collateral.**

120.     The Debtors' request for unfettered allocation against all of its assets has the subsequent effect of priming its liens by virtue of the Carve-Out (as defined in the Motion), and Pinnacle objects to such priming.

121.     Pinnacle objects to the Debtors' reservation of the right to surcharge its Collateral as it is already requesting to allocate administrative expenses against Pinnacle's Collateral.

122.     Pinnacle objects to the elimination of the equitable right to marshal assets and liabilities arising from the DIP Loan.

**JOINDER**

123.     Pinnacle adopts and incorporates by reference the arguments and objections raised by any other Prepetition Secured Parties as to the Motion.

**RESERVATION OF RIGHTS**

124.     Pinnacle's review remains ongoing. Accordingly, Pinnacle hereby reserves all of its rights and remedies including, without limitation, the right to seek relief from the automatic

stay under Bankruptcy Code Section 362(d), and the right to seek conversion or dismissal of these bankruptcy cases.

125.     Pinnacle expressly reserves all rights under 11 U.S.C. § 560 and applicable law.

**WHEREFORE**, Pinnacle respectfully requests that the Court deny Debtors' Motion. Alternatively, if the Court grants Debtors' Motion, Pinnacle requests that the Court condition the use of the cash Collateral on the terms and conditions set forth herein.  Pinnacle requests such other, further and different relief as to which it may be entitled.

Dated: February 28, 2026

**BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ**
A Professional Corporation

By:     */s/  Susan C. Mathews*
Susan C. Mathews
Texas Bar No. 05060650
1301 McKinney St., Suite 3700
Houston, TX 77010
(713) 650-9700
(713) 650-9701 – Facsimile
smathews@bakerdonelson.com

Kathleen G. Furr*
3414 Peachtree Road NE
Suite 1600
Atlanta, GA 30326
(404) 577-6000
kfurr@bakerdonelson.com

**COUNSEL PINNACLE BANK, SUCCESSOR BY MERGER TO SYNOVUS BANK**

## CERTIFICATE OF SERVICE

I hereby certify that, on February 28, 2026, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas on those parties registered to receive electronic notices, including the following:

**DEBTORS**

Inspired Healthcare Capital Holdings, LLC
c/o Ankura Consulting Group, LLC
485 Lexington Avenue, 10th Floor
New York, NY 10017
Email: ben.jones@ankura.com

**U.S. TRUSTEE**

Susan Hersh
1100 Commerce Street
Room 976
Dallas, TX 75202
Email: Susan.hersh@usdoj.gov

**COUNSEL FOR DEBTORS**

McDermott Will & Schulte LLP
c/o Carmen Dingman
c/o Landon Foody
c/o Marcus Alan Helt
c/o Jared Mezzatesta
c/o Daniel M Simon
c/o Jack G. Haake
2801 N. Harwood Street
Suite 2600, Dallas, TX 75201
           and
1180 Peachtree St. NE
Suite 3350,
Atlanta, GA 30309
           and
444 West Lake Street, Suite 4000,
Chicago, IL 60606
Email: cdingman@mwe.com
Email: lfoody@mwe.com
Email: mhelt@mwe.com
Email: jmezzatesta@mcdermottlaw.com
Email: dsimon@mwe.com
Email: jhaake@mcdermottlaw.com

**COUNSEL FOR DIP LENDER**

Foley & Lardner, LLP
c/o Adrienne K. Walker
c/o Jamie N. Class
c/o Thomas C. Scannell
111 Huntington Ave.
Boston, MA 02199,
Email: awalker@foley.com
Email: jclass@foley.com
Email: tscannell@foley.com

*/s/ Susan C. Mathews*
Susan C. Mathews