CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed August 26, 2026**

**United States Bankruptcy Judge**

---

**IN THE UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| INSPIRED HEALTHCARE CAPITAL HOLDINGS, LLC, *et al.*[1] | ) | Case No. 26-90004 (MXM) |
| | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | **Related to Docket No. 1209** |

**ORDER (I) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL ASSETS RELATED TO SALTERRA AT HANOVER (HANOVER, MN) FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES AND (II) GRANTING RELATED RELIEF**

---

1 The last four digits of Inspired Healthcare Capital Holdings, LLC's federal tax identification number are 6696. There are 161 Debtors in these chapter 11 cases, which are being jointly administered for procedural purposes only. A complete list of the Debtors and the last four digits of their federal tax identification numbers are not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/InspiredHealthcare. The Debtors' mailing address is 7033 East Greenway Parkway, Suite 250, Scottsdale, AZ 85254.

Upon the motion (the "Motion")[2] of the Debtors for entry of an order (this "Sale Order") (i) approving and authorizing the APA, a copy of which is attached hereto as **Exhibit 1**, and the Sale of the Property free and clear of all liens, claims, interests, and encumbrances; (ii) approving Buyer as a good faith purchaser pursuant to section 363(m) of the Bankruptcy Code; (iii) approving the adequacy of notice of the Motion and the waiver of the stay imposed by Bankruptcy Rule 6004(h); and (iv) granting related relief, all as more fully set forth in the Motion; and the Debtors having determined, in their business judgement, that consummated the Sale pursuant to the APA, by and among Buyer, UBT, and Sellers, under which, among other things, the Sellers agreed to sell and Buyer agreed to purchase the Property as set forth in the APA and the Motion; and the Debtors having determined that Buyer submitted the best offer for the Property; and this Court having held a hearing on to consider the relief requested in the Motion on a final basis (the "Sale Hearing") on the proposed Sale to Buyer upon the terms and conditions set forth in the APA at which time all interested parties were offered an opportunity to be heard; and it appearing that due and appropriate notice of the Motion and the Sale Hearing having been given; and it appearing that no other notice of the relief granted by this Sale Order need be given; and the Court having heard statements of counsel and the evidence presented in support of the relief requested in the Motion at the Sale Hearing; and it further appearing that the legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein; and after due deliberation thereon and good and sufficient cause appearing therefor:

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

**IT IS HEREBY FOUND AND DETERMINED THAT:**[3]

A. This Court has jurisdiction to hear and determine the Motion, including the transaction contemplated by the APA, and to grant the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334. Venue of the Chapter 11 Cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B. This Sale Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a). To any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure as made applicable by Bankruptcy Rule 7054, and notwithstanding Bankruptcy Rule 6004(h), this Court expressly finds that there is no just reason for delay in the implementation of this Sale Order and expressly directs entry of judgment as set forth herein.

C. This proceeding is a "core proceeding" within the meaning of 28 U.S.C. § 157(b)(2)(A), (N) and (O).

D. The statutory predicates for the Motion and relief granted in this Sale Order are Bankruptcy Code sections 105(a), 363, and 365 and Bankruptcy Rules 2002 and 6004.

E. As evidenced by the affidavits of service filed with the Court, (i) proper, timely and adequate notice of the Motion, the Sale Hearing, the Sale, all the transactions described in the APA, and all related deadlines have been provided in accordance with Bankruptcy Code section 363 and Bankruptcy Rules 2002 and 6004; (ii) such notice was good, sufficient and appropriate;

[3] These findings and conclusions constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. Where appropriate, findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact. All findings of fact and conclusions of law announced by this Court at the Sale Hearing in relation to the Motion are hereby incorporated herein to the extent not inconsistent herewith.

and (iii) no other or further notice of the Motion, the Sale Hearing, the Sale, all related transactions collectively described in the APA, and all related deadlines are necessary or shall be required.

F. A reasonable opportunity to object or be heard with respect to the Motion and the Sale has been afforded to all interested persons and entities. The Debtors also gave due and proper notice to the Fund.

G. Notice, as evidenced by the affidavits of service filed with the Court, has been provided in the form and manner specified in the Motion and required under applicable law, and the Court finds that the notice is adequate and sufficient in all respects to bind all creditors and other parties in interest in these chapter 11 cases.

H. The transaction described in the APA is authorized pursuant to Bankruptcy Code section 363(b)(1) and Bankruptcy Rule 6004(f) and are appropriate and in compliance with applicable statutory requirements. The process for the sale of the Property was conducted in a non-collusive, fair and good faith manner.

I. The Sale represents the highest and best offer for the Property and constitutes a valid and sound exercise of the Debtors' business judgement. Approval of the Motion and the Debtors' assumption of the APA, as well as the consummation of the Sale, are in the best interests of the Debtors, their respective creditors and estates, and all parties-in-interest.

J. The Debtors have demonstrated good, sufficient, and sound business reasons and justifications to enter into the Sale and perform their obligations under the APA.

K. The Buyer is purchasing the Property in good faith and is a good faith purchaser within the meaning of Bankruptcy Code section 363(m) and is therefore entitled to the protection of that provision. In particular, (i) the Buyer recognizes that the Debtors were free to deal with any other party interested in purchasing the Property; (ii) the Buyer in no way induced or caused

the chapter 11 filings by the Debtors; (iii) the Buyer has not violated section 363(n) of the Bankruptcy Code by any action or inaction to the extent applicable; (iv) no common identity of directors, managers, officers, or controlling stockholders exist between the Buyer, on the one hand, and any of the Debtors, on the other hand; (vii) all consideration to be provided by the Buyer in connection with the Sale has been disclosed; (viii) the Buyer has not engaged in any collusion or unfair competitive practices; and (ix) the negotiation and execution of the Sale and the APA were at arm's length and in good faith, and at all times each of the Buyer and the Debtors were represented by competent counsel of their choosing.

L. The APA attached hereto as **Exhibit 1** was negotiated, proposed and entered into by the Sellers, the Buyer, and UBT without collusion, in good faith, within the meaning of Bankruptcy Code section 363(m), and from arm's-length bargaining positions that are substantively and procedurally fair to all entities. Neither the Debtors, the Buyer, nor UBT have engaged in any conduct that would cause or permit the Sale or any part of the transactions contemplated by the APA to be avoidable under Bankruptcy Code section 363(n). The APA was not entered into, and neither the Debtors, the Buyer, nor UBT have entered into the APA, or propose to consummate the transactions collectively described in the APA, for the purpose of hindering, delaying or defrauding creditors of the Debtors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia. Neither the Debtors, the Buyer nor UBT have entered into the APA, or are consummating the transactions collectively described therein, with any fraudulent or improper purpose.

M. Neither the Buyer nor UBT is an "insider" of any Debtor as that term is defined in Bankruptcy Code section 101(31).

N. The consideration provided by Buyer for the Property pursuant to the APA: (i) is fair and reasonable; (ii) is the best offer for the Property; and (iii) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Voidable Transactions Act and all other applicable laws.

O. SLIB provided valuable services to the Debtors and UBT in connection with the marketing and solicitation of offers for the Hanover Assets in consideration for its broker commission of $200,000.

P. The Debtors have demonstrated a sufficient basis and compelling circumstances requiring the Debtors to enter into the APA and sell the Property under Bankruptcy Code sections 363 and 365, and such actions are appropriate exercises of the Debtors' business judgment and are in the best interests of the Debtors, the Debtors' estates and their creditors.

Q. The process implemented by the Debtors and their advisors, as set forth in the Motion and described at the Sale Hearing, was fair, proper, and reasonably calculated to result in the best value received for the Property and the best results for the Debtors' estates and their creditors.

R. The Debtors have full corporate authority and power to execute and deliver all related agreements and all other documents contemplated by the APA, to perform their obligations therein and to consummate the Sale. No additional consents or approvals, other than those provided in the APA, are necessary or required for the Debtors to enter into the APA, perform their obligations therein and consummate the Sale.

S. Buyer would not have entered into the APA and would not consummate the transaction thereby, thus adversely affecting the Debtors and their estates and creditors, if the Property were not sold to them free and clear of all liens, claims, interests, and encumbrances,

other than the Permitted Encumbrances as set forth in the APA, or if Buyer would, or in the future could, be liable or their property, including the Property, could be subject to any such liens, claims, interests, and encumbrances, including based upon successor or vicarious liability or otherwise. A sale of the Property other than one free and clear of all such liens, claims, interests, and encumbrances would adversely impact the Debtors' estates and creditors.

T. The provisions of Bankruptcy Code section 363(f) have been satisfied pursuant to the terms of this Sale Order.

U. The Court has reviewed and considered the facts and circumstances surrounding the Debtors' previous marketing efforts related to the sale of the Property. The Court finds that the sale of the Property through private agreement is appropriate under the circumstances.

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1. The relief requested in the Motion is granted as set forth herein. The Debtors are authorized to enter into the APA and, effective as of the date of entry of this Order, the Debtors are authorized to perform all of their obligations thereunder, including the consummation of the Sale.

2. The Debtors' Sale is hereby approved in all respects, and the Debtors, UBT, and the Buyer (or its assignee(s) or designee(s) as permitted by section 20 of the APA) are authorized to consummate the transactions contemplated under the APA and any additional instruments and documents that may be reasonably necessary to consummate the Sale. The terms and conditions of the Sale and transaction contemplated in connection with the Sale are hereby authorized and approved in all respects pursuant to, *inter alia*, Bankruptcy Code sections 105(a) and 363(b).

3. All objections and responses to the relief sought in the Motion that have not been previously resolved or withdrawn are hereby overruled on their merits and with prejudice. All

persons and entities given notice of the Motion that failed to timely object thereto are deemed to consent to the relief sought therein, including the Trust and its beneficiaries.

4. The Debtors and their respective officers, employees and agents are authorized and directed to take any and all actions necessary or appropriate to (a) consummate the Sale in accordance with the Motion, the APA, and this Sale Order and (b) perform, consummate, implement and close fully the Sale, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Sale. After the date of entry of this Sale Order, the Debtors, the Buyer, and UBT may enter into any amendment, supplement, or modification to the APA that is not material or is not adverse to the Debtors' estates without the need of further notice, hearing or Court order.

5. Those holders of liens, claims, interests, and encumbrances, and other non-Debtor parties who did not object to entry of this Sale Order, the Motion, the Sale Hearing, the Sale, or the APA, are deemed to have consented to this Sale Order, the Sale, and the APA pursuant to Bankruptcy Code section 363(f)(2) and are enjoined from taking any action against the Buyer or UBT, their affiliates, or any agent of the foregoing to recover any claim which such person or entity has against the Debtors.

**Sale and Transfer of the Property**

6. The Sale, all transactions contemplated thereby, and all of the terms and conditions thereof are hereby approved. Pursuant to Bankruptcy Code section 363(b), the Debtors are authorized to consummate the Sale pursuant to and in accordance with the terms and conditions in the APA and this Sale Order. The Debtors and their officers, employees and agents are authorized and directed to execute and deliver, and authorized to perform under, and implement, the APA together with all additional instruments and documents that may be reasonably necessary or

desirable to consummate the Sale, and to take all further actions as may be (a) reasonably requested by the Buyer for the purpose of assigning, transferring, granting, conveying and conferring to the Buyer, or reducing to possession, the Property; or (b) necessary or appropriate to the performance of the obligations contemplated by the APA, all without further order of the Court. The Buyer shall have no obligation to proceed with the closing of the Sale (the "Closing") until all conditions precedent to its obligations to do so have been met, satisfied or waived in a writing signed by the Buyer.

7. In accordance with the APA, the Buyer shall pay the Purchase Price to the Debtors at the Date of Closing and shall enter into the Loan Assumption pursuant to a lender-approved Assignment and Assumption Agreement between UBT and Buyer, with the Debtors being released from all claims by UBT.

8. Upon Closing, other than the Loan Assumption contemplated by the APA, the Property shall be transferred, sold and delivered to the Buyer pursuant to the APA free and clear of all liens, claims, interests, and encumbrances, whether known or unknown, arising by agreement, by statute, or otherwise, and whether occurring or arising before, on, or after the Petition Date. The transfer of the Property to the Buyer constitutes a legal, valid, and effective transfer of the Property and shall vest the Buyer with all right, title, and interest in and to the Property described in the APA.

9. Upon Closing, this Sale Order shall be construed as, and shall constitute for any and all purposes, a full and complete general assignment, conveyance, and transfer of the Property pursuant to the terms of the APA.

10. Upon Closing, except as permitted by the APA, all persons and entities, including, but not limited to, the Debtors and their creditors, employees, former employees and affiliates,

administrative agencies, tax and regulatory authorities, governmental departments, secretaries of state, federal, state and local officials, and their respective successors or assigns, including, but not limited to, persons asserting any liens, claims, interests, and encumbrances against the Property, shall be permanently and forever barred, restrained and enjoined from commencing or continuing in any manner any action or other proceeding of any kind against the Property or the Buyer (or its members, representatives, or affiliates) as alleged successor or otherwise, with respect to (i) any liens, claims, interests, and encumbrances on or in respect of the Property, and (ii) recovering from any claim which such person or entity had solely against the Debtors or any of the Debtors' subsidiaries, affiliates, directors, officers, agents, representatives, employees, investors, owners, partners, or joint venturers.

11. The terms and provisions of this Sale Order shall be binding in all respects upon all entities, including, but not limited to the Debtors, the Buyer, UBT, creditors, employees, former employees and affiliates, administrative agencies, governmental departments, secretaries of state, federal, state and local officials and their respective successors or assigns, including, but not limited to, persons asserting any liens, claims, interests, and encumbrances against or interest in the Debtors' estates or the Property, including any subsequent appointment of a trustee or other fiduciary under any section of the Bankruptcy Code.

12. Upon Closing, other than the Loan Assumption contemplated in the APA, all entities holding liens, claims, interests, and encumbrances of any kind and nature against the Property hereby are barred from asserting such liens, claims, interests, and encumbrances against the Buyer and/or the Property and, effective upon the transfer of the Property to the Buyer upon Closing, the liens, claims, interests, and encumbrances shall attach to the proceeds of the Sale with the same force, validity, priority and effect, if any, as against the Property.

13. This Sale Order (a) is and shall be effective as a determination that, upon Closing, all liens, claims, interests, and encumbrances existing as to the Property, except for the liabilities expressly assumed under the APA, conveyed to the Buyer have been and hereby are adjudged to be unconditionally released, discharged and terminated, with all such liens, claims, interests, and encumbrances attaching automatically to the proceeds in the same manner, extent, validity and priority as they existed at Closing, and (b) shall be binding upon and govern the acts of all entities, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies or units, governmental departments or units, secretaries of state, federal, state and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Property conveyed to the Buyer. All liens, claims, interests, and encumbrances of record as of the date of this Sale Order except for the liabilities expressly assumed under the APA shall be removed and stricken as against the Property in accordance with the foregoing. All entities are authorized and specifically directed to strike all such recorded liens, claims, interests, and encumbrances against the Property from their records, official or otherwise.

14. If any person or entity which has filed financing statements, mortgages, lis pendens, deeds of trust, or other documents or agreements evidencing liens, claims, interests, and encumbrances on the Property shall not have delivered to the Debtors prior to Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements and any other documents necessary for the purpose of documenting the release of all liens, claims, interests, and encumbrances which the person or entity

has or may assert with respect to the Property, the Debtors are hereby authorized and directed upon Closing, and the Buyer is hereby authorized upon Closing, to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Property as attorney in fact pursuant to the terms of this Sale Order a certified copy of which may be submitted to, and shall be accepted by, the applicable recording or filing office and accepted as proof of execution by and on behalf of the applicable holder of the liens, claims, interests, and encumbrances to be released thereby. Upon Closing of the Sale, each of the Debtors' creditors is authorized and directed to execute such documents and take all such actions as may be necessary to release their respective liens, claims, interests, and encumbrances against the Property.

15. Upon Closing, the Buyer shall not be deemed (a) a successor to the Debtors, (b) a party to a de facto merger of the Buyer and the Debtors, or (c) a mere continuation of the Debtors. Without limiting the generality of the foregoing, and except as specifically provided in the APA, the Buyer shall not be liable for any claims against the Debtors, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, under the laws of the United States, any state, territory, or possession of the United States, the District of Columbia or any other country or foreign jurisdiction, other than as expressly provided for in the APA.

16. UBT and Buyer shall each pay the $100,000.00 towards the broker's commission and other fees payable to SLIB as consideration for its brokerage services provided in connection with the Sale.

17. UBT and Buyer shall each pay the Operating Loss Funding pursuant to the terms of the APA.

18. Upon Closing all claims that UBT has against the Debtors shall be released and expunged from the claim register without the requirement of any further actions.

19. The Debtors are authorized, but not directed, to consummate the Sale pursuant to the terms of the APA.

**Additional Provisions**

20. The provisions of this Sale Order and the APA and any actions taken pursuant hereto or thereto shall survive entry of any order that may be entered (a) confirming or consummating any plan of reorganization or liquidation of the Debtors; (b) converting the Debtors' bankruptcy cases from chapter 11 to chapter 7; (c) dismissing the Debtors' bankruptcy cases; or (d) appointing a chapter 11 trustee or examiner, and the terms and provisions of the APA as well as the rights and interests granted pursuant to this Sale Order and the APA shall continue in these Chapter 11 Cases or any superseding cases and shall be binding upon the Debtors, UBT, the Buyer and its respective successors and permitted assigns. The post-closing obligations under the APA shall be unaffected and fully preserved, so that any successor, liquidating trust, Chapter 7 trustee, or the like shall be obligated and required to comply with all post-Closing duties, including without limitation further assurances and any obligations under management and sublease agreements regardless of the status of these chapter 11 cases, without cost to, or the necessity of a motion or administrative claim from, the Buyer.

21. Each and every federal, state and governmental agency or department and any other person or entity is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA.

22. Pursuant to Bankruptcy Code section 1146(a), the sale of the Hanover Assets shall not be taxed under any law imposing a stamp tax or similar tax.

23. Nothing contained in any order of any type or kind entered in these chapter 11 cases or any related proceeding subsequent to entry of this Sale Order, nor in any chapter 11 plan confirmed in these chapter 11 cases, shall conflict with or derogate from the provisions of the APA or the terms of this Sale Order, which shall be expressly preserved under the terms of such plan. To the extent, if any, anything contained in this Sale Order conflicts with a provision in the APA, this Sale Order shall govern and control.

24. The Buyer is purchasing the Hanover Assets in good faith and is a good faith purchaser within the meaning of Bankruptcy Code section 363(m) and is therefore entitled to the protection of that provision. Pursuant to Bankruptcy Code section 363(m), if any or all of the provisions of this Sale Order are hereafter reversed, modified, or vacated by a subsequent order of this Court or any other court, such reversal, modification, or vacatur shall not affect the validity and enforceability of any sale, transfer or assignment under the APA or obligation or right granted pursuant to the terms of this Sale Order, and notwithstanding any reversal, modification or vacatur shall be governed in all respects by the original provisions of this Sale Order or the APA, as the case may be. The consideration provided by the Buyer for the Hanover Assets is fair and reasonable, and the Sale may not be avoided under Bankruptcy Code section 363(n).

25. This Court retains jurisdiction, even after any conversion of these chapter 11 cases to cases under chapter 7, to: (a) interpret, implement and enforce the terms and provisions of this Sale Order (including any injunctive relief provided in this Sale Order) and the terms of the APA, all amendments thereto and any waivers and consents thereunder and of each of the agreements executed in connection therewith; (b) protect the Buyer and the Property from and against any of the liens, claims, interests, and encumbrances; (c) resolve any disputes arising under or related to the APA or the Sale; (d) adjudicate all issues concerning pre-closing liens, claims,

interests, and encumbrances and any other interest(s) in and to the Property, if any, including the extent, validity, enforceability, priority and nature of all such liens, claims, interests, and encumbrances and any other interest(s); and (e) adjudicate any and all issues and/or disputes relating to the Debtors' right, title or interest in the Property, the Motion, or the APA.

26. From and after the date hereof, the Debtors, the Buyer and UBT shall act in accordance with the terms of the APA; *provided*, *however*, the Debtors, the Buyer, and UBT may amend the APA upon mutual agreement between the parties executed in writing without further order of the Court.

27. This Sale Order shall be binding in all respects upon all creditors (whether known or unknown) of the Debtors, all successors and assigns of the Buyer, the Debtors and their affiliates and subsidiaries, the Hanover Assets, and any subsequent trustees appointed in these Chapter 11 Cases or upon (a) conversion of these chapter 11 cases to cases under chapter 7 or (b) dismissal of these Chapter 11 Cases.

28. Notwithstanding anything to the contrary in the APA, the Successful Bidder shall permit, for a period of six (6) years, the Selling Debtors, their professionals, the Committee, the DST Committee, their professionals, any direct or indirect successors to any of the foregoing (collectively, the "Permitted Parties"), at their own expense, reasonable access during normal business hours upon reasonable prior notice to all books and records of the Selling Debtors that are sold properties relating to the Selling Debtors' operations prior to the Closing Date and are in the Successful Bidder's (or any affiliate's, agent's, or affiliate's agent's) possession or control (collectively, the "Business Records") for the purposes of (a) pursuing, assessing, settling, or otherwise dealing with any assets or liabilities that are excluded from the Sale Transaction (including, without limitation, the SEC Claims and any Chapter 5 causes of action); (b) pursuing,

assessing, defending, settling, or otherwise dealing with any claim, action, or cause of action that any Permitted Party has a right to pursue; (c) assisting any one or more of the Permitted Parties in connection with or otherwise relating to the claims reconciliation process; and (d) otherwise administering the Selling Debtors' estates; provided, however, that such access shall (i) not unreasonably interfere with the Successful Bidder's business operations and shall be subject to the Successful Bidder's reasonable security measures and insurance requirements; and (ii) not require the Successful Bidder to disclose any information that, in the reasonable, good faith judgment (after consultation with counsel, which may be in-house counsel) of the Successful Bidder, is reasonably likely to result in any violation of any legal requirement or any contract to which the Successful Bidder is a party, or cause any privilege (including attorney-client privilege) that the Successful Bidder would be entitled to assert to be undermined with respect to such information in a manner that could adversely affect in any material respect the Successful Bidder's position in any pending or reasonably anticipated future litigation; provided further, that in any such case the parties shall cooperate in seeking to find a way to allow disclosure of such information to the extent doing so would not be reasonably likely to result in such violation, privilege waiver, or adverse effect, including through the use of customary "clean-room" arrangements pursuant to which non-employee representatives of the applicable Permitted Party could be provided access to such information.

29. The right of access for the Permitted Parties shall include (a) the right of such Permitted Party to copy, at the location of the sold properties during regular business hours on mutually agreed dates, at such Permitted Party's expense, such Business Records as they may reasonably request, or (b) at the Successful Bidder's election, the Successful Bidder's copying and delivering, at the Permitted Party's expense, to such Permitted Party such Business Records as

may be reasonably requested; provided, however, that no such right of access shall extend to (i) personnel files, workers' compensation files, employee medical files (including employee "protected health information" as defined in HIPAA), or other employee books and records, or (ii) any information that would be subject to the limitations set forth in the preceding paragraph. The Successful Bidder shall not dispose of or destroy any of the Business Records before the sixth (6th) anniversary of the Closing Date. To the extent that any of the Permitted Parties, prior to the sixth (6th) anniversary of the Closing Date, request in writing that the Successful Bidder refrain from disposal or destruction of certain Business Records, the Successful Bidder shall not dispose of or destroy such Business Records until the Permitted Party has had a reasonable opportunity to access such Business Records at the Permitted Party's expense.

30. The failure specifically to include any particular provisions of the APA in this Sale Order shall not diminish or impair the efficacy of such provisions, it being the intent of the Court that the APA with the Buyer and UBT and each and every provision, term and condition thereof be, and therefore is, authorized and approved in its entirety.

31. The Patient Care Ombudsman appointed by the U.S. Trustee shall be discharged upon the closing of the Sale with the Patient Care Ombudsman and the filing of its final report with such final report to be filed following the closing of the Sale and such report to include information from the date of its previous report through the closing of the Sale.

32. The provisions of this Sale Order are non-severable and mutually dependent. This Sale Order shall take effect immediately and shall not be stayed pursuant to Bankruptcy Rules 6004(g), 6004(h), 7062, or otherwise.

33. The Court retains jurisdiction as to all matters relating to or arising from the implementation, enforcement, or interpretation of this Order.

# # # END OF ORDER # # #

Prepared and presented by:

**DECHERT LLP**
Marcus A. Helt (TX 24052187)
Jack G. Haake (TX 24127704)
Debbie Green (TX 24059852)
2651 N. Harwood Street, Suite 120
Dallas, Texas 75201-1574
Telephone: (214) 453 4900
marcus.helt@Dechert.com
jack.haake@Dechert.com
debbie.green@Dechert.com

- and -

Jerry L. Hall (admitted *pro hac vice*)
Three Bryant Park
1095 Avenue of the Americas
New York, New York 10036
Telephone: (212) 698-3500
Facsimile: (212) 698-3599
jerry.hall@dechert.com

*Counsel to the Debtors and Debtors-in-Possession*

# EXHIBIT 1

## APA

# EXHIBIT 1

## APA

# PURCHASE AGREEMENT

THIS PURCHASE AGREEMENT ("Agreement") is made and entered into as of this 20th day of May, 2026 ("Effective Date"), by and among, **IHC - HANOVER PROPCO, LLC**, a Delaware limited liability company ("Propco"), **INSPIRED SENIOR LIVING OF HANOVER, LLC**, a Delaware limited liability company ("Opco" and, together with Propco, "Sellers"), **10875 SETTLERS LLC**, a Minnesota limited liability company, and its successors and assigns ("Buyer"), and **UNION BANK AND TRUST COMPANY**, a Nebraska state banking corporation ("UBT").

## R E C I T A L S:

A. On February 2, 2026 (the "Petition Date"), each of the Sellers commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases") in the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division (the "Court"). The Chapter 11 Cases are being jointly administered under the caption Inspired Healthcare Capital Holdings, LLC, *et al*. Case No. 26-90004, for procedural purposes only pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1. The Sellers continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

B. Sellers desire to sell and Buyer desires to purchase the Property upon the terms and conditions set forth herein.

C. Buyer and UBT shall enter into an Assumption Agreement pursuant to which Buyer shall assume payment and performance of the indebtedness evidenced by that certain loan ("Loan") and Loan Documents ("Loan Documents") further identified on Exhibit "A" attached hereto and by this reference incorporated herein.

D. The term "Property," as used herein, means:

(1) That certain land located in Hennepin County, Minnesota, consisting of the real estate legally described on Exhibit "B" attached hereto and by this reference incorporated herein ("Real Property"), including all easements, rights-of-way and other appurtenances to the Real Property;

(2) All buildings and other improvements located on, affixed to or installed in the Real Property ("Improvements");

(3) All personal property described on Exhibit "C" attached hereto and by this reference incorporated herein ("Personal Property"); and

(4) All contracts described on Exhibit "D" attached hereto and by this reference incorporated herein ("Assigned Contracts").

NOW THEREFORE, in consideration of the mutual promises contained herein, Sellers, Buyer and UBT hereby agree as follows:

1. <u>Agreement to Sell and Purchase</u>. Sellers covenant and agree to sell the Property, and Buyer covenants and agrees to purchase the Property, upon the terms and conditions set forth herein. Buyer covenants to timely file all transfer of ownership or control and other forms, information and supporting documents with the Minnesota Department of Health ("MDH") in order

to obtain a license to own and operate an Assisted Living Facility and an Assisted Living Facility Dementia Care license, (collectively, the "MDH License").

2. Earnest Money; Operating Expenses.

a. Within two (2) Business Days following the Effective Date, Buyer shall deposit with the Title Company, as escrow agent ("Escrow Agent"), in immediately available funds the sum of $116,000 (the "Earnest Money"). The Earnest Money shall be non-interest bearing.

i. If the transactions contemplated by this Agreement are consummated, the Earnest Money (as reduced pursuant to Section 4(b) in the event of any Buyer's Discretionary Closing Extension(s)) shall be delivered by Escrow Agent to UBT at Closing (as defined herein) and shall be applied to reduce the outstanding principal balance of the Loan being assumed by Buyer pursuant to the Assumption Agreement.

ii. If the transactions contemplated by this Agreement are not consummated on or before the Date of Closing (as defined herein), because of Buyer's default under or breach of this Agreement, then the Earnest Money (as reduced pursuant to Section 4(b) in the event of any Buyer's Discretionary Closing Extension(s)) shall be released to Sellers as liquidated damages, and thereafter neither party shall have any further rights or obligations hereunder except those that expressly survive termination.

iii. If the transactions contemplated by this Agreement are not consummated on or before the Date of Closing for any reason other than Buyer's default, then the Earnest Money (as reduced pursuant to Section 4(b) in the event of any Buyer's Discretionary Closing Extension(s)) shall be released to Buyer, and thereafter neither party shall have any further rights or obligations hereunder except those that expressly survive termination.

iv. Notwithstanding anything to the contrary herein, if the transactions contemplated by this Agreement are not consummated because of Buyer's election to terminate as provided in Section 10(g), $50,000 of the Earnest Money shall be delivered to the Sellers, and the remaining $66,000 will be returned to the Buyer.

b. Within two (2) Business Days following the Effective Date, UBT shall pay to Sellers in immediately available funds the sum of $50,000 (the "UBT Operating Loss Funding"), to fund operating losses of the Property incurred from and after the Effective Date and costs, expenses and taxes incurred by Sellers in order to consummate the Closing. Within two (2) Business Days following the expiration of the due diligence period set forth in Section 8(c), if Buyer does not exercise its election to terminate the Agreement pursuant to Section 10(g), Buyer shall pay to Sellers in immediately available funds the sum of $50,000 (the "Buyer Operating Loss Funding" and, together with the UBT Operating Loss Funding, the "Operating Loss Funding"). Sellers agree that the Operating Loss Funding shall be used solely (a) to pay bona fide operating expenses of the Property, including payroll, utilities, insurance, real estate taxes, maintenance, and other ordinary course operating expenses and (b) costs, expenses and taxes incurred by Sellers in order to consummate the Closing. On the Date of Closing, all Operating Loss Funding that has

not been used to fund operating losses of the Property or to consummate the Closing shall be remitted to Buyer and to UBT pro rata.

3. Purchase Price. The purchase price of the Property (the "Purchase Price") shall be assumption of the indebtedness and obligations evidenced by the Loan and Loan Documents (the "Loan Assumption"). Buyer shall make the cash payment by wire transfer of immediately available funds on the Date of Closing. The Loan Assumption shall be effected pursuant to that certain Assumption Agreement to be entered into between Buyer and UBT upon terms and conditions mutually acceptable to the parties, pursuant to which Buyer shall assume the payment and performance of all indebtedness and obligations evidenced by or arising under the Loan Documents.

4. Closing.

a. Closing shall occur one hundred and twenty (120) days following the Effective Date ("Closing" or "Date of Closing"), unless the Date of Closing is accelerated or extended on the written agreement of both Buyer and Sellers. The Title Company, acting as escrow agent for both parties, shall handle the Closing.

b. Notwithstanding the foregoing, Buyer may unilaterally extend the Date of Closing a total of two (2) times, for thirty (30) days each (each such extension a "Buyer's Discretionary Closing Extension"), by (i) notifying Sellers in writing of its election to effect a Buyer's Discretionary Closing Extension no later than two (2) days prior to the then applicable Date of Closing and (ii) concurrently instructing the Escrow Agent to immediately release to the Sellers $25,000 of the Earnest Money.

5. Possession. Possession of the Property will transfer to Buyer as of completion of Closing.

6. Title. Sellers shall convey by Special Warranty Deed ("Deed") insurable fee simple title to the Real Property and Improvements at Closing, free and clear of all liens, security interests and encumbrances (except for the lien imposed by the Loan Documents), but subject to all easements, covenants, restrictions and reservations of record and all prior, current and future real estate taxes and any assessments. In addition, Sellers shall, by bill of sale ("Bill of Sale"), convey and transfer all Personal Property to Buyer, free and clear of all liens, security interests and encumbrances (except for the lien imposed by the Loan Documents), but subject to any personal property taxes.

7. Title and Survey Examination. Buyer has ordered a title insurance commitment ("Title Commitment") for an ALTA owner's title insurance policy ("Title Policy") issued by Fidelity National Title Insurance Company ("Title Company") necessary to insure the title to the Real Property and Improvements together with copies of all recorded documents listed as exceptions therein. Buyer may order and obtain an ALTA survey ("Survey") at its cost. Buyer shall provide a copy of the Title Commitment and Survey to Sellers as they become available. Buyer shall have ten (10) days from the Buyer's receipt of the initial Title Commitment and Survey within which to deliver to Sellers written notice of any defects in title discovered during the examination of the initial Title Commitment and initial Survey by Buyer (collectively "Title Defects"). However, Buyer shall have the right to object to any additional title exceptions that first arise after the date of the initial Title Commitment in accordance with the foregoing procedure for a period of ten (10) days after being provided with a revised Title Commitment containing such new exceptions and copies of the corresponding documents. Notwithstanding the foregoing, Buyer shall have no

obligation to object to (i) the Loan and the Loan Documents identified on Exhibit "A" and any liens, encumbrances or exceptions arising therefrom or securing the same, or (ii) any existing mortgages, assignments of leases and rents or liens of record other than those securing indebtedness unrelated to the Loan, and such matters relating to the Loan and the Loan Documents shall not be considered Title Defects. After receiving a written notice of the Title Defects from Buyer, Sellers shall have ten (10) days ("Seller Cure Period") to (a) cure such Title Defects or have the Title Company insure over such Title Defects in a form reasonably satisfactory to Buyer, at Sellers' expense, or (b) notify Buyer of its inability to cure or election to not cure any one or more Title Defects. In the event Sellers do not cure the Title Defects or have the Title Company insure over such Title Defects within the Seller Cure Period, then Buyer shall have the option to either (i) terminate this Agreement, or (ii) waive such objections. Buyer's termination option shall be deemed waived if not exercised by written notice delivered to Sellers within three (3) days following expiration of the Seller Cure Period. For the sake of clarity and avoidance of any doubt, any right for the Buyer to terminate the Agreement pursuant to this Section must occur during the Diligence Period. Upon expiration of the Diligence Period, Buyer waives any further rights with respect to this Section 7, and such waiver shall constitute a waiver of all claims and rights in relation to such title defects under this Purchase Agreement.

8. Covenants of Sellers. Prior to Closing, Sellers agree that:

a. From and after the Effective Date, Sellers shall not enter into any new leases or contracts or modifications of existing leases or contracts with respect to the Property in each case which would be material to the business or operations of the Sellers, without the prior written approval of Buyer, which can be given or withheld in Buyer's sole discretion.

b. Sellers shall not sell, assign, or convey any right, title, or interest whatsoever in or to the Property, or create or permit to attach any new lien, security interest, easement, encumbrance, charge or condition affecting the Property without the prior written approval of Buyer.

c. Buyer and its agents will have the right, at Buyer's sole cost and expense, on or before 45 days after the Effective Date (the "Diligence Period") to enter upon the Property during normal business hours to examine the same and the condition thereof and to conduct such surveys and to make such engineering and other non-invasive inspections, tests, and studies as Buyer determines to be reasonably necessary. Buyer will give Sellers advance written three (3) day notice of such examinations or surveys and will conduct such examinations or surveys during normal business hours to the extent practicable. Sellers shall have the right to be present during any such examination or inspection. At Seller's request, Buyer will promptly furnish to Sellers copies of any reports received by Buyer relating to the Property. Buyer expressly acknowledges and agrees not to contact, or have discussions, whether directly or indirectly, with, (i) any tenants, subtenants, guests, licensees, contractors or other users or occupants of the Property, or any of their respective affiliates, (ii) any property manager of the Property, (iii) any partners or managing agents of the Property, (iv) adjoining property owners, or any of Sellers' lenders, contractors or insurers with respect to the Property, or (v) any governmental authority except for routine inquiries regarding zoning and property compliance status, without the prior written consent of Sellers in each instance. Buyer will conduct all examinations and surveys of the Property in a manner that will not (i) interfere with the operation, use and maintenance of the Property, (ii) compromise the safety or privacy of occupants on the Property, (iii) harm or damage the Property so that it cannot be restored

to its prior condition or (iv) cause any claim adverse to Sellers, and will restore the Property to its condition prior to any such examinations or surveys immediately after conducting the same. Buyer will protect, indemnify, defend, save, and hold Sellers, their manager, partners, agents, representatives, and their respective successors and assigns, harmless from and against any claims for injury or death to persons, damage to property or other demands, suits, obligations, losses, damages or claims, and costs and expenses, including attorneys' fees and litigation costs, arising out of any action of any person or firm entering the Property on Buyer's behalf as aforesaid, including claims made by any occupant against Sellers for Buyer's entry into such occupant's premises or any interference with any occupant's use or damage to its premises or property in connection with Buyer's review of the Property, which indemnity will survive the Closing and any termination of this Agreement without the Closing having occurred. Buyer agrees to provide, or have its agents provide, Sellers with a certificate of commercial general liability insurance with limits of not less than One Million Dollars ($1,000,000) per occurrence and One Million Dollars ($1,000,000) in the aggregate, naming the Sellers as additional insured, in connection with any inspections, tests, surveys, studies or other entry upon or use of the Property by Buyer or its agents. Notwithstanding the foregoing, Buyer will not be liable merely for the discovery of a pre-existing condition at the Property.

9. Covenants of Buyer. Prior to Closing, Buyer agrees that:

a. Without limiting Buyer's obligation under Section 1, Buyer shall submit to MDH all transfer of ownership forms and all supporting documents required to obtain an MDH License (collectively, the "MDH Filing") no later than sixty (60) days prior to the then-scheduled Date of Closing (the "MDH Filing Deadline"). Buyer shall use reasonable best efforts to prepare and submit a complete and accurate MDH Filing as promptly as practicable and, in any event, no later than the MDH Filing Deadline.

b. Within three (3) Business Days following submission of the MDH Filing, Buyer shall deliver to Sellers written confirmation of such submission, which confirmation shall include: (i) copies of all transfer of ownership forms and supporting documents submitted to MDH; and (ii) any confirmation of receipt, filing acknowledgment, or other written communication issued by MDH upon submission. Buyer shall further deliver to Sellers, promptly upon receipt thereof, copies of any correspondence, requests for additional information, or other communications received from MDH relating to the MDH Filing or the pendency of MDH's review thereof.

c. Buyer's failure to submit the MDH Filing by the MDH Filing Deadline shall constitute a material breach of this Agreement and shall be treated as a Buyer default under Section 21 hereof. In such event, Sellers may, at their option, terminate this Agreement by written notice to Buyer, whereupon the Earnest Money (as reduced pursuant to Section 4(b) in the event of any Buyer's Discretionary Closing Extension(s)) shall be released and delivered to Sellers as liquidated damages, and neither party shall have any further rights or obligations hereunder except those provisions that expressly survive termination.

10. Conditions Precedent of Buyer. The obligations of Buyer to purchase the Property pursuant to this Agreement shall be subject to the following condition precedent:

a. All of the representations, warranties, and agreements of Sellers set forth in this Agreement shall be true and correct in all material respects as of the Effective Date

and as of Closing, and Sellers shall not have on or prior to Closing, failed to meet, comply with or perform in any material respect any covenants or agreements on Sellers' part as required by the terms of this Agreement.

b. There shall be no material change in the matters reflected in the title documents or material adverse change to the Survey.

c. Sellers shall have materially delivered all items required to be delivered by Sellers hereunder.

d. The Court shall have entered an order pursuant to Section 363 of the Bankruptcy Code which (i) approves this Agreement and the transactions contemplated hereby, (ii) authorizes the sale of the Property to Buyer free and clear of all liens, claims, interests and encumbrances (other than the Loan Documents to be assumed and matters raised as an exception on the Title Commitment), and (iii) approves the assignment and assumption of the Assigned Contracts (the "Sale Order"). For the avoidance of doubt, the effectiveness of this Agreement as to Sellers is conditioned upon entry of the Sale Order, as more fully set forth in Section 24 hereof.

e. No injunction, order or legal restraint shall be in effect prohibiting the consummation of the transactions contemplated hereby.

f. Buyer shall have received from MDH a new MDH License.

g. Buyer shall not have delivered written notice to Sellers of its election to terminate this Agreement, in its sole and absolute discretion, prior to the expiration of the Diligence Period set forth in Section 8(c).

If Buyer notifies Sellers at least five (5) days prior to Closing of a failure to satisfy the conditions precedent set forth in this Section 8, Sellers may, within five (5) days after receipt of Buyer's notice ("Seller's Cure Period"), agree to satisfy the condition by written notice to Buyer, and Buyer shall thereupon be obligated to close the transaction provided (a) Sellers so satisfy such condition to Buyer's reasonable satisfaction and (b) no such right to cure shall extend Closing. If Sellers fail to agree to cure or fails to cure such condition within the Seller Cure Period, then Buyer may, at its option, (a) waive the condition precedent or (b) terminate the Agreement, in any event by written notice to Sellers within five (5) days after the expiration of the Seller Cure Period and receive full refund of the Earnest Money (as reduced pursuant to Section 4(b) in the event of any Buyer's Discretionary Closing Extension(s)). Notwithstanding the foregoing, Sellers shall have no ability to cure Buyer's election to terminate as provided in Section 10(g).

11. Condition Precedent of Sellers. The obligations of Sellers to sell the Property pursuant to this Agreement shall be subject to the following condition precedent:

a. All of the representations, warranties, and agreements of Buyer set forth in this Agreement shall be true and correct in all material respects as of the Effective Date and as of Closing, and Buyer shall not have on or prior to Closing, failed to meet, comply with or perform in any material respect any covenants or agreements on Buyer's part as required by the terms of this Agreement.

b. Buyer shall have delivered all items required to be delivered by Buyer hereunder, including payment of the Purchase Price at the Closing.

c. The Court shall have entered the Sale Order. For the avoidance of doubt, entry of the Sale Order is a condition to the effectiveness of this Agreement as to Sellers, as more fully set forth in Section 24 hereof.

d. Each of UBT and Buyer shall have executed the Assumption Agreement.

e. No injunction, order or legal restraint shall be in effect prohibiting the consummation of the transactions contemplated hereby.

f. Buyer shall have received from MDH an MDH License; provided, however, that Sellers may, in their sole and absolute discretion, waive this condition precedent by written notice to Buyer at any time on or prior to the Date of Closing.

12. Transition Operating Agreement.

a. If, as of the then-scheduled Date of Closing, Buyer has not received from MDH an MDH License (the "MDH Approval"), and:

i. Buyer has timely submitted the MDH Filing in accordance with Section 9(a) above and has not been in default of its obligations thereunder;

ii. MDH Approval remains pending solely as a result of MDH's processing timelines or other governmental delay, and not as a result of any act, omission, deficiency, or failure attributable to Buyer; and

iii. the absence of MDH Approval is not attributable to any act or omission of Sellers;

then, as a condition to each party's obligation to proceed to Closing in lieu of any right to terminate on account of the absence of MDH Approval, the parties shall negotiate in good faith and execute and deliver a mutually agreed transition operating agreement (the "TOA") on or before the Date of Closing.

b. During the Diligence Period the parties shall use their commercially reasonable efforts to agree to the form of TOA, which form shall be mutually agreed upon by the parties in good faith and shall contain, at minimum, the following terms:

i. Sellers (or a designee of Sellers acceptable to Buyer in Buyer's reasonable discretion) shall be authorized to continue to operate the Property under Sellers' existing MDH operating license(s) for the benefit of Buyer during the period commencing on the Date of Closing and ending upon the earlier of: (A) the date on which Buyer receives MDH Approval; or (B) 180 days following the Date of Closing (the "TOA Term"), subject to extension by mutual written agreement of the parties.

ii. All operating revenues and expenses of the Property during the TOA Term shall be for the account of Buyer. Buyer shall fund all operating expenses of the Property during the TOA Term promptly upon request and shall not permit any operating shortfall to arise that would jeopardize the continuity of operations or Sellers' ability to comply with applicable regulatory requirements.

iii. During the TOA Term, Buyer shall: (A) diligently and in good faith pursue receipt of MDH Approval, including promptly responding to all MDH inquiries and requests for additional information; (B) cooperate fully with Sellers in connection with the continued operation of the Property; and (C) not take any action, or fail to take any action, that would reasonably be expected to delay, impair, or jeopardize receipt of MDH Approval.

iv. Buyer shall indemnify, defend, and hold harmless Sellers and their respective successors and assigns from and against any and all claims, liabilities, losses, damages, costs, and expenses (including reasonable attorneys' fees) arising out of or related to the operation of the Property during the TOA Term, except to the extent directly caused by the gross negligence or willful misconduct of Sellers.

v. Each party shall cooperate in good faith to ensure that the continued operation of the Property during the TOA Term complies with all applicable MDH regulations and licensing requirements, and neither party shall take any action that would cause a violation of, or give rise to any regulatory action under, any applicable law or MDH License condition.

vi. The TOA shall terminate automatically upon Buyer's receipt of MDH Approval. If MDH Approval is not received by the expiration of the TOA Term, the parties shall negotiate in good faith regarding a further extension; provided, however, that neither party shall be obligated to agree to any such extension. If the parties are unable to agree on an extension, either party may terminate the TOA upon 30 days' prior written notice to the other party, and the parties shall cooperate in good faith to wind down operations at the Property in an orderly and compliant manner.

c. Notwithstanding Sections 10(f) and 11(f), if the parties execute and deliver a TOA in accordance with this Section 12(a) and 12(b) on or prior to the Date of Closing, the condition precedent requiring receipt of MDH Approval prior to Closing shall be deemed satisfied for purposes of permitting the real estate Closing and transfer of the Property to proceed. For the avoidance of doubt: (i) execution of the TOA and consummation of Closing shall not relieve Buyer of its obligation to diligently pursue and obtain MDH Approval; and (ii) Buyer's failure to pursue MDH Approval diligently following Closing shall constitute a breach of this Agreement.

d. For purposes of Section 12(a)(iii), the absence of MDH Approval shall not be considered to be "through no fault of Sellers" if MDH's failure to grant MDH Approval is attributable, in whole or in part, to: (i) any act or omission of Sellers that adversely affects the transfer of ownership application or MDH's review thereof; (ii) any failure by Sellers to cooperate with MDH's review process or to provide information or documentation that is within Sellers' possession or control; or (iii) any material regulatory violation at the Property arising during the period prior to Closing that is attributable to Sellers' operation thereof.

e. If, as of the then-scheduled Date of Closing, the conditions of Section 10 and 11 (other than the conditions of Sections 10(f) and 11(f)) are satisfied but the parties have not been able to agree upon and execute a TOA despite good-faith negotiations, then the Date of Closing shall be automatically extended for a period of up to 15 days to allow the parties additional time to finalize the TOA. If the parties are still unable to execute

a TOA by the end of such extension period, Sellers may terminate this Agreement by written notice to Buyer, in which case the Earnest Money (as reduced pursuant to Section 4(b) in the event of any Buyer's Discretionary Closing Extension(s)) shall be retained by Sellers as liquidated damages, and neither party shall have any further obligations hereunder except those that expressly survive termination.

13. Real Estate and Personal Property Taxes and Assessments. Real estate taxes, personal property taxes and assessments which become due in the year of Closing shall be prorated between Buyer and Sellers as of the Date of Closing; provided that any such real estate taxes allocated to the Sellers shall be payable from the Operating Loss Funding.

14. Closing Documents. The following shall occur at Closing:

a. Sellers shall deliver to the Title Company:

i. The executed original of the Deed (in a form reasonably acceptable to the applicable parties), conveying the Real Property and Improvements located thereon to Buyer, free and clear of all liens, security interests and encumbrances (except for the lien imposed by the Loan Documents), but subject to all easements, covenants, restrictions and reservations of record and all future real estate taxes, personal property taxes and any assessments;

ii. The executed Bill of Sale (in a form reasonably acceptable to the applicable parties) conveying the Personal Property to Buyer, free and clear of all liens, security interests and encumbrances (except for the lien imposed by the Loan Documents), but subject to any personal property taxes;

iii. A non-foreign affidavit, properly executed and containing such information as is required by the Title Company;

iv. The appropriate Federal income tax reporting form, if any is required;

v. Any reasonable and customary documentation, including an Owner's Affidavit, required by the Title Company to issue the Title Policy;

vi. Such evidence as the Title Company may reasonably require as to the authority of the person or persons executing documents on behalf of Sellers; and

vii. An executed copy of an Assignment and Assumption Agreement relating to the Assigned Contracts pursuant to which the applicable Seller assigns and transfers the applicable Assigned Contracts to Buyer.

b. Buyer shall deliver to the Title Company:

i. The executed Bill of Sale;

ii. An executed copy of an Assignment and Assumption Agreement relating to the Assigned Contracts pursuant to which Buyer agrees to assume and

perform all obligations under the Assigned Contracts from and after the Date of Closing.

iii. The executed original of the Assumption Agreement, together with execution of such additional Loan Documents as shall modify the terms and conditions of the Loan and a new Guaranty in form and content acceptable to UBT, executed by Abdullahi Omar, an individual;

iv. Such evidence as the Title Company may reasonably require as to the authority of the person or persons executing documents on behalf of Buyer; and

v. Any documentation required by the Title Company to issue the Title Policy and fulfill the conditions or requirements set forth in the Title Commitment.

c. Sellers and Buyer shall execute and deliver all other instruments and documents as may be reasonably necessary or appropriate to consummate the transactions contemplated herein.

15. Closing Costs and Prorations. Buyer and Sellers hereby covenant and agree that:

a. Sellers and Buyer shall share equally the costs of the Title Company's closing fees.

b. Buyer shall pay (i) all costs of the Survey; (ii) any other costs, fees or expenses (including attorneys' fees incurred by Buyer) pertaining to or arising out of the negotiation and consummation of the sale and purchase of the Property hereunder incurred by or on behalf of Buyer; (iii) all recording fees; (iv) shall be solely responsible for the cost of the Title Commitment (including any updates), Title Policy, extended coverage and any endorsements as may be required by Buyer; and (v) all other costs, fees or expenses for which Buyer is responsible pursuant to the terms of this Agreement.

c. Sellers shall pay (i) any other costs, fees or expenses (including attorneys' fees incurred by Buyer) pertaining to or arising out of the negotiation and consummation of the sale and purchase of the Property hereunder incurred by or on behalf of Seller; and (ii) all documentary or revenue stamp taxes.

d. Real estate taxes, personal property taxes and assessments shall be prorated between Buyer and Sellers as set forth in Section 13 of this Agreement.

e. Utility charges and other operating expenses of the Property shall be the sole responsibility of Buyer.

16. Risk of Loss. Risk of loss on the Property prior to Closing shall remain with Sellers. Specifically:

a. Casualty. In the event that the Property should be damaged by any casualty prior to Closing, then Sellers shall promptly provide Buyer with written notice of such casualty. If the cost of repairing such damage, as estimated by an architect or contractor retained pursuant to the mutual agreement of the parties ("Cost of Repairs"), is (a) estimated to be less than Fifty Thousand Dollars ($50,000.00), Closing shall proceed

as scheduled and any insurance proceeds, plus the cash amount of any associated deductible, shall be paid over to Buyer; or (b) estimated to be equal to or greater than Fifty Thousand Dollars ($50,000.00), then Buyer may in its sole discretion either (i) elect to terminate this Agreement and neither party shall have any further obligation to the other, or (ii) proceed to Closing in which event any insurance proceeds, plus the cash amount of any associated deductible, shall be paid over to Buyer. In the event that the casualty is uninsured, Buyer may terminate this Agreement or proceed to Closing with no adjustment to the Purchase Price. Any notice required to terminate this Agreement pursuant to this Section shall be delivered no later than the earlier of (i) the Date of Closing or (ii) ten (10) days following Buyer's receipt of Sellers' notice of such casualty.

b. Eminent Domain. If, before Closing, proceedings are commenced for the taking by exercise of the power of eminent domain of all or a material part of the Property which, as reasonably determined by Buyer, would render the Property unable to be used for Buyer's intended use, Buyer shall have the right, by giving written notice to Sellers within ten (10) days after Sellers give notice of the commencement of such proceedings to Buyer, to terminate this Agreement, in which event this Agreement shall automatically terminate, and neither party shall have any continuing obligations hereunder. If, before Closing, proceedings are commenced for the taking by exercise of the power of eminent domain of less than a material part of the Property, or if Buyer has the right to terminate this Agreement pursuant to the preceding sentence but does not exercise such right, then this Agreement shall remain in full force and effect and, on Closing, that portion of the condemnation award (or, if not theretofore received, the right to receive such portion of the award) payable on account of the taking of all or a portion of the Property shall be assigned, or paid to, Buyer. Sellers shall give written notice to Buyer within ten (10) days after Sellers' receiving notice of the commencement of any proceedings for the taking by exercise of the power of eminent domain of all or any part of the Property.

17. Real Estate Commission or Finder's Fee. Buyer and UBT shall each pay $100,000.00 towards the broker's commission and other fees payable to Senior Living Investment Brokerage in connection with the transactions contemplated by this Agreement (the "SLIB Commission"), subject to Senior Living Investment Brokerage modifying its Listing Agreement to provide that the total broker's commission and other fees payable to Senior Living Investment Brokerage is $200,000.00. Except as set forth in the immediately preceding sentence, the parties agree that no party hereto shall be liable for any real estate broker's commission, agent's commission, or finder's fee in connection with the transaction contemplated by this Agreement.

18. Sellers' Representations and Warranties. Sellers represent and warrant to Buyer now and on the Date of Closing that, to the best of Sellers' actual knowledge:

a. Sellers are Delaware limited liability companies, validly existing, and in good standing and qualified to do business in the State of Minnesota. Sellers have full power and authority to enter into this Agreement, to perform this Agreement and to consummate the transactions contemplated hereby. The execution, delivery, and performance of this Agreement and all documents contemplated hereby by Sellers have been duly and validly authorized by all necessary action on the part of Sellers and all required consents and approvals have been or will be duly obtained and will not result in a breach of any of the terms or provisions of, or constitute a default under, any indenture, agreement or instrument to which a Seller is a party or otherwise bound. This Agreement is a legal, valid, and binding obligation of Sellers, enforceable against Sellers in

accordance with its terms, subject to the limitations on effectiveness set forth in Section 24 hereof and conditioned upon entry of the Sale Order.

b. The Sellers have good and insurable title to the Property, subject to all matters of record and the Loan Documents. Except as reflected in the Title Commitment, there are no outstanding rights of first refusal, rights of reverter, or options relating to the Property or any interest therein. To Sellers' knowledge, there are no unrecorded documents or other matters which affect title to the Property.

c. Neither Seller is a "foreign person" within the meaning of Section 1445(f) of the Internal Revenue Code of 1986, as amended.

19. Representations and Warranties of Buyer. Buyer represents and warrants to Sellers now and on the Date of Closing that:

a. Organization and Standing. Buyer is now and on the Date of Closing will be a limited liability company, organized and existing under the laws of the State of Minnesota;

b. Authorization. All necessary action to duly approve the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby will have been taken by Buyer, and this Agreement will constitute a valid and binding agreement of Buyer enforceable in accordance with its terms; and

c. Litigation. No litigation, action, special assessment, charge, lien, suit, judgment, proceeding, or investigation is pending or outstanding before any forum, court, or governmental body, department, or agency of any kind, or to the knowledge of Buyer threatened, to which Buyer is a party which has the stated purpose or the possible effect of enjoining or preventing the consummation of this Agreement or the transactions contemplated hereby or to recover damages by reason thereof, or which questions the validity of any action taken or to be taken pursuant to or in connection with this Agreement. Buyer does not know of any basis for such claim, litigation, action, special assessment, charge, lien, suit, judgment, proceeding, or investigation.

d. Sufficiency of Funds. Buyer has, and at the Closing will have, sufficient cash on hand to enable Buyer to consummate the transactions contemplated by this Agreement, including payment of the Purchase Price and all fees and expenses payable by Buyer in connection with the transactions contemplated by this Agreement.

20. "AS IS" Condition. Buyer acknowledges and agrees that, except for the representations of Sellers expressly contained in this Agreement, as a material part of the consideration for this Agreement, the Property shall be sold and conveyed (and accepted by Buyer at Closing) AS IS, WHERE IS, WITH ALL FAULTS AND DEFECTS AND WITHOUT ANY WRITTEN OR ORAL REPRESENTATION OR WARRANTY WHATSOEVER, EXPRESS OR IMPLIED OR ARISING BY OPERATION OF LAW, INCLUDING WITHOUT LIMITATION, WARRANTIES OF HABITABILITY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. Except as expressly otherwise provided in this Agreement, no Seller makes any representation, warranty or covenant, express, implied or statutory, of any kind whatsoever with respect to the Property, including, without limitation, representation, warranty or covenant as to title, survey conditions, use of the Property for Buyer's intended use, the condition of the Property, past or present use, development, investment potential, tax ramifications or consequences,

compliance with law, present or future zoning, the presence or absence of hazardous substances, the availability of utilities, access to public road, habitability, merchantability, fitness or suitability for any purpose, or any other matter with respect to the Property (collectively, the "Condition of the Property"), all of which are, except as otherwise expressly provided in this Agreement, hereby expressly disclaimed by Sellers. Buyer waives the right to make any claim against Sellers in connection with any Condition of the Property and acknowledges that Buyer has entered into this Agreement with the intention of making and relying upon its own investigation of the physical, environmental, economic use, compliance and legal condition of the Property and that Buyer is not now relying, and will not later rely upon any representations and warranties made by Sellers, or anyone acting or claiming to act, by, through or under or on Sellers' behalf concerning the Condition of the Property.

21. Default. Time is agreed to be of the essence. If Buyer fails to consummate its purchase of the Property in accordance with the terms hereof, then Sellers' sole remedy shall be to retain Buyer's Earnest Money (as reduced pursuant to Section 4(b) in the event of any Buyer's Discretionary Closing Extension(s)) as liquidated damages resulting from Buyer's default. If Sellers default under this Agreement, subject to limitations contained in the Sale Order (if any), Buyer may either, as its sole remedies, (i) seek an action for specific performance within ninety (90) days after Sellers' default or (ii) seek to recover actual damages. Except for any specific timelines set forth herein, no delay or omission of any party in exercising any remedies or power accruing upon any event of default shall impair any remedies or power or shall be construed to be a waiver of any event of default or any acquiescence therein. Sellers' only involvement was as the Lender pursuant to the Loan and Loan Documents.

22. Buyer's Indemnification. Buyer agrees to indemnify, defend and hold harmless Sellers and their respective successors and assigns, from and against any and all damages occasioned by, arising out of or resulting from the operation of the Property subsequent to the Closing.

23. Binding. This Agreement shall be binding upon and inure to the benefit of the parties hereto, and their respective successors and assigns; provided, however, that the effectiveness of this Agreement as to Sellers is subject to the conditions set forth in Section 24 hereof. This Agreement shall be construed in accordance with the laws of the State of Minnesota.

24. Bankruptcy Court Approval; Effectiveness as to Sellers. Notwithstanding anything in this Agreement to the contrary, this Agreement shall be binding upon Buyer upon execution hereof. This Agreement shall not be effective as to the Sellers, and the Sellers shall have no liability or obligation under this Agreement, unless and until the Court shall have entered the Sale Order approving the sale of the Property and the other transactions contemplated by this Agreement. For the avoidance of doubt, prior to the entry of the Sale Order, (a) no Seller shall be deemed to have made any representation, warranty, covenant, or agreement hereunder, and (b) Buyer shall have no right to specific performance or any other remedy against any Seller arising out of or relating to this Agreement. Entry of the Sale Order shall constitute full satisfaction of any condition to the effectiveness of this Agreement as to the Sellers.

25. Notice. Delivery of notice may be accomplished by (i) hand delivery; (ii) delivery by a nationally recognized overnight courier service; or (iii) by email if the sender receives email confirmation of proper transmission and the notice is also delivered by one of the other delivery methods. Except as otherwise specified herein, all notices and other communications shall be deemed to have been duly given on (i) the date received if delivered by hand, (ii) the first (1st) business day after the date of deposit, if transmitted by reputable overnight courier service, or (iii)

the date of transmission with confirmed answer back if transmitted by email . Any party hereto may change its address for notification purposes by written notice to all other parties hereto and the manner and method set forth within this section.

**To Sellers:**

Inspired Healthcare Capital, LLC
C/O Ankura Consulting Group, LLC
Attn: M. Benjamin Jones
485 Lexington Ave., 10th Floor
New York, NY 10017

**With a copy to:**
Dechert LLP
2651 N. Harood Street,
Suite 120
Dallas, TX 75201
Attn: Jack Haake
Email: jack.haake@dechert.com

**To Buyer:**
10875 Settlers, LLC
Attn: Abdullahi Omar
400 S. 4th Street, Suite 410
Minneapolis, MN 55415
Email Address: omar@pslmn.com

**With a copy to:**
Kallas Law Office Ltd
Attention: Mike Kallas
4601 Excelsior Blvd, S. 500
St. Louis Park, MN 55416
Email Address: mkallas@kallas-law.com

**To UBT:**

Union Bank and Trust Company
14400 Branch Street
Omaha, NE 68154
Attn: Tom Weinandt
Email Address: tom.weinandt@ubt.com

**With a copy to:**
Walentine O'Toole, LLP
Attn: Michael F. Kivett
11240 Davenport Street
Omaha, NE 68154
Email Address:
mfkivett@walentineotoole.com

26. Entire Agreement. This Agreement contains the entire agreement between the parties. This Agreement may not be changed or modified in any manner unless an instrument in writing is executed by the parties hereto.

27. Further Assurances. Each party agrees to fully support, coordinate and cooperate to carry out the provisions of this Agreement. Each party shall cooperate in good faith with the other party and shall execute, acknowledge, and deliver any and all documents or requests in order to satisfy the conditions set forth herein and carry out the intent and purposes of this Agreement.

28. Relationship of Parties. Nothing contained herein nor any acts of any party shall be deemed or construed by Sellers or Buyer or by any third person to create the relationship of partnership or of joint venture or of any association between Sellers and Buyer, other than contractual relationships stated in this Agreement.

29. Assignment. This Agreement may not be assigned by either Sellers or Buyer without the prior written consent of the other party to this Agreement.

30. Execution in Counterparts/Signing. This Agreement may be executed in counterparts, each of which shall be an original but all of which shall constitute one and the same instrument. This Agreement may be signed electronically. An electronic signature or a facsimile signature shall be valid and binding.

31. Confidentiality. The parties agree that the provisions of this Agreement shall be confidential and shall not be disclosed or otherwise divulged by either party hereto except as shall be necessary (a) to a party's directors, officers, employees, agents or representatives only to the extent necessary for such party to exercise its rights or perform its duties and obligations under this Agreement or as a result of entering into this Agreement; (b) to enforce or defend any provision of this Agreement; (c) to comply with any requirement of any governmental authority of or (d) to comply with any court order. Each party acknowledges that certain provisions of this Agreement will become public at Closing due to filing of the Deed and any other necessary closing documents with governmental authorities.

32. Drafting of Agreement. Sellers and Buyer each acknowledge and agree that this Agreement has been negotiated by the parties and no party shall be deemed to have drafted this Agreement for purposes of construing any ambiguity.

33. Higher and Better Offer. Notwithstanding anything to the contrary contained herein, Sellers shall have the right to terminate this Agreement upon written notice to Buyer if the Court approves a higher or otherwise better offer for the Property in accordance with bidding procedures approved by the Court. Upon such termination, (a) this Agreement shall be null and void except for provisions that expressly survive termination, and (b) the Earnest Money (as reduced pursuant to Section 4(b) in the event of any Buyer's Discretionary Closing Extension(s)) shall be returned to Buyer.

34. UBT Consent; Assumption Approval. UBT, as holder of the Loan and beneficiary under the Loan Documents, hereby consents to (a) the sale of the Property to Buyer pursuant to this Agreement, (b) the execution and delivery of the Assumption Agreement, and (c) Buyer's assumption of the indebtedness and obligations evidenced by the Loan Documents, subject to the terms and conditions of this Agreement and the Assumption Agreement. Effective as of the Closing and upon Buyer's execution and delivery of the Assumption Agreement, UBT hereby releases Sellers and any guarantors of Sellers from any further liability under the Loan Documents. UBT shall, at Closing, deliver written evidence of such release in form reasonably acceptable to Buyer.

35. UBT Subordination of Other Claims. UBT, in its capacity as a creditor of Sellers or their bankruptcy estates (collectively, the "Estates"), hereby agrees that, effective upon entry of the Sale Order and conditioned upon the Closing of the transactions contemplated by this Agreement, any and all claims UBT may have against Sellers or the Estates shall be subordinated in right of payment to the claims of all allowed general unsecured creditors of the Estates. UBT agrees to execute and deliver such further instruments or stipulations as may be reasonably required to evidence or implement the subordination contemplated by this Section, including incorporation of such treatment in the Sale Order or any confirmed plan of liquidation.

**[The Remainder of This Page Intentionally Left Blank; Signature Page Follows]**

IN WITNESS WHEREOF, this Agreement has been executed by Sellers and Buyer as of the date and year first written above.

**IHC – HANOVER PROPCO, LLC**, a Delaware limited liability company, Seller

Signed by:
By: M. Benjamin Jones
46622179A69843E...

Name: M. Benjamin Jones

Title: Chief Restructuring Officer

**10875 SETTLERS, LLC**, a Minnesota limited liability company, Buyer

Signed by:
By: Abdullahi Omar
A9FC5E8C9595462...

Name: Abdullahi Omar

Title: Manager

**INSPIRED SENIOR LIVING OF HANOVER, LLC**, a Delaware limited liability company, Seller

Signed by:
By: M. Benjamin Jones
46622179A69843E...

Name: M. Benjamin Jones

Title: Chief Restructuring Officer

**UNION BANK AND TRUST COMPANY,** a Nebraska state banking corporation, UBT

Signed by:
By: Tom Weinandt
D715491C96D5444...

Name: Tom Weinandt

Title: Market President

**Exhibit "A"**

Loan in the original principal amount of $6,900,000.00

(i) Construction Loan Agreement dated November 1, 2021 entered into between IHC-Hanover Propco, LLC, a Delaware limited liability company ("Borrower") and UBT, as Lender.

(ii) Promissory Note dated November 1, 2021 in the principal sum of $6,900,000.00 executed by Borrower and payable to UBT as Lender, which has the current outstanding principal amount of $6,551,109.51;

(iii) Construction Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Filing Statement dated November 1, 2021 from Borrower to UBT as Mortgagee, covering the Property (as defined in the Purchase Agreement), recorded on November 2, 2021 in Official Records as Document Number 11034484 in the Office of the County Recorder, Hennepin County, Minnesota;

(iv) Assignment of Leases and Rents dated November 1, 2021 from Borrower to UBT as Lender, covering the Property (as defined in the Purchase Agreement) recorded on November 2, 2021 in the Official Records as Document Number 11034485 in the Office of the County Recorder of Hennepin County, Minnesota.

(v) Environmental ADA Indemnity Agreement dated November 1, 2021, executed by Borrower for the benefit of UBT, as Lender.

Docusign Envelope ID: 99D70134-25E2-433D-8D4D-D226C520CB3B


**<u>Exhibit "B"</u>**

Parcel 1:

Lot 40, Block 8, The Bridges at Hanover, Hennepin County, Minnesota

Parcel 2:

Non-exclusive easements contained in Declaration of Easements dated February 21, 2002, recorded March 26, 2002, as Document No. 7684399

Parcel 3:

Non-exclusive easement contained in Access Easement dated October 15, 2014, recorded November 5, 2014, as Document No. A10135050

Docusign Envelope ID: 99D70134-25E2-433D-8D4D-D226C520CB3B


**<u>Exhibit "C"</u>**

Personal Property

[to be provided prior to Closing]

Docusign Envelope ID: 99D70134-25E2-433D-8D4D-D226C520CB3B


**<u>Exhibit “D”</u>**

Assigned Contracts

[to be provided prior to Closing]

**EXECUTION VERSION**
***HIGHLY CONFIDENTIAL***

August 24 , 2026

***VIA EMAIL***

10875 Settlers LLC
Attn: Abdullahi Omar
400 S. 4th Street, Suite 410
Minneapolis, MN 55415
Email: omar@pslmn.com

**RE: LETTER ADDENDUM TO PURCHASE AGREEMENT**

To Whom It May Concern,

Reference is hereby made to that certain Purchase Agreement dated as of May 20, 2026 (the "Purchase Agreement"), by and among IHC – Hanover Propco, LLC, a Delaware limited liability company ("Propco"), Inspired Senior Living of Hanover, LLC, a Delaware limited liability company ("Opco" and, together with Propco, "Sellers"), 10875 Settlers LLC, a Minnesota limited liability company, and its successors and assigns ("Buyer" and, together with the Sellers, the "Parties"), and Union Bank and Trust Company, a Nebraska state banking corporation. Capitalized terms used but not defined herein have the meanings given to them in the Purchase Agreement.

1. For valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the Parties, the Parties hereby agree that this letter agreement (the "Agreement") shall constitute an addendum to the Purchase Agreement that amends the Purchase Agreement as applicable to the Parties to:

    a. insert the following new Section 9(d), immediately following Section 9(c) of the Purchase Agreement:

        "d. Prior to the Closing, Buyer shall extend, or shall cause to be extended by one of its affiliates, a bona fide written offer of employment, effective upon the Closing, to no fewer than twenty-five (25) employees of Sellers or their affiliates as of the Closing who have been continuously employed full-time at the Property for at least six consecutive months immediately preceding the Closing, with each such offer to be on substantially the same terms and conditions of employment (including position and base compensation and employee benefits) as the terms of such employee's employment with Sellers or their applicable affiliates immediately prior to Closing."; and

    b. insert the following new Section 11(g), immediately following Section 11(f) of the Purchase Agreement:

        "g. Buyer shall have satisfied its obligations under Section 9(d) hereof."

2. Except as modified herein, all terms and conditions of the Purchase Agreement remain unmodified and in full force and effect. In the event of a contradiction between the provisions of the Purchase Agreement and this Agreement, as applicable to Parties, the provisions of this Agreement shall prevail. This Agreement is incorporated by reference into the Purchase Agreement and shall be a part of and (subject to the foregoing sentence) subject to all terms of the Purchase Agreement. The provisions of Sections 23 through 32 of the Purchase Agreement are hereby incorporated by reference *mutatis mutandis* into this Agreement as if set forth in full in this Section 2.

* * * * *

IN WITNESS WHEREOF, the undersigned parties have executed this Agreement as of the date first written above.

Very truly yours,

**IHC - HANOVER PROPCO, LLC**, a Delaware limited liability company

Signed by:

By: M Benjamin Jones

46622179A69843E...

Name: M. Benjamin Jones
Title: Chief Restructuring Officer

**INSPIRED SENIOR LIVING OF HANOVER, LLC**, a Delaware limited liability company

Signed by:

By: M Benjamin Jones

46622179A69843E...

Name: M. Benjamin Jones
Title: Chief Restructuring Officer

**ACCEPTED AND AGREED TO**

**10875 SETTLERS LLC**, a Minnesota limited liability company

Signed by:
By: Abdullahi Omar
A9FC5E8C9595462...
Name: Abdullahi Omar
Title: Manager