**DECHERT LLP**
Marcus A. Helt (TX 24052187)
Jack G. Haake (TX 24127704)
Debbie E. Green (TX 24059852)
2651 N. Harwood Street, Suite 120
Dallas, Texas 75201
Telephone: (214) 453-4900
Email: marcus.helt@dechert.com
jack.haake@dechert.com
debbie.green@dechert.com
*Counsel to the Debtors and Debtors-in-Possession*

**DECHERT LLP**
Jerry L. Hall (admitted *pro hac vice*)
Three Bryant Park
1095 Avenue of the Americas
New York, New York 10036
Telephone: (212) 698-3500
Facsimile: (212) 698-3599
Email: jerry.hall@dechert.com

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| INSPIRED HEALTHCARE CAPITAL HOLDINGS, LLC, *et al.*[1] | ) | Case No. 26-90004 (MXM) |
| | ) | (Jointly Administered) |
| Debtors. | ) | **Related to Docket Nos. 465 and 1070** |

**NOTICE OF SALE ORDER FOR NOTICE OF SUCCESSFUL BIDDER FOR SALTERRA AT LAS VEGAS (LAS VEGAS) THE ARCHER SENIOR LIVING AT CRESCENT PARK (EUGENE) AND MARIELLA OF GRAPEVINE (GRAPEVINE)**

**PLEASE TAKE NOTICE** that on February 2, 2026, Inspired Healthcare Capital Holdings, LLC and its debtor affiliates, as debtors and debtors-in-possession (collectively, the "Debtors"), each filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division (the "Court"), and their cases are being jointly administered under Case No. 26-90004-mxm (collectively, the "Chapter 11 Cases").

**PLEASE TAKE FURTHER NOTICE** that on April 13, 2026, the Court entered the *Order Granting Debtors' Motion for Entry of an Order (I) Establishing Bid Procedures, (II)*

[1] The last four digits of Inspired Healthcare Capital Holdings, LLC's federal tax identification number are 6696. There are 161 Debtors in these chapter 11 cases, which are being jointly administered for procedural purposes only. A complete list of the Debtors and the last four digits of their federal tax identification numbers are not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/InspiredHealthcare. The Debtors' mailing address is 7033 East Greenway Parkway, Suite 250, Scottsdale, AZ 85254.

*Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Authorizing the Debtors to Enter into a Stalking Horse Agreement and Provide Bid Protections, (IV) Approving the Form and Manner of Notice Thereof, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, and (VI) Granting Related Relief* [Docket No. 465] (the "Bidding Procedures Order")[2] approving, among other things, the Bidding Procedures, and authorizing the Debtors to (a) designate one or more Stalking Horse Bidders to serve as the Stalking Horse Bid and (b) agree to Bid Protections.

**PLEASE TAKE FURTHER NOTICE** that on July 12, 2026, pursuant to and in accordance with the Bid Procedures, the Debtors filed the *Notice of Designation of Stalking Horse Bidder for (A) Salterra at Las Vegas, (B) The Archer Senior Living at Crescent Park, and (C) Mariella Of Grapevine* [Docket No. 1070], selecting Sonida Acquisition, LLC, or one of its affiliates or designees as the Stalking Horse Bidder for substantially all the relevant Debtors' assets related to Salterra at Las Vegas (Las Vegas, NV), The Archer Senior Living at Crescent Park (Eugene, OR) and Mariella Of Grapevine (Grapevine, TX), and attaching thereto the corresponding Asset Purchase Agreement (the "APA").

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Bidding Procedures Order and the *Corrected Amended Notice of Auction and Sale Hearing and Related Deadlines For The Sale of Substantially All Debtors' Assets* [Docket 1270], on August 25, 2026, at 10:00 a.m., prevailing Eastern Time, the Auction commenced, and concluded on September 9, 2026. The Debtors designated Sonida Acquisition, LLC as the Successful Bidder for Salterra at Las Vegas (Las Vegas, NV), The Archer Senior Living at Crescent Park (Eugene, OR) and Mariella of Grapevine (Grapevine, TX).

**PLEASE TAKE FURTHER NOTICE** that a copy of the current version of the order approving the sale to the Successful Bidder is attached hereto as **Exhibit A** (the "Proposed Sale Order"), which remains subject to continued review, comment, and approval.

**PLEASE TAKE FURTHER NOTICE** that the Sale Hearing to consider approval of the Successful Bid or Successful Bids, pursuant to which the Debtor and the Successful Bidder or Successful Bidders will consummate the Transaction, will commence on September 22, 2026, at 10:00 a.m. prevailing Central Time. The Hearing will be conducted in hybrid format, with parties being permitted to appear either in-person or virtually via WebEx, at their option. Parties who wish to participate in the hearing via WebEx may do so at the following link: https://us-courts.webex.com/meet/mullin

**PLEASE TAKE FURTHER NOTICE** that parties who wish to participate in the Continued Hearing by teleconference may do so via WebEx using the following dial-in and access code information:

Dial-In: 650-479-3207
Access Code: 2310 650 8783

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the Bidding Procedures Order.

**PLEASE TAKE FURTHER NOTICE** that all documents related to the sale process, including the relevant asset purchase agreements and proposed orders can be found on the public docket that can be found (i) at https://dm.epiq11.com/case/ihcare/dockets (ii) from the Court's website https://ecf.txnb.uscourts.gov/ via CM/ECF, or (iii) upon request to the undersigned.

*[Remainder of Page Intentionally Left Blank]*

Dated: September 21, 2026
Dallas, Texas

**DECHERT LLP**

*/s/ Jack G. Haake*
Marcus A. Helt (TX 24052187)
Jack G. Haake (TX 24127704)
Debbie E. Green (TX 24059852)
2651 N. Harwood Street, Suite 120
Dallas, Texas 75201-1574
Telephone: (214) 453-4900
marcus.helt@dechert.com
jack.haake@dechert.com
debbie.green@dechert.com

- and -

Jerry L. Hall (admitted *pro hac vice*)
Three Bryant Park
1095 Avenue of the Americas
New York, New York 10036
Telephone: (212) 698-3500
Facsimile: (212) 698-3599
jerry.hall@dechert.com

*Counsel to the Debtors and Debtors-in-Possession*

**CERTIFICATE OF SERVICE**

I hereby certify that on this date a true and correct copy of the foregoing was served by the Court's CM/ECF system on all counsel of record registered in these Chapter 11 Cases through CM/ECF. The Debtors' claims and noticing agent will be filing a supplemental certificate of service on the docket to reflect any additional service of the foregoing notice.

Dated: September 21, 2026
Dallas, Texas

*/s/ Jack G. Haake*
Jack G. Haake

# EXHIBIT A

**IN THE UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| In re:<br><br>INSPIRED HEALTHCARE CAPITAL HOLDINGS, LLC, *et al.*[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 26-90004 (MXM)<br><br>(Jointly Administered) |

**ORDER (A) APPROVING SALE OF (I) SALTERRA AT LAS VEGAS (LAS VEGAS, NV), (II) THE ARCHER SENIOR LIVING AT CRESCENT PARK (EUGENE, OR), AND (III) MARIELLA OF GRAPEVINE (GRAPEVINE, TX), (B) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (C) GRANTING RELATED RELIEF**

Upon consideration of the *Debtors' Motion for the Entry of an Order (I) Establishing Bid Procedures, (II) Scheduling Certain Dates and Deadlines With Respect Thereto, (III) Authorizing*

[1] The last four digits of Inspired Healthcare Capital Holdings, LLC's federal tax identification number are 6696. There are 161 Debtors in these chapter 11 cases, which are being jointly administered for procedural purposes only. A complete list of the Debtors and the last four digits of their federal tax identification numbers are not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/InspiredHealthcare. The Debtors' mailing address is 7033 East Greenway Parkway, Suite 250, Scottsdale, AZ 85254.

*the Debtors to Enter Into a Stalking Horse Agreement and Provide Bid Protections, (IV) Approving The Form and Manner of Notice Thereof, (V) Establishing Notice And Procedures For The Assumption and Assignment of Contracts and Leases and (VI) Granting Related Relief* [Dkt. No. 99] (the "Motion");[2] for entry of an order (this "Order") and the Court having found that it has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc dated August 3, 1984, entered by the United States District Court for the Northern District of Texas; and the matter being a core proceeding within the meaning of 28 U.S.C. § 157(b)(2); and venue of this proceeding and the Motion in this District being proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court being able to issue a final order consistent with Article III of the United States Constitution; and the Court having considered the Motion, as it pertains to the sale of the Acquired Assets (as defined below) of (a) Inspired Senior Living of Las Vegas DST, (b) Inspired Senior Living of Las Vegas MT, LLC, (c) Inspired Senior Living of Eugene DST, (d) Inspired Senior Living of Eugene MT, LLC, (e) Inspired Senior Living of Grapevine DST, a Delaware statutory trust, (f) Inspired Senior Living of Grapevine MT, LLC (collectively, the "Selling Debtors"), the arguments of counsel and the evidence presented at the hearing on the Motion on September 22 and 29, 2026 (the "Sale Hearing"), the *Declaration of M. Benjamin Jones in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* [Dkt. No. 33] (the "First Day Declaration"), the *Declaration of Max Levy of Sonida Senior Living, Inc. in Support of Sale Transactions*,[3] the *Declaration of Epiq Corporate*

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the APA (defined below), the Motion, or the Bid Procedures (defined below), as applicable.

[3] *Declaration of Max Levy of Sonida Senior Living, Inc. in Support of Debtors' Motion for the Entry of an Order (I) Establishing Bid Procedures, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Authorizing the Debtors to Enter into a Stalking Horse Agreement and Provide Bid Protections, (IV) Approving the Form and Manner of Notice Thereof, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases and (VI) Granting Related Relief.*

*Restructuring LLC Regarding Service of Sales Transaction Notices* (the "Epiq Declaration"),[4] and the entire record; and the Court having found that the relief requested in the Motion is in the best interests of the Selling Debtors, their estates, their creditors, and other parties in interest; and after due deliberation thereon; and good and sufficient cause appearing therefor; it is hereby

**FOUND AND DETERMINED THAT:**

A. The findings of fact and conclusions of law set forth in this Order constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to these proceedings pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are hereby adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are hereby adopted as such. Any findings of fact or conclusions of law stated by the Court on the record at the Sale Hearing are hereby incorporated, to the extent they are not inconsistent with this Order.

B. In accordance with the Bid Procedures attached as Exhibit 1 to the Bid Procedures Order (as defined below) (the "Bid Procedures"), the Debtors filed a notice with this Court [Dkt. No. 1070] identifying Sonida Acquisition, LLC, a Delaware limited liability company ("Sonida"), as the stalking horse bidder for the Acquired Assets of the Selling Debtors. On August 10, 2026, the Debtors filed a notice with the Court [Dkt. No. 1310], attaching that certain Asset Purchase Agreement dated as of July 11, 2026, along with all schedules and exhibits (as amended, supplemented, or otherwise modified, and including the attachments thereto, the "APA"), by and among the Selling Debtors, as "Sellers," and the Successful Bidder (defined below), as "Buyer."

---

4 *Supplemental Declaration of Alex Warso In Support Of The Debtors' Motion For The Entry Of An Order (I) Establishing Bid Procedures, (II) Scheduling Certain Dates And Deadlines With Respect Thereto, (III) Authorizing The Debtors To Enter Into A Stalking Horse Agreement And Provide Bid Protections, (IV) Approving The Form And Manner Of Notice Thereof, (V) Establishing Notice And Procedures For The Assumption And Assignment Of Contracts And Leases, And (VI) Granting Related Relief.*

On September 10, the Debtors filed a notice with this Court identifying Sonida as the successful bidder ("Successful Bidder"), being the highest or otherwise best bid for the Acquired Assets (the "Successful Bid" and the transaction contemplated thereby, the "Sale Transaction"). A copy of the APA is attached hereto as **Exhibit 1** and is incorporated herein by reference.

C. This Court has jurisdiction to hear and determine the Motion, and over the Selling Debtors, the Selling Debtors' estates, and the Acquired Assets pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

D. The statutory and legal bases for the relief requested in the Motion are sections 105(a), 363(b), 363(f), 363(k), 363(m), 365, 503, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9007, 9008, 9013 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the Local Rules of the United States Bankruptcy Court for the Northern District of Texas (the "Local Rules").

E. This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Rules 4001(a)(3), 6004(h), 6006(d), or any other applicable Bankruptcy Rules, and to any extent necessary under Rule 9014 of the Bankruptcy Rules and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Order.

F. Following a hearing held on March 20, 2026 (the "Bid Procedures Hearing"), this Court entered its *Order Granting Debtors' Motion for the Entry of an Order (I) Establishing Bid Procedures, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Authorizing the Debtors to Enter into a Stalking Horse Agreement and Provide Bid Protections, (IV) Approving the Form and Manner of Notice Thereof, (V) Establishing Notice and Procedures for the*

*Assumption and Assignment of Contracts and Leases and (VI) Granting Related Relief* [Dkt. No. 465] (the "Bid Procedures Order") on April 13, 2026.

G. Certain of the Selling Debtors are Delaware statutory trusts (each, a "DST Seller") formed under the Delaware Statutory Trust Act, 12 Del. C. § 3801 et seq. (the "DST Act"). Each DST Seller holds legal title to the real property on which a senior living community ("Senior Living Communities," or "Communities," and each, a "Community") is located, as well as certain operating assets related to such Community. Each DST Seller is managed by a signatory trustee (each, a "Signatory Trustee"), which is a limited liability company wholly owned by Inspired Healthcare Capital Holdings, LLC ("Holdings"). Pursuant to section 5.03 of the applicable Trust Agreement,[5] any sale or other conveyance of the Trust Property (as defined in the Trust Agreement) by the Signatory Trustee made pursuant to the terms of the Trust Agreement shall bind the applicable DST Seller and the investors in such DST Seller (the "DST Investors") and be effective to transfer or convey all rights, title, and interest of the Trustees and the Investors in and to the Trust Property.

H. Certain of the Selling Debtors are limited liability companies that serve as master tenants (each, a "Master Tenant") under master lease agreements with the DST Sellers (the "Master Leases"). Each Master Tenant subcontracts management responsibilities to third-party management companies (each, a "Third-Party Manager") and, with respect to the senior living communities contemplated under the APA (the "Senior Living Communities" or "Communities"), holds contracts with residents of the applicable Community (the "Resident Agreements"). With respect to each Community contemplated under the APA, the operating licenses required by

5 "Trust Agreement" refers to the trust agreement governing each applicable DST Seller.

applicable state or local law to operate the Community (the "Operating Licenses") are held by the applicable Master Tenant. The Master Tenants are wholly owned subsidiaries of Holdings.

I. The Acquired Assets constitute property of the Selling Debtors' estates and title thereto is vested in the Selling Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code. The Selling Debtors have the exclusive right and power to transfer good title to the Acquired Assets to the Successful Bidder, subject to the provisions of the Bankruptcy Code and this Order. No other person or entity has any ownership right, title, or interest in the Acquired Assets that would prevent or restrict the Sale Transaction or the transfer of the Acquired Assets to the Successful Bidder free and clear of all Interests (as defined below) pursuant to this Order. The Selling Debtors have articulated good and sufficient reasons for this Court to grant the relief requested in the Motion.

J. Notice of the Motion, the Bid Procedures, the Auction, the Sale Hearing, and the APA was provided as evidenced by the Epiq Declaration previously filed with the Court [Dkt. No. [●]].

K. Actual written notice of the Motion and a reasonable opportunity to object or be heard with respect to the Motion and the relief requested therein have been afforded to the following parties: (i) all entities known to have expressed an interest in a transaction with respect to some or all of the Acquired Assets; (ii) all entities known to have asserted any interest in or upon any of the Acquired Assets, including counsel to each Prepetition Secured Party;[6] (iii) all

[6] "Prepetition Secured Parties" shall have the meaning ascribed in the *Debtors' Emergency Motion (i) Authorizing (a) Postpetition Financing and (b) the Use of Cash Collateral, (ii) Granting Liens and Providing Superpriority Administrative Expense Claims, (iii) Granting Adequate Protection to Prepetition Secured Parties, (iv) Modifying the Automatic Stay, (v) Scheduling a Final Hearing, and (vi) Granting Related Relief* [Dkt. No. 28].

federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by the Motion, including the applicable Senior Living Regulatory Authority (as defined herein) in each state in which a Community is located; (iv) known counterparties to any unexpired leases or executory contracts that could potentially be assumed and assigned to a Successful Bidder; (v) the United States Trustee; (vi) the Internal Revenue Service; (vii) any governmental authority known to have a claim against any Selling Debtor; (viii) all environmental authorities having jurisdiction over any of the Acquired Assets; (ix) the Office of the Attorney General and Office of the Secretary of State in each state in which any Acquired Assets are held; (x) the Official Committee of Unsecured Creditors (the "Committee"); (xi) the Official Committee of Delaware Statutory Trust Investors (the "DST Committee" and together with the Committee, the "Committees"); (xii) the Securities and Exchange Commission (the "SEC"); (xiii) all parties entitled to notice pursuant to Bankruptcy Rule 2002; (xiv) all residents of each Community that is part of the Acquired Assets; (xv) counsel to the Successful Bidder; and (xvi) other persons or entities reasonably requested by a potential purchaser of the Acquired Assets (collectively, the "Notice Parties") [Dkt. No. 99 and 158].

L. In accordance with the provisions of the Bid Procedures Order, the Debtors served the Sale Notice on the Notice Parties within three (3) Business Days (or as soon as reasonably practicable thereafter) after the entry of the Bid Procedures Order (the "Mailing Date"), in accordance with Bankruptcy Rules 2002(a) and (c), by first-class mail or, for those parties who have consented to receive notice by the Electronic Case Files ("ECF") system, by ECF (collectively, the "Mailing Notice") [Dkt. No. 522]. Publication of the Sale Notice was made by publication in The Wall Street Journal on April 15, 2026, as evidenced by the Affidavit of Publication filed with the Court [Dkt. No. 1092].

M. The Sale Notice indicated the Sale Objection Deadline and the anticipated date of the Auction and Sale Hearing. On August 4, 2026, the Debtors filed the *Corrected Amended Notice of Auction and Sale Hearing and Related Deadlines for the Sale of Substantially all Debtors' Assets* ("Corrected Amended Notice of Auction and Sale Hearing") [Dkt. 1270] and caused it to be served [Dkt. Nos. 1372 and 1374]. The Corrected Amended Notice of Auction and Sale Hearing set the Sale Objection Deadline for August 20, 2026, the Auction, if any, for August 25, 2026, the Post-Auction Objection Deadline the later of August 28, 2026, at 4:00 p.m., prevailing Central Time and one (1) Business Day following the conclusion of the Auction, and the Sale Hearing for September 15, 2026. Publication of the Corrected Amended Notice of Auction and Sale Hearing was made by publication in The Wall Street Journal on August 7, 2026, as evidenced by the Affidavit of Publication filed with the Court [Dkt. No. 1348]. On September 9, 2026, the Debtors filed a notice of Status Hearing and Sale Hearing [Dkt. No. 1563], indicating that the Debtors anticipate that the September 15, 2026 hearing will provide a status conference regarding the auction and sale process, with the Sale Hearing commencing on September 22, 2026, with any remaining sale related matters to be addressed at a hearing on September 29, 2026.

N. In accordance with the Bid Procedures Order, on April 14, 2026, the Debtors filed the *Notice to Contract Parties to Potentially Assumed Executory Contracts and Unexpired Leases* [Dkt. No. 471] ("Initial Cure Notice"), on June 26, 2026, filed the *First Supplemental Notice to Contract Parties to Potentially Assumed Executory Contracts and Unexpired Leases* [Dkt. No. 940] (the "First Supplemental Notice"), on July 21, 2026, filed the *Second Supplemental Notice to Contract Parties to Potentially Assumed Executory Contracts and Unexpired Leases* [Dkt. No. 1171] (the "Second Supplemental Notice"), on September 15, 2026, filed the *Third Supplemental Notice to Contract Parties to Potentially Assumed Executory Contracts and Unexpired Leases*

[Dkt. No. 1657] (the "Third Supplemental Notice," and together with the Initial Cure Notice, First Supplemental Notice, and the Second Supplemental Notice, the "Cure Notices") and served the Cure Notices on all known counterparties to executory contracts and unexpired leases that potentially would be assumed and assigned in connection with a sale of the Acquired Assets [Dkt. Nos. 523, 982, 1073 and 1184]. The Cure Notices specified: (i) each of the Selling Debtors' executory contracts and unexpired leases that may be assumed and assigned in connection with the sale (the "365 Contracts"), including the name of each non-Debtor counterparty to such 365 Contracts (each, a "Counterparty"); (ii) the proposed amount necessary, if any, to cure all monetary defaults, if any, under the 365 Contracts (the "Cure Costs"); and (iii) the deadline by which any Counterparty shall have filed an objection to the Cure Costs or to assumption and assignment of the applicable 365 Contract.

O. Following the Auction, and in accordance with the Bid Procedures Order, the Debtors filed a notice [Dkt. No. 1569] (the "Post-Auction Notice") identifying the Successful Bidder at the Auction for the Acquired Assets. The Debtors caused the Post-Auction Notice to be served on all known Counterparties to executory contracts and unexpired leases that were identified by the Successful Bidder as a contract or lease that potentially would be assumed and assigned in connection with the sale of the Acquired Assets. The Post-Auction Notice contains (a) identification of such contracts or leases (the "Desired 365 Contracts"), (b) information necessary and appropriate to provide notice of the proposed assumption and assignment of Desired 365 Contracts, and (c) Cure Costs, to the extent amended from the Cure Notices.

P. The Cure Notices and the Post-Auction Notice provided each Qualified Bidder and each Counterparty with proper notice of the potential assumption and assignment of the 365 Contracts and any Cure Costs relating thereto and the procedures established by this Court and

undertaken by the Debtors with regard to any Cure Costs satisfy section 365 of the Bankruptcy Code and Bankruptcy Rule 6006. Each Counterparty has had an opportunity to object to the Cure Costs.

Q. Each Counterparty has had an opportunity to object to the Successful Bidder's proposed adequate assurance of future performance. The Successful Bidder has provided adequate assurance of its future performance under the Desired 365 Contracts within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.

R. The notices described above were good, sufficient, and appropriate under the circumstances, and no other or further notice of the Motion, Bid Procedures, Auction, Sale Hearing, Sale Transaction, Desired 365 Contracts, or Cure Costs, and all related deadlines, is or shall be required.

S. The APA and other documents and instruments related to and connected with the Sale Transaction (the "Transaction Documents") were all negotiated and entered into after arm's-length, good faith negotiations between the Selling Debtors, the Successful Bidder, and their respective counsel and advisors, and without collusion. None of the Selling Debtors, the Successful Bidder, or their respective representatives engaged in any conduct or acted in any improper manner that would cause or permit the APA, any of the other Transaction Documents, or the Sale Transaction to be avoided under section 363(n) of the Bankruptcy Code.

T. In connection with the Debtors' consideration, negotiation, approval, and consummation of the Sale Transaction and the marketing and sale process leading thereto, James Calandra ("Calandra"), CRS Capstone Partners LLC ("Capstone"), Mark Andrews ("Andrews"), Trinity River Advisors, LLC ("Trinity River," and together with Calandra, Capstone, and Andrews, the "Independent Managers"), and M. Benjamin Jones, as Chief Restructuring Officer

of the Debtors (the "CRO"), possessed and exercised independent authority with respect to the sale process and the Sale Transaction, including the authority to evaluate and pursue alternative transactions, negotiate the terms of the Sale Transaction, reject the Sale Transaction if they determined that it was not in the best interests of the Debtors and their estates, and approve or recommend approval of the Sale Transaction only after independently determining, in the exercise of their business judgment and consistent with their fiduciary duties, that the Sale Transaction was in the best interests of the Debtors and their estates. The Independent Managers and the CRO, acting with the advice of their legal and financial advisors, were fully informed regarding the material terms and circumstances of the Sale Transaction and the alternatives reasonable available to the Debtors, actively participated in and appropriately oversaw the sale process, and exercised their independent business judgment in good faith and in a manner they reasonably believed to be in the best interest of the Debtors and their estates. The Independent Managers and the CRO were disinterested and independent of all bidders, including the Successful Bidder, secured lenders, and other interested parties, considered alternatives and received sufficient information and had sufficient time to deliberate.

U. Based upon the foregoing and the evidentiary record before the Court, the Court finds that the Independent Managers and the CRO appropriately considered the interests of the Debtors and their estates and relevant stakeholders, evaluated the Sale Transaction and reasonably available alternatives thereto, and determined, after due consideration and consultation with their advisors, that the Sale Transaction represented the highest or otherwise best transaction reasonably available under the circumstances and was in the best interests of the Debtors and their estates. The Independent Managers and the CRO acted independently, disinterestedly, in good faith, and with due care in connection with the foregoing, appropriately and fully discharged and satisfied

their fiduciary duties under applicable law with respect to the Sale Transaction and the sale process, and did not engage in any self-dealing, improper conduct, or breach of fiduciary duty in connection therewith. The decisions and actions of the Independent Managers and the CRO in connection with the Sale Transaction and the sale process constituted a reasonable exercise of their business judgment and is hereby approved.

V. Neither the Successful Bidder nor any of its affiliates or representatives are insiders of the Selling Debtors. Neither the Successful Bidder nor any Buyer Designee is an "insider" or "affiliate" of any Selling Debtor as those terms are defined in sections 101(31) and 101(2) of the Bankruptcy Code, and no common identity of directors, officers, managers, or controlling equity holders exists between the Successful Bidder or any Buyer Designee, on the one hand, and any Selling Debtor, on the other hand. The Purchase Price was not controlled by any agreement among bidders.

W. Without limiting the foregoing, the Successful Bidder complied with all the provisions in the Bid Procedures Order, and in proceeding with the Sale Transaction, the Successful Bidder did nothing to interfere with the Selling Debtors' ability to seek higher and better offers for the Acquired Assets. All terms and conditions of the APA and the Transaction Documents, including all payments to be made by the Successful Bidder, were fully disclosed to the Court and the Notice Parties.

X. Accordingly, the Successful Bidder is a "good faith purchaser" as that term is used in section 363(m) of the Bankruptcy Code and is hereby granted all of the protections and benefits provided to a good faith purchaser under such section. Reversal, modification, or vacatur by a subsequent order of the Bankruptcy Court or any other court of this Order or the authorization

contained herein shall not affect the validity of the Sale Transaction and the consummation of the transactions contemplated under the APA and other Transaction Documents.

Y. The Debtors conducted an open, extensive, fair, and competitive marketing process consistent with the Bid Procedures. The Debtors solicited offers and noticed the Auction in accordance with the provisions of the Bid Procedures Order. The Auction was duly noticed, and the sale process was conducted in a diligent, non-collusive, fair, and good-faith manner. The Debtors: (i) afforded interested Qualified Bidders a full, fair, and reasonable opportunity to qualify as bidders and submit their highest or otherwise best offer for the Acquired Assets; (ii) provided potential bidders sufficient information to enable them to make an informed judgment on whether to bid for the Acquired Assets; and (iii) considered any Qualified Bids properly submitted in accordance with the Bid Procedures. A reasonable opportunity was given to any interested party to make a higher or otherwise better offer to purchase all or a portion of the Acquired Assets in accordance with the terms of the Bid Procedures.

Z. The APA constitutes the highest or otherwise best offer for the Acquired Assets and provides a greater recovery for the Selling Debtors' estates than would be provided by any other available alternative. The Debtors' determination, in consultation with the Consultation Parties, that the APA constitutes the highest or otherwise best offer for the Acquired Assets constitutes a valid and sound exercise of the Debtors' business judgment.

AA. The terms of the APA represent a fair and reasonable offer to purchase the Acquired Assets, including the Desired 365 Contracts, under the circumstances of these Chapter 11 Cases. No other person or entity or group of entities has offered to purchase the Acquired Assets for greater value to the Selling Debtors' estates than the Successful Bidder.

BB. Approval of the Motion and the consummation of the Sale Transaction contemplated thereby are in the best interests of the Selling Debtors, their estates, creditors of the Selling Debtors' estates, and other parties in interest.

CC. The Selling Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the Sale Transaction outside of a plan of reorganization, including, without limitation, the need to ensure the continued care of their residents and the need to preserve the value of the Selling Debtors' estates for all of their respective stakeholders, including DST Investors, investors in the funds that are managed by or relate to Inspired Healthcare Capital, LLC (the "Investment Fund Investors"), secured lenders, and trade creditors.

DD. The consideration provided by the Successful Bidder pursuant to the APA is fair and adequate and constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, and the District of Columbia. The APA was not entered into, and the Sale Transaction will not be consummated, fraudulently or for the purpose of escaping liability for any of the Selling Debtors' debts, or for the purpose of hindering, delaying, or defrauding creditors of the Selling Debtors, and neither the Selling Debtors nor the Successful Bidder has entered into the APA or is consummating the Sale Transaction contemplated thereby with any fraudulent or otherwise improper purpose.

EE. The Selling Debtors have full power and authority to execute and deliver the APA, the Transaction Documents, and all other documents contemplated thereby, and no further consents or approvals are required for the Selling Debtors to consummate the Sale Transaction, except as otherwise set forth in the APA. With respect to each DST Seller, the applicable Signatory Trustee has the power and authority under the applicable Trust Agreement and the DST Act to

sell, convey, and transfer the Trust Property of the DST Seller on the terms set forth in the APA, all in accordance with Trust Agreement sections 2.03(iii), 5.03, 5.04, and 7.02(a).

FF. The transfer of the Acquired Assets, including the Desired 365 Contracts, to the Successful Bidder, as of the applicable Closing Date, will be a legal, valid, and effective transfer of such Acquired Assets and will vest the Successful Bidder with all right, title, and interest of the Selling Debtors to the Acquired Assets free and clear, to the fullest extent possible under 11 U.S.C. § 363(f), of all Interests and all Claims (as defined in section 101(5) of the Bankruptcy Code) relating to any time prior to the applicable Closing Date, except as otherwise set forth in the APA. The Selling Debtors may sell the Acquired Assets free and clear of all Interests, Claims, and other interests of any kind or nature whatsoever, because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.

GG. All parties in interest, including, without limitation, any holders of Interests and other interests and any Counterparties who did not object, or who withdrew their objections, to the Sale Transaction, the Motion, or the assumption and assignment of the applicable Desired 365 Contracts or the associated Cure Costs are deemed to have consented to the Sale Transaction, pursuant to section 363(f)(2) of the Bankruptcy Code. Those holders of Interests who did object fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are adequately protected by having their Interests, if any, attach to the proceeds of the Sale Transaction in the same order of priority, with the same validity, force, and effect that such Interests had prior to the Sale Transaction, subject to any rights, claims, defenses, or objections, if any, that the Selling Debtors, their estates, or the Committees may possess with respect thereto. Each ground constitutes an independent and sufficient basis for the relief granted herein. Thus, any such objections are expressly overruled.

HH. Certain of the Acquired Assets are, or were immediately prior to Closing, subject to the liens and security interests of DST DIP LLC (the "DIP Lender") under the *Final Order (I) Authorizing (A) Postpetition Financing and (B) the Use of Cash Collateral; (II) Granting Liens and Providing Superpriority Administrative Expense Claims; (III) Granting Adequate Protection to Prepetition Secured Parties; (IV) Modifying the Automatic Stay; and (V) Granting Related Relief* [Dkt. No. 339] (the "Final DIP Order") and the Prepetition Liens (as defined in the Final DIP Order) of the applicable Prepetition Secured Parties (which include UMB Bank, N.A. and HPI Fairmount Lender, LP) (collectively, the "DIP and Prepetition Lienholders"). Pursuant to section 363(f) of the Bankruptcy Code and this Order, upon the applicable Closing, the applicable Acquired Assets shall be transferred to the Successful Bidder free and clear of all such liens and security interests of the DIP and Prepetition Lienholders and any other Interests, including, without limitation, all DIP Liens (as defined in the Final DIP Order) and all Prepetition Liens, and such liens and security interests shall not attach to or encumber the Acquired Assets or any interest therein in the hands of the Successful Bidder or any of its successors or assigns. All such liens and security interests of the DIP and Prepetition Lienholders shall attach solely to the proceeds of the Sale Transaction with respect to the applicable Acquired Assets in the same order of priority, with the same validity, force, and effect that such liens and security interests had against the applicable Acquired Assets immediately prior to the Closing, subject to the obligation of the Selling Debtors to pay certain pre-Closing taxes set forth in the APA and any rights, claims, defenses, or objections, if any, that the Selling Debtors, their estates, or either of the Committees may possess with respect thereto; including, but not limited to, (a) agreements, stipulations, and claims set forth in, and preserved by, the *Stipulation and Agreed Order Between the Official Committee of Unsecured*

*Creditors and Integrity Life Insurance Company* [Dkt. No. 1287], and (b) the claims and causes of action asserted in the Adversary Proceeding 26-9008.

II. The Successful Bidder would not have entered into the APA and would not consummate the Sale Transaction contemplated thereby if the sale of the Acquired Assets to the Successful Bidder were not, except for Permitted Liens and Assumed Liabilities, free and clear of all Interests of any kind or nature whatsoever, or if the Successful Bidder were not free of all successor liability with respect to the Selling Debtors' liabilities, except as expressly assumed in the APA. The total consideration to be provided under the APA reflects the Successful Bidder's reliance on this Order to provide it, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, with title to and possession of the Acquired Assets free and clear of all Interests (other than Permitted Liens and Assumed Liabilities). A sale of the Acquired Assets other than on a free-and-clear basis would yield substantially less value for the Selling Debtors' estates, with less certainty than is provided by the Sale Transaction.

JJ. The assumption and assignment of the Desired 365 Contracts pursuant to the terms of the APA and this Order is integral to the APA, is in the best interests of the Selling Debtors and their estates, creditors, and other parties in interest, and represents the reasonable exercise of sound and prudent business judgment by the Selling Debtors. The Desired 365 Contracts shall be transferred to, and remain in full force and effect for the benefit of, the Successful Bidder in accordance with their respective terms. The failure of the Selling Debtors or the Successful Bidder to enforce prior to the Closing of the Sale Transaction one or more terms or conditions of the Desired 365 Contracts shall not be a waiver of such terms or conditions.

KK. Pursuant to the terms of the APA, including the Successful Bidder's right to modify the list of Desired 365 Contracts, the Selling Debtors shall assume and assign to the Successful

Bidder each Assumed Contract identified on Schedule 2.5(a)(i) to the APA that is capable of being assumed and assigned. The Successful Bidder shall be solely responsible for the payment of the Cure Costs with respect to all Desired 365 Contracts assumed by the Selling Debtors and assigned to the Successful Bidder, unless otherwise provided under the APA. The Successful Bidder shall assume and perform and discharge the Assumed Liabilities, if any, under the Desired 365 Contracts. The Successful Bidder has provided adequate assurance of its future performance under the Desired 365 Contracts within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code. The Cure Costs specified in the Cure Notices are hereby found to be the sole amounts necessary to cure any and all defaults under the Desired 365 Contracts under section 365(b) of the Bankruptcy Code, subject to any timely filed objections to such Cure Costs.

LL. To the extent any provision in any Assumed Contract (a) prohibits, restricts, or conditions, or purports to prohibit, restrict, or condition, such assumption or assignment (including, without limitation, any "change of control" provision), or (b) is modified, breached, or terminated, or deemed modified, breached, or terminated by (i) the commencement of these Chapter 11 Cases, (ii) the insolvency or financial condition of the Selling Debtors at any time before the closing of these Chapter 11 Cases, (iii) the Selling Debtors' assumption and assignment of such Assumed Contract, or (iv) the consummation of the Sale Transaction, then such provisions shall be deemed modified so as to not entitle the non-Debtor party thereto to prohibit, restrict, or condition such assumption or assignment, to modify, terminate, or declare a breach or default under such Assumed Contract, or to exercise any other default-related rights or remedies with respect thereto. For the avoidance of doubt, all foregoing provisions shall be deemed to constitute unenforceable anti-assignment provisions and are void and of no force and effect pursuant to sections 365(b), 365(e), and 365(f) of the Bankruptcy Code.

MM. [In accordance with Section 5.01(c) of the applicable Trust Agreements, each DST Seller does not constitute a "business trust" within the meaning of Treasury Regulations Section 301.7701-4(b) or any other business entity for federal income tax purposes but instead constitutes an "investment trust" within the meaning of Treasury Regulations Section 301.7701-4(c) and a grantor trust under Subpart E of Part 1, Subchapter J of the Internal Revenue Code ("IRC"). Further, each such DST Seller is a "domestic trust" within the meaning of Treasury Regulations Section 301.7701-7(a)(2). Accordingly, upon a disposition of a United States real property interest by such DST Seller, each Signatory Trustee (or its applicable agent) will be required under Section 1445(e)(1)(B) of the IRC and Treasury Regulation Section 1.1445-5(c)(1)(iv) to withhold tax with respect to the portion of any gain realized that is allocable to a beneficial interest treated as owned by any grantor that is not a United States person within the meaning of Section 7701(a)(30) of the IRC or is deemed not to be a United States person within the meaning of Section 7701(a)(30) of the IRC. The Signatory Trustee (or its applicable agent) may rely on a valid IRS Form W-9 as a certification of non-foreign status and, absent such certification, may withhold as provided in the applicable Treasury Regulations. Additionally, any applicable withholding agent shall be entitled to withhold on any amounts treated as interest in U.S. federal income tax purposes. Notwithstanding Section 5.01(c) of the applicable Trust Agreements, each DST Seller constitutes a "business trust" within the meaning of Treasury Regulations Section 301.7701-4(b) and a partnership within the meaning of Section 7701(a)(2) of the IRC. Further, each such DST Seller is a "domestic partnership" within the meaning of Sections 7701(a)(2) and 7701(a)(4) of the IRC and Treasury Regulations Section 301.7701-5(a). Accordingly, upon delivery of a properly completed and validly executed IRS Form W-9 by such DST Seller to the applicable payor, no U.S. federal

withholding taxes shall be required to be deducted and withheld on any payment to the applicable DST Seller by such payor].[7]

NN. Notwithstanding anything to the contrary in this order, any finding of fact or conclusion of law in this Order regarding the formation, nature, or characterization of a DST Seller is solely for the purposes of the Sale Transactions contemplated hereby and shall have no res judicata effect for any other purposes in these Chapter 11 Cases. This Order shall not be used to prohibit, prejudice, impair, or limit the right of any party in interest in these Chapter 11 Cases to challenge the legal status or characterization of any DST Seller for any purpose, including, but not limited to, seeking a determination by the Court that a DST Seller was improperly formed, should be disregarded, or otherwise fails to satisfy the requirements under applicable law to be treated as a valid statutory trust; provided that any subsequent determination by the Court regarding the legal status or characterization of a DST Seller shall not affect the enforceability of this Order with respect to the Sale Transactions approved hereby.

OO. To enhance the Selling Debtors' level of liquidity, to preserve the value of the Selling Debtors' estates and reduce the amount of post-petition expenses borne by the Selling Debtors, and to maximize the amount of funding available to provide for a timely exit from these Chapter 11 Cases, it is essential that the sale of the Acquired Assets occur within the time constraints set forth in the APA. Time is of the essence in consummating the Sale Transaction.

PP. Given all of the circumstances of these Chapter 11 Cases and the adequacy and fair value of the Purchase Price, the sale of the Acquired Assets to the Successful Bidder constitutes a reasonable and sound exercise of the Selling Debtors' business judgment and should be approved.

---

[7] Under ongoing review.

QQ. The Sale Transaction does not constitute a de facto or sub rosa plan of reorganization or liquidation because the Selling Debtors do not propose to (i) impair or restructure existing debt of, or equity interests in, the Selling Debtors, (ii) impair or circumvent voting rights with respect to any plan proposed by the Selling Debtors, (iii) circumvent chapter 11 safeguards, including those set forth in sections 1125 and 1129 of the Bankruptcy Code, or (iv) classify claims or equity interests.

RR. The consummation of the Sale Transaction is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), 365(b), and 365(f), and all of the applicable requirements of such sections have been complied with in respect of the Sale Transaction.

SS. The terms of the APA, including any amendments, supplements, and modifications thereto, are fair and reasonable in all respects.

TT. The continued and uninterrupted care and safety of the residents of the Senior Living Communities is of paramount importance and constitutes an independent basis supporting approval of the Sale Transaction. The Successful Bidder has demonstrated adequate assurance of its ability to continue to operate the Communities in compliance with all applicable Senior Living Laws (as defined below).

UU. The Sale Transaction is subject to the Successful Bidder obtaining all required governmental authorizations and regulatory approvals necessary to operate the Communities included in the Acquired Assets, including, without limitation, the operating licenses required by applicable state or local law to operate the Community (the "Operating Licenses") or change-of-ownership approvals from the applicable state Senior Living Regulatory Authority in each state in which a Community is located (each, a "Senior Living Regulatory Authority" and collectively, the

"Senior Living Regulatory Authorities," and the laws enforced by such authorities, together with all other federal, state, and local laws applicable to the ownership, operation, and licensing of assisted-living, independent-living, and memory-care facilities, the "Senior Living Laws"). To the extent that any required Operating License has not been issued to the Successful Bidder as of the Closing Date, the Selling Debtors and the Successful Bidder shall, if required by applicable laws, enter into (a) an Interim Management Agreement (the "Interim Management Agreement"), and (b) an Interim Lease (the "Interim Lease" and together with the Interim Management Agreement, the "Bridging Agreements") [incorporating the terms set forth on Schedule 7.11(b) to the APA, pursuant to which the applicable Master Tenant Seller shall remain the licensee of record and shall continue to hold the applicable Operating License, and the Successful Bidder or a Buyer Designee shall act solely as lessor under the Interim Lease or sublease and its designated manager as manager under the interim management agreement, in each case in accordance with such Bridging Agreements. The Bridging Agreements are hereby approved in the form attached hereto, and the Selling Debtors and the Successful Bidder are authorized to execute, deliver, and perform under the Bridging Agreements without further order of this Court. For the avoidance of doubt, nothing in this Order shall be construed to authorize the Successful Bidder or any Buyer Designee to operate any Community without the Healthcare Permits required under applicable Senior Living Laws except as otherwise permitted by applicable Senior Living Laws, or to constitute the Successful Bidder or any Buyer Designee a licensee, co-licensee, or operator of record with respect to any Community].[8]

[8] Subject to internal review.

**IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED THAT:**

1. The relief requested in the Motion with respect to the Acquired Assets of the Selling Debtors is GRANTED AND APPROVED as set forth in this Order, and the Sale Transaction contemplated thereby is APPROVED.

2. This Court's findings of fact and conclusions of law set forth in the Bid Procedures Order are fully incorporated into this Order by reference.

3. Notice of the Motion, the Sale Hearing, the Bid Procedures, Sale Objection Deadline, the Auction, and the Sale Transaction, including, without limitation, the Sale Notice, the Cure Notices, the Mailing Notice, and the Post-Auction Notice was provided as evidenced by the certificates of service previously filed with the Court, and was adequate, fair, and equitable under the circumstances and complied in all respects with section 102(1), 105 (a), 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, 6006, 9007 and 9008. All objections to the relief requested in the Motion that have not been withdrawn, waived, or settled as announced to the Court at the Sale Hearing or by stipulation filed with the Court, and all reservations of rights included therein, are hereby overruled on the merits or have been otherwise satisfied or adequately provided for pursuant to this Order.

4. The APA and the terms and conditions thereof are hereby APPROVED, and the Selling Debtors are authorized and directed to enter into the APA and all Transaction Documents including any Bridging Agreements that are necessary or desirable and such other ancillary documents consistent with the terms hereof and in furtherance thereof.

5. The CRO is hereby authorized (consistent with his fiduciary duties), and empowered, in the name of and on behalf of the Selling Debtors, to take or cause to be taken any and all such other and further action to: execute, acknowledge, deliver, and file any and all such

agreements, certificates, instruments, and other documents as shall be necessary, advisable, or desirable, including all Transaction Documents, to fully consummate the Sale Transaction. With respect to each DST Seller, the applicable Signatory Trustee is authorized and directed to execute and deliver such instruments of transfer, including deeds and trust certificates, as are necessary to convey the DST Seller's Trust Property to the Successful Bidder.

6. Pursuant to section 363(b) of the Bankruptcy Code, the Selling Debtors are authorized and directed to take any and all actions necessary or appropriate to (a) consummate the sale of the Acquired Assets to the Successful Bidder pursuant to and in accordance with the terms and conditions of the APA, (b) close the Sale Transaction as contemplated in the APA and this Order, and (c) execute and deliver, close, perform under, consummate, and implement the APA, together with all other Transaction Documents and ancillary documents that may be reasonably necessary or desirable to implement the APA and the Sale Transaction.

7. This Order authorizes and approves multiple closings on different dates with respect to different Acquired Assets, to the extent contemplated by the APA. Each closing with respect to any Sold Property shall be deemed a separate "Sale Transaction" entitled to the full protections of this Order, including sections 363(b), 363(f), 363(m), and 365 of the Bankruptcy Code, without the need for any further order of this Court, and no supplemental order of this Court shall be required in connection with any individual Closing. The removal of any Community from Schedule 2 to the APA, whether as a Seller Removed Community pursuant to Section 2.1(c) of the APA or as a Buyer Removed Community pursuant to Section 2.1(d) of the APA, and the corresponding automatic reduction of the Purchase Price by the Allocation attributable to such Community, shall be effective automatically upon delivery of the applicable notice in accordance with the APA and without further order of this Court. The inability or failure to close a Sale

Transaction with respect to any particular Community shall not affect the validity or enforceability of any other Sale Transaction consummated under this Order, unless otherwise provided under the APA.

8. This Order shall be binding in all respects upon the Selling Debtors, their estates, successors and assigns, all holders of equity interests in the Selling Debtors (including all DST Investors and Investment Fund Investors), all holders of any Claim(s) (as defined in the Bankruptcy Code) against the Selling Debtors, whether known or unknown and any and all other parties in interest, including, without limitation, any holders of Interests, claims, encumbrances, and other interests of any kind or nature whatsoever or any portion of the Acquired Assets, all Counterparties, the Notice Parties, the Successful Bidder, all successors and assigns of the Successful Bidder, any other Bidder for the Acquired Assets, and any trustees, if any, subsequently appointed in these Chapter 11 Cases or upon a conversion to chapter 7 under the Bankruptcy Code. This Order and the APA shall inure to the benefit of the Selling Debtors, their estates, their creditors, the Successful Bidder, and their respective successors and assigns.

9. The Sale Transaction contemplated by and consummated under the APA and the Transaction Documents was undertaken by the Successful Bidder, without collusion and in good faith and at arm's-length, as that term is defined in section 363(m) of the Bankruptcy Code. The APA was not entered into and will not be consummated for the purpose of hindering, delaying, or defrauding creditors of the Selling Debtors, and neither the Selling Debtors nor the Successful Bidder has entered into the APA or is consummating the Sale Transaction contemplated thereby with any fraudulent or otherwise improper purpose.

10. The Successful Bidder is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of section 363(m) of the

Bankruptcy Code. Accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the sale of the Acquired Assets shall not affect the validity of the Sale Transaction (including the assumption and assignment of the Desired 365 Contracts), unless such authorization and such Sale Transaction are duly stayed pending such appeal. The APA and the Sale Transaction contemplated thereby cannot be avoided under section 363(n) of the Bankruptcy Code. The Selling Debtors and the Successful Bidder have not engaged in any conduct that would cause or permit the APA or the consummation of the Sale Transaction contemplated thereby to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code.

11. The Debtors solicited offers and noticed the Auction in accordance with the provisions of the Bid Procedures Order. The Auction was duly noticed, the sale and sale process were conducted in a non-collusive manner, and the Debtors afforded a full, fair, and reasonable opportunity for any person or entity to make a higher or otherwise better offer to purchase all or a portion of the Acquired Assets.

12. The APA constitutes the highest or otherwise best offer for the Acquired Assets and will provide a greater recovery for the Selling Debtors' estates than would be provided by any other available alternative. The Debtors' determination, in consultation with the Consultation Parties, that the APA constitutes the highest or otherwise best offer for the Acquired Assets is a valid and sound exercise of the Debtors' business judgment.

13. In addition, the APA represents a fair and reasonable offer to purchase the Acquired Assets, including the Desired 365 Contracts, under the circumstances of these Chapter 11 Cases. The Selling Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the Sale Transaction outside of a plan of

reorganization. Accordingly, the Motion is hereby APPROVED as to the Acquired Assets, and the consummation of the Sale Transaction contemplated thereby, including the APA and other Transaction Documents, are in the best interests of the Selling Debtors, their estates, creditors of the Selling Debtors' estates, and other parties in interest.

14. Pursuant to sections 105(a), 363(b), 363(f), 365(b), and 365(f) of the Bankruptcy Code, the Selling Debtors are authorized and directed to transfer the Acquired Assets on the applicable Closing Date. Upon the applicable Closing and the Selling Debtors' receipt of the applicable Purchase Price, the Acquired Assets shall be transferred to the Successful Bidder free and clear of all Liens, Liabilities, rights, and other interests of any kind or nature whatsoever against the Debtors or the Acquired Assets (other than the Permitted Liens and Assumed Liabilities), including, without limitation, other than Permitted Liens and the Assumed Liabilities, any liabilities, debts or obligations arising under or out of, in connection with, or in any way relating to, any acts or omissions, agreements, suits, demands, guaranties, contractual commitments, licenses, restrictions, options, environmental liabilities, labor and employment claims, employee pension or benefit plan claims, multiemployer benefit plan claims, workers' compensation claims, claims for taxes of or against the Debtors or their assets (other than as contemplated in paragraph 53 as to the Texas Tax Authorities), any derivative, vicarious, transfer or successor liability claims, and any other rights or causes of action (whether in law or in equity, under any law, statute, rule or regulation of the United States, any state, territory, or possession thereof or the District of Columbia), whether arising prior to or subsequent to the commencement of these Chapter 11 Cases, whether known or unknown, matured or unmatured, liquidated or unliquidated, or contingent or non-contingent, and whether imposed by agreement, understanding, law, equity or otherwise, arising under or out of, in connection with, or in any way related to the

Debtors (or their predecessors), the Debtors' interests in the Acquired Assets, the operation of the Debtors' businesses before the Closing, or the transfer of the Debtors' interests in the Acquired Assets to the Successful Bidder, and all Excluded Liabilities (collectively, and excluding any Permitted Liens and Assumed Liabilities, the "Interests"), because, with respect to each party asserting an Interest, one or more of the standards set forth in sections 363(f)(1)-(5) of the Bankruptcy Code has been satisfied. Such transfer shall constitute a legal, valid, binding, and effective transfer of the Acquired Assets. Upon the applicable Closing, the Successful Bidder shall take title to and possession of the applicable Acquired Assets. All Interests shall attach to the proceeds of the Sale Transaction of the applicable Acquired Assets with the same validity, priority, force, and effect that they now have as against the Acquired Assets, subject to the obligations of the Selling Debtors to pay certain pre-Closing taxes as set forth in the APA and any rights, claims, defenses, or objections, if any, that the Selling Debtors, their estates, the Committee, or the DST Committee may possess with respect thereto.

15. Notwithstanding anything to the contrary in the APA or otherwise, (i) causes of action under Chapter 5 of the Bankruptcy Code or applicable state law equivalents and the proceeds thereof, (ii) any pre-petition and post-petition commercial tort claims and the proceeds thereof, including, without limitation, any and all causes of action (and the proceeds thereof) against (a) current and former directors, officers, managers, employees, agents, equity holders, and members of the Selling Debtors and/or their affiliates (including, but not limited to, Luke Lee and any entities controlled by him), (b) any of the Selling Debtors' and/or their affiliates' auditors, broker-dealers (including, but not limited to, Emerson Equity, LLC), such broker-dealers employees and representatives and consultants, and/or (c) the Selling Debtors' affiliates, subsidiaries, or related persons and entities, (iii) all claims, rights, and causes of action arising

from or related to the investigation initiated by the SEC on or about April 30, 2025, and any related investigation by the Arizona Corporation Commission (collectively, the "SEC Claims"), and (iv) claims (including intercompany claims) or causes of action against any party owned or held by the Selling Debtors (including rights of setoff) or the respective creditors and beneficiaries of the Selling Debtors shall constitute Excluded Assets. Consistent with paragraph 25 of the Bid Procedures Order, no cause of action under Chapter 5 of the Bankruptcy Code, commercial tort claim, or claim against any insider of the Debtors, or any proceeds of the foregoing, is being sold or assigned. Notwithstanding the foregoing, the Excluded Assets shall not include, and nothing in this paragraph shall limit, impair, or affect the Successful Bidder's acquisition of, (x) the claims and Causes of Action conveyed to the Successful Bidder pursuant to Section 2.1(a)(vii) of the APA, including, without limitation, all warranty, guaranty, contribution, indemnity, construction defect, design defect, latent defect, and product liability claims against contractors, subcontractors, design professionals, suppliers, manufacturers, or others, in each case to the extent arising out of or relating to damage to or defects in the Owned Real Property or Improvements, (y) the insurance rights and proceeds conveyed pursuant to Section 2.1(a)(vi) of the APA, or (z) any other Acquired Asset described in Section 2.1(a) of the APA.

16. The Sale Transaction to the Successful Bidder and the sale and assignment of the Desired 365 Contracts to the Successful Bidder shall be, except as otherwise provided in the APA and this Order, free and clear of all Interests. The Acquired Assets shall not be subject to any claims or interests allowed in these Chapter 11 Cases, including, without limitation, any claims allowed under sections 361, 362, 363, 365, 502, 503, 506, or 507 of the Bankruptcy Code, nor shall the Acquired Assets be subject to a surcharge or "carve out" that is otherwise agreed to or approved in these Chapter 11 Cases. For the avoidance of doubt and without limiting anything in

this Order, the Sale Transaction shall be free and clear of any successor liability to the Successful Bidder for any of the Selling Debtors' liabilities, except for the Assumed Liabilities set forth in the APA.

17. Except as expressly provided by the APA, all persons and entities (including without limitation, all contract counterparties and all federal, state, and local governmental units and taxing authorities, to the fullest extent permitted by applicable law) are forever barred, estopped, and permanently enjoined from asserting any Interest, right of setoff, recoupment, netting, or deduction of any kind against the Successful Bidder or its successors or assigns, their property, or the Acquired Assets, on account of any claim against, or obligation of, the Selling Debtors or any of their affiliates. On the Closing Date, each holder of an Interest is authorized and directed to execute such documents and take all other actions as may be deemed by the Successful Bidder to be necessary or desirable to release its Interests on the Acquired Assets, as provided for in this Order, as such Interests may have been recorded or may otherwise exist. The Selling Debtors are authorized and directed to take such actions as may be necessary to ensure that such Interests are released and all filings and records are timely made. Notwithstanding the foregoing, the provisions of this Order authorizing the sale and transfer of the Acquired Assets free and clear of all Interests are self-executing, and neither the Selling Debtors nor the Successful Bidder shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate, or implement the provisions of this Order.

18. All persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Selling Debtors to sell and transfer the Acquired Assets to the Successful Bidder, including the Sale Transaction and the

assumption and assignment of the Desired 365 Contracts to the Successful Bidder in accordance with the terms of the APA and this Order.

19. All persons and entities that are in possession of some or all of the Acquired Assets on the applicable Closing Date are directed to surrender possession of such Acquired Assets to the Successful Bidder at Closing. Each Third-Party Manager is directed to cooperate with the transition, including with respect to the transfer of operational records, resident information, employee information, billing and collection functions, regulatory correspondence, Resident Records (as defined below), and all documents, data, and information related to the Resident Agreements, and is enjoined from taking any action that would interfere with the transition of operations contemplated by the APA.

20. With respect to each Community included in the Acquired Assets, the applicable Master Lease (as defined in the APA) between the DST Seller and the Master Tenant shall be treated in accordance with the election made by the Successful Bidder pursuant to the APA. Any required lender consent under any assignment of Executory Contracts and Unexpired Leases shall be obtained or deemed unnecessary by virtue of section 363(f) of the Bankruptcy Code. Rejection of a Master Lease shall not extinguish or impair the applicable Master Tenant Seller's status as licensee of record with respect to the Operating License(s) for the applicable Community. Where the Successful Bidder elects rejection of a Master Lease, such rejection shall be effective simultaneously with the execution and commencement of the Bridging Agreements with respect to the applicable Community, and the Master Tenant Seller's continued status as licensee of record during the bridge period shall be governed by, and maintained pursuant to, the Bridging Agreements independently of the rejected Master Lease. The Successful Bidder and the applicable Selling Debtor shall coordinate the timing of any Master Lease rejection and the execution of the

Bridging Agreements to ensure no gap in licensure or operational authority with respect to the applicable Community.

21. The Successful Bidder shall, as a condition of Closing with respect to each Community, either (a) have obtained the required new Operating License or change-of-ownership approval from the applicable Senior Living Regulatory Authority, or (b) have entered into the Bridging Agreements with the applicable Selling Debtor(s), effective simultaneously with, and as of, the termination of all existing management agreements with respect to such Community at Closing, in each case as provided in Sections 7.11(b), 9.6, and 10.6 of the APA. The Bridging Agreements and the transactions contemplated thereby are hereby authorized and approved and shall be enforceable notwithstanding any anti-assignment, change-of-control, non-delegation, consent, termination, or similar restriction in any applicable contract, lease, permit, license, agreement, or other instrument, subject in each case to applicable Senior Living Laws and any required approval or authorization of the applicable Senior Living Regulatory Authority. Notwithstanding anything to the contrary in the APA, any Bridging Agreement, or any other Transaction Documents, following the Closing, the Debtors shall have no liability to the Successful Bidder or any other Person or entity for any costs or expenses of operating the applicable Community or maintaining any of the Acquired Assets, including, but not limited to, any costs arising from or in connection with maintaining the required Operating License during the bridge period.

22. Upon the applicable Closing, the Successful Bidder shall (a) assume responsibility for all resident trust funds and personal-needs accounts held by the Selling Debtors or Third-Party Managers for the benefit of residents of the Communities; and (b) comply with all applicable requirements of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), as a

successor to the Selling Debtors with respect to protected health information of residents of the Communities. The Successful Bidder shall retain all Resident Records transferred to the Successful Bidder at the applicable Closing for the period required by applicable Legal Requirements (as defined in the APA). Prior to destroying any Resident Records, the Successful Bidder shall comply with all applicable HIPAA and state law requirements governing the destruction of protected health information including any required notice to the applicable resident or resident representative.

23. A certified copy of this Order may be filed with the appropriate clerk and/or recorded with the appropriate recorder in each state in which any Sold Property is located to cancel any Interests of record (other than as contemplated in Permitted Liens). All filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, and other persons or entities may rely on this Order, without requiring any separate release, satisfaction, termination statement, assignment, consent, or other instrument, as conclusive evidence of the transfer of the Sold Properties and the release, cancellation, and discharge of all Interests in accordance with this Order.

24. If any person or entity that has filed statements or other documents or agreements evidencing Interests on all or any portion of the Acquired Assets shall not have delivered to the Successful Bidder prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of Interests, and any other documents necessary or desirable to the Successful Bidder for the purpose of documenting the release of all Interests, which the person or entity has or may assert with respect to all or any portion of the Acquired Assets, the Selling Debtors are hereby authorized and directed, and the

Successful Bidder is hereby authorized, to execute and file such statements, instruments, releases, and other documents on behalf of such person or entity with respect to the Acquired Assets.

25. This Order shall govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease, in any of the states in which the Acquired Assets are located; and each of the foregoing persons and entities is hereby authorized and directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the Sale Transaction contemplated by the APA.

26. Effective as of the applicable Closing, and subject to payment of the applicable Cure Costs, at or following the applicable Closing in accordance with section 2.5 of the APA, the Selling Debtors are authorized to assume and sell and assign the Desired 365 Contracts to the Successful Bidder free and clear of all Interests. With respect to each Assumed Contract, the payment of the applicable Cure Costs (if any) shall (a) effect a cure of all monetary defaults existing thereunder as of the applicable Closing Date, (b) compensate the applicable Counterparty for any actual pecuniary loss resulting from such default, and (c) together with the assumption of the Desired 365 Contracts by the Successful Bidder, constitute adequate assurance of future performance thereof. The Successful Bidder shall be solely responsible for the payment of the Cure Costs. Except for payment of the required applicable Cure Costs, the Successful Bidder shall not be liable for any amounts owed prior to the applicable Closing Date under any Assumed

Contract. The Cure Costs set forth in the Cure Notices, the Post-Auction Notice, and Schedule 2.5(a) to the APA (as amended in accordance with the APA) are fixed, final, and binding upon each Counterparty that did not timely file and serve an objection thereto. Each such Counterparty is forever barred, estopped, and permanently enjoined from asserting against the Selling Debtors, the Successful Bidder, any Buyer Designee, or the Acquired Assets any Cure Cost, default, breach, claim, right of setoff or recoupment, or pecuniary loss in excess of, or in addition to, the applicable Cure Costs so fixed, whether arising before or as a result of the Closing. In no event shall the Successful Bidder or any Buyer Designee be liable for Cure Costs in respect of any Contract that is not an Assumed Contract as of the applicable Closing.

27. Any provision in or effect of any Assumed Contract that prohibits or conditions the assignment of such Assumed Contract or allows the party to such Assumed Contract to terminate, recapture, impose any penalty, condition on renewal or extension, or modify any term or condition upon the assignment of such Assumed Contract constitutes an unenforceable anti-assignment provision that is void and of no force and effect pursuant to section 365(f) of the Bankruptcy Code. Upon Closing and the payment of the required Cure Costs, in accordance with sections 363 and 365 of the Bankruptcy Code, the Successful Bidder shall be fully and irrevocably vested with all right, title, and interest of the Selling Debtors under each Assumed Contract and shall also be fully and irrevocably obligated to perform and fulfill all obligations and responsibilities of the Selling Debtors under each Assumed Contract arising from and after the Closing.

28. Upon the Closing and the payment by the Successful Bidder of the Cure Costs applicable to any Assumed Contract, the Successful Bidder shall be deemed to be substituted for the Selling Debtors as a party to such Assumed Contract, and the Selling Debtors shall be relieved,

pursuant to section 365(k) of the Bankruptcy Code, from any further liability to the Counterparties under such Desired 365 Contracts arising from and after the Closing.

29. Upon the Closing and the payment of the applicable Cure Costs, if any, the Desired 365 Contracts shall remain in full force and effect, and no default shall exist thereunder nor shall there exist any event or condition that, with the passage of time or giving of notice, or both, would constitute such a default.

30. There shall be no rent accelerations or increases, assignment fees, deposits, increases, or any other fees charged to the Successful Bidder or the Selling Debtors as a result of the assumption and assignment (including due to any change in control) of the Desired 365 Contracts.

31. Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, all Counterparties to Desired 365 Contracts are forever barred and permanently enjoined from raising or asserting against the Selling Debtors, their estates, the Successful Bidder, or any of their respective successors and assigns any increased rent or fees, assignment fee, default, breach, claim, pecuniary loss, right of setoff, right of recoupment, reclamation claim, security deposit or letter-of-credit draw, use restriction, radius restriction, exclusivity, right of first refusal, right of first offer, purchase option, consent right, profit-sharing, escalation, or condition to assignment, arising under or related to the Desired 365 Contracts existing as of the applicable Closing Date or arising by reason of these Chapter 11 Cases or the Closing. For the avoidance of doubt, nothing herein shall relieve the Successful Bidder from liability for any default, breach, or similar claim arising subsequent to the Closing under an Assumed Contract assumed and assigned to the Successful Bidder.

32. All Counterparties to an Assumed Contract shall cooperate and expeditiously execute and deliver, upon the reasonable requests of the Successful Bidder, and shall not charge the Selling Debtors or the Successful Bidder for any instruments, applications, consents, or other documents which may be required or requested by any public or quasi-public authority or other party or entity to effectuate the applicable transfers of the Desired 365 Contracts in connection with the Sale Transaction. Nothing in this Order or any other document is or shall be deemed an admission by the Selling Debtors that any contract or Assumed Contract is an executory contract or unexpired lease or must be assumed and assigned pursuant to the APA in order to consummate the Sale Transaction.

33. Effective upon the applicable Closing Date, all persons and entities are forever prohibited and permanently enjoined from (i) commencing or continuing in any manner any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral, or other proceeding against the Successful Bidder and its successors and assigns, the Acquired Assets, including, without limitation, the Desired 365 Contracts (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against the Successful Bidder and its successors, assigns, assets, or properties, (iii) creating, perfecting, or enforcing any Lien against the Successful Bidder and its successors, assigns, assets, or properties, or (iv) asserting a setoff, recoupment, or right of subrogation against any obligation due to the Successful Bidder, in each case, with respect to (a) any Interest arising prior to the Closing Date (other than Permitted Liens and Assumed Liabilities), or (b) any theory of claim or remedy sounding in successor liability.

34. Except as otherwise provided in this Order and to the maximum extent available under applicable law and to the extent provided for under the APA, the Successful Bidder shall be authorized, as of the applicable Closing Date, to operate under any license, permit, registration,

and governmental authorization or approval of the Selling Debtors with respect to the Acquired Assets, including the Desired 365 Contracts, and, to the maximum extent available under applicable law and to the extent provided for under the APA, all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been transferred to the Successful Bidder as of the applicable Closing Date; provided, however, that nothing in this paragraph shall be construed to authorize the Successful Bidder to operate under an existing Operating License in any state that requires issuance of a new Operating License or final change-of-ownership approval prior to commencement of operations, and, to the extent required, the Bridging Agreements shall govern operations in such states during the period prior to the issuance of the applicable new Operating License or final change-of-ownership approval, and, during any such bridge period, the applicable existing licensee of record shall continue to operate under its own Operating License in accordance with the Bridging Agreements and paragraph [**Error! Reference source not found.**] of this Order. All existing licenses or permits applicable to the Acquired Assets shall remain in place for the Successful Bidder's benefit until either new licenses and permits are obtained or existing licenses and permits are transferred in accordance with applicable administrative procedures. To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any grant, permit, or license relating to the operation of the Acquired Assets sold, transferred, or conveyed to the Successful Bidder on account of the filing or pendency of these Chapter 11 Cases or the consummation of the Sale Transaction. Medicaid billing rights and provider numbers applicable to the Acquired Assets shall be addressed and maintained through the Bridging Agreements to the extent required pending issuance of new provider enrollment or Medicaid certifications to the Successful Bidder.

35. The transfer of the Acquired Assets to the Successful Bidder pursuant to the APA does not require any consents other than as specifically provided for in the APA.

36. Except for the Assumed Liabilities under the APA, the Successful Bidder shall not have any liability for any obligation of the Selling Debtors arising under or related to any of the Acquired Assets to the extent such obligation arises prior to Closing. Without limiting the generality of the foregoing, the Successful Bidder shall not be liable for any Claims against the Selling Debtors or any of their predecessors or affiliates. The Sale Transaction and the APA have been negotiated and are being consummated in a manner that does not constitute a consolidation, merger, or de facto merger of the Successful Bidder and the Selling Debtors. The Successful Bidder is not a mere continuation of the Selling Debtors or their estates, and there is no continuity of enterprise or common identity between the Successful Bidder and the Selling Debtors. By virtue of the Sale Transaction, the Successful Bidder and its affiliates, successors, and assigns shall not be deemed or considered to (a) be a legal successor or otherwise be deemed a successor to any of the Selling Debtors, (b) have, de facto or otherwise, merged with or into the Selling Debtors, or (c) be a continuation or substantial continuation, or be holding itself out as a mere continuation, of the Selling Debtors or their estates, businesses, or operations. The Successful Bidder shall have no successor or vicarious liabilities of any kind or character, including, but not limited to, any theory of antitrust, environmental, successor or transferee liability, labor law, de facto merger, or substantial continuity, whether known or unknown as of the applicable Closing Date, now existing or hereafter arising, whether fixed or contingent, with respect to the Selling Debtors or any obligations of the Selling Debtors arising prior to the applicable Closing Date, including, but not limited to, liabilities on account of any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of any of the Acquired Assets prior to the

Closing; provided that nothing herein shall be deemed to modify or alter any proration of liabilities as set forth in the APA, including, but not limited to, pursuant to section 8.1(b) and 8.3 thereof. The Successful Bidder would not have entered into the APA or agreed to consummate the Sale Transaction but for the foregoing protections against successor or transferee liability.

37. The Excluded Assets (as defined in the APA) shall be retained by the applicable Selling Debtor and shall not be sold or transferred to the Successful Bidder as part of the Sale Transaction. Nothing in this Order shall release any claims or causes of action that constitute Excluded Assets, including, without limitation, the SEC Claims, any causes of action under Chapter 5 of the Bankruptcy Code, or any claims against current or former officers, directors, managers, members, or broker-dealers who may have caused harm to the Selling Debtors' estates. For the avoidance of doubt, all proceeds of Excluded Assets shall constitute property of the respective Selling Debtor's estate and shall not be subject to any lien, claim, encumbrance, or interest of the Successful Bidder.

38. Except as provided in paragraph GG. above or otherwise necessary to transfer the Acquired Assets to the Successful Bidder free and clear of all Interests, nothing in this Order shall alter, modify, limit, or amend the terms or provisions of the Final DIP Order [Dkt. No. 339] or any other prior order entered in these Chapter 11 Cases, except that (a) the DIP Liens, the Prepetition Liens, and all other Interests shall be released from, and shall not attach to, the Acquired Assets as provided herein and shall attach solely to the proceeds thereof, and (b) to the extent of any conflict between this Order and any prior order with respect to the Acquired Assets, the Sale Transaction, the Deposit, the APA, or the rights of the Successful Bidder or any Buyer Designee, this Order shall govern.

39. In the event the Successful Bidder fails to consummate the Closing in accordance with the APA, the Selling Debtors are authorized, but not required, without further notice or order of this Court, to consummate the Sale Transaction with the Back-Up Bidder (if any was designated at the Auction) in accordance with the terms of the Back-Up Bidder's asset purchase agreement as soon as is commercially reasonable. All references in this Order to the Successful Bidder, the APA, and the Purchase Price shall be understood to refer to the Back-Up Bidder, the Back-Up Bidder's asset purchase agreement, and the Back-Up Bid, respectively, and the provisions of this Order shall apply to any such transaction with full force and effect. For the avoidance of doubt, consummating the Sale Transaction with the Back-Up Bidder due to Successful Bidder's failure to consummate the Closing in accordance with the APA does not relieve the Successful Bidder of liability thereunder.

40. Pursuant to Bankruptcy Rules 4001, 6004(h), 6006(d), 7062, 9014, and any other applicable Bankruptcy Rules or provisions of the Local Rules, this Order shall be effective immediately upon its entry, and the Selling Debtors and the Successful Bidder are authorized to close the Sale Transaction immediately, or as otherwise contemplated under the APA. If the Successful Bidder fails to close the Sale Transaction pursuant to the provisions of the APA, the Selling Debtors shall retain the applicable Deposit if, and to the extent, so provided in the APA, which Deposit shall be subject to the applicable liens under the Final DIP Order and any prior orders of the Court. Notwithstanding the provisions of Bankruptcy Rule 4001(a)(3), 6004, or any applicable provisions of the Local Rules, this Order shall not be stayed for fourteen (14) days after the entry hereof, but shall be effective and enforceable immediately upon entry, and the fourteen (14) day stay provided in such rules is hereby expressly waived and shall not apply. Any party objecting to this Order must exercise due diligence in filing an appeal and pursuing a stay within

the time prescribed by law and prior to the Closing Date or risk its appeal will be foreclosed as moot.

41. Notwithstanding anything in the APA to the contrary and for the avoidance of doubt: (a) neither this Order nor the APA allocates or determines the distribution of the Sale Transaction proceeds (the "Sale Proceeds") as between any of the Selling Debtors, including any applicable DST Seller and the applicable Master Tenant Seller with respect to any Community; (b) any allocation made for tax or any other purposes between the Selling Debtors and Successful Bidder arising under or related to the APA shall not be binding or otherwise be determinative in any manner or for any purpose whatsoever on the Court, the Debtors, the Committees, any holder of a Lien, or any other party in interest in the Bankruptcy Cases for the purposes of allocating or distributing the Sale Proceeds between the Selling Debtors, including any applicable DST Seller and any applicable Master Tenant that is a Selling Debtor with respect to any Community; (c) any such allocation and/or distribution of the Sale Proceeds among the Selling Debtors shall only occur upon further order of the Court, after notice and a hearing; (d) all Sale Proceeds payable in cash shall be deposited on a Community basis into an escrow account, and such Sale Proceeds shall not be transferred to or commingled with funds owned by the applicable Selling Debtors, other Selling Debtors or any other Debtors, pending further order of the Court, after notice and a hearing; and (e) nothing in this paragraph shall limit, impair, or otherwise modify (i) the obligations of the Selling Debtors under Sections 8.1(b) and 8.3 of the APA with respect to Apportioned Taxes attributable to any Pre-Closing Tax Period, including the reduction of the Purchase Price at the applicable Closing for delinquent Apportioned Taxes as provided therein, (ii) the provisions of Section 7.7 of the APA requiring that all existing Liens (including any Liens for Taxes) be released from the Acquired Assets at the applicable Closing and attach instead to the Sale Proceeds in

accordance with their existing priority, or (iii) the Successful Bidder's rights under the APA with respect to any of the foregoing. Clause (d) of this paragraph governs the Selling Debtors' handling of the Sale Proceeds following receipt and shall not limit, impair, or otherwise affect the manner in which the Successful Bidder is required or permitted to pay the Purchase Price under the APA. Delivery of the Closing Cash Payment or any Subsequent Closing Cash Payment to the Title Company or to any Paying Agent in accordance with Article 3, Section 4.2, and Section 7.14 of the APA shall fully discharge the Successful Bidder's payment obligations, and the Successful Bidder shall have no obligation to monitor, and no liability with respect to, the deposit, segregation, commingling, or distribution of the Sale Proceeds after such delivery. Nothing in this paragraph shall be a condition to, or permit any party to delay, any Closing.

42. Notwithstanding anything to the contrary in this Order, including without limitation paragraph [41] above, following the Closing, the Debtors are hereby authorized, but not directed, in their sole and absolute discretion, to use all or any portion of the proceeds of the Sale to pay, satisfy, or otherwise reduce, in whole or in part, any claims related to the assets sold pursuant to the Sale asserted by the Debtors' secured lenders (collectively, the "Secured Claims") or Raymond James (the "RJ Claim") as a result of the closing of any Transaction (as defined in the Raymond James engagement letter approved by the Court), without further order of the Court; provided, however, that prior to making any such payment, the Debtors shall provide reasonable advance notice to counsel to the Committees of the Debtors' intention to make such payment and the amount thereof. Any payment made pursuant to this paragraph shall be without prejudice to, and shall not constitute a waiver of, any rights, claims, defenses, objections, or causes of action of the Debtors, their estates, the Committees, or any other party in interest with respect to the validity, priority, extent, enforceability, allowance, or amount of any Secured Claim, except to the extent

otherwise expressly provided by this Order or another Final Order of the Court. To the extent that any payment made pursuant to this paragraph is subsequently determined by a Final Order of the Court to exceed the final allowed amount of the applicable Secured Claim, whether as a result of disallowance, reduction, recharacterization, avoidance, surcharge, setoff, recoupment, or otherwise, the recipient of such payment shall promptly repay to the applicable Debtor or its estate the amount of such excess payment. The Court shall retain jurisdiction to enforce the repayment obligations set forth in this paragraph. Nothing in this paragraph shall require the Debtors to make any payment on account of any Secured Claim or RJ Claim or limit the Debtors' discretion as to the timing or amount of any such payment.

43. For the avoidance of doubt, nothing in this Order shall be construed to determine or adjudicate any claim of any Third-Party Manager arising under or relating to any management agreement, reimbursement arrangement, or similar agreement, and all rights with respect thereto are expressly reserved.

44. No bulk sales law or any similar law of any state or other jurisdiction applies in any way to the Sale Transaction.

45. The failure specifically to include any particular provision of the APA in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the APA be authorized and approved in its entirety except as otherwise set forth herein, in which case this Order shall govern. For the avoidance of doubt, to the extent there is any inconsistency between the terms of this Order and the terms of the APA (including all ancillary documents executed in connection therewith), the terms of this Sale Order shall govern. In the event of any inconsistency between the terms of the APA and any ancillary documents executed in connection therewith, the terms of the APA shall govern.

46. The APA, other Transaction Documents, and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment, or supplement does not have a material adverse effect on the Selling Debtors' estates or on the interests of the Successful Bidder. For the avoidance of doubt, additions to and deletions from Schedule 2.5(a) to the APA, Previously Omitted Contract designations, Community Removal Notices, Buyer Community Removal Notices, Reinclusion Notices, and Paying Agent Notices shall not constitute amendments requiring notice to, or further order of, this Court. The Committees' rights are reserved solely as to object to any material modification, amendment, or supplement of the APA or other Transaction Documents and any related agreements, documents, or other instruments are expressly reserved and preserved. To the extent any modification, amendment, or supplement to any Transaction Document materially changes the economic substance of the transactions contemplated by the APA as determined by the Debtors, such modification, amendment, or supplement shall be (i) filed on the docket and served on the Committees, and (ii) parties in interest shall have seven days to object to such modification, amendment, or supplement.

47. The Successful Bidder shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies hereunder or under the APA. The automatic stay imposed by section 362 is modified to the extent necessary to implement the preceding sentence.

48. To the extent not previously filed with the Court, the Selling Debtors shall file, no later than three (3) Business Days following the applicable Closing Date, final execution versions

of the APA, together with all schedules, exhibits, annexes, supplements, and amendments thereto, and a redline version reflecting any changes in the final versions if applicable.

49. In accordance with, and subject to all limitations set forth in, Section 8.7 of the APA, for a period of six (6) years after the applicable Closing Date the Successful Bidder shall permit, the Selling Debtors, the Committee, the DST Committee, and their respective professionals (collectively, the "Permitted Parties"), in each case whose representatives have a reasonable need to know at their own expense, reasonable access during normal business hours upon reasonable prior notice to all books and records of the Selling Debtors that are Acquired Assets relating to the Selling Debtors' operations prior to the applicable Closing Date and are in the Successful Bidder's (or any affiliate's, agent's, or affiliate's agent's) possession or control (collectively, the "Business Records") for the purposes of (a) pursuing, assessing, settling, or otherwise dealing with any assets or liabilities that are excluded from the Sale Transaction (including, without limitation, the SEC Claims and any Chapter 5 causes of action); (b) pursuing, assessing, defending, settling, or otherwise dealing with any claim, action, or cause of action that any Permitted Party has a right to pursue; (c) assisting any one or more of the Permitted Parties in connection with or otherwise relating to the claims reconciliation process; and (d) otherwise administering the Selling Debtors' estates; provided, however, that such access shall (i) not unreasonably interfere with the Successful Bidder's business operations and shall be subject to the Successful Bidder's reasonable security measures and insurance requirements; and (ii) not require the Successful Bidder to disclose any information that, in the reasonable, good faith judgment (after consultation with counsel, which may be in-house counsel) of the Successful Bidder, is reasonably likely to result in any violation of any legal requirement or any contract to which the Successful Bidder is a party, or cause any privilege (including attorney-client privilege) that the Successful Bidder would be entitled to assert

to be undermined with respect to such information in a manner that could adversely affect in any material respect the Successful Bidder's position in any pending or reasonably anticipated future litigation; provided further, that in any such case the parties shall cooperate in seeking to find a way to allow disclosure of such information to the extent doing so would not be reasonably likely to result in such violation, privilege waiver, or adverse effect, including through the use of customary "clean-room" arrangements pursuant to which non-employee representatives of the applicable Permitted Party could be provided access to such information. Nothing in this paragraph or the immediately following paragraph shall limit, or be deemed a waiver of, any right of access of the Successful Bidder under Section 8.7 of the APA.

50. The right of access for the Permitted Parties shall include (a) the right of such Permitted Party to copy, at the location of the Acquired Assets during regular business hours on mutually agreed dates, at such Permitted Party's expense, such Business Records as they may reasonably request, or (b) at the Successful Bidder's election, the Successful Bidder's copying and delivering, at the Permitted Party's expense, to such Permitted Party such Business Records as may be reasonably requested; provided, however, that no such right of access shall extend to (i) personnel files, workers' compensation files, employee medical files (including employee "protected health information" as defined in HIPAA), or other employee books and records, or (ii) any information that would be subject to the limitations set forth in the preceding paragraph. The Successful Bidder shall not dispose of or destroy any of the Business Records before the sixth (6th) anniversary of the Closing Date without providing at least thirty (30) days' notice to the Permitted Parties prior to disposal of any Business Records. To the extent that any of the Permitted Parties, prior to the sixth (6th) anniversary of the Closing Date, request in writing that the Successful Bidder refrain from disposal or destruction of certain Business Records, the Successful

Bidder shall not dispose of or destroy such Business Records until the Permitted Party has had a reasonable opportunity to access such Business Records at the Permitted Party's expense.

51. For a period expiring on the date that is the sixty (60) day anniversary of the Closing Date, the Successful Bidder shall use commercially reasonable efforts to cause certain senior executive employees of the acquired business (the "Executive"), as reasonably determined by the Successful Bidder, to respond to reasonable, written requests provide by the Permitted Parties in connection with the Selling Debtors' closing of the financials; provided, however, that (a) neither the Successful Bidder nor any of the Executives shall have any liability to the Permitted Parties in the event that, following the Executives good faith efforts, the Executives are unable to provide the information requested by the Permitted Parties, (b) the Permitted Parties may only request information to the extent not readily apparent on the face of any books and records provided by the Successful Bidder or otherwise maintained by the Selling Debtors as Excluded Assets, and (c) such requests by Permitted Parties shall not interfere with the Successful Bidder's business operations.

52. To facilitate the orderly transition of the Communities post-Closing, for ninety (90) days following the Closing Date, provided, that (x) such period may be extended by mutual written agreement of the Successful Bidder and Selling Debtors or (y) such period shall be extended to the extent that there is any request for information or cooperation originating from a Governmental Authority relating to a Permit or Healthcare Regulatory Filing; provided that Selling Debtors' informational and cooperation obligations shall be limited to (i) information that is unique to the Selling Debtors and not otherwise reasonably available to the Successful Bidder through the Data Room, public records, or Successful Bidder's own diligence channels, and (ii) reasonable cooperation only, and shall not require Selling Debtors to respond to duplicative requests

inconsistent with Selling Debtors' operational capacity: the Selling Debtors agree to cooperate with reasonable written requests for information or assistance from the Successful Bidder; provided, however, that (a) such cooperation shall not unreasonably interfere with the Selling Debtors' administration of their remaining estates or their obligations to other creditors and parties in interest, and (b) the Successful Bidder shall reimburse the Selling Debtors for 50% of the Seller Cooperation Costs (as defined in the APA) within ten (10) Business Days of receipt of an invoice from the Selling Debtors. For the avoidance of doubt, the cooperation obligations set forth in this paragraph and the sixty (60)-day employee availability period set forth in paragraph 51 shall not be construed to limit, supersede, or otherwise affect any regulatory cooperation obligation of the Selling Debtors or the Successful Bidder arising under applicable Senior Living Laws or pursuant to the requirements of any Senior Living Regulatory Authority, including, without limitation, obligations relating to open survey findings, plans of correction, Medicaid billing tails, and pending or open governmental authority correspondence, all of which shall survive independently for such period as required by applicable law or regulation.

53. For the avoidance of doubt, and notwithstanding anything to the contrary in this Sale Order or any asset purchase agreement, the Successful Bidder assumes full responsibility for payment of 2026 ad valorem taxes in full to Tarrant County, City of Grapevine and Grapevine-Colleyville ISD (collectively, the "Texas Tax Authorities"), in the ordinary course of business, when due. If not timely paid, any of the Texas Tax Authorities may proceed with non-bankruptcy collections against the Successful Bidder, without leave or approval of the Court. This paragraph shall not affect any agreement between the Selling Debtors and the Successful Bidder regarding the proration of ad valorem taxes; however, any dispute regarding the proration of the ad valorem taxes between the Selling Debtors and the Successful Bidder shall have no effect on the Successful

Bidder's responsibility to the Texas Tax Authorities to pay the 2026 ad valorem taxes. The Texas Tax Authorities shall retain their liens against the Acquired Assets, as applicable, until paid in full, including any applicable penalties or interest.

54. Nothing in this Order or the APA, discharges, releases, precludes, or enjoins: (i) any liability to or any claim arising on or after the Closing Date of any governmental unit as defined in 11 U.S.C. § 101(27) ("Governmental Unit") that is not a "claim" as defined in 11 U.S.C. § 101(5) ("Claim"); (ii) any liability to a Governmental Unit under police and regulatory statutes or regulations that any entity would be subject to as the owner or operator of property after the Closing Date of the Sale Transaction; or (iii) any liability to a Governmental Unit on the part of any Person other than the Debtors. All rights of each Governmental Unit that are implicated by the terms of this Order are expressly reserved, and all rights and defenses of the Debtors, the Buyer, and other parties in interest are hereby preserved. Nor shall anything in this Order enjoin or otherwise bar a Governmental Unit from asserting or enforcing, outside this Court, any liability described in this paragraph.

55. Further, nothing in this Order or related documents, including the APA, authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization, (e) agreement, or (f) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law. Nothing in this Order shall relieve any entity from any obligation to address or comply with information requests or inquiries from any Governmental Unit. Nothing in this Order shall affect any setoff or recoupment rights of any Governmental Unit. Nothing in this Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Order or to adjudicate any defense asserted under this Order. For the avoidance of doubt, any Medicare

Agreements and Medicaid Contracts shall not be sold pursuant to section 365 of the Bankruptcy Code and all applicable Medicare and Medicaid statutes and regulations, the Anti-Assignment Act, and all applicable non-bankruptcy law, as applicable.

56. All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

57. To the extent that this Order is inconsistent with any prior order or pleading with respect to the Motion filed in these Chapter 11 Cases, the terms of this Order shall govern.

58. The provisions of this Order and the APA and any actions taken pursuant hereto or thereto shall survive entry of any order which may be entered (a) confirming or consummating any plan of reorganization of the Selling Debtors, (b) converting these Chapter 11 Cases from chapter 11 to chapter 7 of the Bankruptcy Code, (c) dismissing these cases, or (d) pursuant to which this Court abstains from hearing these cases.

59. The Court shall retain exclusive jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order, the APA, and all amendments thereto and any releases, waivers, and consents hereunder and thereunder, and each of the agreements executed in connection therewith, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to any of the foregoing. So long as these Chapter 11 Cases are not closed (or, if closed but then reopened), the Court shall retain jurisdiction to enforce the injunctions and other rights of the Successful Bidder described in this Order, in the event that after the Closing Date any third parties attempt to or actually interfere with such rights, even if the Selling Debtors are not directly involved or named in any such actions or disputes.

60. The Court shall retain jurisdiction as to the implementation, enforcement, and interpretation of this Order, and to, among other things, enforce any right to surcharge or similar relief including equitable claims.

# # # END OF ORDER # # #

Proposed Order prepared by:

DECHERT LLP
Marcus A. Helt (Texas Bar #24052187)
Debbie E. Green (Texas Bar #24059852)
Jack G. Haake (Texas Bar #24127704)
2651 N Harwood Street, Suite 120
Dallas, Texas 75201
Tel: (214) 453-4900
marcus.helt@dechert.com
debbie.green@dechert.com
jack.haake@dechert.com

DECHERT LLP
Jerry L. Hall (Admitted Pro Hac Vice)
Three Bryant Park
1095 Avenue of the Americas
New York, New York 10036
Telephone: (212) 698-3500
Facsimile: (212) 698-3599
jerry.hall@dechert.com

COUNSEL FOR THE DEBTORS AND
DEBTORS-IN-POSSESSION